## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 06-519 |
| v. | ) ) ) | Judge P.L.F. Friedman |
| UNITED STATES OF AMERICA, <u>et</u>. <u>al</u>., | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants hereby move to dismiss this lawsuit, or, in the alternative, for summary judgment. Pursuant to FRCP 12(b)(6), the Defendants move to dismiss this suit for failure to state a claim upon which relief may be granted. In the alternative, the Defendants move to dismiss this suit for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1).

Dismissal under FRCP 12(b)(6) is warranted because the Tribes ceded all right to, title to, or interest in the Fort Reno lands under the Agreement of November 13, 1890, ratified on March 3, 1891, and, thus, have no present beneficial interest in the Fort Reno lands. Accordingly, the equitable relief and monetary damages they seek in this lawsuit cannot be granted. This position is supported by the fact that bills were introduced in Congress (on behalf of the Tribes) in 1949, 1950 and 1952 which would have vested beneficial title in the Fort Reno lands in the Tribes, but were not enacted.

1

In the alternative, this suit should be dismissed under FRCP 12(b)(1) because Plaintiffs' claim concerning the Fort Reno lands is barred by the finality provision, Section 22(a), of the Indian Claims Commission Act (Pub. L. No. 79-926, ch. 959, Act of August 13, 1946, 60 Stat. 1049, 1055) (hereinafter "ICCA").  In 1965, the Tribes settled their "unconscionable consideration" claim filed under the ICCA with respect to the March 3, 1891 effective date of the November 13, 1890 cession of 5,138,560 acres of land contained within the reservation created by the Executive Order of August 10, 1869.  With the sole exception of 529,682 acres allotted to members of the Tribes, all of the 5,138,500 acres, including the Fort Reno lands, were ceded to the United States in 1891.  Since this cession included the "Fort Reno" lands, which are the subject of this case, Plaintiffs were compensated for these lands by the entry of final judgment pursuant to a stipulated settlement in 1965 in ICC Docket Nos. 329-A and 329-B.  Cheyenne-Arapaho Tribes of Indians of Oklahoma  v. United States, 16 Ind. Cl. Comm. 162, 185, 187, 190a (1965).

The second grounds for Defendants' FRCP 12(b)(1) motion is that the Quiet Title Act, 28 U.S.C. § 2409a, (QTA),  is the exclusive remedy for challenging the United States' title to the Fort Reno lands, and the QTA's twelve-year statute of limitations provision bars any suit on these lands.  Yet another ground for dismissal is that this suit over the Fort Reno lands is barred by the doctrine of res judicata.   Finally, the governing general federal statute of limitations (28 U.S.C. § 2401(a)) bars this suit because the Tribes' cause of action accrued in 1948.

A Memorandum in Support of Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment is attached hereto.

Dated this 16th  day of October, 2006.

Respectfully submitted,

/s/ James M. Upton

_____

JAMES M. UPTON
U.S. Department of Justice
Environment & Natural Resources
    Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel.(202) 305-0482
Fax: (202) 305-0506
E-mail: james.upton@usdoj.gov

OF COUNSEL:

Thomas Bartman, Esq.
Office of the Solicitor
U.S. Department of the Interior
Main Bldg.– Mail Stop   6456
1849 C Street, N. W.
Washington, D.C.    20240

James Snow, Esq.
Jeffrey T. Vail, Esq.
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, D.C.    20250

Attachment

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CHEYENNE-ARAPAHO TRIBES OF    )
OKLAHOMA,                    )
                            )
                Plaintiffs,    )            No. 06-519
                            )            Judge P.L.F. Friedman
        v.                  )
                            )
UNITED STATES OF AMERICA, <u>et</u> <u>al.</u>,    )
                            )
                Defendants.    )
_____)

## MEMORANDUM  IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### Introduction

Plaintiffs seek a declaratory judgment that they presently hold a beneficial interest in approximately 8,500 acres of the "Fort Reno" lands in Oklahoma (alleged to originally amount to about 9,600 acres), and seek an award of money damages for uses made of the surface and mineral estate thereof for the past 50 years.   This is the <u>second</u> suit in which the Tribes have raised a specific claim concerning the Fort Reno lands.  They also filed another suit in the United States Court of Claims in 1929 which implicates the same Fort Reno lands.

The 1929 suit in the United States Court of Claims was filed under a special jurisdictional act (Pub. L. No. 237, ch. 222, Act of June 3, 1920, 41 Stat. 738 (as amended )).  In that action, the Tribes sued the United States for money damages for allegedly having paid the Tribes inadequate compensation for various cessions of tribal lands. They specifically referred to the

1

1890 cession Agreement, ratified by Congress on March 3, 1891, under which the lands comprising their 1869 Executive Order Reservation in Oklahoma were ceded. See I Kappler 841 (copy appended hereto as Attachment B).   That suit was dismissed with prejudice in 1941 for failure to prosecute. See Attachment A hereto (copy of Sen. Rep. No. 2246, 81st Cong., 2nd Sess., Part 2 at 16 (1950)).

    In 1951, the Tribes brought suit under the Indian Claims Commission Act ("ICCA") on various claims, including the claim that they had received "unconscionable consideration" (within the meaning of Clause (3) of Section 2 of the ICCA) for the cession of lands in Oklahoma comprising a reservation created by an Executive Order of August 10, 1869.  In a "Severed Petition" filed on June 23, 1961 in ICC Docket No. 329-A ( see  Attachment C for copy thereof), the Tribes contended that pursuant to a July 17, 1883 Executive Order (I Kappler, 842-843; see Attachment D for copy thereof) " . . .  The President ordered the withdrawal of an area of 9,493 acres from said reservation for the establishment of the Fort Reno Military Reserve . . ."  In this same petition, the Tribes claimed:

> the reasonable value of the use of said lands by the defendant from the date July 17, 1883, reasonable and fair damages for the failure of the Secretary of the Interior to require the return of said lands to the use and benefit of petitioners; and pray for the exercise of its powers in equity by the Indian Claims Commission to set aside, or recommend the setting aside the jurisdiction of the Department of Agriculture conferred by the Act of April 21, 1948  (Pub. L. No. 494, 80th Congress; see Appendix I ), in said lands . . . .

Attachment C at 9.

    In 1965, the parties settled the suits in Docket Nos. 329-A and 329-B.  Pursuant to a stipulated settlement (which provided that entry of a final judgment "shall finally dispose of all rights, claims or demands which the petitioner [the Cheyenne-ArapahoTribes] has asserted or

could have asserted  with respect to the subject matter of those claims . . .  " the Indian Claims

Commission entered a final judgment in the amount of $15,000,000 in favor of the Tribes.  Entry

of this final judgment had two direct consequences: (1) it meant that the Tribes had been paid for

the  Fort Reno lands <u>and</u> for their Fort Reno lands claim set out above; and (2) it barred the

Tribes from bringing any future claim concerning the Fort Reno lands against the United States.

Despite these clear facts, Plaintiffs boldly bring the instant lawsuit.  For the reasons set forth

herein, this case should be dismissed with prejudice.

## FACTUAL BACKGROUND

### 1. The 1869 Executive Order Reservation.

By an Executive Order of August 10, 1869, President Grant created a reservation in

north-central Oklahoma for the Cheyenne and Arapaho Tribes.  The Tribes' Severed  Petition,

filed in ICC Docket No. 329-A, states that the 1869 Reservation contained 5,138,560 acres,

according to the records of the General Land Office.   <u>See</u> Attachment C, para. 17 at 8.   As

noted,  in 1883, President Arthur withdrew 9,493 acres of the 1869 Reservation to be used for

"military purposes exclusively" by an Executive Order of July 17, 1883.

### 2. The 1890 Cession Agreement and its History.

On November 13, 1890, the Tribes agreed to "cede, transfer, relinquish, and surrender

forever and absolutely . . . all their claim, title, and interest of every kind and character . . . " in

the lands contained within the 1869 Reservation (<u>see</u> Article I of this Agreement, I Kappler 415;

<u>see</u> Attachment E at 415).  This cession was made "subject to the allotment of land in severalty"

under Article II of the Agreement. <u>Id</u>.  Article II of the Agreement sets out the legal description of

the lands ceded and states that the cession includes **"all other lands or tracts of country in the**

**Indian territory to which they [the Cheyenne-Arapaho Tribes] have or may set up or allege any right, title, interest, or claim whatsoever."**  [Emphasis added].  Significantly, the 1890 Agreement contains no indication that the Fort Reno lands were reserved from this cession and, indeed, makes no reference at all to the Fort Reno lands.

The history of the negotiations between the Cheyenne-Arapaho Tribes and the federal government leading to the 1890 Agreement is set forth in the November 14, 1890 Report of the Cherokee Commission (which negotiated this, and other cessions, with the Cheyenne and Arapaho Tribes).  This Report states the following with respect to the 1869 Reservation lands:

*   *   *

**In order that all claim of title in the Indians might be extinguished, we have included in the contract [Agreement] a complete relinquishment of title in and to all the  above tracts of country, saving to the Indian[s] allotments of land in severalty only**, in the reservation created by said executive order [Executive Order of August 10, 1869].

*   *   *   *

[Emphasis added] See Attachment F, third page (marked as page "2")  (copy of November 14, 1890 Report of the Cherokee Commission).  This statement seems to account for the very broad language contained in Article II of the 1890 Agreement (quoted in the preceding paragraph).  That is, the Commission clearly intended to bar the Tribes' future assertion of any kind of claim relating to any of the lands within the original 1869 Executive Order Reservation.

The Cherokee Commission's Report gives no indication that the Fort Reno lands were being reserved from the cession; instead, only the lands to be allotted in severalty to the members of the Tribes were reserved.  Indeed, the Report makes no reference of any kind to the Fort Reno  lands.  See also the report on the "Historical Background" by Arthur Ekirch, Jr. of this

4

cession (copy of excerpts therefrom appended hereto as Attachment G at 42-43) which also makes no mention of the Fort Reno lands.

The 1890 Agreement became effective when it was ratified by the Act of March 3, 1891, 26 Stat. 989, 1022.

### 3.  The Tribes' Severed Petition Filed in ICC Docket No. 329-A.

The Tribes' 1961 Severed Petition filed in ICC Docket No. 329-A states that Articles I and II of the 1890 Agreement relinquished the Tribes' rights to several tracts of land held by the Cheyenne-Arapaho Tribes, including the " . . .  **5,138,560 acres of land** defined in the Executive Order of August 10, 1869 . . . " [Emphasis added] See Attachment C, para. 18 at 9-10).  The Indian Claims Commission conducted a trial on the Tribes' claim that they had received "unconscionable consideration" for the cession of the lands contained within the 1869 Executive Order Reservation.

### 4.  TheTribes' and the Government's Respective  Historical Appraisals of the Lands Ceded in 1891.

The real estate appraiser retained by the Tribes valued all 5,138,560 acres in Tract 2 - - that is, the lands encompassed by the 1890 cession  (see Attachment H for copy of excerpts from appraisal report submitted by the Tribes); he made no deduction of the 9,493 acres withdrawn from the 1869 Reservation for the Fort Reno military reserve.  It appears that the Tribes' claims counsel did not instruct the Tribes' appraiser to delete the 9,493 acres of Fort Reno lands from the lands to be valued.  In the absence of such an instruction, the Tribes' appraiser  treated the Fort Reno lands as part of the lands to be valued.

The real estate appraiser retained by the Government valued a total of 4,608,708 acres (that is, the 5,138,560 total acres in the ceded 1869 Executive Order Reservation, minus the 529,682 acres comprising the "allotments selected by the Cheyenne and Arapahoe Indians"); see Attachment I for copy of excerpts of appraisal report submitted by the government) at 1-2, 7, 38 and 88. Defendant's appraiser, too, did not deduct the 9,493 acres of Fort Reno lands from the 5,138,560 total acres. This means that counsel for the government had not instructed the government's appraiser to delete the 9,493 acres of Fort Reno lands from the lands which he was to value. Instead, the Government's appraiser, too, treated the Fort Reno lands as part of the lands to be valued.

Finally, the Government's appraiser referenced "Royce Areas 525 and 540A" located in Indian Territory (in Oklahoma) as comprising the 1890 cession area. See Attachment I at 13. These "Royce" Areas are taken from "Indian Land Cessions in the United States" compiled by Charles C. Royce and published in the Eighteenth Annual Report of the Bureau of American Ethnology in 1897. The Indian Claims Commission viewed this publication as the ultimate controlling authority on Indian land cessions [and used the Royce numbering system to designate Indian land cessions in its many decisions on the historical value of lands encompassed by a particular cession]. Accordingly, it is significant that the Royce Area 525 Map establishes that the Fort Reno lands are within the cession area. See Attachment J (copy of Royce at 942-943 and map of Royce Areas 525 and 540A) and Attachment I at 87 (enlarged version of Royce Areas 525 and 540A areas).

Defendants stress that Mr. Royce traditionally delineated tracts within the boundaries of a cession area which were reserved from a particular cession and gave these tracts their own

6

separate  Royce Area numbers.  See, for example, Royce at 686-687 with regard to the Royce

Area 87 cession (pursuant to the Treaty of September 29, 1817), which designates those areas

within Royce Area 87 that were not ceded under said Treaty.  See Attachment L (copy of  Royce

at 686-687 and  map of Royce Area 87).

In short, the Royce Area 525 map clearly shows that the Fort Reno lands are within the

cession area.  This map does not depict the Fort Reno lands as a distinct tract with its own Royce

number.   In sum, the Royce Area 525 Map gives no indication that the Fort Reno lands were

reserved  from the 1890 cession.

**5.  The November 17, 1993 Letter from Previous Tribal Counsel**.

Previous counsel for the Tribes, Ms. Katherine Boyce, stated in a 1993 letter to an

attorney in the Office of General Counsel of the Department of Agriculture, in pertinent part, as

follows: "As the $15 million award [by the Indian Claims Commission in Docket No. 329-A and

329-B in 1965] covers the entire parcel of land given the tribes in 1869 and ceded by the tribes in

1890, **it must  include some payment for the Fort Reno lands** . . . . " Emphasis added]   See

Attachment M.

**6.  Prior Suits Involving/Implicating the Fort Reno Lands**.

**a.  The 1929 Lawsuit.**

In 1929, the Cheyenne-Arapaho Tribes filed a suit for money damages in the U.S. Court

of Claims pursuant to a special jurisdictional act (Pub. L. No. 237, ch. 222, Act of June 3, 1920,

41 Stat. 738, as amended by the Acts of June 4, 1926, 44 Stat. 769, and March 29, 1928, 45 Stat.

380).  They alleged that the compensation paid to them by the government for the cession of

certain tribal lands was inadequate, including the lands ceded pursuant to the November 13, 1890

7

cession Agreement.  See Attachment A (copy of Sen. Rep. No. 2246, 81st Cong., 2nd Sess. Part 2 at 16  (1950)).  [1/] This suit was dismissed in 1941 for lack of prosecution.  Id.

### b.  The 1951 Suit Under the Indian Claims Commission Act.

In 1951, the Tribes filed suit under the Indian Claims Commission Act (Pub. L. No. 79-926, ch. 959, Act of August 13, 60 Stat. 1049, 1050) (hereinafter "ICCA"), the petition was assigned Docket No. 329.   Subsequently, the Indian Claims Commission created two sub-dockets, 329-A and 329-B.  On June 23, 1961, the Tribes filed their "Severed Petition" in Docket No. 329-A.  Paragraph No. 17(b) of this Petition states that **" . . .  on or about July 17, 1883, the President ordered the withdrawal of an area of  9,493 acres from said reservation** [the Oklahoma Reservation created by the August 10, 1869 Executive Order] **for the establishment of the Fort Reno Military Reserve . . . ."** [Emphasis added].  With respect to this transaction, the Tribes alleged:

> No compensation was stipulated nor paid to petitioner.  Petitioner understood that the lands of the Fort Reno Military Reserve would be returned to its use and benefit when no longer used for military purposes or that same were to be relinquished by the military when required by the Secretary of the Interior for petitioner's purposes.

The Plaintiffs' Fort Reno claim was articulated as follows:

> **Wherefore, petitioner asserts [a] claim for the reasonable value of the use of said lands by the defendant from the date July 17, 1883, reasonable and fair damages for the failure of the Secretary of the Interior to require the return of said lands for the use and benefit of petitioners**; and pray for the exercise of its [the Commission's] powers in equity by the Indian Claims Commission to set aside, or recommend the setting aside [of] the jurisdiction of the Department of Agriculture conferred by the act of April 21, 1948 . . .  in said lands, . . . .

---

[1/] Defendants' counsel has attempted unsuccessfully to locate a copy of the 1929 Petition filed in Court of Claims Docket No. K-103 at the National Archives and the Federal Records Center at Forestville, Maryland.

[Emphasis added] <u>See</u> Attachment C at 9. In 1965, the Indian Claims Commission entered a final judgment in Docket Nos. 329-A and 329-B in favor of plaintiffs in the amount of $15 million pursuant to a stipulated settlement. <u>Cheyenne and Arapaho Tribes of Indians of Oklahoma</u>, 16 Ind. Cl. Comm. 162, 185, 187 and 190a (1965). The events described above, coupled with the 1965 final judgment, establish that the Tribes were, <u>in fact, paid for the Fort Reno lands in 1965</u> **and** under the terms of Paragraph No. 2 of the Stipulation for Entry of Final Judgment (<u>see</u> copy of this stipulation which is designated as Attachment N), <u>paid for their Fort Reno lands claim in 1965</u> - - <u>see</u> Paragraph No. 17(b) of the Tribes' 1961 Severed Petition filed in Docket No. 329-A (<u>see</u> copy of Severed Petition designated as Attachment C).

7. <u>**Proposed 1949, 1950 and 1952 Legislation to Vest Beneficial Title to the Fort Reno Lands in the Cheyenne-Arapaho Tribes.**</u>

In 1949, Bill No. H.R. 6114 was introduced in Congress. Section 1 of this draft legislation provided for "the conveyance of 6,925 acres of the Fort Reno Military Reservation to the United States in trust for the Cheyenne-Arapaho Tribes of Indians of Oklahoma." <u>See</u> Attachment A (H.R. Rep. No. 1323, 81st Cong., 1st Sess. at 3 (1949)). Section 2 of the bill provided for the transfer of " . . . approximately 1,568 acres of the Fort Reno Military Reservation to the control and jurisdiction of the Attorney General of the United States . . . ." <u>Id</u>. H.R. Rep. No. 1323 states: " <u>It may be questionable whether or not there is a pure legal claim to the land</u>; but, certainly, all testimony points to the justification of a moral and equitable obligation on the part of the United States to return the Fort Reno Military Reservation to the Indians when same ceases use as a military reservation." [Emphasis added] <u>Id</u> at 2. The Report also states that the bill was a "compromise between the Cheyenne-Arapaho Indians, <u>who</u>

claim title to all of the Fort Reno Military Reservation, and the Bureau of Prisons, who originally

made a request for approximately 3,500 acres of this land . . . " [Emphasis added] Id.  The bill

was not enacted and was reintroduced in the second session of the 81st Congress.  See

Attachment A (Sen. Rep. No. 2246, 81st Cong., 2nd Sess. 1 (1950)).

Sen. Rep. No. 2246  notes that this 1,568 acres [to be transferred to the Attorney General]

" . . . together with the 1,000 acres transferred by the act of May  24, 1937 [cited in Paragraph

No. 17 of the Tribes' present petition] gives use to the Bureau of Prisons of   . . . 2,568 acres of

contiguous land .   .   . " all of which acreage had been part of the lands included in the 1883 Fort

Reno Military Reservation.   Again, this proposed legislation was not enacted.   Two years later it

was reintroduced (and amended in some respects not material to this motion).  See Attachment A

(H.R. Rep. No.  1935, 82nd Cong. , 2nd Sess. at 1, 2  (1952)).  Finally, H. R. Report No. 1323

includes a copy of the letter from the Department of the Interior expressing its views on Bill No.

6114; this letter mentions the prospective "return of the military reserve lands to tribal ownership

. . . " [Emphasis added] H.R. Rep. No. 1323 at 6.  This bill, too, was not enacted.


**ARGUMENT**

**Standards for FRCP 12(b)(6) and 12(b)(1) Motions.**

On a motion to dismiss a claim for failure to state a claim upon which relief may be

granted under FRCP 12(b)(6), well pleaded allegations of the complaint must be accepted as true.

Gross v. Winter, 876 F.2d 165 (D.C. Cir. 1989).  So construed, the court may not dismiss the

complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove

no set of facts in support of the claim which would entitle plaintiff to the relief requested; in

other words, a complaint may be dismissed if relief cannot be granted on some set of facts consistent with the complaint.  Hishon v. King & Spaulding, 467 U.S.  69, 73 (1984).

On a motion to dismiss under FRCP 12(b)(1), the plaintiff bears the burden of demonstrating that the Court has jurisdiction to decide plaintiff's suit.  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994).  In considering the motion, the Court must draw all reasonable inferences in favor of the plaintiff.  Maljack Prods.,Inc.  v. Motion Picture Ass'n of America, Inc., 52 F. 3d 373, 374 (D.C. Cir. 1995). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." Kowal v.  MCI Communications Corp.,16 F.3d 1271, 1276 (D.C. Cir. 1994). "Nor must the court accept legal conclusions cast in the form of factual allegations." Id.  In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court is not limited to allegations in the complaint, but may consider materials outside the pleadings.  Shulman v. Voyou, 305 F. Supp. 2d 36, 38-39 (D.D.C. 2004).

I. **THE PLAINTIFFS' SUIT CONCERNING THE FORT RENO LANDS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.**

Pursuant to FRCP 12(b)(6), the Defendants move to dismiss this lawsuit on the grounds that the Complaint fails to state a claim upon which relief may be granted.   Plaintiffs seek a declaratory judgment that they presently have a beneficial interest in all but 960 acres [the correct figure is 1,000 acres] of the approximately 9,600 acres [the correct figure is 9,493 acres] which comprised the Fort Reno lands.  Defendants submit that the language of the 1890 cession Agreement stating that this cession extended to all lands "**to which they [the Cheyenne-Arapaho Tribes] have or may set up or allege any right, title, interest or claim whatsoever**"

11

clearly encompassed the Fort Reno lands and supports the Defendants' position that the Tribes ceded these lands in 1890.

The November 14, 1890 Report of the Cherokee Commission on the negotiations leading to the 1890 Agreement states this cession [of all of the 5,138,560 acres of land comprising the 1869 Executive Order Reservation] amounted to **" a complete relinquishment of title in and to all the above tracts of country, saving to the Indian[s] allotments of land in severalty only . . .** " Defendants submit that this statement by the Cherokee Commission, which negotiated the 1890 Agreement, indicates the Tribes understood in 1890 that they were agreeing to cede all lands within the boundaries of the 1869 Executive Order Reservation, which necessarily included the Fort Reno lands. See cf. Northwestern Band of Shoshone Indians v. United States, 324 U. S. 335, 353 (1945) (court attempts to determine what the parties meant by the treaty); Choctaw Nation v. United States, 318 U.S. 423, 432 (1943) (in interpreting Indian treaty the court must " . . . look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.").

The proposed legislation introduced in Congress in 1949, 1950 and 1952 to vest beneficial title to most of Fort Reno military reserve lands in the Cheyenne-Arapaho Tribes further supports the Defendants' interpretation of the 1890 cession Agreement.  Plaintiffs' contention that they presently have a beneficial interest in about 8,500 acres (out of the total 9,493 acres) of Fort Reno lands cannot be reconciled with the introduction 57 years ago of proposed legislation to vest beneficial title in the Tribes.  Defendants submit that, given the factual background of the Fort Reno lands claim, the requisite legal premise for the actual existence of the Tribes' alleged present beneficial interest in these lands would be the present day

12

existence of Plaintiffs' beneficial title thereto.  This contention is supported by the legislative

history of Bill No. 1323 to vest beneficial title to the Fort Reno lands in the Tribes found in H.R.

Report No. 1323 of the Committee on Public Lands of the  House of Representatives.  This

Report noted that Bill No. 6114 was a "compromise between the Cheyenne-Arapaho Indians,

who claim **title** to all of the Fort Reno Military Reservation, and the Bureau of Prisons . . . ."

[Emphasis added]  See H.R.Rep. No. 1323 at 2.  The same report also included a copy of the

Department of Interior's letter to Congress on this bill which speaks of the prospective "return of

the military reserve lands to tribal ownership." Id. at 5.  In short, it would not have been

necessary to introduce  this draft legislation **if,** as Plaintiffs contend in this lawsuit, they have

retained a beneficial interest in the Fort Reno lands since 1883.

        The Defendants' interpretation of the 1890 Agreement is reinforced by the fact that the

map of Royce Areas 525 and 540A establishes that not only were the Fort Reno lands within the

boundaries of the cession area, but also there was no exclusion of the Fort Reno lands from the

cession area.  See Attachment K at fourth page.   Furthermore, it is very significant that

Plaintiffs' appraisal report did not exclude the 9,493 acres of the Fort Reno military reserve from

the area to be valued.   This significance is attributable to the fact that the Tribes' claims counsel

were responsible for instructing the Tribes' appraiser as to which lands, if any, within the cession

area should not be valued because the Tribes had not ceded them in 1890.   It appears they did

not instruct the appraiser to do so because he did not deduct the 9,493 acres from the overall

acreage of the lands within the cession area - - that is, deduct the 9,493 acres from the total of

5,138,560 acres encompassed by the 1869 Executive Order Reservation.

## II.  IN THE ALTERNATIVE, THIS SUIT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER  JURISDICTION.

Even if the Court finds that the Tribes did not cede the Fort Reno lands in 1890, and, as a result, rejects our argument of  failure to state a claim upon which relief may be granted, the Court should still dismiss this suit for lack of subject matter jurisdiction, pursuant to FRCP 12(b)(1), for the reasons set forth below.

### A.  Section 22(a) of the ICCA Bars This Lawsuit.

Section 22(a) of the Indian Claims commission Act (ICCA)  provides, in pertinent part, as follows:

* * *

The payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.

* * * *

See  60 Stat. at 1055.

The 1965 payment made to the Plaintiffs pursuant to the Indian Claims Commission's final judgment of $15 million and a stipulated settlement of all "rights, claims and demands which the petitioner asserted or could have been asserted with respect to the subject matter of those claims .  .  . "  triggered the operation of Section 22(a) of the ICCA.  The present claim asserting a beneficial interest in the Fort Reno lands is a claim "touching [two] of the matters involved in the controversy" in ICC Docket No. 329-A.  That is, the present claim concerning the Fort Reno lands touches upon: (1)  the "unconscionable consideration"claim as to the lands ceded by the November 1890 Agreement (which encompassed the Fort Reno lands which are within the cession area as delineated by the map of Royce Areas 525 and 540A) (Paragraph No. 18(b) of the Severed Petition); and (2) the claim for damages for the government's use of the Fort Reno lands

14

after July 17, 1883 and for the Secretary's failure to return these lands to the Tribes once military use by the government ceased (Paragraph No. 17(b) of the Severed Petition).  See United States v. Dann, 470 U.S. 39, 45-50 (1985) (held that individual Western Shoshones could not assert as a defense to the ejectment of their trespassing livestock from BLM lands that the Western Shoshone Tribe still had aboriginal title to the BLM lands because the payment of a final judgment in favor of the Tribe for the extinguishment of its aboriginal title to about 26 million acres of land (including the BLM lands) triggered the operation of Section 22(a)).

In this connection, Defendants stress the 1993 statement of a previous counsel for the Tribes  that the 1965 final award to the Tribes " . . .  **must include some payment for the Fort Reno lands  . . . "** This statement further supports Defendants' position that the Tribes were paid for the Fort Reno lands **and** for their Fort Reno lands claim in 1965.

In sum, Plaintiffs' instant suit against the United States is barred by Section 22(a) of the ICCA and the suit should be dismissed.

### B.   This Suit Also Must be Dismissed Because the Exclusive Remedy for Challenging the United States' Title to Land is the Quiet Title Act.

In addition to the applicability of Section 22(a) of the ICCA, the Court should dismiss this suit on the grounds that the exclusive means of challenging the United States' title to the Fort Reno lands is the Quiet Title Act (Pub. L. No.  92-562, Act of October 25, 1972, 86 Stat. 1176, codified at 28 U.S.C. § 2409a (2006) (hereinafter "QTA")).  See Block v. North Dakota, 461 U. S. 273, 278 (1985).  The QTA waives the government's sovereign immunity to suit where the United States has an interest in the lands at issue.  Clearly, the government is asserting an interest in the Fort Reno lands because it has used them for various non-military purposes, beginning in

15

1937, when Congress transferred 1,000 acres to the Department of Justice and continuing in 1948 when Congress conveyed the bulk of the remaining Fort Reno lands to the Department of Agriculture.  (Pub. L. No.  80- 494,  Act of April 21, 1948, 62 Stat. 197).  See Warren v. United States, 234 F.3d 1331, 1335-1337 (D.C. Cir. 2000) (held that the government had given the plaintiff (and his predecessor-in-interest) both express and constructive notice of the government's adverse interest in the land at issue); and Spirit Lake Tribe v. North Dakota, 262 F. 3d  732, 738 (8th Cir. 2001), cert. denied, 535 U.S. 998 (2002) (held that actions by the federal government which create a "cloud on title" are sufficient to establish  the government's adverse interest in a particular tract of land within the meaning of the Quiet Title Act).

The essence of this lawsuit is that Plaintiffs claim a beneficial interest in all of the Fort Reno lands, except for the approximately 1,000 acres transferred to the Department of Justice in 1937.  Defendants submit that no later than 1948, when Congress transferred about 7,100 acres (of the 9,493 acres) of Fort Reno lands to the Department of Agriculture, the Plaintiffs were on notice that the government was asserting an interest in the Fort Reno lands adverse to the Tribes. The Plaintiffs' Severed Petition filed in ICC Docket No. 329-A supports this argument because it requested that the Commission set aside Congress' 1948 transfer to Agriculture.  See Attachment C at 9.  It must be inferred from this request that the Plaintiffs viewed the 1948 transfer as the pivotal government action which adversely affected their alleged beneficial title to/interest in the Fort Reno lands.

In short, under the circumstances set forth above, the Plaintiffs' request for equitable relief in their 1961 Severed Petition must be read as a tacit admission that the Tribes' exclusive remedy for challenging the federal government's title to the Fort Reno lands was the Quiet Title

Act.  Accordingly, the court should find it is without jurisdiction over the instant lawsuit and dismiss it.

###    C.   This Lawsuit is Barred by the Statute of Limitations Provision of the Quiet Title Act.

The Quiet Title Act waived the United States' sovereign immunity to suit with respect to suits involving title to land. However, the twelve-year statute of limitations provision of the QTA (28 U.S.C. § 2409a(g)) is a condition on that waiver of sovereign immunity.  Therefore, the timely commencement of a suit to quiet title against the United States is a prerequisite to subject matter jurisdiction.  Block v. North Dakota, supra, 461 U.S.  at 282-83; Mcintyre v.  United States, 789 F. 2d 1408, 1410-11 (9th Cir. 1986); and Hat Ranch, Inc. v. Babbitt, 932 F. Supp. 1, 3 (D.D.C. 1995), aff'd without opinion, 102 F. 3rd 1272 (D.C. Cir. 1996).

Since the statute of limitations is a condition upon the waiver of sovereignty immunity, it must be strictly construed in favor of the United States. Block, supra, at 461.  A cause of action arises under the QTA when a plaintiff knew or should  have known of the conflicting federal claim to the lands at issue - - here, the Fort Reno lands.  A QTA claim accrues when the claimant is reasonably aware that the United States asserts 'some' interest adverse to the plaintiff.  See Warren v. United States, supra, 234 F.3d at 1335; and  Hawaii v. United States, 676 F. Supp. 1024, 1035 (D. Hawaii 1988), aff'd, 866 F. 2d 313 (9th Cir. 1989).  In this case, the Plaintiff Tribes should have been reasonably aware that the United States was asserting 'some' interest adverse to the Tribes no later than 1948 when Congress transferred the bulk of the Fort Reno lands - -  about 7,100 acres thereof - - to the Department of Agriculture. (Complaint, para. 19).

The QTA's statute of limitations provision is triggered by the Plaintiffs' knowledge of the

transaction giving rise to their claim.  Hawaii v. United States, supra, 676 F. Supp. at 1033.  The Tribes' filing of the Severed Petition in ICC Docket No. 329-A establishes that the Tribes were at least reasonably aware of the government's adverse interest in 1948 when about 7,100 acres (of the 9,493 total acres) of  Fort Reno lands were transferred to the Department of Agriculture, since their Severed Petition sought to have this transfer set aside.  Therefore, they should have brought a  Quiet Title Act suit within twelve years of 1948, or 1960.   In the alternative, the Tribes were, in fact, clearly aware of the government's adverse interest in 1961 when they filed their Severed Petition.  This means that, at a minimum, they should have filed a Quiet Title Act suit within 12 years of 1961 - -  that is, by 1973- - but they did not do so.

In sum, this suit is barred by the statute of limitations provision of the Quiet Title Act.

**D.  This Suit is Barred by the Doctrine of Res Judicata.**

Paragraph No. 2 of the 1965 Stipulation for Entry of Final Judgment, pursuant to which the $15 million ICCA final judgment was entered in 1965, provides as follows:

> 2.  Entry of final judgment in said amount shall finally dispose of all rights, claims or demands which the petitioner **has asserted or could have asserted** with respect to the subject matter of these claims, and petitioner shall be barred thereby from asserting any such right, claim or demand against defendant in any future action.

[Emphasis added]  See Attachment N (copy of Stipulation for Entry of Final Judgment filed with the Indian Claims Commission in Docket Nos. 329-A and 329-B on October 11, 1965).  In Docket No. 329-A, Plaintiffs asserted the claim that they had received "unconscionable consideration" for the lands comprising the 1869 Executive Order Reservation which they ceded pursuant to the November 13, 1890 Agreement, and which was, in turn, ratified by the Act of March 3, 1891.  Defendants submit that the 1890 cession included the Fort Reno lands.  In

18

addition to the "unconscionable consideration" claim, the Tribes asserted a claim for damages for

the "reasonable value of the use of said [Fort Reno] lands by the defendant from the date July 17,

1883, [the date of the Executive Order creating the Fort Reno military reserve] [and] "reasonable

and fair damages for the failure of the Secretary of the Interior to require the return of said lands

to the use and benefit of the petitioners . . . "

The entry of final judgment pursuant to the 1965 Stipulation bars the present claim

concerning the Fort Reno lands by the doctrine of res judicata.  This is because the Tribes

expressly raised a claim concerning the Fort Reno lands in their ICCA suit (Paragraph No. 17(b)

of the Tribes' Severed Petition) that was encompassed  by Paragraph No. 2 of the 1965

stipulation and the entry of final judgment pursuant thereto.  See White Mountain Apache Tribe

v. Hodel, 784 F. 2d 921, 925-26 (9th Cir. 1986) (held that Tribe's claims filed in federal district

court in 1984 for: (1) a declaratory judgment that the Tribe had title to 16,000 acres of timber

lands excluded from the White Mountain Apache Reservation by an allegedly erroneous 1887

survey (and now part of the Apache-Sitgreaves National Forest); and (2) damages equal to the

amount of revenues derived from these lands by the U.S. Forest Service since 1887 were barred

by the doctrine of res judicata; this ruling was based upon the stipulation for entry of final

judgment entered  in 1972 in the Tribe's Docket No. 22-D ICCA suit (to recover damages for

extinguishment of aboriginal title to these very same lands (and other lands)) which provided that

the entry of  final judgment "shall finally dispose of all rights, claims or demands which the

[Tribe] **has asserted or could have asserted**" in its ICCA suit. [Emphasis added])  The identical

"final disposition" language is found in Paragraph No. 2 of the Stipulation for Entry of Final

Judgment filed in Docket No. 329-A in 1965.  See Attachment N.

In short, the 1965 Stipulation for Entry of Final Judgment in ICC Docket No. 329-A (and No. 329-B) and the White Mountain Apache decision strongly support dismissal of this lawsuit.

### E.   This Lawsuit is Barred by 28 U.S.C. § 2401(a).

The six-year statute of limitations period which governs this suit is found in 28 U.S.C. § 2401(a) (assuming the court were to first find the QTA inapplicable).  Under 28 U.S.C. § 2401, a cause of action accrues when the factual and legal prerequisites  for filing suit are in place. Norwest Bank Minnesota Nat. Ass'n v. F.D.I.C., 312 F.3d 447, 451 (D.C. Cir. 2002).  We submit that the factual and legal prerequisites for Plaintiffs' suit were in place in 1948 when Congress transferred  the bulk of the Fort Reno lands (about 7,100 acres out of a total of 9,493 acres set aside in 1883) to the Department of Agriculture.  This transfer was sufficient to establish the government's adverse interest in these lands.  Warren v. United States, supra, 234 F.3d at 1335–1337; and  Spirit Lake Tribe v. North Dakota, supra, 262 F. 3d at 738. That is, by 1948, the Plaintiffs had notice the United States was asserting an interest in these lands adverse to the Tribes which, in turn, means that the factual and legal prerequisites for filing suit were then in place.  Indeed, in their Severed Petition filed in ICC Docket No. 329-A in 1961, the Tribes requested that this 1948 transfer of the Fort Reno lands to Agriculture be set aside; this request amounts to a tacit admission by Plaintiffs that these prerequisites were in place in 1948.

In short, 28 U.S.C. §§ 2401(a), the six-year statute of limitations which governs all civil suits filed against the United States in federal district court (including suits filed under 28 U.S.C. 1331,1332, and 2201) bars this suit. [2] Saffron v. Department of the Navy, 561 F. 2d 938, 941

---

[2] Suit under 28 U.S.C. §1505 (also cited by the Tribes) is barred by virtue of 28 U.S.C. §2501, the six-year statute of limitations provision governing suits filed in the United States Court of

(D.C. Cir. 1977).  The Tribes should have filed suit under 28 U.S.C. §§ 1331, 1332, and 2201 no later than 1954 - - that is, within six years after 1948 - - but did not do so.  The same is true for a suit filed under 28 U.S.C. § 1505.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, should be granted. [3]

Dated this 16th day of October, 2006.


Respectfully submitted,


/s/ James M. Upton

_____
JAMES M. UPTON
U.S. Department of Justice
Environment & Natural Resources
   Division
Natural Resources Section
 P.O. Box 663
Washington, D.C.   20044-0663
Tel. (202) 305-0482
 Fax: (202) 305-0506
 E-mail; james.upton@usdoj.gov

_____

 Federal Claims under 28 U.S.C. §§ 1491 and 1505.

[3] A copy of the Proposed Order is found on page 23 of this Memorandum.

21

OF COUNSEL:

Tom Bartman, Esq.                    James Snow, Esq.
Office of the Solicitor              Jeffrey T. Vail, Esq.
U.S. Department of the Interior      Office of the General Counsel
Main Bldg. - -Mail Stop 6456         U.S. Department of Agriculture
1849 C Street, N. W.                 1400 Independence Avenue, S.W.
Washington, D.C.   20240             Washington, D. C.   20250

Attachments

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————
**CHEYENNE-ARAPAHO TRIBES OF** )
**OKLAHOMA,** )
　 )
　　　　　　**Plaintiffs,** )
　 )　　　　　**No. 06-519**
　　　　**v.** )　　　　**Judge P.L.F. Friedman**
　 )
**UNITED STATES OF AMERICA, et al.,** )
　 )
　　　　　**Defendants.** )
—————————————————————— )

**ORDER**

　　　After careful consideration of the Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, Plaintiffs' Response thereto, and the Defendants' Reply to the Tribes' Response, the court has decided to grant the Defendants' Motion to Dismiss.  Defendants' motion raises multiple arguments which amply support dismissal. Accordingly, it is hereby ORDERED that the Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment be, and it hereby is GRANTED.   It is hereby ORDERED  that this lawsuit is hereby dismissed with prejudice.

Dated: _____

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　JUDGE P.L.F. FRIEDMAN
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT