**ATTACHMENT   A**

| 81st Congress | HOUSE OF REPRESENTATIVES | Report |
|---|---|---|
| 1st Session | | No. 1323 |

## SETTING ASIDE CERTAIN LANDS IN OKLAHOMA, FORMERLY A PART OF THE CHEYENNE-ARAPAHO RESERVATION, AND KNOWN AS THE FORT RENO MILITARY RESERVATION, FOR THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA, AND FOR OTHER PURPOSES

August 25, 1949.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. Morris, from the Committee on Public Lands, submitted the following

# REPORT

[To accompany H. R. 6114]

The Committee on Public Lands, to whom was referred the bill (H. R. 6114) to set aside certain lands in Oklahoma, formerly a part of the Cheyenne-Arapaho Reservation, and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Indians of Oklahoma, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## EXPLANATION OF THE BILL

### PURPOSE

H. R. 6114 provides for the conveyance of approximately 6,925 acres of land, now under the jurisdiction of the Department of Agriculture and formerly a part of the Fort Reno Military Reservation, Okla., to the United States in trust for the Cheyenne-Arapaho Tribes of Indians of Oklahoma. It further provides for the transfer of approximately 1,568 acres of land, now under the jurisdiction of the Department of Agriculture and formerly a part of the Fort Reno Military Reservation, to the Attorney General of the United States for use in connection with the Federal reformatory at El Reno, Okla.

### HISTORY

By Executive order of President Chester A. Arthur, dated July 17, 1883, 9,493 acres of the Cheyenne-Arapaho Indian Reservation were set apart as a military reservation known as Fort Reno. It is ques-

tionable whether compensation, if any, was given to the Cheyenne-Arapaho Tribes for the taking of the 9,493 acres.

Fort Reno continued as a fort and military reservation for use by the United States Army until after World War II, when same was declared surplus to the needs of the United States Army. It was transferred by the War Department, by act of Congress approved April 21, 1948, for use by the Secretary of Agriculture for light horse breeding. Subsequently, by act of Congress, it was provided that the Secretary of Agriculture should liquidate the Fort Reno remount service on or before December 31, 1949. Since, therefore, the military reservation was declared surplus to the needs of the United States Army and was transferred to the Department of Agriculture, who now by act of Congress must liquidate its remount program at Fort Reno on or before December 31, 1949, it becomes necessary to make some disposition of the 8,493 acres (approximately 1,000 acres of the original military reservation was given to the Federal reformatory at El Reno, Okla., by act of Congress).

### HEARINGS

Originally, H. R. 4756 was heard by the Public Lands Committee, which bill provided for the transfer of all the Fort Reno Military Reservation to the United States in trust for the Cheyenne-Arapaho Indians. Extensive hearings were held in which the Bureau of Prisons, the Department of the Interior, Department of Agriculture, and the Cheyenne-Arapaho Indians with their attorney participated. Hearings on H. R. 4756 brought out the need of the Federal reformatory at El Reno, Okla., for additional land in order to provide adequate pasture for the reformatory cattle which are used to provide beef for the inmates at the reformatory. As a result, H. R. 6114 was worked out. It represents a compromise between the Cheyenne-Arapaho Indians, who claim title to all of the Fort Reno Military Reservation, and the Bureau of Prisons, who originally made a request for approximately 3,500 acres of this land for use in connection with the Federal reformatory at El Reno, Okla.

Evidence before the committee clearly sets forth the moral and equitable right of the Cheyenne-Arapaho Indians to the land in question. It may be questionable whether or not there is a pure legal claim to the land; but, certainly, all testimony points to the justification of a moral and equitable obligation on the part of the United States to return the Fort Reno Military Reservation to the Indians when same ceases to be used as a military reservation. There is ample precedent for the return of this land to the Indians, inasmuch as Congress has on previous occasions recognized the rights of the Cheyenne-Arapaho Indians in and to the lands included in the Fort Reno Military Reservation.

Testimony of the Indians evidences a well-planned program for the utilization of this land by the tribes. It is planned by the Cheyenne-Arapaho Tribes to make use of the land in question by engaging in the cattle business for the benefit of the 3,000 Indians of the Cheyenne-Arapaho Tribes. The program as outlined by the Indian representatives of the tribes is endorsed by the Bureau of Indian Affairs.

## ANALYSIS OF THE BILL

Section 1 of the bill provides for the conveyance of 6,925 acres of the Fort Reno Military Reservation to the United States in trust for the Cheyenne-Arapaho Tribes of Indians of Oklahoma.

Section 2 of the bill provides for the transfer of approximately 1,568 acres of the Fort Reno Military Reservation to the control and jurisdiction of the Attorney General of the United States for use in connection with the Federal reformatory at El Reno, Okla. The section further provides that any claim the Indians may have to the land provided for in section 2 will not be prejudiced by the transfer to the Attorney General. In other words, their claim to proceed in the Indian Claims Commission or the Court of Claims will not be barred or prejudiced by the section.

Section 3 provides that the Secretary of the Interior, with the consent of the Cheyenne-Arapaho Tribes, may lease or sell 640 acres of described land covered in section 1 to the United States for use in connection with the Federal reformatory at El Reno, Okla. This section further provides that if no lease or sale is made to the United States, 40 acres of the land so described shall be restricted in use to that of the grazing of livestock. This latter provision is for the protection of the Federal reformatory at El Reno, Okla.

Section 4 provides for a continuance and renewal by the Secretary of the Interior of easements, licenses, permit, or commitments heretofore made with respect to the land covered in section 1. The committee particularly wish to express their desire that the easement with respect to the disposal plant operated by the Federal reformatory be continued.

Section 5 provides that the Secretary of the Interior may make disposition of the buildings and improvements on the land described in section 1.

Section 6 provides for the issuance of patents-in-fee for homestead purposes to veterans of World Wars I and II in amounts not to exceed 2¼ acres. This section is based upon testimony before the committee to the effect that veterans of World Wars I and II were desirous of establishing homesteads on certain portions of the land described in section 1 near the city of El Reno.

In addition, the committee desire to point out that much consideration was given to inserting a provision in the bill with reference to the establishment of a cemetery on the reservation in order to preserve the old burial grounds now there. It was decided, however, that such a provision was not necessary inasmuch as the Secretary of the Interior and the tribes could establish such a cemetery without legislative authority. The committee do wish to express their desire that such a cemetery be established to preserve the old burial grounds and provide cemetery facilities for those deemed proper for burial therein.

## CONCLUSION

It is the belief of the committee that this measure represents the fair and equitable disposition of the lands. The Indians have unquestionably established a moral claim to the lands; and, since same are now surplus to the needs of the United States, the return in part to the Indians and in part to the Federal reformatory at El Reno, Okla., seems to be in the public interest.

## DEPARTMENT REPORTS

The reports of the Department of the Interior and Department of Agriculture read as follows:

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D. C., August 25, 1949.*

Hon. J. HARDIN PETERSON,
*Chairman, Committee on Public Lands,*
*House of Representatives.*

MY DEAR MR. PETERSON: Reference is made to your request for report on H. R. 4756, a bill to set aside certain lands in Oklahoma, a part of the Cheyenne-Arapaho Reservation and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Oklahoma.

For the reasons herein set forth, I recommend that this bill be enacted.

The lands embraced in the Fort Reno Military Reserve were formerly a part of the Cheyenne and Arapaho Indian Reservation. By section 2 of the agreement between the Cheyenne and Arapaho Indians and the United States, ratified by the act of March 3, 1891 (26 Stat. 989, 1022), the Indian title to these and other lands was extinguished. The Indians, however, have always been dissatisfied with the consideration of approximately 50 cents an acre paid to them by the Government. The Congress has recognized the merits of the position of the Indians by restoring to them certain lands which had been reserved but which were no longer needed for the purposes for which reserved, or by providing for the sale of the land with the provision that the proceeds of the sale be credited to the Indians. See the acts of June 29, 1942 (56 Stat. 21), April 13, 1938 (52 Stat. 213), June 17, 1910 (36 Stat. 533), and May 29, 1908 (35 Stat. 444, 447-448).

As early as 1934, when it appeared that the military reserve might be abandoned, the Cheyenne and Arapaho Indians requested that the lands embraced in the reserve be returned to tribal ownership. These Indians were allotted as early as 1891, and no allotments have been made to members born since that date. As a result, there is a generation or more of Indians now of middle age or older who have received no allotments. Among these are a number of veterans of World War II who do not own land and for whose use no tribal lands are available. The return of the military reserve lands to tribal ownership would permit the tribal business committee to allocate their use to landless members of the tribe, with special consideration to the veterans of World War II, and to lease to the city of El Reno the hospital facilities as outlined in section 2 of H. R. 4756.

In view of the foregoing, I recommend that the Congress restore the lands comprising the Fort Reno Military Reserve to the Cheyenne and Arapaho Tribes.

In view of your desire to have an immediate statement of the Department's views, I have not submitted this report to the Bureau of the Budget. I am unable, therefore, to inform you as to the relation of the proposed legislation to the program of the President.

Sincerely yours,

OSCAR L. CHAPMAN,
*Under Secretary of the Interior.*

DEPARTMENT OF AGRICULTURE,
*August 4, 1949.*

Hon. J. HARDIN PETERSON,
*Chairman, Committee on Public Lands, House of Representatives.*

DEAR MR. PETERSON: This is in response to letter of July 25, 1949, from Mr. Preston Peden, counsel, Committee on Public Lands, requesting this Department's views on several proposed committee amendments to H. R. 4756, a bill to set aside certain lands in Oklahoma formerly a part of the Cheyenne-Arapaho Reservation and known as the Fort Reno Military Reservation for the Cheyenne-Arapaho Tribes of Indians of Oklahoma.

It seems entirely proper to strike out section 2 of the bill for the reason that during the time that the Fort Reno Reservation has been under the jurisdiction of the Department of Agriculture no representative of the city of El Reno, Okla., has expressed a desire to secure the use of the hospital facility for the city, although we had previously expressed to two proponents of the idea our willingness to permit the city to use the building as a hospital under mutually agreeable terms. At any rate, such transfer or use would be possible under the proposed section 3.

The proposed new section 2 of the bill would continue in effect any nonrevocable easement, license, permit, or commitment heretofore granted or made for a specific period of time and would authorize the Secretary of the Interior to renew any such agreement as he deems advisable. This section would also authorize the Secretary of the Interior to continue in effect, or to renew, any similar agreements which are revocable or of indefinite duration. We believe these provisions desirable in order that persons or organizations now using land or buildings within the reservation may receive adequate consideration in the future.

Proposed new sections 3 and 4 deal with future utilization and disposition of land and buildings after jurisdiction shall have been transferred from this Department with consequent cessation of our direct interest. It does not appear appropriate that we comment on these provisions

In view of the time situation, we have not obtained advice from the Bureau of the Budget as to the relationship of this proposed legislation to the program of the President.

Sincerely,

CHARLES F. BRANNAN, *Secretary.*

The Committee on Public Lands urge the passage of this bill. No appropriation is or will be necessary as a result of this legislation.

O

# Calendar No. 2248

| 81st Congress } | SENATE | { Report |
|---|---|---|
| 2d Session } | | { No. 2246 |

SETTING ASIDE CERTAIN LANDS IN OKLAHOMA, FORMERLY A PART OF THE CHEYENNE-ARAPAHO RESERVATION, AND KNOWN AS THE FORT RENO MILITARY RESERVATION, FOR THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA, AND FOR OTHER PURPOSES

August 4 (legislative day, July 20), 1950.—Ordered to be printed

Mr. McFarland, from the Committee on Interior and Insular Affairs, submitted the following

# REPORT

[To accompany H. R. 6114]

The Committee on Interior and Insular Affairs, to whom was referred the bill (H. R. 6114) to set aside certain lands in Oklahoma, formerly a part of the Cheyenne-Arapaho Reservation, and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Indians of Oklahoma, and for other purposes, having considered the same, report thereon and recommend that the bill do pass with the following amendment:

Line 12, page 2, after the word "Oklahoma" strike the colon and insert in lieu thereof a comma; strike the words *"Provided, however,"* and strike the language in lines 13, 14, 15, 16, and 17 and insert after said comma the following:

and the title in fee is hereby vested in the United States Government and all claims in regard thereto, by said Indian tribes, are hereby extinguished.

## PURPOSE

The bill as amended by your committee would vest title to approximately 6,925 acres of land, formerly used as a military reservation (Fort Reno, Okla.), in the United States for the use and benefit of the Cheyenne and Arapaho Tribes of Indians of Oklahoma. It would also transfer approximately 1,568 acres of the former military reservation lands to the Attorney General of the United States for the use of the Bureau of Prisons.

## HISTORY

Originally, 9,493 acres of land known as Fort Reno were taken from the Cheyenne-Arapaho Reservation in Oklahoma and set aside

**2**  SET ASIDE CERTAIN LANDS FOR THE CHEYENNE-ARAPAHO TRIBES

for military purposes.  This occurred by Executive order of President Arthur on July 17, 1883.  No compensation for the taking was at that time paid over to the Indian tribes.  The evidence shows that some years later (1891) approximately 15 cents per acre was appropriated for the relinquishment of all the Cheyenne and Arapaho Reservation lands in Oklahoma.  There are various ways of computing the actual amount and there is considerable doubt as to the benefit of the appropriation which actually flowed to the Indians.  Your committee believes the consideration and benefit unconscionable.

By the act of May 24, 1937 (50 Stat. 200), Congress transferred 1,000 acres of the Fort Reno Military Reservation to the Department of Justice for the use of the Bureau of Prisons.  This land lies south of United States Highway No. 66.  On June 30, 1946, the War Department issued a permit to the Department of Justice (for the Bureau of Prisons) to use the remaining land (1,568 acres) lying south of said highway for grazing purposes.  The act of April 21, 1948 (Public Law 494, 80th Cong.), transferred jurisdiction of the Fort Reno lands (8,493 acres) to the Department of Agriculture following abandonment of the fort by the Army.  The Agriculture Remount Service was liquidated on December 31, 1949.

Several minor permits and easements have been granted which are discussed hereafter in the analysis of the bill.

### HEARINGS

Your committee has had the benefit of information and evidence adduced in extensive hearings on the bill before both the Senate and House committees.  Strong moral and equitable rights of the Cheyenne-Arapahoes have been established in the opinion of your committee.  No appropriation is involved nor will any be involved as a result of this legislation.

The Cheyenne-Arapaho Tribes of Oklahoma propose to initiate and operate a well-planned livestock breeding, feeding, and management program upon the Fort Reno lands which would be returned to them.  The program outlined will go a long way in making them self-sustaining and relieve them of much of their present ill-housed, ill-fed, ill-clothed condition brought about largely from their landless status.

The return of the Fort Reno Lands involved will afford homestead sites to tribal veterans of World War I and World War II.  Future necessity for appropriations for relief and other purposes will be greatly reduced, if not made entirely unnecessary.  Since the Fort Reno lands have long since been declared surplus to the needs of the Military Establishment your committee feels that the provisions of the bill, as amended, are the best possible disposition and utilization.

### ANALYSIS OF THE BILL

Section 1 of the bill provides for the conveyance of 6,925 acres of the Fort Reno Military Reservation to the United States in trust for the Cheyenne-Arapaho Tribes of Indians of Oklahoma.

Section 2 of the bill provides for the transfer of approximately 1,568 acres of the Fort Reno Military Reservation to the control and jurisdiction of the Attorney General of the United States for use in connection with the Federal reformatory at El Reno, Okla.

This acreage, together with the 1,000 acres transferred by the act of May 24, 1937, gives use to the Bureau of Prisons of all the Fort Reno lands situated south of United States Highway No. 66. Thus, 2,568 acres of contiguous land will continue to be used and useful to the Bureau. Your committee believes that by striking the proviso clause in section 2, as passed the House, that this transfer to the Bureau more than sets off the small consideration which may have flowed to the Indians for the original taking.

Section 3 provides that the Secretary of the Interior, with the consent of the Cheyenne-Arapaho Tribes, may lease or sell 640 acres of described land covered in section 1 to the United States for use in connection with the Federal reformatory at El Reno, Okla. This section further provides that if no lease or sale is made to the United States, 600 acres of the land so described shall be restricted in use to that of the grazing of livestock. This latter provision is for the protection in problems of discipline of the Federal reformatory at El Reno, Okla.

Section 4 provides for a continuance and renewal by the Secretary of the Interior of easements, licenses, permits, or commitments heretofore made with respect to the land covered in section 1.

The easements, licenses and permits involve pipelines, electric-power transmission lines, sewers, telephone pole lines, roads, railroads, use of two buildings by the Oklahoma National Guard and experimentation and research by Oklahoma Agricultural Experiment Station.

Section 5 provides that the Secretary of the Interior may make disposition of the buildings and improvements on the land described in section 1.

Section 6 provides for the issuance of patents-in-fee for homestead purposes to veterans of World Wars I and II in amounts not to exceed 2½ acres. This section is based upon testimony that Cheyenne and Arapaho Indian veterans of World Wars I and II were desirous of establishing homesteads on certain portions of the land described in section 1.

## CONCLUSION

Your committee believes, after careful consideration of the entire matter that passage of the bill (H. R. 6114), as amended, will serve the best public interest. There is definite precedent for the enactment of H. R. 6114. The lands are no longer useful for the military purpose for which in 1883 they were set aside. As to the Cheyenne-Arapaho Reservation lands in Oklahoma here involved in each case where these lands were reserved for a purpose and they became no longer useful for that purpose the Congress has done one of two things with respect to the lands. The Congress has either sold the lands and credited the money to the Cheyenne-Arapahoes, or it has revested title in the United States for the use and benefit of the tribes.

Attention is directed to four acts of Congress in that regard. The first one was in 1908, Public Law 156 of the Sixtieth Congress (35 Stat. 447). This involved 640 acres of land known as the Darlington tract. It was found that these 640 acres were no longer needed for their original purpose. The Congress authorized the sale of the land and the improvements thereon, and ordered deposit of the proceeds thereof in the Treasury to the credit of the Cheyenne-Arapaho Indians. Those lands and improvements were sold for approximately

**4**  SET ASIDE CERTAIN LANDS FOR THE CHEYENNE-ARAPAHO TRIBES

$75,000, and the funds were made available for the use and benefit of the tribes.

In 1910 there was Public Law 215 of the Sixty-first Congress (36 Stat. 533). Involved in this act were certain lands formerly in the Cheyenne-Arapaho Reservation, no longer required for the purpose of the original reserve. The Congress authorized the sale under the homestead law at not less than $5 an acre, in 1910, and the proceeds were paid into the Treasury to the credit of the Cheyenne-Arapaho Indians of Oklahoma, and drew 3-percent interest per annum.

In 1938 there was Public Law 480 of the Seventy-fifth Congress (52 Stat. 213). Certain lands were eliminated from the Seeger school reservation in the western part of the then reservation. Having been eliminated from the school reserve, no longer useful for school purposes, the lands were set aside for the use and benefit of the Cheyenne-Arapaho Tribes of Oklahoma. No allotments in severalty were permitted. They added to the sum total of the tribal ownership of land.

In 1942 there was Public Law 419 of the Seventy-seventh Congress (56 Stat. 21). That act of Congress vested title in certain lands formerly in the Cheyenne-Arapaho Reservation, in the United States in trust for the Cheyenne-Arapaho Indians.

No appropriation is involved nor will any appropriation be involved if the bill is passed. Your committee recommends that the bill, as amended, do pass.

O

# Calendar No. 2248

81st Congress ⎱     SENATE     ⎰ Rept. 2246
   *2d Session* ⎰                  ⎱ Part 2

SETTING ASIDE CERTAIN LANDS IN OKLAHOMA, FORMERLY A PART OF THE CHEYENNE-ARAPAHO RESERVATION, AND KNOWN AS THE FORT RENO MILITARY RESERVATION, FOR THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA

August 22 (legislative day, July 20), 1950.—Ordered to be printed

Mr. BUTLER, from the Committee on Interior and Insular Affairs, submitted the following

## MINORITY VIEWS

[To accompany H. R. 6114]

This bill should not be enacted because:

The lands in question never were owned by the Cheyenne and Arapaho Tribes. They are a part of the reservation set aside by Executive order approved August 10, 1869, for the temporary residence of the Cheyenne and Arapaho Tribes who refused to occupy their treaty reservation and squatted on lands to the south of it. The temporary reservation included lands claimed by the Choctaw and Chickasaw Nations on which, by agreement with them, the United States was permitted to settle friendly tribes.

By the agreement of November 13, 1890, ratified by the act of March 3, 1891, the Choctaws and Chickasaws were paid $1.25 per acre for their lands within the reservation set apart by Executive order of August 10, 1869, and the Cheyennes and Arapahoes were then allotted upon said lands and were given $1,500,000 for the relinquishment of these shadowy claims to other lands in Oklahoma.

The Cheyenne and Arapahoe Tribes entered into a treaty with the United States on October 28, 1867 (treaty of October 28, 1867, 15 Stat. 593) by which they reserved an area of land in Oklahoma bounded on the east by the Arkansas River, on the north by the present southern boundary of the State of Kansas, and on the west and south by the Cimarron River. The area contained 5,184,640 acres. But the Cheyennes and Arapahoes never had possession of a foot of it for a second of time. They were dissatisfied with it, and settled in territory to the south claimed by the Choctaws and Chickasaws. The Government made no effort to place them on the reservation set aside for them by the said treaty of 1867, but said by its action through an

Executive order, "You need not go there; you can remain in the area where you are now located." The provisions of this treaty were not carried out and the land reverted to the Government under the agreement of November 13, 1890.

The lands involved in H. R. 6114 are a part of those to which the Choctaw and Chickasaw Nations, pursuant to the treaties of June 22, 1855 (11 Stat. 611), and June 28, 1866 (14 Stat. 269), claimed title. The conveyance of these lands to the Choctaws and the Chickasaws was limited by the retained right of the United States to locate friendly tribes thereon. This the Government did by its Executive order of August 10, 1869, when it temporarily located the Cheyenne and Arapahoe Tribes on the land.

The said Executive order of August 10, 1869, provides as follows:

DEPARTMENT OF THE INTERIOR,
OFFICE OF INDIAN AFFAIRS,
*Washington, D. C., August 10, 1869.*

Hon. J. D. Cox,
*Secretary of the Interior.*

SIR: Referring to my report to you of the 19th of June last, relative to the change of location of the reservation for the Cheyenne and Arapaho Indians, I now have the honor to submit herewith copies of the following letters relative to this subject, viz:

Letter from Superintendent Hoag, dated the 31st ultimo, inclosing letter from Brevet Major General Hazen, dated 24th ultimo.

Letter from Superintendent Hoag, dated the 4th instant, inclosing letter from General Hazen, dated the 2d instant.

It appears from these letters that the Cheyennes and Arapahoes did not understand the location of the reservation as defined by the treaty of August 19, 1868; that they have never been upon said reserve, and do not desire to go there, but that they desire to locate on the North Fork of the Canadian, some 60 miles below Camp Supply; that the agent for these tribes has a large quantity of valuable stores in this locality, which are very much exposed.

Inasmuch as these Indians express a desire to be located upon a reserve, I think it very desirable that their wishes should be gratified, and that they be not permitted to again roam on the plains. I therefore respectfully recommend that the President be requested to authorize the location of these Indians on the North Fork of the Canadian River, where they desire to go, and that immediate steps be taken to provide temporarily for them there. The country desired by them is public land, and I think it competent for the President to direct their location thereon. In view, however, of the fact that these Indians have a reservation defined for them by treaty stipulation, legislation can be asked of Congress at the coming session to insure a permanent reservation for them where they may locate and abandon as a reservation the present one, restoring it to the public lands.

Very respectfully, your obedient servant,

E. S. PARKER, *Commissioner.*

AUGUST 10, 1869.

The recommendation of the Indian Commissioner approved.

J. D. Cox, *Secretary.*

Approved August 10, 1869.

U. S. GRANT, *President.*

Since the purposes of the treaty of 1867 were not carried into effect and the Government failed in its purpose to provide a permanent home for the Cheyennes and Arapahoes, Congress authorized a commission to negotiate with them for land which they could occupy permanently. This resulted in the agreement of November 13, 1890, by which the Cheyenne and Arapahoe Tribes agreed to—

cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatsoever, expressed or implied, all their claim, title, and interest of every kind and character—

SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS    **3**

in and to the lands described in the said Executive order dated August 10, 1869, and to other lands in Oklahoma.

In consideration of such session and relinquishment of said lands by the Cheyenne and Arapahoe Tribes, the United States agreed to allot each man, woman, and child of them, 160 acres of land situated within the boundaries of the lands included in said Executive order of August 10, 1869, and on lands for which the United States had paid the Choctaws and Chickasaws the sum of $1.25 per acre. After the allotment, white settlers on the unallotted lands of the reservation paid to the United States $1.50 per acre for their holdings, thus showing that the Indians had no claim on the unallotted land.

It was expressly agreed that no selection of allotment should be made on land occupied by the military agency, school, school farm, or on land used for religious or other public purposes, or on sections 16 or 36 in each congressional township, or on that part of the reservation occupied by the Wichita and affiliated bands of Indians. In addition, the Cheyennes and Arapahoes were paid $1,500,000; $250,000 in cash; $250,000 to be paid out for said Indians under the direction of the Secretary of the Interior; and $1,000,000 to be retained in the Treasury of the United States to the credit of said Indians, drawing 5-percent interest per annum, to be paid to said Indians per capita annually.

This, the agreement of November 13, 1890, was ratified by Congress through the act of March 3, 1891 (26 Stat. 989, 1022), which agreement provides as follows:

[S. Ex. Doc. No. 1, 51st Cong., 2d sess.]

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES, TRANSMITTING A LETTER OF THE SECRETARY OF THE INTERIOR WITH AN AGREEMENT BY THE CHEROKEE COMMISSION WITH THE CHEYENNE AND ARAPAHOE INDIANS FOR THE CESSION OF CERTAIN LANDS

EXECUTIVE MANSION,
*December 4, 1890.*

To the SENATE AND HOUSE OF REPRESENTATIVES:

I transmit herewith a communication of the 3d instant, from the Secretary of the Interior, accompanied by an agreement concluded by the Cherokee Commission with the Cheyenne and Arapahoe tribes of Indians, for the cession of certain lands, and for other purposes.

The agreement is submitted for the consideration of Congress, as required by law.

BENJ. HARRISON.

———

DEPARTMENT OF THE INTERIOR,
*Washington, December 3, 1890.*

The PRESIDENT:

I have the honor to submit herewith an agreement made and entered into by and between the Cherokee Commission and the Cheyenne and Arapahoe tribes of Indians, and also a report of the said Commission transmitting the agreement.

The accompanying report of the 1st instant, from the Commissioner of Indian Affairs, contains, in brief, the provision of the agreement, and states that it appears to be in proper form and properly executed, and that the price to be paid seems to be fair and reasonable, both to the Government and to the Indians.

I also inclose a draught of a bill carrying into effect the provisions of this agreement, and have the honor to request that the matter be presented for the early and favorable action of Congress.

I have the honor to be, very respectfully, your obedient servant,

JOHN W. NOBLE, *Secretary.*

**4**    SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS

DEPARTMENT OF THE INTERIOR,
OFFICE OF INDIAN AFFAIRS,
*Washington, December 1, 1890.*

The SECRETARY OF THE INTERIOR.

SIR: I have the honor to acknowledge the receipt of your communication, dated November 20, 1890, with which you transmit articles of agreement made and entered into at Darlington, Oklahoma, on the day of October 1890, by and between the Cherokee Commission and the Cheyenne and Arapahoe tribes of Indians, and also a report of the Commissioners, of date November 13, 1890. You request that this contract be given early and earnest consideration and report, with a view of having the matter laid before the President without delay.

By the first article of the agreement the Cheyenne and Arapahoe tribes cede, convey, transfer, relinquish and surrender, forever and absolutely, all their claim, title, and interest of every kind and character in and to the reservation set apart for said Cheyenne and Arapahoe Indians, by the treaty of October 28, 1867 (15 Stats., 593).

By the second article they cede, convey, transfer, relinquish, and surrender, forever and absolutely without any reservation or condition, express or implied, all their claims, title and interest of every kind and character in and to the land embraced in the reservation set apart for their use and occupation by the executive order of August 10, 1869, subject to the allotment of land in severalty to the individual members of the said Cheyenne and Arapahoe tribes of Indians, as provided in the agreement.

They also cede and relinquish all their claim, title, and interest of every kind and character in and to all other lands or tracts of country in the Indian Territory to which they have or may set up or allege any right, title, interest, or claim whatsoever.

The third article provides that out of the lands ceded, conveyed, transferred, relinquished, and surrendered by article 2 each member of the said Cheyenne and Arapahoe tribes of Indians over the age of eighteen years shall have the right to select for himself or herself 160 acres of land, to be held and owned in severalty, and that the father, or if he be dead the mother, if members of either of said tribes of Indians, shall have the right to select a like amount of land for each of his or her children under the age of eighteen years, and that the Commissioner of Indian Affairs, or someone by him appointed for that purpose, shall select a like amount of land for each orphan child belonging to either of said tribes under the age of eighteen years.

By article 4 it is agreed that the land in said reservation shall be classed as bottom land and grazing land, and that in making selection of land to be allotted in severalty, as aforesaid, each and every Indian shall be required to take at least one-half in area of his or her allotment of grazing land. It also provides that the land occupied for military, agency, school, school farm, religious, or other public uses, or in sections 16 and 36 in each Congressional township, shall be exempt from allotment, except in cases where any Indian has heretofore made improvements upon and now uses and occupies a part of said sections 16 and 36.

It also exempts from allotments a tract of land occupied and claimed by the Wichita and affiliated bands of Indians. It is further provided that said sections 16 and 36 shall not become subject to homestead entry, but shall be held by the United States and finally sold for public school purposes. Provision is also made for religious societies or other organizations now occupying any portion of said reservation for religious or educational work among the Indians.

Article 5 provides that all allotments thereunder shall be selected within ninety days from the ratification of the agreement by Congress, provided that the Secretary of the Interior may extend the time for making such allotments, and that if any now entitled to allotments shall fail or refuse to make his or her selection, then the allotting agent in charge of the work shall, within the next thirty days after said time, make allotments to such Indians, and shall have the same force and effect as if selections were made by the Indians.

Article 6 provides that when said allotments of land shall have been selected, and approved by the Secretary of the Interior, the titles thereto shall be held in trust for the allottees respectively, for a period of twenty-five years, in the manner and to the extent provided for in the act of February 8, 1887 (25 Stats., 388), and that at the expiration of said period, titles thereto shall be conveyed in fee simple to the allottees or their heirs, free from all incumbrances.

Article 7 provides that, as a further and only additional consideration for the cession of territory and relinquishment of titles, claim, and interest in and to

the lands, as aforesaid, the United States will pay to the Cheyenne and Arapahoe tribes of Indians $1,500,000, as follows:

Two hundred and fifty thousand dollars in cash, to be distributed per capita among the members of said tribe within sixty days after the agreement shall be ratified by Congress; $250,000 to be paid out for said Indians under the direction of the Secretary of the Interior, and the remaining $1,000,000 to be retained in the Treasury of the United States placed to the credit of the said Indians, and while so retained to draw 5 percent interest per annum, to be paid to said Indians per capita annually.

It is further provided that nothing contained in said article shall be held to affect in any way any annuities due said Indians under existing laws, agreements, or treaties.

By the eighth article it is agreed that if any member of either of said tribes has, in pursuance of any laws or of any rules or regulations of the Department, taken an allotment, such allotment at the option of the allottee shall be confirmed and governed by all the conditions attached to allotments taken under this agreement.

Article 9 provides that the agreement shall take effect whenever it shall be ratified by the Congress of the United States.

The Commission report that the signing of the contract on the part of the Indians began on the 13th day of October last, when 91 signed, and that the signing was completed on the 13th of November.

From the report it appears that the adult male members of the Cheyenne and Arapahoe tribes number 618, and that the agreement has been signed by more than three-fourths of said male adults as required by the treaty of 1867.

The Commission further state that the contract, if ratified by Congress, will furnish farms in severalty to about 3,500 Indians, and extinguish the Indian title to more than 3,000,000 acres of land, and make it available for white settlement; and that besides this, the claim, title, and interest, whatever it may be, that these Indians may have in the treaty reservation, or that they may claim under any unratified agreements in the Cherokee outlet and Creek cession is absolutely extinguished.

The agreement appears to be in proper form and to be properly executed. The price to be paid seems to be fair and reasonable, both to the Government and to the Indians. It is perhaps a matter of regret that the funds and interest are to be paid to the Indians pro rata instead of being expended for their benefit. Doubtless the Commission found it necessary to make this provision when securing the consent of the Indians, and I do not think that objection should be raised to the ratification of the agreement for this reason.

It may also be remarked that while the provisions in regard to the title to be given to the Indians for allotments follow closely the provisions of the act of February 8, 1887, it does not provide that the President may in his discretion extend the trust period beyond twenty-five years. The contract refers to all the lands ceded as being within the Indian Territory. As a matter of fact, however, the greater portion of the ceded lands is within the Territory of Oklahoma. This, though, is not deemed a material variation, as the lands are otherwise accurately described.

Acting upon the suggestions contained in your communication of July 28, 1890, relative to the agreements made between the Cherokee Commission and the Iowa, Sac and Fox and Citizen Pottawatomie, and Absentee Shawnee tribes of Indians, I have prepared the draught of a bill carrying into effect the provisions of this agreement. I have also prepared copies of the papers for transmission to Congress.

Very respectfully, your obedient servant.

R. V. BELT, *Acting Commissioner.*

---

FORT RENO, IND. T.,
*November 13, 1890.*

The PRESIDENT,
    *Washington, D. C.*

SIR: We now have the honor and very great satisfaction to report to you that we have concluded a contract with the Cheyenne and Arapahoe Tribes of Indians in this Territory.

You are already advised by former report of the negotiations up to the 22d of July last.

Negotiations were resumed on the 3d day of October and have continued without intermission until today, when we secured the requisite number of male

**6**   SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS

adult signers, according to section 12 of the treaty with said Indians concluded October 28, 1867, viz, 75 per cent.

The signing of the contract on the part of the Indians began on the 13th day of October ultimo, when 91 signed. Others came in from day to day, sometimes more and sometimes less, until today, when the signing was concluded.

Including the three weeks spent with them in July last, a full month was given to the discussion of the questions involved. The dullest Indian was made to understand the terms of the contract and its effect.

These Indians have some claim by treaty to a reservation in the Cherokee Outlet and lands in the Creek cession. They also agreed, in treaties, for two other reservations in the same country, which were never agreed to by the United States Senate. They also have at least a possessory claim in and to the lands now occupied by them by virtue of an Executive order, dated August 10, 1869. In order that all claim of title in the Indians might be extinguished we have included in the contract a complete relinquishment of title in and to all the above tracts of country, saving to the Indian allotments of land in severalty only, in the reservation created by said Executive order.

We concluded that, although these Indians never occupied the reservation in the Cherokee and Creek countries, nor those stipulated for by the unratified treaties above referred to, we would observe the treaty stipulation in relation to the treaty reservation, and secured 75 percent of the adult male population to sign. This puts the execution of the contract beyond question or cavil.

The allotments of lands to the Indians and all other conditions of the contract are the same as stated in the former contract, except the payment of the price agreed upon.

The original proposition was that $500,000 of the purchase price should be paid per capita to the Indians, under the direction of the Commissioner of Indian Affairs.

The fact that the Indians could not be assured, under this proposition, that they would receive in their own hands any money proved an insuperable obstacle. Therefore, after much and careful consideration, we modified the proposition and proposed that $250,000 should be paid to the Indians within sixty days after the contract should be ratified by Congress, and $250,000 should be paid out to or for them under the direction of the Secretary of the Interior. This proposition was accepted and written in the contract as signed.

In the execution of the contract the fact that some of the male adults entitled to sign were absent from the reservation attending school at Carlisle, Pa., and Lawrence, Kans., and others were distant from the agency and unable without great inconvenience to come there, and the further fact that it was deemed both unwise and impracticable for the Commission to visit them, we resorted to the use of powers of attorney, which are attached to the contract inclosed. The following persons authorized the signing of their names by separate powers, which was done, but we count them once only, and rely upon the signatures numbered as being the best authenticated, and exclude in the count the names marked with a star on the contract, viz, Thomas Carlisle (who was first signed Thomas Bear Robe), John B. Tyler, Kish Hawkins, Richard Davis (who first signed as Davis Bull Bear), John Van Horn, DeForest Antelope, Joseph C. Thunder (who was first signed as Calling Thunder), (Ben Come Up Hill), Noble Prentice, Philip B. Man (who was first signed as Philip Bad Man), Frank Harrington, Albert W. Wolf (who was first signed as Albert White Wolf), James P. Yellow (who was first signed as James Point Yellow), Casper Edson, Lewis H. Miller, Fieldy Sweeny (who was first signed as Fielding Sweezy), Dan. Wheeler (who was first signed as Wheeler), and Kiser Younger Man (who was first signed as Kiser Youngerman).

The only means available to ascertain the male adult population of the two tribes was the United States Indian agent, the records of his office, and information derived from reliable Indians.

Relying upon such sources of information, Mr. Charles F. Ashley, the agent here, gave us a certificate under the seal of his office, which is hereto attached and made a part hereof, that the adult male population is 618; 75 percent of which is 464. We have secured more than that number of male adult signers. In addition thereto we have permitted about 100 women—who are widows or wives of white men—to sign the contract. The contract provides that the father, or if he be dead, the mother of children under eighteen years of age, may select the lands for such minor children, and on that account they were permitted to sign, although we do not count them in determining the completion of the contract.

In addition to the double signatures above explained, there are two others that perhaps need explanation: One is Kias Red Wolf, he signed the contract and after-

SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS    **7**

ward, surreptitiously, and without the knowledge of the Commission at the time, attempted to erase his name by drawing a pen through it. Afterward he voluntarily came and asked to sign it again, which he did.

Another is Little Bear, a chief, who did not come in until many had signed the contract. When his name was written by the interpreter and he was asked to "touch the pen," he refused to do so unless his name should be written among the first signers, who were the chiefs; this was done, and no mark was made where his name was first written.

This contract, if ratified by Congress, in the opinion of the Commission, furnishes farms a quarter section each, in severalty, to about 3,500 Indians, and extinguishes the Indian title to more than 3,000,000 acres of land, and makes it available for white settlement. Its magnitude can be better understood by stating that the area of the land so secured is nearly twice that of Oklahoma proper. Besides this, the claim, title, and interest, whatever it may be that these Indians have in the treaty reservation, or that they may claim under said unratified treaties in the Cherokee Outlet and Creek cession is absolutely extinguished.

The Commission takes pleasure in certifying to the zeal and earnestness in furthering the present Indian policy of the Government of all the officers and employes of the Government, both civil and military, with whom it has come in contact.

In conclusion, it affords the Commission much satisfaction to be able to state, that since it was reorganized last May, five contracts with Indians have been concluded and only await the action of Congress to make them effective. The total amount of lands to which Indian title has been extinguished and made available for white settlement is more than 4,000,000 acres, after deducting more than 750,000 acres for homes and farms for the Indians, or 25,000 farms of a quarter section each. The aggregate cost to the Government of all, by the contracts, is $2,294,000, or about 55 cents per acre.

The Commission further begs leave to report that the Indians generally with whom contracts have been concluded, having made up their minds to take lands in severalty, are eager to enter upon the conditions under which they are to live. Therefore the contracts should be made effective at the earliest possible time, in the opinion of the Commission. The contract with the accompanying documents is herewith inclosed.

We go from here tomorrow to Tahlequah, where the Cherokee national council is now sitting.

We have the honor to be, very respectfully,

<div align="right">

DAVID H. JEROME,
ALFRED M. WILSON,
WARREN G. SAYRE,
*Commissioners.*

</div>

---

ARTICLES OF AGREEMENT MADE AND ENTERED INTO AT DARLINGTON, IN THE INDIAN TERRITORY, ON THE — DAY OF OCTOBER A. D. 1890, BY AND BETWEEN DAVID H. JEROME, ALFRED M. WILSON, AND WARREN G. SAYRE, COMMISSIONERS ON THE PART OF THE UNITED STATES, AND THE CHEYENNE AND ARAPAHOE TRIBES OF INDIANS IN THE INDIAN TERRITORY

### ARTICLE I

The said Cheyenne and Arapahoe tribes of Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character in and to the lands embraced in the following described tract of country in the Indian Territory, to wit: A tract of country west of the ninety-sixth degree of west longitude, bounded by the Arkansas River on the east, the thirty-seventh parallel of north latitude (being the southern boundary line of the State of Kansas) on the north, and the Cimarron or Red Fork of the Arkansas River on the west and south.

### ARTICLE II

Subject to the allotment of land in severalty to the individual members of the Cheyenne and Arapahoe tribes of Indians, as hereinafter provided for, and subject to the conditions hereinafter imposed, for the consideration hereinafter mentioned, the said Cheyenne and Arapahoe Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character, in and to the lands embraced in the following described tract of country in the Indian Territory, to wit:

Commencing at a point where the Washita River crosses the 98th degree of west longitude as surveyed in the years eighteen hundred and fifty-eight and eighteen hundred and seventy-one; thence north on a line with said 98th degree to the point where it is crossed by the Red Fork of the Arkansas (sometimes called the Cimarron River); thence up said river, in the middle of the main channel thereof, to the north boundary of the country ceded to the United States by the treaty of June 14, 1886, with the Creek Nation of Indians; thence west on said north boundary and the north boundary of the country ceded to the United States by the treaty of March 21, 1866, with the Seminole Indians, to the 100th degree of west longitude; thence south on the line of said 100th degree to the point where it strikes the North Fork of the Red River; thence down said North Fork of the Red River to a point where it strikes the north line of the Kiowa and Comanche reservation; thence east along said boundary to the point where it strikes the Washita River; thence down said Washita River, in the middle of the main channel thereof, to the place of beginning; and all other lands or tracts of country in the Indian Territory to which they have or may set up or allege any right, title, interest, or claim whatsoever.

ARTICLE III

Out of the lands ceded, conveyed, transferred, relinquished, and surrendered by Article II hereof, and in part consideration for the cession of lands named in the preceding article, it is agreed by the United States that each member of the said Cheyenne and Arapahoe tribes of Indians over the age of eighteen (18) years shall have the right to select for himself or herself one hundred and sixty (160) acres of land to be held and owned in severalty, to conform to legal surveys in boundary; and that the father, or if he be dead, the mother, if members of either of said tribes of Indians, shall have a right to select a like amount of land for each of his or her children under the age of eighteen (18) years; and that the Commissioner of Indian Affairs, or someone by him appointed for the purpose, shall select a like amount of land for each orphan child belonging to either of said tribes under the age of eighteen (18) years.

ARTICLE IV

It is further agreed that the land in said reservation shall be classed as bottom land and grazing land; and in making selection of lands to be allotted in severalty as aforesaid, each and every Indian herein provided for, shall be required to take at least one-half in area, of his or her allotments, of grazing land.  It is hereby further expressly agreed that no person shall have the right to make his or her selection of land in any part of said reservation that is now used or occupied for military, agency, school, school-farm, religious, or other public uses, or in sections sixteen (16) and thirty-six (36) in each Congressional township, except in cases where any Cheyenne or Arapahoe Indian has heretofore made improvements upon and now uses and occupies a part of said sections sixteen (16) and thirty-six (36), such Indian may make his or her selection within the boundaries so prescribed so as to include his or her improvements, or in that part thereof now occupied and claimed by the Wichita and affiliated bands of Indians described as follows, viz: Commencing at a point in the middle of the main channel of the Washita River where the 98th meridian of west longitude crosses the same; thence up the middle of the main channel of the said river to the line of 98° 40′ west longitude; thence up said line of 98° 40′ due north to the middle of the main channel of the main Canadian River; thence down the middle of the main Canadian River to where it crosses the 98th meridian; thence due south to the place of beginning.

It is further agreed that wherever in said reservation any Indian, entitled to take lands in severalty hereunder, has made improvements, and now uses and occupies the land embracing such improvements, such Indian shall have the undisputed right to make his or her selection within the area above provided for allotments, so as to include his or her said improvements.

It is further agreed that said sections sixteen (16) and thirty-six (36) in each Congressional township in said reservation shall not become subject to homestead entry, but shall be held by the United States and finally sold for public school purposes.  It is hereby further agreed that wherever in said reservation any religious society or other organization is now occupying any portion of said reservation for religious or educational work among the Indians, the land so occupied may be allotted and confirmed to such society or organization; not, however, to exceed one hundred and sixty (160) acres of land to any one society or organization so long as the same shall be so occupied and used, and such land shall not be subject to homestead entry.

### ARTICLE V

All allotments hereunder shall be selected within ninety days from the ratification of this agreement by the Congress of the United States, provided the Secretary of the Interior in his discretion may extend the time for making such selection; and should any Indian entitled to allotments hereunder fail or refuse to make his or her selection of land in that time, then the allotting agent in charge of the work of making such allotments shall, within the next thirty (30) days after said time, make allotments to such Indians, which shall have the same force and effect as if the selection were made by the Indian.

### ARTICLE VI

When said allotments of land shall have been selected and taken as aforesaid, and approved by the Secretary of the Interior, the titles thereto shall be held in trust for the allottees, respectively, for the period of twenty-five (25) years in the manner and to the extent provided for in the act of Congress entitled "An act to provide for the allotment of land in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes." Approved February 8, 1887. And at the expiration of said period of twenty-five (25) years the titles thereto shall be conveyed in fee simple to the allottees, or their heirs, free from all incumbrances.

### ARTICLE VII

As a further and only additional consideration for the cession of territory and relinquishment of title, claim, and interest in and to lands as aforesaid the United States agrees to pay to the Cheyenne and Arapahoe tribes of Indians one million and five hundred thousand ($1,500,000) dollars, as follows: Two hundred and fifty thousand ($250,000) dollars in cash, to be distributed per capita among the members of said tribes within sixty days after this agreement shall be ratified by the Congress of the United States; two hundred and fifty thousand ($250,000) dollars, to be paid out for said Indians under the direction of the Secretary of the Interior, and the remaining one million ($1,000,000) dollars to be retained in the Treasury of the United States, placed to the credit of the said Indians, and while so retained to draw five per cent, interest per annum, to be paid to said Indians per capita annually.

Nothing herein contained shall be held to affect in any way annuities due said Indians under existing laws, agreements, or treaties.

### ARTICLE VIII

It is further agreed that wherever in said reservation any member of either of said tribes has, in pursuance of any laws or under any rules or regulations of the Interior Department, taken an allotment, such allotment, at the option of the allottee, shall be confirmed and governed by all the conditions attached to allotments taken under this agreement.

### ARTICLE IX

This agreement shall have effect whenever it shall be ratified by the Congress of the United States.

In witness whereof the said commissioners, on the part of the United States, have hereunto set their hands, and the undersigned members of said tribes, for themselves and their tribes, set their hands, the day and year first above written.

DAVID H. JEROME,
ALFRED M. WILSON,
WARREN G. SAYRE,
*Commissioners.*

1. Left Hand, his X mark, and 564 others.

\*          \*          \*          \*          \*          \*

"UNITED STATES INDIAN AGENCY, Darlington, Indian Territory, *as:*

"I, Charles F. Ashley, United States Indian agent at Darlington, in the Indian Territory, hereby certify that the adult male population of the Cheyenne and Arapahoe tribes of Indians in said Territory is six hundred and eighteen (618).

"This certificate is made upon my best knowledge, information, and belief derived from the records of my office and fortified by all other sources of reliable information as to ages.

10    SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS

"Given under my hand and the seal of the said agency this 10th day of November, A. D. 1890.
"[SEAL.]    "CHARLES F. ASHLEY,
    "U. S. Indian Agent."

"We, George Bent and Paul Boynton, do hereby certify, respectively, that we are the chosen interpreters for the Cheyenne and Arapahoe tribes of Indians in the Indian Territory in the matter of their relinquishment to the United States of all their right, claim, and interest in and to lands in said Indian Territory; that we fully interpreted the annexed and foregoing contract and agreement to said Indians, and that they were made to fully understand the same; that after said Indians whose names are subscribed to said contract and agreement understood the same, they subscribed said contract in our presence, or authorized the same to be done for them, and that we are Indians and members of said tribes; that of said subscribers there are four hundred and sixty-six (466) male adult members of said tribes in said Territory and ninety-nine (99) female adults of said tribes who are widows or heads of families equally interested in said contract with said male adults, and that we are personally acquainted with all who have signed said contract and know them to be the persons they represent themselves to be.

"Given under our hands at the Cheyenne and Arapahoe Agency at Darlington in said Territory this 14th day of November, A. D. 1890.
    "GEORGE BENT,
    "PAUL BOYNTON."

———

Therefore, be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that said agreement be, and the same is hereby, accepted, ratified, and confirmed.

SEC. 2. That for the purpose of making the allotments provided for in said agreement, including the pay and expenses of the necessary special agent or agents hereby authorized to be appointed by the President for the purpose, and the necessary re-surveys, there be and hereby is appropriated out of any money in the Treasury not otherwise appropriated the sum of fifteen thousand dollars, or so much thereof as may be necessary.

SEC. 3. That for the purpose of carrying the provisions of this act into effect, there is hereby appropriated out of any money in the Treasury not otherwise appropriated the sum of one million five hundred thousand dollars, of which amount the sum of one million dollars shall be placed in the Treasury to the credit of the Cheyenne and Arapahoe Indians, parties to the foregoing agreement, to bear interest at the rate of five per centum per annum, which interest shall be paid to them per capita annually; the balance of five hundred thousand dollars to be expended as provided for in Article VII of said agreement.

The Fort Reno Military Reserve of 9,493 acres of land, located within the boundaries of the lands reserved for the temporary use of the Cheyenne and Arapahoe Tribes by the Executive order dated August 10, 1869, was created by Executive order dated July 17, 1883.

The said Executive order creating the Fort Reno Military Reserve provides as follows:

FORT RENO MILITARY RESERVE

WAR DEPARTMENT,
Washington City, July 17, 1883.

To the PRESIDENT:

SIR: Upon recommendation of the post commander, concurred in by the commanding general, Department of the Missouri, and the lieutenant general, I have the honor to request that the following-described tract of land in the Indian Territory, located within the limits of the Cheyenne and Arapaho Indian Reservation, created by Executive order dated August 10, 1869, be duly declared and set apart by the Executive as a military reservation for the post of Fort Reno. viz:

Beginning at the northwest corner of section 28, township 13 north, range 8 west of the Indian meridian, and running thence east to North Fork of the Canadian River; thence down this stream to the range line between ranges 7 and 8 west of the Indian meridian; thence south on said range line to the southeast

corner of section 36, township 13 north, range 8 west of the Indian meridian; thence east to the northeast corner of township 12 north, range 8 west of the Indian meridian; thence south to the southeast corner of section 12 of said township; thence west to the southwest corner of section 9 of said township; thence north to the northwest corner of section 4 of said township; thence west to the southwest corner of section 33, township 13 north, range 8 west of the Indian meridian; thence north to the point of beginning, containing an area of about 14⅞ square miles, or 9,493 acres.

A sketch showing the proposed reservation is inclosed herewith, and the Interior Department reports that there is no objection on the part of the Indian Office to the setting apart for military purposes exclusively of the tract of land herein described.

I have the honor to be, sir, with great respect, etc.,

ROBERT T. LINCOLN, *Secretary of War.*

EXECUTIVE MANSION,
*Washington, July 17, 1883.*

The within request is approved, and the reservation is made and proclaimed accordingly.

The Secretary of the Interior will cause the same to be noted in the General Land Office.

CHESTER A. ARTHUR.

The agreement of November 13, 1890, together with the provision for payment to the Choctaw and Chickasaw Nations of $2,991,450 for all rights, title, interest, and claim which said Nations of Indians may have had in, and to the lands then occupied by the Cheyenne and Arapahoe Tribes under said Executive order, which agreement of November 13, 1890, was ratified by the act of March 3, 1891 (26 Stat. 1022).

The said act of March 3, 1891, provides as follows:

\*     \*     \*     \*     \*     \*     \*

SEC. 13. The following agreement entered into by the Commissioners named below on the part of the United States, and the Cheyenne and Arapahoe Tribes of Indians on the — day of October, eighteen hundred and ninety, and now on file in the Interior Department, signed by the said Commissioners on the part of the United States, and by Left Hand, his mark, and five hundred and sixty-four others, on the part of the said Indians, is hereby accepted, ratified, and confirmed, to wit:

Articles of agreement made and entered into at Darlington, in the Indian Territory, on the — day of October, A. D. eighteen hundred and ninety, by and between David H. Jerome, Alfred M. Wilson, and Warren G. Sayre, commissioners on the part of the United States, and the Cheyenne and Arapahoe tribes of Indians, in the Indian Territory.

### ARTICLE I

The said Cheyenne and Arapahoe tribes of Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character in and to the lands embraced in the following described tract of country in the Indian Territory, to wit: A tract of country west of the ninety-sixth degree of west longitude, bounded by the Arkansas River on the east, the thirty-seventh parallel of north latitude (being the southern boundary line of the State of Kansas) on the north, and the Cimarron or Red Fork of the Arkansas River on the west and south.

### ARTICLE II

Subject to the allotment of land in severalty to the individual members of the Cheyenne and Arapahoe tribes of Indians, as hereinafter provided for, and subject to the conditions hereinafter imposed, for the consideration hereinafter mentioned, the said Cheyenne and Arapahoe Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character, in and

**12**   SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS

to the lands embraced in the following described tract of country in the Indian Territory, to wit:

Commencing at a point where the Washita River crosses the 98th degree of west longitude as surveyed in the years eighteen hundred and fifty-eight and eighteen hundred and seventy-one; thence north on a line with said 98th degree to the point where it is crossed by the North Fork of the Arkansas (sometimes called the Cimarron River); thence up said river, in the middle of the main channel thereof, to the north boundary of the country ceded to the United States by the treaty of June 14, 1886, with the Creek Nation of Indians; thence west on said north boundary and the north boundary of the country ceded to the United States by the treaty of March 21, 1866, with the Seminole Indians, to the 100th degree of west longitude; thence south on the line of said 100th degree to the point where it strikes the North Fork of the Red River; thence down said North Fork of the Red River to a point where it strikes the north line of the Kiowa and Comanche reservation; thence east along said boundary to the point where it strikes the Washita River; thence down said Washita River, in the middle of the main channel thereof, to the place of beginning; and all other lands or tracts of country in the Indian Territory to which they have or may set up or allege any right, title, interest, or claim whatsoever.

### ARTICLE III

Out of the lands ceded, conveyed, transferred, relinquished, and surrendered by Article II hereof, and in part consideration for the cession of lands named in the preceding article, it is agreed by the United States that each member of the said Cheyenne and Arapahoe tribes of Indians over the age of eighteen (18) years shall have the right to select for himself or herself one hundred and sixty (160) acres of land to be held and owned in severalty, to conform to legal surveys in boundary; and that the father, or if he be dead, the mother, if members of either of said tribes of Indians, shall have a right to select a like amount of land for each of his or her children under the age of eighteen (18) years; and that the Commissioner of Indian Affairs, or someone by him appointed for the purpose, shall select a like amount of land for each orphan child belonging to either of said tribes under the age of eighteen (18) years.

### ARTICLE IV

It is further agreed that the land in said reservation shall be classed as bottom land and grazing land; and in making selection of lands to be allotted in severalty as aforesaid, each and every Indian herein provided for, shall be required to take at least one-half in area, of his or her allotments, of grazing land.  It is hereby further expressly agreed that no person shall have the right to make his or her selection of land in any part of said reservation that is now used or occupied for military, agency, school, school-farm, religious, or other public uses, or in sections sixteen (16) and thirty-six (36) in each Congressional township, except in cases where any Cheyenne or Arapahoe Indian has heretofore made improvements upon and now uses and occupies a part of said sections sixteen (16) and thirty-six (36), such Indian may make his or her selection within the boundaries so prescribed so as to include his or her improvements, or in that part thereof now occupied and claimed by the Wichita and affiliated bands of Indians described as follows, viz: Commencing at a point in the middle of the main channel of the Washita River where the 98th meridian of west longitude crosses the same; thence up the middle of the main channel of the said river to the line of 98° 40' west longitude; thence up said line of 98° 40' due north to the middle of the main channel of the main Canadian River; thence down the middle of the main Canadian River to where it crosses the 98th meridian; thence due south to the place of beginning.

It is further agreed that wherever in said reservation any Indian, entitled to take lands in severalty hereunder, has made improvements, and now uses and occupies the land embracing such improvements, such Indian shall have the undisputed right to make his or her selection within the area above provided for allotments, so as to include his or her said improvements.

It is further agreed that said sections sixteen (16) and thirty-six (36) in each Congressional township in said reservation shall not become subject to homestead entry, but shall be held by the United States and finally sold for public-school purposes.  It is hereby further agreed that wherever in said reservation any religious society or other organization is now occupying any portion of said reservation for religious or educational work among the Indians, the land so occupied may be allotted and confirmed to such society or organization; not, however, to

exceed one hundred and sixty (160) acres of land to any one society or organization so long as the same shall be so occupied and used, and such land shall not be subject to homestead entry.

### ARTICLE V

All allotments hereunder shall be selected within ninety days from the ratification of this agreement by the Congress of the United States, provided the Secretary of the Interior in his discretion may extend the time for making such selection; and should any Indian entitled to allotments hereunder fail or refuse to make his or her selection of land in that time, then the allotting agent in charge of the work of making such allotments shall, within the next thirty (30) days after said time, make allotments to such Indians, which shall have the same force and effect as if the selection were made by the Indian.

### ARTICLE VI

When said allotments of land shall have been selected and taken as aforesaid, and approved by the Secretary of the Interior, the titles thereto shall be held in trust for the allottees, respectively, for the period of twenty-five (25) years in the manner and to the extent provided for in the act of Congress entitled "An act to provide for the allotment of land in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes." Approved February 8, 1887. And at the expiration of said period of twenty-five (25) years the titles thereto shall be conveyed in fee simple to the allottees, or their heirs, free from all incumbrances.

### ARTICLE VII

As a further and only additional consideration for the cession of territory and relinquishment of title, claim, and interest in and to lands as aforesaid the United States agrees to pay to the Cheyenne and Arapahoe tribes of Indians one million and five hundred thousand ($1,500,000) dollars, as follows: Two hundred and fifty thousand ($250,000) dollars in cash, to be distributed per capita among the members of said tribes within sixty days after this agreement shall be ratified by the Congress of the United States; two hundred and fifty thousand ($250,000) dollars, to be paid out for said Indians under the direction of the Secretary of the Interior, and the remaining one million ($1,000,000) dollars to be retained in the Treasury of the United States, placed to the credit of the said Indians, and while so retained to draw five percent interest per annum, to be paid to said Indians per capita annually.

Nothing herein contained shall be held to affect in any way annuities due said Indians under existing laws, agreements, or treaties.

### ARTICLE VIII

It is further agreed that wherever in said reservation any member of either of said tribes has, in pursuance of any laws, or under any rules or regulations of the Interior Department, taken an allotment, such allotment, at the option of the allottee, shall be confirmed and governed by all the conditions attached to allotments taken under this agreement.

SEC. 14. That for the purpose of making the allotments provided for in said agreement, including the pay and expenses of the necessary special agent or agents hereby authorized to be appointed by the President for the purpose, and the necessary resurveys, there be, and hereby is, appropriated, out of any money in the Treasury not otherwise appropriated, the sum of fifteen thousand dollars, or so much thereof as may be necessary.

SEC. 15. That for the purpose of carrying the provisions of foregoing agreement into effect there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of one million five hundred thousand dollars, of which amount the sum of one million dollars shall be placed in the Treasury to the credit of the Cheyenne and Arapahoe Indians, parties to the foregoing agreement, to bear interest at the rate of five per centum per annum, which interest shall be paid to them per capita annually; the balance of five hundred thousand dollars to be expended as provided for in article seven of said agreement, to be immediately available.

And the sum of two million nine hundred and ninety-one thousand four hundred and fifty dollars be, and the same is hereby, appropriated out of any money in the Treasury not otherwise appropriated, to pay the Choctaw and Chickasaw Nations

**14**   SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS

of Indians for all the right, title, interest, and claim which said nations of Indians may have in, and to certain lands now occupied by, the Cheyenne and Arapahoe Indians under Executive order; said lands lying south of the Canadian River, and now occupied by the said Cheyenne and Arapahoe Indians, said lands have been ceded in trust by article three of the treaty between the United States and said Choctaw and Chickasaw Nations of Indians, which was concluded April twenty-eighth, eighteen hundred and sixty-six, and proclaimed on the tenth day of August of the same year, and whereof there remains, after deducting allotments as provided by said agreement, a residue ascertained by survey to contain two million three hundred and ninety-three thousand one hundred and sixty acres; three-fourths of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Choctaw Nation to receive the same, at such time and in such sums as directed and required by the legislative authority of said Choctaw Nation, and one-fourth of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Chickasaw Nation to receive the same, at such times and in such sums as directed and required by the legislative authority of said Chickasaw Nation; this appropriation to be immediately available and to become operative upon the execution by the duly appointed delegates of said respective nations specially authorized thereto by law of releases and conveyances to the United States of all the right, title, interest, and claim of said respective nations of Indians in and to said land (not including Grier County, which is now in dispute) in manner and form satisfactory to the President of the United States; and said releases and conveyances, when fully executed and delivered, shall operate to extinguish all claim of every kind and character of said Choctaw and Chickasaw Nations of Indians in and to the tract of country to which said releases and conveyances shall apply.

SEC. 16. That whenever any of the lands acquired by either of the three foregoing agreements respecting lands in the Indian or Oklahoma Territory shall by operation of law or proclamation of the President of the United States be open to settlement they shall be disposed of to actual settlers only, under the provisions of the homestead and town site laws (except section twenty-three hundred and one of the Revised Statutes of the United States which shall not apply): *Provided, however,* That each settler, on said lands shall before making a final proof and receiving a certificate of entry, pay to the United States for the land so taken by him, in addition to the fees provided by law, and within five years from the date of the first original entry, the sum of one dollar and fifty cents per acre, one-half of which shall be paid within two years; But the rights of honorably discharged Union soldiers and sailors as defined and described in Sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes of the United States shall not be abridged except as to the sum to be paid as aforesaid, and all the lands in Oklahoma are hereby declared to be agricultural lands, and proof of their nonmineral character shall not be required as a condition precedent to final entry.

SEC. 17. That before any lands in Oklahoma are open to settlement it shall be the duty of the Secretary of the Interior to divide the same into counties which shall contain as near as possible not less than nine hundred square miles in each county. In establishing said county line the Secretary is hereby authorized to extend the lines of the counties already located so as to make the area of said counties equal, as near as may be, to the area of the counties provided for in this act. At the first election for county officers the people of each county may vote for a name for each county, and the name which receives the greatest number of votes shall be the name of such county: *Provided, further,* That as soon as the county lines are designated by the Secretary, he shall reserve not to exceed one-half section of land in each county to be located near the center of said county, for county seat purposes to be entered under sections twenty-three hundred and eighty-seven and twenty-three hundred and eighty-eight of the Revised Statutes: *Provided,* That in addition to the jurisdiction granted to the probate courts and the judges thereof in Oklahoma Territory by Legislative enactments which enactments are hereby ratified, the Probate Judges of said Territory are hereby granted such jurisdiction in town site matters and under such regulations as are provided by the laws of the State of Kansas.

SEC. 18. That the school lands reserved in the Territory of Oklahoma by this and former acts of Congress may be leased for a period not exceeding three years for the benefit of the school fund of said Territory by the Governor thereof, under regulations to be prescribed by the Secretary of the Interior.

*       *       *       *       *       *

The statements which have been made that the Cheyenne and Arapahoe Tribes were paid 50 cents, 15 cents, or any other amount per acre, are incorrect assumptions.   Insofar as I have been able to ascertain, at no time, either during the negotiations or in the debates in Congress on the bill providing for the ratification of the agreement of 1891 with the Cheyenne and Arapahoe Tribes and for the payment of $2,991,450 to the Choctaws and Chickasaws for the same lands, was the agreements pertaining to settlement with the Cheyenne and Arapahoes ever based on the number of acres concerned, but the Choctaws and the Chickasaws were definitely paid $1.25 per acre, or $2,991,450.

The unjustified statements that have been made asserting that the lands of the Cheyennes and Arapahoes were sold for insignificant amounts per acre are intended to indicate that these Indians were dissatisfied with the agreement of November 13, 1890.   Such was not the case.   The Commission was composed of Hon. David H. Jerome, of Michigan, Judge Alfred M. Wilson, of Arkansas, and Hon. Warren G. Sayre, of Indiana.   Mr. Jerome was a former Governor of Michigan and the other two were highly respected citizens of their respective States.   The Commission states in its report to the President (S. Ex. Doc. No. 1, 51st Cong., 2d sess.) that "the dullest Indian was made to understand the terms of the contract and its effect." The qualified interpreters certified that all signers of the said agreement understood fully the terms of the contract.   The Cheyenne and Arapahoe Tribes were also represented by their attorneys, Messrs. Crawford, Reynolds & Miles.

The negotiations, discussions, and the signing of the agreement continued for several months until November 13, 1890, when these Indians, through their attorneys, accepted the proposal of the Commissioners.

To be sure, there were malcontent Indians among the Cheyennes and Arapahoes who did not want to make any agreement at all. They no doubt did everything they could to keep the other Indians from negotiating in regard to the cession of such rights as they might have had in the lands under consideration, but they constituted a very small minority group.

Our Government has dealt honestly, justly, and generously with the Cheyennes and Arapahoes according to its policy in dealing with Indians.   These Indians thought so in 1890, and I am certain that the rank and file of the membership of these tribes now feel that they have had just and fair treatment from their magnanimous Government.

The setting aside of the Fort Reno Military Reserve for the Cheyenne and Arapahoe Tribes would be a gratuity of little value to them and of great detriment to the State of Oklahoma which has suffered the loss of millions of dollars in taxes by reason of the vast amount of tribal and trust-held land within its borders.   Were the land returned to the Indians it would, in all probability, be operated as a tribal enterprise under a manager and the supervision of the Indian Bureau and free from State taxes.   The income, if any, divided among the people of the tribes, would be eaten up in the cost of distribution. But leaving the title of the land as it is at present in the United States Department of Agriculture and the Oklahoma Agricultural Experiment Station, for the operation of beef-production research for the

**16**  SETTING ASIDE CERTAIN LANDS IN OKLAHOMA FOR INDIANS

Southern Great Plains area, will be of great value, not only to Oklahoma, including the Cheyenne and Arapahoe Tribes, but to the whole United States. And as a further consideration, the United States would not lose the valuable mineral rights to land in this oil-rich territory.

It is claimed that the lands described in the bill have potential values for oil development, yet it does not provide for reserving the mineral rights to the United States.

THE CHEYENNE AND ARAPAHOE TRIBES HAVE SUBMITTED THEIR ALLEGED CLAIMS AGAINST THE UNITED STATES TO THE COURT OF CLAIMS FOR ADJUDICATION

By the act of June 3, 1920 (41 Stat. 738), as amended by the acts of June 4, 1926 (44 Stat. 769), and March 29, 1928 (45 Stat. 380), Congress authorized the Cheyenne and Arapahoe Tribes to bring suit against the United States for their alleged claims. They alleged in their petition that in some cases where compensation was paid, that the consideration received by them was wholly inadequate. They also asked that the United States be required to render a proper accounting of the transactions between the Government and these Indians concerning treaties, agreements, and acts of Congress.

Pursuant to the said jurisdictional act as amended, the record reveals that a suit (No. K. 103) was filed in the Court of Claims demanding judgment in favor of the Cheyenne and Arapahoe Tribes in the sum of $24,644,761.50 and interest thereon for the alleged violations of the treaty of 1867, the Executive order of 1869, and the agreement of November 13, 1890.

The provision under the act under which the Cheyenne and Arapahoe Tribes filed suit allowed credit to the United States for all sums heretofore paid to or expended for their benefit. This detailed accounting, prepared by the General Accounting Office showed that $12,234,535.50 had been paid to them under treaties, agreements, and acts of Congress, and that in addition, there had been expended for their benefit, between January 1, 1828, and June 30, 1930, an aggregate sum of $15,937,037.76.

The said suit was filed March 28, 1929, and was dismissed due to lack of prosecution on January 6, 1941 (92 Ct. of Cls. 607). It is assumed that the Cheyenne and Arapahoe Tribes were represented by able and competent attorneys and that if the suit had had merit it would have been prosecuted.

PRESENT USES OF LAND

This act, if enacted into law, would vest title to approximately 90 percent of the acreage of the Fort Reno Reservation in the United States in trust for the Cheyenne-Arapaho Tribes of Indians, and would transfer the remaining 10 percent immediately to control and jurisdiction of the Attorney General for use in connection with the Federal Reformatory at El Reno, Okla. Such action would disrupt and destroy a currently active program of research in livestock and pasture work of great and far-reaching importance to farmers and stockmen throughout the Great Plains States of America. The principal use proposed for the area to be held in trust for the Indians, according to

a report by Congressman Morris, author of the bill, would be the growing of cattle. The presently active research program makes full use of the land now for the same purpose, and in addition is developing new knowledge of untold value to farmers and stockmen as shown by testimony of experts in the United States Department of Agriculture and the Oklahoma Agricultural Experiment Station.

Fort Reno Reservation, located in Canadian County in the central prairies of Oklahoma long was maintained by the United States Army as a military reservation. The 1948 Congress directed that the reservation and its stock of remount horses be transferred to the United States Department of Agriculture, for continuation of the horse-breeding work. The 1949 Congress made no appropriation for further perpetuation of the Remount Service and the Department of Agriculture had to liquidate the stocks of breeding horses.

The Department of Agriculture, foreseeing discontinuation of the remount work, entered into written agreement in March 1949 with the Oklahoma Agricultural Experiment Station to conduct cooperative research in livestock breeding, feeding, and management at the Fort Reno Agriculture Remount Station. This cooperative research program was activated in the summer of 1949.

Representatives of the Department of Agriculture explained to the House Committee on Public Lands and to the Senate Committee on Interior and Insular Affairs that the Fort Reno Reservation, no longer required for the horse-breeding work, was put to use in the livestock research program in cooperation with the Oklahoma Agricultural Experiment Station. They pointed out that this type of research was a major function of the Department, authority of the Department in utilization of Fort Reno covered use for this purpose, and the opportunity was there to enlist the cooperation and large support of the Oklahoma Agricultural Experiment Station in this important research work.

Both the Department of Agriculture and the Oklahoma Agricultural Experiment Station, through their representatives who appeared before the committees and in written statements filed for the record, pointed out the excellent suitability of the Fort Reno land and facilities for beef cattle research. They called attention to the vast area known as the Southern Great Plains, extending from Nebraska and Wyoming on the north to the Rio Grande and Mexico on the south; from the rolling border of the Missouri-Mississippi Valley on the east to the Rocky Mountains on the west. This great region, comprising most of Kansas, Colorado, New Mexico, Texas and Oklahoma, they said, produces range beef cattle as its number one commodity of food and commerce. A large fraction of the land in all that area is suited only to grazing by cattle. The Fort Reno station lies central in this Southern Great Plains area and provides a location for research where the results secured will be directly applicable to the whole region.

It was further shown by representatives of the Department of Agriculture and the Oklahoma Agricultural Experiment Station that the Fort Reno Reservation alone provided the land in sufficient acreage, grass of adequate grazing quality and cattle-handling facilities of the right sort to carry on this livestock research program. Full control by the United States Army had prevented plowing up and destruction of the grass, leaving pastures large enough in total acreage

and sufficient in carrying capacity to support a program of the magnitude necessary to achieve desired results. Fences, corrals and handling facilities which were left upon closing of the horse-breeding work likewise were adaptable with little change to the cattle program. The cost of initiating this research program elsewhere, or of moving it to a new location now if a suitable one could be found, would be prohibitive, they said.

It was further brought out in hearings that the Federal reformatory at El Reno now has full use of the same 10 percent of the land of the Fort Reno Reservation, as the bill would transfer to the Attorney General, under a use permit executed with the Department of Agriculture. Also, it was indicated that such a permit could be continued indefinitely, or other arrangements could be made whereby the reformatory would be assured of permanent use of that land.

Communications from the Secretary of the Interior dated August 25, 1949; from the Secretary of Agriculture dated August 4, 1949; and from the Attorney General dated April 7, 1950; expressing their views in respect to this proposed legislation are hereto attached and made a part of this report, as follows:

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D. C., August 25, 1949.*

Hon. J. HARDIN PETERSON,
*Chairman, Committee on Public Lands,*
*House of Representatives.*

MY DEAR MR. PETERSON: Reference is made to your request for report on H. R. 4756, a bill to set aside certain lands in Oklahoma, a part of the Cheyenne-Arapaho Reservation and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Oklahoma.

For the reasons herein set forth, I recommend that this bill be enacted.

The lands embraced in the Fort Reno Military Reserve were formerly a part of the Cheyenne and Arapaho Indian Reservation. By section 2 of the agreement between the Cheyenne and Arapaho Indians and the United States, ratified by the act of March 3, 1891 (26 Stat. 989, 1022), the Indian title to these and other lands was extinguished. The Indians, however, have always been dissatisfied with the consideration of approximately 50 cents an acre paid to them by the Government. The Congress has recognized the merits of the position of the Indians by restoring to them certain lands which had been reserved but which were no longer needed for the purposes for which reserved, or by providing for the sale of the land with the provision that the proceeds of the sale be credited to the Indians. See the acts of June 29, 1942 (56 Stat. 21), April 13, 1938 (52 Stat. 213), June 17, 1910 (36 Stat. 533), and May 29, 1908 (35 Stat. 444, 447–448).

As early as 1934, when it appeared that the military reserve might be abandoned, the Cheyenne and Arapaho Indians requested that the lands embraced in the reserve be returned to tribal ownership. These Indians were allotted as early as 1891, and no allotments have been made to members born since that date. As a result, there is a generation or more of Indians now of middle age or older who have received no allotments. Among these are a number of veterans of World War II who do not own land and for whose use no tribal lands are available. The return of the military reserve lands to tribal ownership would permit the tribal business committee to allocate their use to landless members of the tribe, with special consideration to the veterans of World War II, and to lease to the city of El Reno the hospital facilities as outlined in section 2 of H. R. 4756.

In view of the foregoing, I recommend that the Congress restore the lands comprising the Fort Reno Military Reserve to the Cheyenne and Arapaho Tribes.

In view of your desire to have an immediate statement of the Department's views, I have not submitted this report to the Bureau of the Budget. I am unable, therefore, to inform you as to the relation of the proposed legislation to the program of the President.

Sincerely yours,

OSCAR L. CHAPMAN,
*Under Secretary of the Interior.*

DEPARTMENT OF AGRICULTURE,
*August 4, 1949.*

Hon. J. HARDIN PETERSON,
 *Chairman, Committee on Public Lands,*
  *House of Representatives.*

DEAR MR. PETERSON: This is in response to letter of July 25, 1949, from Mr. Preston Peden, counsel, Committee on Public Lands, requesting this Department's views on several proposed committee amendments to H. R. 4756, a bill to set aside certain lands in Oklahoma formerly a part of the Cheyenne-Arapaho Reservation and known as the Fort Reno Military Reservation for the Cheyenne-Arapaho Tribes of Indians of Oklahoma.

It seems entirely proper to strike out section 2 of the bill for the reason that during the time that the Fort Reno Reservation has been under the jurisdiction of the Department of Agriculture no representative of the city of El Reno, Okla., has expressed a desire to secure the use of the hospital facility for the city, although we had previously expressed to two proponents of the idea our willingness to permit the city to use the building as a hospital under mutually agreeable terms. At any rate, such transfer or use would be possible under the proposed section 3.

The proposed new section 2 of the bill would continue in effect any nonrevocable easement, license, permit, or commitment heretofore granted or made for a specific period of time and would authorize the Secretary of the Interior to renew any such agreement as he deems advisable. This section would also authorize the Secretary of the Interior to continue in effect, or to renew, any similar agreements which are revocable or of indefinite duration. We believe these provisions desirable in order that persons or organizations now using land or buildings within the reservation may receive adequate consideration in the future.

Proposed new sections 3 and 4 deal with future utilization and disposition of land and buildings after jurisdiction shall have been transferred from this Department with consequent cessation of our direct interest. It does not appear appropriate that we comment on these provisions.

In view of the time situation, we have not obtained advice from the Bureau of the Budget as to the relationship of this proposed legislation to the program of the President.

Sincerely,

CHARLES F. BRANNAN, *Secretary.*

———

*APRIL 7, 1950.*

Hon. JOSEPH C. O'MAHONEY,
 *Chairman, Committee on Interior and Insular Affairs,*
  *United States Senate, Washington, D. C.*

MY DEAR SENATOR: This is in response to the request of Mr. Grorud of the professional staff of your committee for the views of the Department of Justice on the bill (H. R. 6114) to set aside certain lands in Oklahoma, formerly a part of the Cheyenne-Arapaho Reservation, and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Indians of Oklahoma, and for other purposes.

The purpose of this measure is clearly indicated by its title, and its six sections are all designed to effectuate that purpose. The land affected by the bill is in part the same land covered by S. 2527, a bill to authorize and direct the Secretary of Agriculture to transfer to the control and jurisdiction of the Attorney General for the use of the Bureau of Prisons in connection with the operation of the El Reno Reformatory, approximately 3,968.5 acres in the Fort Reno Military Reservation.

On September 21, 1949, this Department reported to your committee on S. 1788, a predecessor bill to that under consideration. The need and the equities of the Bureau of Prisons were fully discussed in that report of which a copy is attached for your ready reference. The present bill, H. R. 6114, differs somewhat from S. 1788. It provides for the transfer to the Attorney General of approximately 1,568 acres of the land of the reservation. This provision, contained in section 2 of the measure, is, according to the report of the House Committee on Public Lands (H. Rept. 1323), intended as a "compromise between the Cheyenne-Arapaho Indians, who claim title to all of the Fort Reno Military Reservation, and the Bureau of Prisons, who originally made a request for approximately 3,500 acres of this land for use in connection with the Federal reformatory at El Reno, Okla."

Because the need is so great, the Department of Justice is impelled to advise your committee that the compromise which would be effected by H. R. 6114 is inadequate from its standpoint and considered inimicable to the best public interest.

Although the Department does not desire to enter into any controversy concerning the legal or equitable right of the Indians to the land considered essential for the operation of the El Reno Reformatory, it should be noted that by article II of the agreement of 1890, ratified by the act of March 3, 1891 (26 Stat. 1022), the Indians ceded to the United States upon the payment of a lump sum and the making of allotments in severalty all their unallotted lands. The description of the lands ceded includes the Fort Reno Military Reservation.

It is accordingly urged that the committee favorably report S. 2527 and recommend the amendment of H. R. 6114, so as to transfer only the remaining land in trust for the Indians.

However, if the committee finds the above suggestions impracticable, it is earnestly requested that it recommend the amendment of H. R. 6114 so as to provide at least that the reformatory obtain section 1, on which are located the prisoner of war camp, the sewage-disposal plant, and rights-of-way the Bureau has for water lines and roads to and from the sewage-disposal plant, and a half section of land (the south half of section 2) immediately across Highway 66 from the reformatory, to protect its future safe operation. Also, it is requested that the measure be amended so as to exclude from the land to be transferred in trust for the Indians, the area now occupied by sewage effluent lakes from the sewage-disposal plant which abuts the south portion of the southeast one-quarter of section 36.

To accomplish the above-mentioned amendments, it is suggested that the following changes be made:

1. Page 1, line 7: Delete "All of sections 1, 2," and insert "The north one-half of section 2 and all of sections".

2. Page 2, line 3: Delete "#36," and insert "all of section 36 except the southeast one-quarter,".

3. Page 2, line 5: Delete "Sec. 2. All of sections" and insert "Sec. 2. All of section 1, the south one-half of section 2 and all of sections".

4. Page 2, line 9: After the words "township 12 north," insert "and the southeast one-quarter of section 36, township 13 north."

It should be noted that amendments 3 and 4 obviate the need for section 3 of the bill.

For the convenience of the committee, there is attached a land map which clearly indicates (I) land now occupied by the Bureau of Prisons under permanent legislation, (II) land used by the Bureau of Prisons under S. 2527 and (IV) the effect of the amendments proposed. Also attached for the convenience of the committee are photostatic copies of the permits pursuant to which the Bureau of Prisons presently occupies the land in question.

Yours sincerely,

PEYTON FORD,
*The Assistant to the Attorney General.*

## SUMMARY

This bill should not be enacted for the following reasons:

1. The Cheyenne and Arapahoe Tribes have never owned the lands which it would transfer to them. Whatever claims they may have made to said lands were liquidated through the agreement of November 13, 1890, and ratified by the act of Congress of March 3, 1891.

2. This is clearly shown, not only by the settlement under the agreement of 1890 and the act of Congress of 1891, but also by the fact that the white settlers on the unallotted lands, after the allotment of the Cheyenne and Arapahoe Indians had been allotted, paid to the United States $1.50 per acre for the lands they occupied.

3. The Cheyennes and Arapahoes have had their day in the Court of Claims where, after their suit had been pending for 12 years, it was dismissed in 1941 for lack of prosecution, yet they still have recourse to the Indian Claims Commission if they feel that they have been defrauded in any manner relating to the lands in question.

4. In its answer to the suit in the Court of Claims, the United States clearly showed that it had paid to, or for the benefit of, the Cheyenne and Arapahoe Indians, over the years up to 1929, the aggregate amount of $28,171,573.15.

5. In all its dealings with the Cheyenne and Arapahoe Tribes, the United States has been fair, just, and patient, never trying to over-reach them, but often leaning to the side of liberty as it did in transferring the Colony School site and the old agency site to them though they had no claim thereto.

6. If the Fort Reno Military Reservation were transferred to them as a gratuity it would merely be added thereby to the great body of land held in trust for Indians—lands that constitute a Federal problem of great magnitude and difficulty of handling.

7. The land is now serving an excellent purpose in range livestock research, why disrupt that purpose and enterprise for one of questionable value.

8. In 1948 Congress transferred the Fort Reno Reservation to the United States Department of Agriculture which in March 1949, entered into a written agreement with the Oklahoma Agricultural Experiment Station to conduct cooperative research in livestock breeding, feeding, and management. This enterprise is now well under way, utilizing the land, buildings and equipment of the former remount station in the new enterprise. It is a properly authorized and going concern of recognized value which should not be terminated by act of Congress.

9. The bill does not provide for the retention of oil and other mineral rights in the lands proposed to be transferred; a possible loss of millions of dollars to the State of Oklahoma and the Federal Government.

10. If the Cheyenne and Arapahoe Indians feel that they have any just claims to added renumeration for these lands they have recourse to the Indian Claims Commission which is the proper place for the adjudication of them. The Indian Claims Commission has jurisdiction over all claims of every nature against the United States on behalf of any Indian tribe or band, including the following as quoted from the act establishing the Indian Claims Commission:

(1) Claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

HUGH BUTLER.

O

| 82d Congress | HOUSE OF REPRESENTATIVES | Report |
|---|---|---|
| *2d Session* | | No. 1935 |

## SETTING ASIDE CERTAIN LANDS IN OKLAHOMA, FORMERLY A PART OF THE CHEYENNE-ARAPAHO RESERVATION, AND KNOWN AS THE FORT RENO MILITARY RESERVATION, FOR THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA

MAY 16, 1952.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. MORRIS, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

[To accompany H. R. 1631]

The Committee on Interior and Insular Affairs, to whom was referred the bill (H. R. 1631) to set aside certain lands in Oklahoma, formerly a part of the Cheyenne-Arapaho Reservation, and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Indians of Oklahoma, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill do pass.

The amendments are as follows:

Page 2, line 12, after the word "Oklahoma", strike the colon and insert a "comma", and strike the remainder of the language in section 2 and insert in lieu thereof the following: "and all claims in regard thereto, by said Indian tribes, are hereby extinguished."

Page 3, after section 4, add the following subsections:

(c) The Secretary of the Interior is further authorized and hereby is directed to continue in effect, and to renew, so long as the same are used and useful to the Bureau of Prisons for purposes of maintaining sewage-disposal plant, water lines, roads to and from the sewage-disposal plant, and sewage-effluent lakes from the sewage-disposal plant, easements, rights-of-way, or permits to that part of section 1, township 12 north, range 8 west, and to that part of the southeast one-quarter of section 36, township 13 north, range 8 west which at present are used by the Bureau of Prisons for said purposes.

(d) The Secretary of Interior and the Secretary of Agriculture are hereby authorized to determine, upon such terms and conditions as they may agree to be in the public interest, the number of acres of land described in section 1 hereof, if any, needed and necessary for the conduct of the cooperative research program at present operated thereon by the Department of Agriculture, the Oklahoma Agricultural Experiment Station, and Oklahoma Agricultural and Mechanical

2    SETTING ASIDE LANDS FOR THE CHEYENNE-ARAPAHO TRIBES

College: *Provided, however,* That said lands shall not be reserved for said coopera-
tive research program for more than ten years after approval of this Act and
*Provided further,* That in the event the Secretary of Agriculture and the Secretary
of Interior are unable to agree as provided herein, they are hereby directed to
submit the matter to the President whose decision shall be final.

### EXPLANATION OF THE BILL

The bill provides for the disposition of some 8,493 acres of federally
owned land located in the State of Oklahoma formerly a part of the
Fort Reno Military Reservation and now used by the Department of
Agriculture in cooperation with the Oklahoma Agricultural and
Mechanical College for experimentation in livestock production.

H. R. 1631 would dispose of such lands by conveying approximately
6,925 acres to the United States in trust for the Cheyenne-Arapaho
Indians of the State of Oklahoma, subject to a 10-year period during
which time the Secretary of the Interior and the Secretary of Agricul-
ture would agree upon a land-use program for the use of all or part of
such land by the Department of Agriculture for the continuation of
the cooperative experimental program. In the event that such
Secretaries cannot agree on any land-use program, then such matter
shall be determined by the President of the United States. In addition,
the bill provides for the transfer of approximately 1,568 acres of such
land to the Attorney General of the United States for use in connection
with the Federal reformatory at El Reno, Okla. Further, it gives
authority to the Secretary of the Interior to grant certain rights-of-
way, easements, or permits to the Bureau of Prisons for water rights,
sewerage rights, and sewage-disposal plants and their related features.

### HISTORY

On July 17, 1883, President Arthur by Executive order set aside
9,493 acres of Cheyenne-Arapaho Indian Reservation land for purposes
of a military reservation which was to be known as Fort Reno. The
testimony is conflicting as to whether compensation was given the
Cheyenne-Arapaho Tribes for the taking of this land. In any event
the testimony shows that if consideration was given, that it was
inadequate.

The land was used continually by the United States Army as a
fort and military reservation from the date of the Executive order,
until some time after World War II when it was declared surplus to
the needs of the United States Army. In April of 1948 Congress
authorized the transfer of such land by the War Department to the
Secretary of Agriculture for use in light horse breeding. Later by
another act of Congress the Secretary of Agriculture was directed to
liquidate the Fort Reno Remount Service on or before December 1,
1949. Subsequent to such date the Department of Agriculture, in
cooperation with the Oklahoma Agricultural and Mechanical College,
have utilized the lands for a cooperative program in research and
experimentation in the breeding and raising of beef cattle and swine.
The original military reservation of 9,493 acres has been reduced to
approximately 8,493 acres since some 1,000 acres was given to the
Federal reformatory at El Reno, Okla. by act of Congress.

### ACTION IN THE EIGHTY-FIRST CONGRESS

H. R. 4756, Eighty-first Congress, was considered by the Public Lands Committee, which bill provided for the transfer of all of the lands of the Fort Reno Military Reservation to the United States in trust for the Cheyenne-Arapaho Tribes of Indians.  Extensive hearings were held in which the Bureau of Prisons, Department of the Interior, Department of Agriculture, and the Cheyenne-Arapaho Tribes of Indians with their attorney participated.  Such hearings on the bill brought out the need of the Federal reformatory at El Reno, Okla., for additional lands in order to provide adequate pasture for the reformatory cattle which are used to provide beef for the inmates at the reformatory.  As a result, the committee worked out substitute legislation which was introduced at a later date in the Eighty-first Congress as H. R. 6114.  This bill represented a compromise between the Cheyenne-Arapaho Tribes of Indians who claim title to all of the Fort Reno Military Reservation, and the Bureau of Prisons who originally made a request for approximately 3,500 acres of such land for use in connection with the Federal reformatory at El Reno.

The committee acted favorably on H. R. 6114 and reported the same to the House with the recommendation that the passage of such legislation would in the opinion of the committee be in the public interest as well as give the Indians land to which they had a moral and equitable right, if not a pure legal right.  The bill passed the House of Representatives and was considered by the Committee on Interior and Insular Affairs of the Senate.  The bill was favorably reported to the Senate but no final consideration was given the measure by the Senate.

### HEARINGS IN THE EIGHTY-SECOND CONGRESS

H. R. 1631 is identical to the bill H. R. 6114, Eighty-first Congress. Extensive hearings have been held on this measure.  The Indians with their attorney, the Department of the Interior, and the Department of Agriculture have all given extensive testimony on the measure. The testimony of the Indians shows that little, if any, compensation was ever given them for the lands taken by Executive order in 1883. The Indians contend that when the military reservation ceased by act of Congress that their right to such land became paramount and that they now have prior right and claim to such lands.  It is their contention and such is corroborated by other testimony that theirs is a moral and equitable right to the land even though technically they might not have an enforceable legal claim to the lands.  The Indians further testified in regard to a program for the use of such land should they be successful in obtaining a right to the land.  The Cheyenne-Arapaho Tribes plan to make use of the land by engaging in the cattle business for the benefit of the 3,000 Indians of such tribes. The program as outlined by such Indians evidences a well-planned utilization of this land and is endorsed by the Bureau of Indian Affairs.

The Department of the Interior testified at the hearing in support of this measure and contended with the Indians that such Indians have a prior right to these lands.

4    SETTING ASIDE LANDS FOR THE CHEYENNE-ARAPAHO TRIBES

Since, however, there was strong contention on the part of the Secretary of Agriculture for a continuation of the present experimental program the committee deemed it advisable to amend the bill so as to permit, for a 10-year period, the continuation of the experimental program now being carried on by the Department of Agriculture in cooperation with the Oklahoma Agricultural and Mechanical College. Therefore, the bill was amended by the committee so as to provide authorization to the Secretary of the Interior and the Secretary of Agriculture for their agreement on a land-use program for all or part of such lands for a period of 10 years.

### ANALYSIS OF THE BILL AS AMENDED

Section 1 of the bill provides for the conveyance of 6,925 acres of the Fort Reno Military Reservation to the United States in trust for the Cheyenne-Arapaho Tribes of Indians of Oklahoma.

Section 2 of the bill provides for the transfer of approximately 1,568 acres of the Fort Reno Military Reservation to the control and jurisdiction of the Attorney General of the United States for use in connection with the Federal reformatory at El Reno. Further, such section provides that any claim the Cheyenne-Arapaho Tribes of Indians may have with respect to such lands are extinguished.

Section 3 provides that the Secretary of the Interior, with the consent of the Cheyenne-Arapaho Tribes, may lease or sell 640 acres of described land covered in section 1 to the United States for use in connection with the Federal reformatory at El Reno, Okla. This section further provides that if no lease or sale is made to the United States, 40 acres of the land so described shall be restricted in use to that of the grazing livestock. This latter provision is for the protection of the Federal reformatory at El Reno, Okla.

Section 4 (a) and (b) provides for a continuation and renewal by the Secretary of the Interior of easements, licenses, permits, or commitments heretofore made with respect to land provided for in section 1.

Section 4 (c) is an amendment by the committee authorizing and directing the Secretary of the Interior to grant certain easements and rights-of-way in certain of the land in question for use by the Bureau of Prisons for purposes of maintaining the sewage-disposal plant, water lines, etc.

Section 4 (d) is an amendment by the committee authorizing the Secretary of the Interior and the Secretary of Agriculture to determine the number of acres of land described in section 1 that may be needed and necessary for the continuation for a period not to exceed 10 years of the cooperative research program now operated by the Department of Agriculture and the Oklahoma Agricultural and Mechanical College, and provides further that should such Secretaries be unable to agree upon a land-base operation that such matter shall be determined by the President of the United States.

Section 5 provides that the Secretary of the Interior may make disposition of buildings and improvements on the land described in section 1.

Section 6 provides for the issuances of patents in fee for homestead purposes to veterans of World Wars I and II in amounts not to exceed 2½ acres.    This section is based upon testimony before the committee to the effect that veterans of World Wars I and II were desirous of establishing homesteads on certain portions of the land described in section 1 near the city of El Reno.

## CONCLUSION

The committee has given detailed consideration to this matter both in the Eighty-first and Eighty-second Congresses.    It is the belief of the committee that the Indians have established a moral claim to the lands in question, and that since the same are now surplus to the military needs of the United States that justice will best be served by returning certain parts of such land to the Indians for use in a project which will materially benefit their general welfare.    It is the opinion of the committee that this bill represents an equitable solution to the interest of all parties concerned.    There is ample precedent for the return of this land to the Indians inasmuch as Congress has on previous occasions recognized the rights of the Cheyenne-Arapaho Indians to their former reservation lands of which the Fort Reno Military Reservation is a part.

The reports of the Department of the Interior and the Department of Agriculture, respectively, are as follows:

DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D. C., May 12, 1952.*

Hon. JOHN R. MURDOCK,
*Chairman, Committee on Interior and Insular Affairs,*
*House of Representatives, Washington, D. C.*

MY DEAR MR. MURDOCK: This responds to your letter, dated April 22, 1952, requesting a report on H. R. 1631, a bill to set aside certain lands in Oklahoma, formerly a part of the Cheyenne-Arapaho Reservation, and known as the Fort Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Indians of Oklahoma, and for other purposes, as amended by the Committee on Interior and Insular Affairs and ordered reported favorably to the House of Representatives.

I recommend that the bill, as amended by the committee, be enacted.

On August 25, 1949, I recommended the enactment of H. R. 4756, Eighty-first Congress, which would have vested in the United States in trust for the Cheyenne-Arapaho Tribes of Oklahoma, title to all of the Fort Reno Military Reserve, except approximately 1,090 acres that were transferred to the Attorney General as directed by the act of May 24, 1937 (50 Stat. 200).    H. R. 4756 provided that the Secretary of the Interior would make available by grant or long-term lease to the city of El Reno, Okla., the hospital facility located upon the reserve.

Extensive hearings were held on H. R. 4756, in which the Bureau of Prisons, the Department of Agriculture this Department, and the Cheyenne-Arapaho Indians, with their attorneys, participated.    The hearings brought out the need of the Federal reformatory at El Reno, Okla., for additional land in order to provide adequate pasture for the reformatory cattle used to provide beef for the inmates at the reformatory.    The Bureau of Prisons originally made a request for approximately 3,500 acres of this land for use in connection with the Federal reformatory at El Reno, Okla., and, by S. 2527 introduced September 1, 1949, the acreage desired by the Bureau of Prisons was raised to 3,908.5.    As a result of the hearings on H. R. 4756 a new bill, H. R. 6114, was drafted in an attempt to provide an equitable solution for the conflicting interests of the Cheyenne-Arapaho Indians, who claim title to all of the Fort Reno Military Reservation, and the Bureau of Prisons, which is desirous of acquiring more land for pasturage. See also Senate Report No. 2246, Eighty-first Congress, second session, dated August 4, 1950.

H. R. 1631, Eighty-second Congress, is identical with H. R. 6114, Eighty-first Congress.    The amendment on page 2 of the bill enclosed with your letter embodied

**6**   SETTING ASIDE LANDS FOR THE CHEYENNE-ARAPAHO TRIBES

the substance of the change in section 2 recommended in Senate Report No. 2246. This amendment was changed on April 25, 1952, by the committee to read as follows: "On page 2, lines 12 to 17, change the colon to a comma, delete the remainder of the sentence and insert in lieu thereof 'and all claims in regard thereto, by said Indian tribes, are hereby extinguished'." In this form the amendment embodies a part of the change in section 2 recommended in Senate Report No. 2246, but it does not purport to vest title in the United States as of the date of the act, as recommended by the Senate report. Title to the land is already vested in the United States and any further provision for that purpose might be construed as a present taking of the land rather than a taking as of the date the Fort Reno Military Reservation was established or the Indian title was extinguished. Insofar as the extinguishment of tribal claims to this part of the land is concerned, tribal representatives and their attorney were present at the hearing when the amendment was proposed and adopted and they offered no objection to it. This provision is regarded by the Indians as one of the compromises they are willing to make in order to obtain the legislation.

The lands embraced in the Fort Reno Military Reserve were formerly a part of the Cheyenne and Arapaho Indian Reservation. By section 2 of the agreement between the Cheyenne and Arapaho Indians and the United States, ratified by the act of March 3, 1891 (26 Stat. 989, 1022), the Indian title to these and other lands was extinguished. The Indians, however, have always been dissatisfied with the consideration of approximately 50 cents an acre paid them by the Government. The Congress has recognized the merits of the position of the Indians by restoring to them certain lands that had been reserved but that were no longer needed for the purposes for which reserved, or by providing for the sale of the land with the provision that the proceeds of the sale be credited to the Indians. See the acts of June 29, 1942 (56 Stat. 21), April 13, 1938 (52 Stat. 213), June 17, 1910 (36 Stat. 533), and May 29, 1908 (35 Stat. 444, 447–448).

As early as 1934, when it appeared that the military reserve might be abandoned, the Cheyenne and Arapaho Indians requested that the lands embraced in the reserve be returned to tribal ownership. These Indians were alloted as early as 1891, and no allotments have been made to members born since that date. As a result there is a generation or more of Indians now of middle age or older who have received no allotments. Among these are a number of veterans of World War II who do not own land and for whose use no tribal lands are available. The return of the military reserve lands to tribal ownership would permit the tribal business committee to allocate their use to landless members of the tribe, with special consideration to the veterans of World War II.

While this Department recommended the enactment of H. R. 4756, which would have vested title to the remainder of the Fort Reno Military Reservation in the United States in trust for the Cheyenne-Arapaho Indian Tribes, it is my opinion that H. R. 1631, as amended by the committee, provides for the more practical disposition of the land. The provisions for retention by the United States of title to a part of the land and the right to lease an additional part of the land for the purposes of the Federal reformatory at El Reno, Okla., and the provisions for the use of a part of the land for 10 years for the cooperative research program presently conducted thereon by the Department of Agriculture, the Oklahoma Agricultural Experiment Station, and the Oklahoma Agricultural and Mechanical College, seem to be an equitable arrangement in the light of conflicting interests involved. The uses reserved to the Government in the proposed subsections (c) and (d) of section 4, of course, are to continue without charge to the Government. The committee may wish to make this clear in its report.

In view of the imminent consideration of H. R. 1631 by your committee, there has not been sufficient time to secure the views of the Bureau of the Budget on this report. Therefore, I am unable to state the relationship of the views expressed herein to the program of the President.

Sincerely yours,

OSCAR L. CHAPMAN,
*Secretary of the Interior.*

DEPARTMENT OF AGRICULTURE,
*Washington 25, D. C., May 5, 1952.*

Hon. JOHN R. MURDOCK,
*Chairman on Interior and Insular Affairs, House of Representatives.*

DEAR MR. MURDOCK: This is in reply to your letters of April 22 and 25, 1952, requesting a report on H. R. 1631, a bill to set aside certain lands in Oklahoma, formerly a part of the Cheyenne-Arapaho Reservation, and known as the Fort

Reno Military Reservation, for the Cheyenne-Arapaho Tribes of Indians of Oklahoma, and for other purposes, and indicating the amendments to the bill which are being recommended by your committee.

The Department, in cooperation with the Oklahoma Agricultural Experiment Station, is now fully utilizing for research, chiefly research on the more efficient production of beef cattle and swine, all of the land available to it on the area formerly known as the Fort Reno Military Reservation, except about 600 acres required for an indefinite period as an assembly area for horses and mules acquired by the Department of Defense for use in the foreign aid program and except that land covered by section 2 of the bill which is presently being used by the Federal reformatory. The land was transferred to the Department of Agriculture under the act of April 21, 1948 (7 U. S. C., Supp. IV, 435–438), at the time the Army Remount Service was transferred to this Department. This law directed the Secretary of Agriculture to administer the property in such manner as he deemed best to advance the livestock and agricultural interests of the United States.

As amended, H. R. 1631 would authorize the transfer to the Attorney General of a certain portion of lands presently used in connection with the Federal reformatory at El Reno under use permit. Title to the remainder of the land covered by the bill which is now being used for research, would be vested in the United States in trust for the Cheyenne-Arapaho Tribes. It would authorize and direct the Secretary of the Interior to sell, assign, lease, or manage the land under certain conditions. Under section 4 (d) of the bill the Secretary of the Interior and the Secretary of this Department would be required to determine what land now used for cooperative research would continue to be used for that purpose and to limit its use to a period not to exceed 10 years from the date of approval of the bill.

The research program at Fort Reno serves the public interest of the locality, the State of Oklahoma, the Plains region, indeed of the whole United States in high degree. Our present annual population increase of 2,500,000 persons necessitates the production of about 300,000 additional slaughter cattle and 1,000,000 hogs each year. These must be produced with very little increase in cropland through more efficient production and utilization of feed. A most important portion of this increase, which is absolutely necessary to maintain—not to increase—our present nutritional standard, can be accomplished only through a selective breeding improvement of beef cattle for higher percentage calf crop and increased rate of gain which will bring about a large annual supply of slaughter cattle with minimum increase in breeding herds.

Selective breeding improvement of pigs for fecundity, rapid growth, viability, high feed efficiency and especially for high production of pork without excess lard production is the principal means of maintaining pork supplies proportionate to population increase. The urgency of this program and the urgency of the research needed to combat it is even greater than is at once apparent from recent meat supplies when we consider that the Great Plains have had better than average weather during the past 10 years, a major factor in food production during that period.

The Fort Reno area is unique in having a combination of virgin tall grass and short grass areas on soil of adequate basic fertility. This is the only station available to our livestock reasearch where this is the case, which makes this station highly essential to both State and Federal livestock research areas. It is also unique in that it provides the only acreage of virgin grass available to the research program of sufficient area to provide pasture without experimental variables, such as differences in pasture treatment or abuse of land. Class I cropland on this station is sufficient for the production of forage and grain for the livestock used in the research program. The livestock and crops used in the program are produced by and are the property of the Oklahoma Agricultural Experiment Station. Gross returns for livestock and crop production in 1951 amounted to about $100,000, net about $40,000, the residue from the broad and effective research program on the station. The $40,000 net was expended by the Oklahoma Agricultural Experiment Station in strengthening the research program.

The research programs with cattle and swine are part of coordinated regional programs participated in by all stations in the area, the program of each supplementing that of the others. The application of the results of the research program will increase annual farm income not only in Oklahoma but the whole southern Great Plains area by many millions of dollars Value to Corn-Belt farmers through the improvement of feedlot gains of feeder cattle and in the identification of swine families of outstanding production and carcass quality will be fully as great.

8    SETTING ASIDE LANDS FOR THE CHEYENNE-ARAPAHO TRIBES

Only through research to effect more efficient livestock production, of which the program at Fort Reno is an essential part, can consumers be assured an adequate meat supply.   There is no other available area which can be substituted for Fort Reno.   No curtailment of the land now available to the Department at Fort Reno can be accomplished without serious or critical impairment of the research program.

Since our population is expanding and our acreage is not, there is no foreseeable termination point when additional research to continually improve meat production effectively can be curtailed or stopped without jeopardizing the public welfare. Certainly 10 years, as provided in section 4 (d) of H. R. 1631, as amended, is entirely inadequate to bring the research program now under way to completion, though substantial, important results are being obtained and put to use each year.

H. R. 1631 is identical with H. R. 6114, Eighty-first Congress.   In this connection we should like to call your attention to the enclosed Senate Report 2246, parts 1 and 2, Eighty-first Congress, second session, the majority and minoirty reports on that bill.

Passage of the bill is not recommended, although the Department would interpose no objection to the transfer of land covered by section 2, which land is now used for Federal reformatory purposes.

In view of the time limitation we have not obtained advice from the Bureau of the Budget as to the relationship of this proposed legislation to the program of the President.

Sincerely yours,

C. J. McCORMICK, *Under Secretary.*