**ATTACHMENT C**

OCT 28 1961

BEFORE THE

INDIAN CLAIMS COMMISSION

CHEYENNE-ARAPAHO TRIBES OF INDIANS )
OF OKLAHOMA, suing on its own behalf )
and as representative of the )
CONFEDERATED TRIBES OF CHEYENNE AND )
ARAPAHO INDIANS OF THE UPPER )
ARKANSAS, also known as the SOUTHERN )
CHEYENNE AND ARAPAHO TRIBES OF INDIANS, )
and on behalf of the CHEYENNE AND )
ARAPAHO TRIBES OF INDIANS, )
                        Petitioner, )   DOCKET NOS.
        v. )
                                )   329 - 329-A
THE UNITED STATES OF AMERICA, )
                      Defendant. )

## SEVERED PETITION

Claims under The Treaty of Medicine Lodge Creek, October 28, 1867 (15 Stat. 593), The Executive Order of August 10, 1869 (1 Kapp. 840-1) and the Act of March 3, 1891, 26 Stat. 989) - See Appendix D, F, H, J, $J^1$ AND $J^2$, Docket 329.

WILLIAM HOWARD PAYNE
Attorney of Record for Petitioner
1086 National Press Building
Washington 4, D. C.
Telephone: EXecutive 3-8268

Filed: June 23, 1961

BEFORE THE

INDIAN CLAIMS COMMISSION

| | |
|---|---|
| CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA, suing on its own behalf and as representative of the CONFEDERATED TRIBES OF CHEYENNE AND ARAPAHO INDIANS OF THE UPPER ARKANSAS, also known as the SOUTHERN CHEYENNE AND ARAPAHO TRIBES OF INDIANS, and on behalf of the CHEYENNE AND ARAPAHO TRIBES OF INDIANS, <br><br> Petitioner, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant, | DOCKET NOS. <br><br> 329 - 329-A |

SEVERED PETITION

    Claims under The Treaty of Medicine Lodge Creek, October 28, 1867 (15 Stat. 593), The Executive Order of August 10, 1869 (1 Kapp. 840-1) and the Act of March 3, 1891, 26 Stat. 989) - See Appendix D, F, H, J, $J^1$ AND $J^2$, Docket 329.

    COMES NOW Petitioner the CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA, by their attorney of record, WILLIAM HOWARD PAYNE and for their Petition respectfully show the following:

    1. Petitioner is an identifiable tribe, band, or group of American Indians known and recognized as hereinafter set forth.

    Petitioner, THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA, is an organized tribe of Indians recognized by the Secretary of the Interior. It is here suing on its own behalf, and on behalf of the CONFEDERATED TRIBES OF CHEYENNE AND ARAPAHO INDIANS OF THE UPPER ARKANSAS RIVER, also known as the SOUTHERN CHEYENNE AND ARAPAHO TRIBES OF INDIANS, of whom petitioner is the factual and legal successor, and, as set out in Count I, (See Petition Docket

- 2 -

329) on the relation of the CHEYENNE AND ARAPAHO TRIBES OF INDIANS, of which petitioner is a member tribe.

2. Petitioner files this petition under and pursuant to the Act of August 13, 1946 (60 Stat. 1049) and asserts the claims herein under Section 2 of that Act.

3. There is no suit now pending in the Court of Claims or in the Supreme Court of the United States upon or involving the claims herein presented or any part thereof.

4. Petitioner is and always has been the absolute owner of the claims alleged herein, either jointly or severally, and no person other than petitioner has ever had any interest therein. No assignment or transfer of the claims alleged in this petition, nor of any part or interest therein, has been made. Petitioner has not been paid for the claims herein made, nor for any part thereof, and is justly entitled to recover upon the claims made herein from the United States after the allowance of all proper credits and set-offs.

5. No action in relation to the claims herein asserted has been taken by Congress or by any department of the Government or in any judicial proceeding, except as follows:

(a) Defendant has entered into certain treaties and agreements, and issued certain orders, and passed certain laws, as follows:

> Treaty of September 17, 1851, commonly known as the Fort Laramie Treaty (2 Kapp. 594); Treaty of February 18, 1861 (12 Stat. 1163); Treaty of October 14, 1865 (14 Stat. 703); Treaty of October 28, 1867 (15 Stat. 593); Executive Order of August 10, 1869 (1 Kapp. 840-1); Executive Order of April 18, 1882 (1 Kapp. 1047), amended by Executive Order of January 17, 1883 (1 Kapp. 843); Agreement of October 19, 1872, confirmed by Agreement of June 4, 1891, ratified by Act of March 2, 1895 (28 Stat. 876); Executive Order of July 17, 1883 (1 Kapp. 842); Act of March 3, 1891, ratifying an Agreement of October 1890 (26 Stat. 989, 1022); all of which are set out with particularity in the various counts of petition Docket No. 329.

- 3 -

(NOTE:  Text of the above citations is fully set forth in the Appendix of Petition in Docket 329 as Appendix A, through J, $J_1$ and $J_2$, Respectively)

(b)  Under acts of June 24, 1926 (44 Stat. 764) and March 29, 1928 (45 Stat. 380) amending a Sioux jurisdictional Act of June 3, 1920 (41 Stat. 738), to permit the Arapaho and Cheyenne Tribes of Indians, residing in the State of Wyoming, Montana, and Oklahoma to intervene in the Sioux suit, the said Indians filed two petitions in the Court of Claims:  (1) No. C-531, filed April 19, 1928, and (2) No. K-103, filed March 28, 1929.  Subsequently the attorney for the said petitioners died and the actions were never prosecuted to judgment; on May 3, 1937 and January 6, 1941, respectively, the two petitions were dismissed without adjudication.

6.  At all times mentioned in this petition, defendant was the guardian and trustee of the property and affairs of the petitioners, subject to a high degree of fiduciary obligation and required to deal fairly and honorably with them as to their property and property rights.

7.  At the time of the transactions with defendant set forth herein, the chiefs, headmen and members of petitioner's tribes were uneducated and ignorant in the ways of the white man, his treaties and land values, and were induced by mistake, or duress or unfair dealings, to enter into such transactions as they did and cede their lands as they did.

8.  Prior to September 17, 1851, and until shortly thereafter, as hereinafter set forth, petitioner, or its member tribes, was affiliated in a confederacy composed of what is now identified as the Northern Cheyenne, Northern Arapaho, Southern Cheyenne, and Southern Arapaho Tribes of Indians, who jointly owned or occupied lands in the accustomed Indian manner.  Such association was recognized by defendant in the Treaty of September 17, 1851, commonly known as

- 4 -

the Treaty of Fort Laramie, supra. Beginning about 1861, petitioner emerged as a separate confederation comprised of the said Southern Cheyenne and Southern Arapaho Tribes of Indians. This confederation was recognized by defendant by treaties of February 18, 1861, supra, October 14, 1865, supra, and October 28, 1867, supra, and upon many occasions thereafter.

9. Lands Owned or Occupied. Prior to and on September 17, 1851, petitioner owned or occupied in the customary Indian manner lands within the limits of the present states of Montana, Wyoming, Colorado, South Dakota, Nebraska and Kansas, both in its own right and for the use and enjoyment of its members and member tribes. Or, in the alternative, prior to, and on September 17, 1851, the Northern Arapaho, Northern Cheyenne, Southern Arapaho, and Southern Cheyenne Tribes, or all the Cheyenne and Arapaho Indians, however grouped and affiliated, owned or occupied, in the customary Indian manner, as a confederation of Cheyenne and Arapaho Tribes of Indians, lands as described above for the common or joint use and enjoyment of all the member groups thereof.

10. Lands Owned or Occupied. Petitioner further alleges that as a constituent member of said Cheyenne and Arapaho Tribes of Indians it was the owner of a proportionate undivided interest in all the lands owned or occupied, jointly or in common, by said tribes.

11. White Encroachments. (a) Beginning before 1851, and continuously and increasingly thereafter, great numbers of citizens and subjects of defendant encroached upon petitioner's land, so that petitioner was deprived of use and enjoyment of much of its lands and driven more and more to the extremes along the Arkansas and Platte Rivers. The presents received at the time of negotiations at Fort Laramie, 1851, are an unconscionable consideration to petitioners for the so-called settling-up of their complaints for resulting destruction of

- 5 -

their buffalo, game, timber and grass by citizens of defendant prior to September 1, 1851. Defendant aided and abetted in these encroachments, notwithstanding it had agreed by Article 3 of the Fort Laramie Treaty to protect petitioner against the same. Furthermore, in or about 1855, defendant divided the Upper Platte and Arkansas Indian Agency, which had theretofore served all of petitioner's members, into two agencies, namely, the Upper Arkansas Agency at Fort Bent and the Upper Platte Agency at Fort Laramie. This administrative division further compressed petitioner's members into two groups at the northern and southern extremes of its territory.

(b) Or, in or about 1855, petitioner's member tribes, for reasons of their own, as well as for the reasons above set out, had come through custom or agreement or preference to use their lands in such a way that the Northern Cheyenne and Arapaho Tribes were generally using the northern portions and the Southern Cheyenne and Arapahoes were generally using the southern portions, but they continued in their confederated capacity to hold their whole title and interest in all of the lands described and recognized as belonging exclusively to petitioner under the Treaty of Fort Laramie, 1851, supra.

12. Treaty of Fort Wise. By virtue of the acts of defendant set out in paragraph 11 (a), after 1855 defendant no longer dealt with the four tribe entity described in paragraph 8 and on February 18, 1861 entered into a treaty with "the confederated tribes of Arapahoe and Cheyenne Indians of the Upper Arkansas River."

13. Treaty of Little Arkansas. On October 14, 1865 defendant entered into a treaty with petitioner. (By this Treaty Petitioner ceded and relinquished all its rights, title and claims under the Treaty of Fort Laramie, supra, for which Petitioner received no land and no enforceable rights therein or otherwise.)

- 6 -

14. Treaty of Medicine Lodge Creek. On October 28, 1867, supra, defendant executed a treaty with the same Indian parties who had entered into the treaties of 1861 and 1865. By the said treaty the Indians relinquished all claim to all territory outside a reservation of approximately 5,000,000 acres which was to be located as follows:

> "commencing at the point where the Arkansas River crosses the 37th parallel * * * thence west (along the southern boundary of Kansas) to the Cimarone River * * * thence down said Cimarone River * * * to the Arkansas River, thence up the Arkansas River * * * to the place of beginning."

In consideration, defendant undertook to supply certain services and annuities of an indeterminate amount, having a value of less than $1,300,000. All prior treaties and treaty rights were revoked.

15. Treaty of Medicine Lodge Creek. On October 28, 1867 petitioner entered into a treaty with defendant by the terms of which petitioner was to cede lands and receive consideration as alleged in paragraph 14. Petitioner further alleges that if it should be found that neither of the treaties of 1861 and 1865 was a valid cession of petitioner's interest in the lands of the Cheyenne and Arapaho Tribes of Indians, then the said Treaty of 1867 was the first cession of petitioner's title therein. If by the said Treaty of 1867 the defendant did acquire a cession of petitioner's title in the said lands, then it was for unconscionable consideration. Or, in the alternative, said consideration was induced by a mistake by either or both parties as to the value of said lands. Wherefore, petitioner was deprived of just compensation for, or the fair and reasonable value of, the lands thus taken.

(a) In the alternative, the petitioner's reservation created by the Treaty of October 28, 1867, supra, was secured to its member tribes by solemn stipulation, and by virtue of the provisions of Article 11 thereof petitioner

alleges it relinquished all right to occupy permanently the reservation of 7,655,680 acres defined by the Treaty of October 14, 1865, supra, not situated in what is now Oklahoma, except that petitioner had a right to hunt on any lands "south of the Arkansas so long as the buffalo may range thereon in such numbers as to justify the chase; and no white settlements shall be permitted on any part of the lands contained in the old reservation * * * within three years." Continuously and increasingly thereafter great numbers of citizens of defendant came upon and through petitioner's lands to hunt, settle, reside upon and pass through, destroying petitioner's game, grass and timber in large and valuable quantities, and such conduct and encroachments of its citizens were negligently condoned and permitted, if not aided and abetted by defendant, to the grievous deprivation of necessities common to petitioner's way of life and further deprived petitioner of the use and enjoyment of said lands. Petitioner further alleges that Congress in 1872 recognized title of petitioner in said lands by the Act of May 29th (17 Stat. 190) which authorized negotiations "with the Southern Cheyenne and Arapahoes for the relinquishment of their claim to the land ceded to them by the second Article of the Treaty of October twenty-eighth, eighteen hundred and sixty-seven." Wherefore, petitioner asserts a right to recover for deprivation of fair and reasonable value of lands taken by defendant, and for the unconscionable consideration if any thereof and for dealings not fair and not honorable.

16. Expulsion of Petitioner from its Lands. (a) In violation of its obligation under Article 3 of the Treaty of 1861, defendant failed to protect petitioner in the use and enjoyment of the reservation set aside by said treaty, and on November 29, 1864 defendant by its Army, without provocation, while the Indians were at peace and under the pledge of protection, attacked a village of

Case 1:06-cv-00519-PLF    Document 6-3    Filed 10/16/2006    Page 10 of 17

- 8 -

Southern Arapahoes and Cheyennes at Sand Creek and indiscriminately slaughtered defenseless men, women and children, and destroyed their property. The said Southern Arapahoes and Cheyennes were generally forced to flee to the south beyond petitioner's territory, for safety.

(b) In and about the same time, or thereafter and before 1868, by the continuance of the acts alleged in paragraph 11, and by the fear excited by the said Sand Creek massacre, many of petitioner's people, including a portion of the Northern Cheyennes and Arapahoes, were driven from petitioner's land by defendant.

17. Executive Order of August 10, 1869 (see Appendix F.) Pursuant to Article 2 of the Treaty of October 14, 1865 (14 Stat. 703), and on August 10, 1869, the President designated a reservation for petitioner located in what is now known as the State of Oklahoma and South of the Reservation described in the Treaty of October 28, 1867, SUPRA, said reservation, according to reports of the General Land Office, comprising 5,138,560 acres. Petitioner thereafter took occupancy and possession of said reservation and is now in individual and tribal occupancy and possession of a portion of same.

(a) Notwithstanding the said Executive Order of 1869, on or about October 19, 1872, by agreement, confirmed by agreement by and between defendant and the Wichita and affiliated bands of Indians in Oklahoma Territory dated the fourth day of June 1891, and ratified by the Act of Congress of March 2, 1895 (28 Stat. 876; See Appendix G Docket 329), defendant set apart a reservation for the Wichita and affiliated bands of Indians, wholly within petitioners' reservation confirmed by aforesaid Executive Order, comprising 732,800 acres, and described as follows:

> "Commencing at a point in the middle of the main channel of the Washita River, where the ninety-eighth meridian of west longitude

    crosses the same, thence up the middle of the main channel of said river to the line of 98° 40' west longitude, thence on said line of 98° 40', due north to the middle of the channel of the main Canadian River, thence down the middle of said main Canadian River to where it crosses the ninety-eighth meridian, thence due south to the place of beginning."

  Wherefore, petitioner has a right to recover for deprivation of just compensation, or the fair and reasonable value of the lands thus taken in excess of $1.50 per acre and a further right to recover for the fair and reasonable rental value from October 19, 1872.

  (b) Notwithstanding the said Executive Order of August 10, 1869, and on or about July 17, 1883, the President ordered the withdrawal of an area of 9,493 acres from said reservation for the establishment of the Fort Reno Military Reserve (see Executive Order of July 17, 1883 (I. Kapp., 842-43) Appendix H). No compensation was stipulated nor paid to petitioner. Petitioner understood that the lands of the Fort Reno Military Reserve would be returned to its use and benefit when no longer used for military purposes or that same were to be relinquished by the military when required by the Secretary of the Interior for petitioner's purposes. Wherefore, petitioner asserts claim for the reasonable value of the use of said lands by the defendant from the date July 17, 1883, reasonable and fair damages for the failure of the Secretary of the Interior to require the return of said lands to the use and benefit of petitioners; and pray for the exercise of its powers in equity by the Indian Claims Commission to set aside, or recommend the setting aside the jurisdiction of the Department of Agriculture conferred by the Act of April 21, 1948 (Public Law 494, 80th Congress; see Appendix I), in said lands, and for such other and further relief as may be deemed meet and proper.

  18. The Agreement of October 1890, by and between Defendant and the Cheyenne and Arapaho Tribes of Indians, in the Indian Territory (I Kapp. 415;

- 10 -

Ratified Act of March 3, 1891; 26 Stat. 989; see Appendix J). Said Agreement in Articles I and II thereof purported to relinquish petitioner's claims, right and title to 5,184,640 acres of land defined in the Treaty of October 28, 1867, Supra, and to 5,138,560 acres of land defined in the Executive Order of August 10, 1869, Supra, and to approximately 2,300,000 (total 12,623,200) acres of land described and located as follows:

> Beginning at a point where the 100° of west longitude crosses the 37th parallel; thence east on said 37th parallel to the Cimarron River; thence down the middle of the said Cimarron River to the north boundary of the country ceded to the United States by the treaty of June 14, 1866, with the Creek Nation of Indians; thence west directly to the 100° of west longitude; thence north on said 100° of west longitude to the place of beginning.

as well as claims to other lands therein defined. Said Agreement further provided for individual allotment of 160 acres of land, subject to certain restrictions contained in Articles III, IV, V, VI, and VIII thereof, to each of petitioner's members, and further provided in Article VII thereof for payment to petitioner the amount of $1,500,000. Subsequent to the Act of March 3, 1891, Supra, petitioner's Executive Order Reservation lands (EO August 10, 1869, Supra) were disposed of (I Kapp., 1030) as follows:

| Disposition | No. Acres |
|---|---|
| (a) Open to public settlement.................. | 3,500,562 |
| (b) Allotted in severalty to C & A's............ | 529,682 |
| (c) Reserved to Wichita Tribe................... | 732,800 |
| (d) Reserved for public schools................. | 231,829 |
| (e) Reserved for military purposes.............. | 32,344 |
| (f) Reserved for highways, roads, etc........... | 111,343 |

(Item (f) in above tabulation derived by subtracting sum of other items from total acreage.)

(a) Wholly within and upon the lands purportedly ceded by petitioner by the Agreement of 1890 (Supra) the President by EXECUTIVE ORDER OF APRIL 18, 1882 (I Kapp. 1047), and JANUARY 17, 1883 (I Kapp. 843; SEE APPENDIX - J1

- 11 -

and Appendix - J2, respectively), withdrew 40,320 acres thereof for the establishment of the Fort Supply Military Reserve. The said Executive Orders, inter alia, provided

> "* * * That whenever any portion of the lands set apart for this post may be required by the Secretary of the Interior for Indian purposes the same shall be relinquished by the military, upon notice to that effect to the Secretary of War * * *."

Wherefore, petitioners assert claim for just compensation for or the reasonable value of the use of said lands by the defendant from the date of taking and reasonable and fair damages for the failure of the Secretary of the Interior to require relinquishment by the military for the use and benefit of petitioners.

(b) Petitioner claims that compensation for such lands purportedly ceded by the agreement of 1890, supra, was not in excess of one or two cents per acre and that any such compensation as may have been paid by defendant was not just, fair nor reasonable but was, in fact unconscionable and further that it was the duty of defendant's representatives in negotiations of the said Agreement of 1890 to free themselves of an intent to drive a bargain and consummate only a just and fair settlement with the distressingly poor, hungry, uneducated and dependent petitioners.

(c) Petitioner claims damages for the failure of the defendant to retain the sum of one million dollars ($1,000,000) in the Treasury of the United States in trust at interest of five per centum (5%) per annum as provided in Article VIII of the Agreement of 1890 (supra) thereby depriving petitioners of subsequent per capita payments of fifty-thousand dollars ($50,000) annually and for depletion and dissipation of said trust fund in an amount as will be shown by the evidence.

- 12 -

(d) Petitioner claims damages for dealings not fair and honorable in that defendant failed to exempt the appropriation of funds provided in Sec. 15 of the Act of March 3, 1891, supra, from the payment of depredation claims thus, without cause, treating petitioner differently in this respect from that accorded to other Indian tribes. Wherefore, petitioner asserts claims for money paid out of aforesaid appropriation for settlement of depredation claims in an amount to be shown by the evidence.

(e) In the alternative, petitioner claims that the reservation lands defined in Article 2 of the Treaty of October 28, 1867, supra, were not relinquished by the Agreement of October 1890, supra, for the reason that Article 12 of said treaty required the signatures of at least three-fourths of all the adult male Indians occupying or interested in the same before a future cession could be valid. The Agreement of 1890, supra, was negotiated with petitioner alone and the Northern Cheyenne and the Northern Arapaho Indians were not a party to it. Petitioner alleges that the required number of signatures of male members of its own tribes were not secured to the Agreement of 1890, and that no signatures, nor three-fourths thereof, of the aforesaid northern tribes were affixed thereto and therefore said Agreement of 1890 is invalid to cede said lands and of no binding effect and that if the Agreement of 1890 were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, petitioner is entitled to fair and reasonable value of said lands in excess of $1.50 per acre on the basis of fair and honorable dealings.

NOTE: (Appendix references in this paragraph refer to those contained in Docket No. 329).

19. Failure to account. At all times mentioned herein, the books of account and all other records pertaining to all money and financial transactions of, for, and with petitioner, and property and transactions therein other than moneys have been in the exclusive possession and control of defendant.

- 13 -

(a) Moneys and goods have been due petitioner under the treaties and agreements recited herein, and under all appropriation Acts pursuant thereto.

(b) Proceeds of property of petitioner or of rents or other income therefrom have been payable to or collected by defendant, or by it dealt with and disposed of.

(c) At all times referred to herein, defendant has been under a duty to pay interest on funds of petitioner in accordance with the provisions of law. Alternatively, defendant has at all times been under a duty to pay to or for the account and behalf of petitioner, interest on any and all sums of money in the hands of defendant which it retained for its own uses and pruposes, whether by way of interest or principal. Alternatively, defendant at all times has been under a duty, in paying out moneys of petitioner held by it, to pay any sum or sums from the least productive funds or property of petitioner before proceeding to pay money from funds or property of greater productivity.

(d) At all times referred to herein, defendant has been under a duty as guardian and trustee of petitioner and the property of petitioner promptly and providently to invest funds of petitioner coming into the hands of defendant and to reinvest the same, and any rents, issues or profits thereof.

(e) Upon information and belief, petitioner alleges that defendant from time to time has collected or received, or in the exercise of its fiduciary duties ought to have collected or received, various property, including money, for or on behalf of petitioner, or defendant itself has become liable to pay moneys to or for or on behalf of petitioner. Defendant has failed to account for its management, handling and disposition of the said moneys and properties. As a result, petitioner has been damaged by having been deprived of the amount of money or value of other property, together with interest thereon, which may be shown to be owing to petitioner upon a proper accounting in accordance with the fiduciary duties and the liabilities herein set forth.

- 14 -

20. Prayer for Relief. Wherefore, petitioner prays that defendant make a full and complete accounting and that petitioner be awarded judgment in the amount shown to be due under such an accounting; that petitioner be awarded judgment (with alternatives as set forth) for just compensation for, or the fair and reasonable value of, lands, or interests therein, or of the use and occupancy thereof, taken or otherwise acquired by defendant, and for losses and damages suffered by virtue of defendant's violations of treaties and agreements and principles of fair honorable dealings, less the allowance of proper set-offs; and that petitioner be awarded such other relief as to the Commission may seem proper.

/s/ William Howard Payne
WILLIAM HOWARD PAYNE
Attorney of Record for
Petitioner Cheyenne-Arapaho Tribes
  of Indians of Oklahoma,
1086 National Press Building,
Washington 4, D. C.
Telephone: EXecutive 3-8268

- 15 -

CERTIFICATE OF SERVICE

I hereby certify that 15 copies of the within and foregoing Severed Petition were served on Defendant by delivering same to John L. Sullivan, Esquire, and Clifford R. Stearns, Esquire, Indian Claims Section, Lands Division, U. S. Department of Justice, Washington 25, D. C., this 23rd day of June, A.D., 1961, and service was had by U. S. mail upon attorneys of record for petitioners as follows:

| | |
|---|---|
| Docket No. 173 | Paul M. Niebell, Esquire<br>1201 - 19th Street, N. W.<br>Washington 6, D. C. |
| Docket No. 329 | John W. Cragun, Esquire<br>1616 H Street, N. W.<br>Washington 6, D. C. |
| Docket No. 329 | John M. Schiltz, Esquire<br>508 Electric Building<br>Billings, Montana |

/s/ William Howard Payne
    WILLIAM HOWARD PAYNE