**ATTACHMENT   J**

Docket 329 - A

Comm'r Watkins

Petitioners Exh. No. **27**

# A P P R A I S A L

Of

Certain Lands Of

The Cheyenne And Arapaho Tribes

Located In Northern And Western Oklahoma

**EFFECTIVE DATE OF THE APPRAISAL**

**3 MARCH 1891**

## EDWARD A. RAMBO
### M.A.I. & S.R.A.

**OKLAHOMA CITY, OKLAHOMA**

**3 NOVEMBER 1962**

## AFFIDAVIT OF THE APPRAISER

State of Oklahoma    )
                     ) SS.
County of Oklahoma   )

EDWARD A. RAMBO, being first duly sworn, deposes and says:

That he was employed to make an appraisal and report the Market value of certain lands of the Cheyenne-Arapaho Tribes of Indians, in Northern and Western Oklahoma, consisting of two tracts, the one in the West having 5,138,560 acres and the one in the North having 5,184,640 acres.

That he has inspected the property as completely as practical, both by land and by air.

That he has no interest in the property, either at present or prospective.

That his fee for such an appraisal is in no way contingent upon the valuation estimate to be reported.

That he assumes the title to be good and merchantable.

That, to the best of his knowledge and belief, the statements contained in this appraisal are true and correct, and that the appraisal has been made in conformity with the Rules of Professional Ethics of the American Institute of Real Estate Appraisers.

That as a result of his investigation, and by virtue of his experience, he has been able to form an opinion of the Market Value of the property, as if free and clear of all liens and encumbrances, as of 3 March 1891, the value was:

Tract No. 1 . . . . . . . . $ 40,180,960.00
Tract No. 2 . . . . . . . . $ 33,400,640.00  29,957,707

In witness whereof, the said EDWARD A. RAMBO has hereunto set his hand and seal.

_____
            Edward A. Rambo

Subscribed and sworn to before me this 16th day of
November , 1962.

_____
            Notary Public

My Commission Expires: July 11, 1965

-i-

## CONTINGENT AND LIMITING CONDITIONS

1.  Value estimate is reported in dollars on the basis of the currency prevailing on the date of the appraisal.

2.  The appraiser has no interest in the property, either at present or contemplated.

3.  No survey of the property has been made by the appraiser. Valuation is reported without regard to questions of title, boundaries or encumbrances.

4.  Title to the property is assumed to be good and marketable.

5.  No responsibility for matters legal in character is assumed by the appraiser.

6.  Legal and Treaty Description of the property under appraisal was furnished by others and is assumed to be correct.

## LEGAL DESCRIPTION

### TRACT I

A tract of country west of the ninety-sixth degree of west longitude, bounded by the Arkansas River on the east, the thirty-seventh parallel of north latitude (being the southern boundary line of the State of Kansas) on the north, and the Cimarron or Red Fork of the Arkansas River on the west and south.

### TRACT II

Commencing at a point where the Washita River crosses the ninety-eighth degree of west longitude, as surveyed in the years eighteen hundred and fifty-eight and eighteen hundred and seventy-one; thence north on a line with said ninety-eight degree to the point where it is crossed by the Red Fork of the Arkansas (sometimes called the Cimarron River); thence up said river, in the middle of the main channel thereof, to the north boundary of the country ceded to the United States by the Treaty of June fourteenth, eighteen hundred and sixty six, with the Creek Nation of Indians; thence west on said north boundary and the north boundary of the country ceded to the United States by the Treaty of March twenty-first, eighteen hundred and sixty six, with the Seminole Indians, to the one-hundredth degree of west longitude; thence south on the line of said one-hundredth degree to the point where it strikes the North Fork of the Red River; thence down said North Fork of the Red River to a point where it strikes the north line of the Kiowa and Comanche Reservation; thence east along said boundary to a point where it strikes the Washita River; thence down said Washita River, in the middle of the main channel thereof, to the place of beginning; and all other lands or tracts of country in the Indian Territory to which they have or may set up or allege any right, title, interest or claim whatsoever.

-1-

## PURPOSE OF THE APPRAISAL

To estimate the Market Value of the lands of the Cheyenne - Arapaho Tribes in Oklahoma as of a date determined to be 3 March 1891.

– – – –

Market Value is defined here as the highest price estimated in terms of money, that a willing buyer would pay for the lands, and a willing seller would accept, both buyer and seller being fully aware of all the uses for which the property is adapted and for which it is capable of being used; both buyer and seller acting freely and with prudence and without compulsion to either buy or sell.

# PHYSICAL DESCRIPTION OF THE PROPERTY

As indicated heretofore, this appraisal covers two tracts. One which will be known in this appraisal as Tract No. 1 is bounded on the North by the State of Kansas, on the East by the Arkansas River and on the South by the Cimarron River. The other, known herein as Tract No. 2, is bounded on the East by the 98th degree of West Longitude, on the North by the North boundary of the country ceded to the United States by the Treaty of June 14th, 1866 with the Creek Nation of Indians; and North boundary of the country ceded to the United States by the Treaty of March 21st, 1866 with the Seminole Indians, bounded on the West by the 100th degree of West Longitude, (the State of Texas) on the South by the North Fork of the Red River, the North line of the Kiowa and Comanche Reservation and the Washita River.

Tract No. 1 containing, more or less, 5,184,640 acres, and
Tract No. 2 containing, more or less, 5,138,560 acres.

Investigation reveals that on September 25th, 1929, the Commissioner of Indian Affairs, C. S. Rhoads, wrote to Charles C. Moore, then Commissioner of the General Land Office, requesting a statement as to "actual areas" of each of the tracts described in Court of Claims Case No. K-103, Tract No. 1 being the Medicine Lodge Treaty Tract of October 28th, 1867, and Tract No. 2 being the Executive Order Tract of 1869.

Finally, on January 23, 1933, the Assistant Commissioner of the General Land Office replied to Commissioner Rhoads' letter of September 25th, 1929, stating in part: "The areas described in the respective paragraphs (tracts) have been estimated by this office as follows:

'Paragraph 9, (Tract No. 1) . . . 5,184,640 acres.
'Paragraph 17, (Tract No. 2). . . 5,138,560 acres.'"

It is further noted by the appraiser, the Bureau of Indian Affairs, Land Records, the Bureau of Land Management and the General Land Office that they had no record or knowledge of the number of acres in the various tracts of the various counties, where only a part of the County is located in one of the tracts of this appraisal, or as in one case where parts of one County are in both tracts. (Kingfisher).

For the purpose of this appraisal, these acreages have been estimated from the best information available to the appraiser.

The lands of both tracts contain the same general type of terrain, being level to rolling prairies, level bottom lands, rough broken areas, numerous rivers and their tributaries, some waste land in parts, with timbered areas confined generally to the bottoms along the rivers and their tributaries.

The tracts both, in general, slope gently to the Westward toward the High Plains of West Texas and Colorado, there being no areas which would be classed as mountainous.

As a summary of the soils and natural vegetation of the Cheyenne and Arapaho tribal lands as of March 3, 1891, the following table has been developed:

| | AREA I | | AREA II | | TOTAL ACRES |
|---|---|---|---|---|---|
| | Acres | % of Area | Acres | % of Area | |
| 1. Central Oklahoma Claypan Prairies | 570,310 | 11% | 565,242 | 11% | 1,135,552 |
| 2. Rolling Red Prairie Soils, Clay Subsoils | 674,003 | 13% | 668,103 | 13% | 1,342,016 |
| 3. Rolling Red Prairie Soils, Sandy Subsoils | 1,762,777 | 34% | 1,952,653 | 38% | 3,715,430 |
| 4. Rough Broken Land | 518,464 | 10% | 513,856 | 10% | 1,032,320 |
| 5. Sandy Land Soils of the Red Prairies | 777,696 | 15% | 770,784 | 15% | 1,548,480 |
| 6. High Plains Soils | 155,559 | 3% | 154,157 | 3% | 309,696 |
| 7. Eastern Oklahoma Prairie Soils | 207,386 | 4% | — | | 207,386 |
| 8. Central Oklahoma Cross Timbers | 129,616 | 2.5% | — | | 129,616 |
| 9. Western Oklahoma Sandy Land | 259,232 | 5% | 256,928 | 5% | 516,160 |
| 10. Soils of Alluvial and Bottom Land | 129,616 | 2.5 % | 256,928 | 5% | 386,544 |
| Totals | 5,184,640 | 100% | 5,138,560 | 100% | 10,323,200 |



# CHEYENNE AND ARAPAHO TRIBAL LANDS -- 1891

## MAJOR SOIL AREAS DEVELOPED UNDER SIMILAR VEGETATION

### LEGEND

CENTRAL OKLAHOMA CLAYPAN PRAIRIE -- Flat to undulating topography; (Kirkland, Oswego, Caldwell, Pondcreek and tainer Soils)

ROLLING RED PRAIRIE SOILS, CLAY SUBSOILS -- Undulating to rolling Topography; (Renfro, Carnol and Illinois Soils )

ROLLING RED PRAIRIE SOILS WITH SANDY, FRIABLE SUBSOILS -- Undulating to rolling Topography (Nash, Woodward, Quinlan and Grant)

ROUGH, BROKEN LAND -- Dominately Little Soil Development from Red Shales and Clays of the Permian Materials ( Vernon, Sammie)

SANDY LAND SOILS OF THE RED PRAIRIE-- Including to Undulating topography. Developed from Sandstones and resprected and altered by wind.--(Derby, Pratt, Dill and Cayce)

HIGH PLAINS SOILS -- Developed over calcutimee, unconsolidated Gravelly and Calcite Silts and Clays. Rolling to Rough Topography (Potter, Manchair Soil materials)

EASTERN OKLAHOMA PRAIRIE SOILS -- Undulating to Rolling Topography; Developed from Shales and In to do and Sandstones or from the Pennsylvania Geological Materials -- (Bates, Summit and Lutesaia Soils)

CENTRAL OKLAHOMA CROSS TIMBER SOILS -- Developed under mixed forest and prairie openings. Rolling to Steep Topography; (Darnell, Stephenville, Dougherty and Teller)

WESTERN OKLAHOMA SANDY LAND -- Monotomly to dune topography, Wind blown and wind altered materials--( Pratt, Tivoli and Enterprises).

SOILS OF THE ALLUVIAL AND BOTTOM LANDS -- Flat to undulating Topography. Developed from soils of the Red Ares material ranging from Sands to Clays--(Miller, Yahola, Meinaed, Portland and Port)

MAP PREPARED BY CHAS. A HOLLOPTER FOR MR. E. A. RAMBO  M.A.I.  JULY 1962.

## INCOME APPROACH TO VALUE

While it has been indicated heretofore in this appraisal that the opinion of Highest and Best Use of these Tracts was not for sale as one large tract for the raising of cattle, nor its division into several very large tracts and put up for sale as a number of large cattle ranches, but that the proper use was the sale of the tracts in smaller farms and smaller cattle operations, below the large ranch category. The sale of the land to the numerous thousands that desired to move Westward, to own their own farms, was considered to be the most likely, and most profitable method of disposition of this very large acreage.

In the absence of large tracts under rental contracts upon which to form the basis of an indicated value by means of the Income Approach, it appears that the only method by which an indication of value may be found would be by estimating its value by means of its capacity to carry cattle.

If one assumes that on 3 March 1891 the property was available in economic range size, the estimate of its potential value for this purpose becomes obvious.

While the method of converting the cattle-carrying capacity of land to value is somewhat of a modern technique, it is traditional that Western cattle ranchers have used this method of estimating range value.

This has normally been done on the basis of 1 to 1; or the year-long cow unit being the equal of the market price of an adult steer.

For the purpose of estimating or arriving at an indicated value by this means, the report of Mr. Chas. A. Hollopeter on soils and grasses of the areas is the best-known source of information leading to an opinion by this method of valuation estimating. This report is made a part of this appraisal heretofore and is identified as such.

It should be noted in the report spoken of above that Mr. Hollopeter stated that his estimate of the capacity to carry cattle on the lands of the CandA was based on a figure that would maintain the grass in "top condition."

As it is traditional that early-day cattlemen were not schooled in present-day conservation practices for long-time range preservation but were very universally known to graze many more cattle on specified tracts than would be done in present times in order to maintain the grass in top condition, it appears reasonable to increase the carrying capacity of the various types of land and various sections of the tracts above that shown by Mr. Hollopeter as it is not felt that the early-day cattleman would have been as careful as to the numbers of cattle to be grazed on an area as are the estimates of Mr. Hollopeter.

It is estimated by the appraiser that this estimate should be increased up to a maximum of 60% and for the purpose of this estimate by means of the Income Approach it is increased by 40%.

There being no mountainous areas in the tracts there was little waste lands to be found and practically 100% of the area grew an abundant supply of highly nutrient native grasses.  The climate allowed grazing for practically all of the year-long period.  If supplemental feed was needed at  times it could be cut from streams and river bottoms.  Year-long operation was practicable.

The following is an estimate of the number of cattle that could be carried on a year-long basis on Tract No. 1 and Tract No. 2:

| | Acres in Tract No. 1 | Cattle Indicated by Grass Report | Plus Est. 40% | Acres in Tract No. 2 | Cattle Indicated by Grass Report | Plus 40% |
|---|---|---|---|---|---|---|
| 1. | 835,856 | 161,065 | 225,491 | 309,696 | 56,308 | 78,831 |
| 2. | 825,856 | 127,054 | 177,875 | 516,160 | 79,409 | 111,172 |
| 3. | 1,858,176 | 195,597 | 273,835 | 1,651,712 | 173,864 | 243,409 |
| 4. | 619,392 | 68,821 | 96,349 | 412,928 | 45,880 | 64,232 |
| 5. | 619,392 | 56,308 | 78,831 | 928,688 | 84,426 | 118,196 |
| 6. | 82,585 | 7,507 | 10,509 | 221,110 | 20,100 | 28,140 |
| 7. | 412,928 | 63,527 | 88,937 | None | – | --- |
| 8. | None | --- | --- | 258,080 | 16,650 | 23,310 |
| 9. | 309,696 | 24,775 | 34,685 | 206,464 | 16,517 | 23,126 |
| 10. | 165,171 | 30,031 | 42,047 | 92,909 | 16,892 | 23,648 |
| | 5,184,640 | 734,685 | 1,028,559 | 5,138,560 | 510,046 | 714,064 |

(Numerical divisions shown above are the same as shown on the report of Mr. Hollopeter)

From the above estimates it is shown that Tract No. 1 would sustain 1,028,559 cattle and Tract No. 2 would sustain 714,064 on a year-long basis.

These are figures of the number of cattle on the range, and it still remains for them to be sent to market before their value can be realized and it is this value that would indicate their final value and in turn the value of the land from which they came.

From the cattle prices at Kansas City it is noted that 1891 prices were $5.25 per cwt. and that the 5-year average from 1890 through 1894 was $5.32.

In this estimate of value $5.25, or the 1891 price, is used. Based on an adult native steer of 1,000 pounds would have brought on the Kansas City Market in 1891, $52.50.

From this total value of the adult steer the shipping cost must be deducted which we find from the freight rates from the shipping point.

Shown heretofore in this appraisal it is noted that freight rates to Kansas City from Dodge City were $0.24 per 100 pounds, from Newton $0.145 per 100 pounds, and from Wichita $0.15 per 100.

Freight rates from the Santa Fe which traversed the area to the immediate East of Tract No. 2 and which run through Tract No. 1, and those of the Rock Island which went through both tracts, are not available so the rate as known from Wichita to Kansas City is used.

Also, some expense of reaching the railroad must be accounted for as the areas were not all immediately accessible to railroads, so in this estimate, to the freight rate used is added $1.00 to account for this added cost of shipping.

Also, a prudent purchaser would have made some allowance for the establishment of a herd and the breeding increases. A purchaser would have discounted the current market value 8% for 5 years.

By the application of this method the following indication of value is found:

Estimated number of cattle attributable
to Tract No. 1 . . . . . . . . . . .  1,028,559

Value of 1 steer, less $1.50 freight and
less $1.00 other shipping costs, total  $2.50

$52.50 less $2.50 equals $50.00 per steer
delivered in Kansas City

1,028,559 steers x $50.00 . . . . . . . $51,427,950.00

Discounted 8% for 5 years (1)

$51,427,950.00 x .6806 (1)  . . . . . . $35,001,862.00

Total Estimated Value of Tract No. 1,
by means of the Income Approach . . . $35,001,862.00

Estimated per acre value, Tract No. 1,
by means of the Income Approach . . . . $      6.75

– – – – – – – – – –

(1) Appraisal Terminology – A. I. R.E. A. 1954, Page 201

Estimated Number of cattle attributable to
  Tract No. 2 . . . . . . . . . . . .    714,064

Value of 1 steer delivered in Kansas City,
  $50.00

714,064 steers x $50.00 . . . . . . . .  $35,703,200.00

Discounted 8% for 5 years (1)

$35,703,200.00 x .6806 (1)  . . . . . . .  $24,299,597.00

Total Estimated Value of Tract No. 2
  by means of the Income Approach . . .  $24,299,577.00

Estimated Per Acre Value, Tract No. 2,
  by means of the Income Approach . . .  $      4.73

Estimate of Co,posite Value of both
  Tracts, Per Acre . . . . . . . . . .  $      5.74

— — — — — — — —

## APPRAISER'S NOTE

The estimates of cattle shown in this approach to value become very realistic when one notes that in 1960, as stated previously in this report, on 55% of the acreage in these two tracts, there were 1,020,445 cattle after 60 years of grazing. This is compared with 1,742,623 capable of being grazed on 100% of the tracts in 1891.

(1) Appraisal Terminology - A. I. R. E. A. 1954, Page 201

## ESTIMATE OF VALUE BY MARKET APPROACH

In Choctaw Nation v. United States, Indian Claims Commission, 291. 313, the Commission said:

> "Obviously, in determining the value of vast tracts of land, comprising many millions of acres, as of a time beyond the memory of man and at a time when land occupied by Indians was put to very little use, we must use the evidence available under the peculiar conditions which must govern such inquiries."

When evaluating 10,000,000 acres of land it is necessary to go fairly far afield for market data. The appraiser must take what can be found and make necessary allowances for it. To ignore such data an appraiser is derelict in his duty.

The findings by this method are tempered and authenticated by the use of the other approaches that are available.

– – –

The following must be considered in any valuation of the subject lands:

1. Early exploration and familiarity of white people with the lands.

2. The Westward expansion after the Civil War.

3. Political subdivisions at the time of the appraisal.

4. The extent of the cattle industry at the time.

5. The amount of investment capital available at the time.

6. Interest rates.

7. The state of mind of people concerning the future of the area.

8. The coming of the railroads.

9. The sales of other lands prior to, at the same time, and immediately following the date of the appraisal, with proper adjustments for time, geographical locations, adequacy or rail transportation, adequacy of rainfall, surface and subsurface water supplies.

The measure of value is the amount of money a potential purchaser will pay for possession of a thing desired. Price, therefore, is a measure of value, not value in itself.

The American Institute of Real Estate Appraisers state in their handbook entitled "The Appraisal of Real Estate":

1. Value is not a characteristic inherent in the object itself, but dependent on the desires of man. It varies from man to man and from time to time as their individual desires vary.

2. An object cannot have value unless it has utility, which is defined as the capacity to excite the desire for possession.

3. Utility alone is insufficient to lend an object value; it must also be scarce. Similarly, scarcity alone does not lend an object value; it must also have utility.

4. The desire which gives an object utility only creates value in the market when the possessor of the desire has the purchasing power to satisfy it. (1)

(1) The Appraisal of Real Estate, The American Institute of Real Estate Appraisers, 1951, Pages 27 and 28.

The subject property had all of the elements that create value.

It had recently been shown in the opening of Oklahoma Territory in 1889, adjacent to the tracts of this appraisal, that the desires of man were pointed towards the eventual opening of all of Oklahoma to the settlement of the white man. Oklahoma Territory was engulfed in an avalanche of humanity that desired it when it was thrown open. Cities sprung up over night. Nearly every quarter section was taken as soon as it could be reached.

The tracts possessed utility as was evidenced by areas that adjoined it on the North, the West and the East. To the North in Kansas where the white man had been for many years, crops were growing, people were living. To the East in the newly opened Oklahoma Territory such was the case also. Even after only 2 years of white settlement, crops were in evidence, cities had begun to grow larger in this new country, and rail transportation was at hand.

Scarcity was immanent as to the supply of desirable land left in the Public Domain. Most of the land that was suitable for cropping and the raising of cattle in the Midwest had been exhausted. To the West for great distances were large areas of arid, non-agricultural lands that were not as desirable as these lands. It was becoming evident to the Westward-moving population that if they ever desired to take up lands that would sustain them, time was running

out. Most of the vast areas of railroad land had been sold at this time and here was a vast area to be the eventual home of multiple thousands of white families that wanted to move Westward away from the East that even at this early date was becoming crowded in a manner of speaking.

Purchasing power was evident. There was rapidly becoming available an apparently unlimited supply of capital for the improvement of the West. Even foreign capital was interested in such financial investments. The homesteader needed only his efforts for his purchasing power. Capital could see the great desire of the American public for these lands and the expending of such capital appeared to be a sound investment.

The public was familiar with these lands. They had been written about by many writers, the newspapers of the day carried descriptions of them, the railroads were extolling their virtues, and utterances by government officials described the lands as very desirable for crops and cattle.

After the Civil War there grew rapidly an air of expansion to the West. States were being formed: Kansas on the North, Texas on the South and West, Arkansas on the East. This was an island of unorganized territory awaiting only its chance to join the others.

The cattle industry had grown greatly after the Civil War and at this time was the largest industry of the Great Plains. Here were great areas of nutritious prairies for the advancement of this industry.

Capital was available for the expansion of such a territory, and was becoming more abundantly available every day.

Interest rates were dropping down into an area where they were not as prohibitive to the financing of land transactions as they had been for some long time.

The public had the image of this great expanse of land as a land of great opportunity, removed from the over-crowded East, a land to grow with.

Railroads had come to the area. No longer was the covered wagon the method of crossing the country. Here was what was considered then as rapid transportation.

Turning to the Market Approach, which appears to be the most logical indication of value for these large tracts, at the appraisal date, the following has been found to indicate values of other lands which sold in other areas, and all of which can to some degree be compared to the subject lands:

### Railroad Sales

Between 1870 and 1879 the Denver Pacific and the Kansas Pacific sold lands in Colorado at prices ranging from $3 to $4 per acre. In the year 1870 they sold 10,580 acres at a price that averaged $3.56 per acre. This was 21 years prior to the date of this appraisal.

The Kansas and Pacific advertised 5,000,000 acres for sale in Kansas in 1879 at from $2 to $6 per acre. One-fourth off for cash or 6 to 11 years credit at 7%.

The Kansas and Pacific sold 20,059 acres in Clay
County, Kansas, in 1867, 24 years prior to the
date of this appraisal, for $1.70 per acre.

The same Railroad sold 2,159 acres in Clay County,
Kansas, in 1871, 20 years prior to the date of
this appraisal, for $1.62 per acre.

The same Railroad sold 20,017 acres in Clay County,
Kansas for $1.62 per acre in 1869, 22 years prior
to the date of this appraisal.

The comparable sales shown in this section of this ap-
praisal reflect the following:

1.   Sale of 8 large tracts in West Texas, having a
     total acreage of 1,307,521 acres for a total
     sales price of $2,162,563.00 or an average per
     acre price of $1.65.  (6 were prior to date of
     appraisal)

     Some of these were before the coming of the
     railroads to the areas and all were in the high
     plains of West Texas where there was less rain-
     fall, less ground water available, and in areas
     classed as "Short Grass Country" rather than
     "Tall Grass Country" such as the subject.

2.   Sales of Kansas lands along the border with
     Tract No. 1, abstracted by Mr. Tucker, showed
     1,472 sales, totaling 291,824 acres, were of
     197 acres average size, and sold for a per
     acre average price of $13.47.

3.   Sales of Kansas lands in the adjoining counties,
     as abstracted by Mr. Hall, reflects the follow-
     ing:

          63,050 acres sold for $340,985.00, or
          an average of $5.40 per acre over a per-
          iod of 1881 to 1890.

4.   Sales in Tract No. 1, following the opening  to
     white settlement in the 8-year period, reflect
     the following:

          1,195 sales totaling 157,443 acres, sold
          for $1,580,058.00, or an average price per
          acre of $9.57 and an average in size of
          131 acres.

5.   Sales in Tract No. 2, following the opening to white settlement, in the 8-year period, reflect the following:

   756 sales, totaling 108,806 acres, sold for $853,906.00, or an average price per acre of $7.84 and an average in size of 144 acres.

6.   908 sales in Oklahoma Territory, prior to the date of this appraisal, and adjoining the tracts which are subject of this appraisal, reflect the following:

   908 sales, covering 127,181 acres, sold for $1,095,558.00, or an average price per acre of $8.58 and contained an average of 140 acres in each tract.

7.   Sales of small tracts in Wheeler, Hemphill and Lipscomb Counties in Texas, abstracted at random, and over a period of 19 years prior to 1896 showed the following:

   77 sales, containing 46,567 acres, sold for $124,313.00, or an average price per acre of $2.65.

   Shows further that for the 10-year period, 1882 to and including 1891, 44 sales were found, totaling 30,837 acres, for a price of $90,471.00, or an average price per acre of $2.93.

It appears to the appraiser that in this section of the appraisal, the numerous sales of the Spanish land grants should be considered only as to their indication of a demand for large tracts of land as direct comparison cannot be made due to the difference in geographical locations, differences in soils, grasses, time lapses and uncertain titles.

Railroad sales in general should be treated the same way as they were in general far removed from the area under consideration.

On the other hand, the sales in Oklahoma Territory that occurred before and after the date of this appraisal had much in common with the subject lands in that they were adjoining, there was no particular difference in rainfall, soils, climate in general and both had the same crop potentials.

The same comparison is possible between the subject lands and the sales found in the adjoining Counties of the State of Kansas, with a more drastic reduction in indicated sales price to account for probable improvements that had occurred in Kansas due to the long period of Kansas settlement.

Sales in the actual areas of the CandA must be given weight in any consideration of their value as of a given date even though all sales must have occurred after the date of the appraisal, as any sale in the area immediately after the opening to white settlement would have naturally been very heavily influenced by sales in other parts of Oklahoma and Kansas that had occurred prior to the opening. There did not exist any other sales at the time that could be used to form a comparison as to price. It is reasonable to assume that after adjustments for certain improvements that had taken place, any purchaser in the CandA area would have used these sales as a basis for offers to buy and sellers would have used them for offers to sell.

Based on this belief, one would arrive at an estimated value of the lands in the Tracts, by means of the Market Approach to Value, as:

Tract No. 1

5,184,640 acres at $8.00 per acre or $41,477,120.00.

Tract No. 2

~~5,138,560~~ acres at $7.00 per acre or ~~$35,969,920.00~~
4,608,878                                        32,262,146

Composite indication of Value                    73,739,266

~~10,323,200~~ acres at $7.50 per acre, or ~~$77,447,040.00.~~
9,793,518

## CORRELATION AND FINAL ESTIMATE OF VALUE

In order to arrive at a final estimate of value, a correlation of methods and results is required. The value estimate is for the entire property and takes into consideration no future mineral values that might have developed at later dates as at the date of this appraisal, as, at the date of this appraisal no evidence was uncovered that mineral values did exist in the property or that the land-buying public thought that such did exist.

Due to the large size of the tracts, a purchaser or seller would most probably reduce the entire acreage to the common unit of an acre in considering price. In the final estimate value, the value will be estimated for each of the two tracts individually and on a per acre basis for the two tracts individually.

The valuation of any individual tracts, such as certain townships or county areas, is dependent on the relationship of that part of the whole area. No segregation is made of any part, from the whole, as that would constitute another appraisal problem and would require a complete revaluation.

From the findings of this appraisal, the following facts are self-evident:

1. There was a great demand for land in the Great Plains Area, as the Eastern portion of the United States was felt to be becoming crowded; the fever of "going out West" was everywhere. Previous lands that were opened for homesteaders had been overrun by these homesteaders and the supply of land previously opened had proved inadequate to satisfy the numbers that seeked homes in the Great Plains.

2. The land in the area was good, it was well watered and had a seemingly inexhaustible supply of nutritious grasses.

3. The windmill had been invented and was growing every day in national use for farmers, stockmen, towns and railroads.

4. The use of barbed wire was a fact by this time, and now the homesteader and the cattleman had an economical way of fencing his land.

5. The railroads were pushing their rails across the land from East to West and from North to South.

6. Capital was available for the financing of the purchase of lands in the Great Plains.

7. Interest rates had dropped to levels that were considered to be reasonable and were not prohibitive for use.

8. The lands of the area of the appraisal were believed to be fertile and areas adjoining were then being used for cropping and it was reasonable to assume that these adjoining were an indication that the lands of this appraisal were also as desirable as those that surrounded it.

9. Sales in areas of Texas, Kansas, New Mexico and adjoining areas in Oklahoma Territory indicated that there was a ready and good market for the lands of the appraisal.

10. The climate was good, winters were moderate, summers were not too hot for the growing of crops and the raising of cattle. Rainfall in general was plentiful to support normal dry farming practices.

From the findings of the Income Approach to Value, it is noted that a per acre value has been indicated for Tract No. 1, of $6.75, and for Tract No. 2, of $4.73 per acre.

The Income Approach must of necessity indicate the lowest possible conclusion of value because it takes into account only the income producing ability of the subject property and takes no account for the desirability of the CandA lands as an area in which to live or of the desire of the homeseeker for a place to call his own, and does not reflect the highest and best use of the property.

It is a fact that the value indicated by the Income Approach being so close to other approaches to value such as the Market Approach, it strengthens the conviction that the Market Approach accurately reflects the market as it existed at the date of the appraisal.

From the Market Approach it appears apparent that the sales found in Western Texas, prior to and after the date of this appraisal, cannot be used too closely to indicate value of the lands of the subject as they are in areas of different climatic conditions, areas of lesser agricultural possibilities than the subject, as they are in areas of thinner soils, poorer grasses, and in general suitable mainly for use as grazing lands, which is not the case of the subject. Most of these sales precede the subject in time by from a few years to a large span of time. For this reason no attempt is made herein to adjust

them to indicate value for the subject lands, but they have been considered only to indicate the demand for land that existed at the time of the appraisal.

In the opinion of the appraiser, the sale of lands in Oklahoma Territory which adjoined both tracts of this appraisal should reflect more accurately the probably value of the lands of the subject.

By the same token, the lands of the adjoining counties of the State of Kansas, which had been an organized State since 1861, would also reflect accurately the probable market value of the subject.

As no private ownership of the lands actually in the subject of this appraisal was permitted, it appears that sales that did occur within the area of the appraisal within the immediate years following the acquisition by private owners, would also be an indication of its value at the time of the appraisal, as any sale made shortly after the date of the appraisal would be based on knowledge that the purchaser had gained within a reasonable time and would be tempered by the prospects of the future as it then appeared.

From the abstracting of 1,472 sales in the 4 counties of Kansas, to the immediate North of the subject, it is noted that these sales, all of which occurred prior to 1893, the average sales price was $13.47. As Kansas had been an organized State for 30 years at the time of the appraisal, it is felt that this average price paid for land must be discounted to account for improvements that must

have been in place over such a long period, such as the construction of permanent type homes and outbuildings, fencing and wells.

By estimating this allowance for improvements that had taken place at 30%, which appears large, one finds that this would amount to $4.04 per acre, or a net indicated sales price for land alone at $9.43 per acre.

By the same reasoning, the sales in Oklahoma Territory would be discounted in the same manner but at a different rate, as a shorter period of private ownership existed.

Estimating this at 10% for improvements, the sales abstracted in Oklahoma Territory would be discounted $0.85 per acre and would indicate a sales price average for the land alone at $7.73 per acre.

Using this same reasoning, the same method of estimating the actual sales prices of lands within the subject tracts, but which occurred after the date of the appraisal, and taking into account the fact that these sales were made at least 4 years after those in Oklahoma Territory and that progress was being made in the improvement of rural homes, etc., by the additional availability of building supplies and transportation being more adequate for such supplies, it is the opinion of the appraiser that this allowance for improvements should be increased to 15% when estimating the sales price as reflected by the sales within the areas of the appraisal.

On this basis, the indicated sales price in Tract No. 1, of $9.57, would be discounted by $1.43 per acre, leaving a net indicated sales price of the land itself of $8.14 per acre.

For Tract No. 2, the indicated sales price of $7.84 would be discounted $1.17 per acre, or a net indicated sale of the land of $6.67 per acre.

After considering all of the facts known to me to be available, and after a careful study of the areas, of the two tracts comprising the lands of the Cheyenne-Arapaho Tribes in Oklahoma, as of 3 March 1891, it is the considered opinion of the appraiser that the Market Value of the subject property is as follows:

**Both Tracts Combined:**

*9,793,518*

*70,138,667.⁰⁰*

10,323,200 acres . . . . . . . $ 73,581,600.00

Per acre value . . . . . . . . $   ~~7.12~~  *7.16*

**Tract No. 1**

5,184,640 acres . . . . . . . $ 40,180,960.00

Per acre value . . . . . . . . $     7.75

**Tract No. 2**

*Took off allotment acreage.*

*4,608,878*

*29,957,707*

5,138,560 acres . . . . . . . $ 33,400,640.00

Per acre value . . . . . . . . $     6.50

E. A. RAMBO

3 November 1962

-145-