**ATTACHMENT M**

**PATTON, BOGGS & BLOW**
2550 M STREET, N.W.
WASHINGTON, D.C. 20037
(202) 457-6000

TRT TELEX: 197780
TELECOPIER: 457-6315

WRITER'S DIRECT DIAL

(202) 457-6094

November 17, 1993

Jeffrey T. Vail, Esquire
United States Department of Agriculture
Office of the General Counsel
Room 4629
1400 Independence Avenue, S.W.
Washington, D.C. 20250

Dear Jeff:

    Following up on my letter to you of October 15, I have now had the opportunity to read the documents you mentioned: the 1869 Executive Order that created the Cheyenne-Arapaho Reservation; the 1890 proclamation whereby the tribes ceded their tribal holdings to the United States in exchange for allotments; and the 1965 Indian Claims Commission decision awarding the tribes $15 million as settlement for certain land claims.

    As you know, the Indian Claims Commission decision awards the tribes $15 million as compensation for various claims, one of which is that they did not receive adequate consideration when they gave up their holdings in 1890 in exchange for $1.5 million. As the $15 million award covers the entire parcel of land given the tribes in 1869 and ceded by the tribes in 1890, it must include some payment for the Fort Reno lands, as did the (unconscionably small) $1.5 million the tribes received as compensation for the cession in 1891.

    We believe, however, that the Indian Claims Commission opinion is irrelevant as far as the Surplus Property Act is concerned. As we have discussed, the Surplus Property Act provides, in part, that "transfers of real property within the State of Oklahoma shall be made to the Secretary of the Interior to be held in trust for Oklahoma Indian tribes recognized by the Secretary of the Interior when such real property (1) is located within boundaries of former reservations in Oklahoma as defined by the Secretary of Interior and when such real property was held in trust by the United States for an Indian tribe at the time of acquisition by the United States." Therefore, the relevant determination is whether the tribes at any time owned the lands and the United States held them in trust, not whether the tribes currently own the lands. In other words, if the lands ever did belong to the Cheyenne and Arapaho tribes, the Surplus Property Act provides that such lands must be returned to the tribes once

PATTON, BOGGS & BLOW

Jeff Vail
October 15, 1993
Page 2

they are declared excess to the needs of the federal government. The three documents mentioned above conclusively determine, of course, that the tribes did own the lands, at least between 1869 and 1890.

In addition, the lands will never be accessible to anyone other than the tribes, because they are under the annexation of the town of El Reno, and federal lands within city limits cannot be leased pursuant to the Minerals Lands Leasing Act. Indian tribes, however, may issue mineral leases under authority of 25 U.S.C. §§ 396 et seq. and develop minerals of Indian lands, regardless of the status of the surface estate. For purposes of not having the minerals drained by other people, it makes sense for the tribes to work out some arrangement with the Department of Agriculture so as to be able to develop that mineral estate, even if only on a limited basis.

Again, I hope your office will advise the rest of your colleagues at USDA of the applicability of the Surplus Property Act to the Fort Reno lands and work with us to expedite the declaration of the subsurface as excess to UDSA needs.

Sincerely,

Katharine R. Boyce

KRB/jac

cc: The Honorable Edward Wilson, Chairman
    Cheyenne-Arapaho Business Committee

    Kathy Bigelow, Consultant
    Cheyenne-Arapaho Tribes

    Mr. James Pace
    Director of Native American Programs
    Department of Agriculture

    Mr. Patrick Hayes
    Director, Office of Trust Responsibilities
    Department of Interior