UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, et.al. )<br>)<br>Defendants. )<br>) | No. 06-519 (PLF) |

MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

INTRODUCTION

Defendant has moved to dismiss, or, in the alternative, for summary judgment, based on a recounting of the relevant history that is inaccurate and incomplete, in most important part because it omits any mention of the fact the Solicitor of the Department of Interior has expressly rejected the fundamental arguments asserted by the Government in favor of dismissal. Attachment 1 (Solicitor to Assistant Secretary for Indian Affairs, February 26, 1999).

The Solicitor did find the applicable twelve year limitations period likely to bar relief pursuant to the Quiet Title Act of 1972, 28 U.S.C. § 2409a (or "QTA").[1] However, as we

---

[1] The Solicitor went on to urge the Department of Agriculture to consider returning the lands pursuant to the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 483(a)(2). Id., pp. 9-12. However, Congress amended the FPASA, such that federal, state and municipal agencies were afforded primary access to

proceed to demonstrate, the Solicitor did so without the benefit of evidence giving rise to genuine issues of material fact as to whether vital information remained classified by the Government and unavailable to the Cheyenne Arapaho Tribes (or "Tribes") for four decades, such that the doctrine of equitable estoppel should prevent the twelve year limitations prescribed by the QTA from running any earlier than May 1994 (The Tribes filed suit March 20, 2006).  See United States v. Beggerly, 524 U.S. 38, 48-49  (1998) (Stevens, J.., concurring) (though doctrine of equitable tolling does not apply in QTA context, "doctrine of fraudulent concealment or equitable estoppel might apply if the Government were guilty of outrageous conduct that prevented the plaintiff, though fully aware of the Government's claim of title, from knowing of [its] own claim.").

     We also demonstrate that, just as the Solicitor of the Department of Interior has determined, the Agreement of November 13, 1890 ratified by Congress in 1891 did not serve to cede the Tribes' right, title, and interest in the Fort Reno lands, nor did settlement of litigation brought under the Indian Claims Commission Act (or "ICCA") extinguish their claim for return of the Fort Reno lands, an issue of paramount importance to the Tribes for more than century.

---

    covered lands.  See Pub. L. 107-217, 116 Stat. 1083 (August 21, 2002).

I. **THE RECORD**

A. **THE AGREEMENT OF 1891**

The Solicitor's Memorandum of February 1999 sets forth in some detail the factual background pertaining to the Tribes' historic claim to the Fort Reno lands, Attachment 1, Solicitor of Department of Interior to Assistant Secretary of Indian Affairs, pp. 1-2[2], describes the reasons for the conclusion that "lands like Fort Reno with ongoing public uses were not ceded by the Tribe in 1891, but remained in their prior state of ownership." (emphasis in original). Id. at 8. The reasons invoked by the Solicitor were as follows:

> First, in negotiations leading to the 1891 allotment, government negotiators assured the Tribe that only "surplus" lands would be ceded.... Since the Fort Reno lands were being used for military purposes, they were not "surplus" in 1891.
>
> Second, many lands designated for religious, school, and agency purposes [like Fort Reno's "military" use, among the "public uses" mentioned in Article IV] in 1891 have since been returned to the Tribe.... Additionally, some school and agency lands were sold with the proceeds held for the benefit of the Tribes....
>
> Third, there is a longstanding principle that, given two plausible interpretations of a statute, ambiguities must be resolved in favor of the Indians.... Construing the ambiguous interplay between Articles II & III and the conditions in Article IV in the Tribes' favor would exclude Fort Reno lands from the cession. (citations omitted).

Ibid.

---

[2]Fed.R.Civ.P. 10( c) provides that "[an] ... exhibit to a pleading is a part thereof thereof for all purposes."

We recognize the Solicitor's determination in this instance is not necessarily of binding significance.  See, e.g.,. Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1042-1043 (10th Cir. 2003).  However, they are "entitled to respect," id. at 1042 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)), and such "weight [as] their power to persuade compels." Id. at 1043.  Their weight here should be compelling in light of the special expertise the Solicitor of Interior brings to the complex subject matter involved, and in light of well-established principles that courts should not "lightly find diminishment [of reservations]," Solem v. Barnett, 465 U.S. 463, 472 (1984), and relevant "statutes are to be construed liberally in favor of Indians with ambiguous provisions interpreted to their benefit..." (citation omitted). South Dakota v. Bourland, 508 U.S. 679, 687 (1993).

For present purposes the determination of the Solicitor of the Department of Interior should carry weight sufficient for the Tribes to withstand a Rule 12(b)(6) motion to dismiss on the ground the Agreement of 1891 served to cede all right, title and interest in the lands of Fort Reno.[3]

---

[3]We are bound to reiterate that the Government withheld the Solicitor's findings in the matter of the Tribes' continuing interest in Fort Reno at the same time it invoked a letter written more than a decade ago by a purported representative whose primary concern was an energy interest's attempt to have mineral rights in the area declared "excess" pursuant to 40 U.S.C. § 482 (a)(2), at the expense of the Tribes' historic and vital interest in the lands of Fort Reno. See Attachment M to Defendants Memorandum. That the "representative" had no contract with the Tribes approved by the Department of Interior as then required by 25 U.S.C. § 81, is an additional reason such a communication has no weight as against a determination of the Solicitor of the Department of Interior.

## B. THE 1948 TRANSFER TO THE
## DEPARTMENT OF AGRICULTURE
## AND LATER SETTLEMENT OF THE ICC CASE

It is undisputed that on April 21, 1948, Public Law 80-494 transferred jurisdiction of Fort Reno from the War Department to the Department of Agriculture ("1948 Transfer")[4], with the exception of 1,000 acres transferred to the Department of Justice for "prison purposes" in 1937. See Act of May 24, 1937, Public Law 75-103. ("1937 Transfer").

The Tribes concede that any claim to the lands subject to the 1937 Transfer was necessarily relinquished in connection with the 1965 settlement of the ICC litigation, in that the transfer took place before the August 13, 1946 effective date of the Indian Claims Commission Act, 60 Stat. 1049. However, as the Solicitor of Interior also determined, there are compelling reasons for concluding the lands involved in the 1948 Transfer were not subject the 1965 settlement of the ICC litigation:

> [T]he Tribe's ICC claim for Fort Reno sought equitable relief; that is they asked for the land back, not compensation for it. This is expressly articulated in their prayer for relief that the ICC "set aside ... the jurisdiction conferred by the Act of April 21, 1948." Early in its history, however (and well before the Tribe filed its claim), the ICC limited remedies to monetary relief. Osage Nation of Indians v. United States, ICC Docket No. 9 (December 30, 1948) at 12 (The ICCA "does not specifically state the character of relief the Commission may grant, but this lack of specificity is not vital, for its provisions plainly limit the relief to that which is compensable in money").

---

[4] Despite the transfer to the Department of Agriculture, the Government still put the property to "military purposes", in that it operated a facility for the training of horses and mules for military use in Greece. This use continued to 1954, when the Government ceased these training operations. See Attachment 3 (articles and formerly classified documents concerning use of facilities and buildings for horse and mule training operations at Fort Reno).

> Second, and more important, the 1965 settlement could not have applied to the Tribes' claim to Fort Reno because the Tribe's claim to it arose in 1948 (when the Army transferred it to USDA and ended its use for "military purposes exclusively"). This was two years <u>after</u> the ICC's jurisdictional cut-off date of 1946.... That is, if the Tribes did not cede Fort Reno in 1891, but instead retained an interest in land that "vested" when the land no longer was to be used for military purposes, their claim did not ripen until 1948. Under this view, although the ICC settlement awarded further compensation to the Tribes for lands the Tribes ceded in 1891, it did not include compensation for the Fort Reno lands. (emphases in original, footnote omitted).

Attachment 1, Solicitor to Assistant Secretary for Indian Affairs, February 26, 1999, p. 9.

Thus dismissal on Rule 12(b)(1) or <u>res judicata</u> grounds deriving from the 1965 settlement of the ICC litigation is no more appropriate than a Rule 12(b)(6) dismissal deriving from the 1891 Agreement.

### C.  <u>EVENTS FOLLOWING THE 1948 TRANSFER</u>

#### 1. LEGISLATIVE PROPOSALS TO EXTINGUISH THE TRIBES' BENEFICIAL INTEREST AFTER THE 1948 TRANSFER

It is undisputed the 1948 Transfer prompted legislative proposals in 1949, 1950 and 1952 designed to extinguish the Tribes' beneficial interest in Fort Reno. H.R. 6114, <u>see</u> Attachment A to Defendant's Memorandum, was the final version of these proposals, which were brought forward precisely because certain Congressional adversaries recognized the Tribes' <u>continuing</u> beneficial interest in the lands of Fort Reno.

#### 2. MISREPRESENTATIONS AS TO THE GOVERNMENT'S INTENT TO EXTEND THE "MILITARY USES" OF FORT RENO LANDS BY MEANS OF AGENCY "SET-ASIDES"

Following the 1948 Transfer to the Department of Agriculture, the Government continued to use the property for "military purposes" by locating a mule and horse training facility on the Fort Reno lands for the possible military conflict between Turkey and Greece and later for Indo-China.

See Attachment 4.

In the spring of 1954, just as the Government was contemplating ending the "military use" of facilities at Fort Reno represented by training of horses and mules destined for service in Greece, the Tribes again asserted its claim for return of the Fort Reno lands when the military ceased using the property. See Attachment 3 (local news articles). The Government then announced the property would again be "set-aside" for possible military purposes in connection with the conflict in Indo-China. Ibid. (news article concerning Government's intent to set aside property for use in Indo-China, which was "believed to invalidate for the time" the Tribes claim to Fort Reno). However, instead of setting aside lands, the record shows the Government actually set aside certain buildings and facilities located on Fort Reno for "possible military purposes". See Attachment 2 (documentary record classified pursuant to the National Security Act of 1947).

The Government withheld the fact of this vitally important difference from the Tribes, employing the press of the day to articulate its position in disingenuous fashion. The Government then declared the matter an issue of national security and "classified" the actual terms of the "set-aside" at Fort Reno. Designating the matter an issue of "national security" had the effect of concealing the terms from the Tribes and the general public for forty years. Ibid..

> 2. THE TRIBES REASONABLY RELIED UPON GOVERNMENTAL MISREPRESENTATIONS CONCERNING CLASSIFIED "SET-ASIDES" IN 1954 ACTUALLY DEVOTED TO BUILDINGS RATHER THAN LAND

In the "severed petition" filed with the Indian Claims Commission in 1961, the Tribes asked that the ICC exercise its "powers in equity" and set aside the 1948 Transfer to the Department of Agriculture. Even though, as noted in the Solicitor's findings of February 1999, the ICC lacked jurisdiction to grant such relief, no other judicial action was available at the time to

enforce the Tribes' beneficial interest in the property.[5]

If the Tribes had known the 1954 set-aside pertained only to buildings and facilities located at Fort Reno and not the land itself, rather than relying upon the misrepresentations of their Government, the Tribes could have fashioned a private bill for relief in the Congress, sought money damages in the Court of Claims, or brought suit immediately once the Quiet Title Act was enacted in 1972. Instead it would be more than two decades after enactment of the Quiet Title Act before access to documents theretofore classified enabled the Tribes to discover the Government's deceptive and misleading treatment of the "set-aside" activity in 1954 it so promptly classified.

### III. ARGUMENT

#### A. THE APPLICABLE LEGAL PRINCIPLES

##### 1. MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

The standard on a Rule 12(b)(6) motion to dismiss is an exacting one. The Court is to construe the allegations in the light most favorable to the Plaintiff Tribes, while according them the benefit of all inferences reasonably to be drawn from the allegations. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). The Supreme Court made clear in the venerable Conley v. Gibson that the Court should not grant dismissal pursuant to Rule Rule 12(b)(6) unless the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id., 355 U.S. at 45-46.

---

[5]The Quiet Title Act codified as 28 U.S.C. 2409a was not enacted until 1972. Public Law 92-562, § 3(a), 86 Stat. 1176 (October 25, 1972).

## 2. MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)

The standard on a Rule 12(b)(1) motion is more generous to a defendant, in that "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  However, the Court should accept as true all the plaintiff's factual allegations,. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), and, in making the determination is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Academy. of Science, 974 F.2d 192, 197 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).

## 3. MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

The standard governing determination of a motion for summary judgment is exacting and well-settled.  Judgment pursuant to Rule 56 is appropriate only where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law,"  Fed.R.Civ.P. 56( c), and "[t]he district judge, in ruling on a motion for summary judgment must assume the truth of the non-movant's evidence, and draw all justifiable inferences in that party's favor." Bayer v. United States Department of the Treasury, 956 F.2d 330, 333 (D.C.Cir. 1992).

## B.  THE GOVERNMENT'S HAS FAILED TO ESTABLISH
## THAT DISMISSAL OR ENTRY OF JUDGMENT IS WARRANTED

We have explained the Tribes' reliance on determinations by the Solicitor of the Department of Interior that the language of cession appearing in the Agreement of 1891 does not warrant dismissal pursuant to Rule 12(b)(6); and that the 1965 settlement of Indian Claims Commission does not justify dismissal pursuant to Rule 12(b)(1).  See infra at 3, 5. We have not yet addressed the Tribes' argument for applying the doctrine of equitable estoppel to prevent the Government from asserting the running of the Quiet Title Act's twelve year limitation period any earlier than May 1994.

The applicability of equitable estoppel in a QTA context is an open question.  United States v. Beggerly, supra, 524 U.S. at 48-49 (Stevens, J., concurring).  Any plaintiff seeking such a remedy against the Government clearly must show "affirmative misconduct on [its] part", FDIC v. Hulsey , 22 F.3d 1472, 1489-90 (10th Cir. 1994), a "high hurdle for the asserting party to overcome."  Ibid.

We submit the existence of genuine issues bearing on the Government's conduct in concealing information relating to the actual terms of the "set-asides" for continuing "military uses" at Fort Reno, should nonetheless preclude entry of summary judgment on limitations grounds, where the record in the light most favorable to the Tribes clearly shows information classified for four decades would otherwise have revealed that only buildings and facilities at Fort Reno were subject to "set-asides" for possible military use, that the lands were no longer in "military use" status, and that Executive Order of 1883 therefore no longer represented an obstacle

to return of the lands or recognition of the Tribes' beneficial interest in them.  See Attachment 2.[6]

## CONCLUSION

For the foregoing reasons, Plaintiff Tribes respectfully request that this Court deny Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, and permit them to pursue a claim of paramount importance to the Tribes for more than a century.

Respectfully submitted,

LAW OFFICE OF RICHARD J. GRELLNER

/s/
Richard J. Grellner, OBA #15521, pro hac vice

439 NW 18th Street
Oklahoma City, Oklahoma 73103
Tel. (405) 834-8484
Fax: (405) 602-0990
E-mail; rjgrellner@hotmail.com

LAW OFFICE OF JOHN P. RACIN

/s/
John P. Racin   Bar No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202.265.2516

Attorneys for Plaintiff Tribes

---

[6] We also note that with benefit of formal discovery, the Tribes could well unearth additional evidence of "affirmative misconduct on the part of the [G]overnment", FDIC v. Hulsey, supra at 1489-90, relating to its conduct during the relevant period which would bolster its claim to the extraordinary remedy of equitable estoppel to prevent the Government from asserting the running of the QTA's twelve year limitations period any earlier than May 1994.