**ATTACHMENT 1**



THE SECRETARY OF THE INTERIOR
WASHINGTON

MAR 16 1999

Honorable Dan Glickman
Secretary of Agriculture
Washington, D.C. 20250

Dear Mr. Secretary:

I am writing concerning a longstanding dispute regarding Fort Reno, Oklahoma, the Cheyenne-Arapaho Tribes of Oklahoma, and the USDA's Agricultural Research Service.

The enclosed memorandum from John Leshy, Solicitor for the Department of the Interior, to the Assistant Secretary - Indian Affairs sets forth the factual and legal background of this dispute. The memorandum concludes that the Tribes have a credible, equitable, if not a judicially cognizable, claim to the lands at Fort Reno. It also points out that the Tribes could, under the Surplus Property Act, gain title to some or all of the Fort Reno lands now under the jurisdiction of the USDA were they declared "excess" to the needs of your Department. Senator Inouye and then-Representative Bill Richardson urged the USDA to consider this approach in 1994 when the ARS facility at Fort Reno was slated for closure.

I hope that you will give this matter serious consideration. We will be happy to provide any further information you may need.

Sincerely,

Enclosure

cc: John Leshy, Solicitor
Charles Rawls, General Counsel, Department of Agriculture
Kevin Gover, Assistant Secretary - Indian Affairs



United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

FEB 26 1999

Memorandum

To:         Assistant Secretary, Indian Affairs

From:       Solicitor

Subject:    Fort Reno Land Claim by the Cheyenne-Arapaho Tribes

This memorandum reviews the legal merits of a claim by the Cheyenne-Arapaho Tribes (Tribes) to approximately 7000 acres of land near Fort Reno, Oklahoma, including issues addressed in a March 1994 memorandum of the Office of General Counsel, Department of Agriculture (USDA) (copy attached). That memorandum concluded that the Tribes ceded Fort Reno lands in an 1891 allotment agreement and were compensated for that cession through a 1965 Indian Claims Commission (ICC) settlement. That memorandum was prepared to provide legal background for the Agriculture Department's consideration of a request by the Tribes to declare mineral rights under Fort Reno excess to federal needs.

As explained in what follows, we believe the Tribes have credible arguments that they did not cede the lands in 1891, were not compensated for the lands, and accordingly have an equitable claim for the return of the lands to their possession. The Tribes cannot pursue these arguments in court, however, because the Quiet Title Act, 28 U.S.C. § 2409a, requires that a civil action for U.S. property commence within twelve years of when the claim accrued. The claim accrued a half century ago.

Because the Tribes have a credible equitable, if not judicially cognizable, claim to Fort Reno lands, the possibility of returning these lands to the Tribe through administrative means should be considered. The USDA could use a provision of the Federal Property and Administrative Services Act (FPASA), 40 U.S.C. § 483(a)(2), to transfer land excess to its needs, through the General Services Administration, to the Department of the Interior to be held in trust for the Tribes. As discussed further below, a case might be made that at least some of Fort Reno is excess; that is, however, a determination for the USDA.

I.    The Cheyenne Arapaho Tribes' Claim to the Fort Reno Lands

A.    Factual Background

In 1867, the Cheyenne and Arapaho Tribes signed a treaty with the United States which set

1

aside certain lands in Oklahoma for a reservation for the Tribes. C.J. Kappler, 2 Indian Affairs: Laws and Treaties 984 (2d. Ed. 1904). The Tribes never resided on the reserved lands and the Department of the Interior recommended, after requests from the Tribes, that they be moved to the northern side of the Canadian River, still in Oklahoma. In 1869, President Grant signed an Executive Order reserving approximately 5.4 million acres for the Tribes and establishing a reservation for the Tribes on the Canadian River. In 1883, President Arthur signed an Executive Order proclaiming a military reservation (Fort Reno) on a 9,500-acre tract of land inside the Tribes' reservation. C.J. Kappler, 1 Indian Affairs: Laws and Treaties 842 (GPO 2d ed. 1904).

In 1891, the Cheyenne-Arapaho reservation was allotted and "surplus" lands opened to settlement by non-Indian settlers. See 26 Stat. 989 (March 3, 1891). The allotment allowed adult Indians to select 160 acres, but specifically excluded from selection lands currently used for military and other public purposes. Id. art. IV, at 1023. The allotment of tribal lands and the opening of surplus lands to non-Indian settlement resulted in the transfer of approximately 4.6 million acres out of Indian ownership.

In 1937, Congress transferred jurisdiction over 1,000 acres of Fort Reno land to the Department of Justice (DOJ) to establish a federal prison. See 50 Stat. 200 (May 24, 1937). In 1963, an Assistant Secretary of the Interior transferred another nearly 1,500 acres of Fort Reno lands to DOJ. See PLO 3089 (May 27, 1963). In 1948, Congress transferred the remaining lands of Fort Reno, then used by the Army's remount service, to USDA for use to "advance the livestock and agricultural interests of the United States." See Pub. L. No. 80-494, § 2, 62 Stat. 197 (April 21, 1948). The next year, Congress began consideration of whether to return Fort Reno to the Tribes. In both 1949 (H.R. 6111) and 1952 (H.R. 1631), bills to return Fort Reno to the Tribes passed the House but died in the Senate.

In 1951, the Tribes filed suit in the Indian Claims Commission seeking compensation for lands previously ceded to the United States. Eventually the Tribes' claims were amended to include a prayer for relief that the ICC "exercise its power in equity to set aside . . . the jurisdiction of the Department of Agriculture conferred by the Act of April 21, 1948" (transferring Fort Reno from the Army to DOA). See Severed Petition 329-A, Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States, ICC Docket Nos. 329 & 329-A (Nov. 1958) at 9. Eventually the case was settled. In September 1965, the Tribal Council, and the next month the ICC, approved a settlement awarding the Tribes $15 million for the 4.5 million acres of land ceded in 1891. 16 ICC 162, 165, 167-69 (1965).

B.  Discussion

1.  **The 1883 Executive Order probably contemplated that Fort Reno would be returned to the Tribes when the Army no longer needed it.**

The 1883 Executive Order creating Fort Reno was based on the assumption that the Army

2

would use the reservation for "military purposes exclusively." The War Department's request to President Arthur so stated. Both the Order, and the Army's request that the President sign it, were silent as to whether the reservation was a permanent one or whether the Tribes retained any rights to the land.

Some other executive orders creating military forts inside other Indian reservations did address this issue.[1] Although the Fort Reno order did not, there are four arguments for a contemporary understanding that Fort Reno would be returned to the Tribes when no longer needed for military purposes.

First, the Fort was apparently established to keep the peace among the Indians (to protect the Cheyenne and Arapaho from other Tribes) and to protect non-Indians. See Hearings on H.R. 4756 Before the House Subcomm. On Indian Affairs, 81st Cong. 1st Sess. (1949) at 95-96, 102, 123. Because its reason for existence was so closely identified with the presence of the Tribes on the surrounding land, it would be natural to assume that, once that reason no longer obtained, the Tribes maintained a continuing interest in the lands.

Second, the 1883 Order did not provide compensation to the Tribes for Fort Reno lands. Severed Petition 329-A, supra, at 9. By contrast, the allotment of the Tribes' reservation eight years later, like the allotment of many other reservations during the second half of the nineteenth century, included compensation ($1.5 million). 26 Stat. at 1022-23. The failure to provide compensation is an indicia that a permanent cession was not contemplated. See Solem v. Bartlett, 465 U.S. 463, 469 n.10 (1984).

Third, during congressional hearings between 1949 and 1952, a number of DOI officials, tribal members, and residents of neighboring Oklahoma communities testified that it was generally understood Fort Reno lands were to be returned to the Tribes when no longer needed for the Army's Fort. See Hearings on H.R. 4756 Before the House Subcomm. on Indian Affairs, 81st Cong., 1st Sess. (1949) at 79 (statement of Jesse Rowlodge, Tribal Chairman); at 93 (statement of Kish Hawkins, Tribal member alive during the late 1800s, asserting Fort Reno was established to prevent conflicts between Indians and non-Indians, with the intent to return lands to the Tribes upon fulfillment of this duty); at 96-98 (statement of J.F. Nighswander, non-Indian businessman from El Reno, Oklahoma, that the general community understanding was that the Tribes still owned Fort Reno); and at 112 (letter from Guy Hobgood, BIA

---

[1] See Fort Supply Military Reserve (Jan. 17, 1883), Kappler, supra, at 843 ("whenever ... required by the Secretary of the Interior for Indian purposes the same shall be relinquished by the military"); Fort Washakie (May 24, 1887), id. at 936 ("the use and occupancy of the land in question [is] subject to such right, title, and interest as the Indians have in and to the same, and that it be vacated whenever the interest of the Indians shall require it, upon notice to that effect to the Secretary of War"); Fort Du Chesne (Sept. 1, 1887), id. at 900 (identical language to that for Fort Washakie).

3

Superintendent, to Commissioner of Indian Affairs (April 20, 1945).

Fourth, diminishment of a reservation, like abrogation of any Indian right, "will not be lightly inferred." Solem, 465 U.S. at 470; Absentee Shawnee Tribe of Indians v. Kansas, 862 F.2d 1415, 1418 (10th Cir. 1988). Instead, congressional extinguishment of Indian title must be "plain and unambiguous." County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 248 (1985). See F. Cohen, Handbook of Federal Indian Law, 221-25 (1982 ed.).

For these reasons, we think the Tribes have a credible case that their interest in the lands continued after the Fort was created.

2.  **The Tribes have a credible argument that the 1891 allotment did not cede Fort Reno lands.**

As was the case with allotments elsewhere, the 1891 allotment of the Cheyenne-Arapaho Reservation created a process to break up Indian land holdings by conferring title in small parcels to individual Indians. This served the dual purpose of allowing encroaching non-Indians to settle on the resulting "surplus" land, and promoting the assimilation of Indians into the dominant non-Indian culture. To this end, Articles II and III of the 1891 allotment act provided:

> Subject to the allotment of land in severalty to the individual members of the [Tribes] as hereinafter provided for, and subject to the conditions hereinafter imposed . . . [the tribes] cede . . . all their claim, title and interest, of every kind and character, in and to the lands [in the 1869 Executive Order]
>
> \*\*\*
>
> Out of the lands ceded . . . by Article II hereof . . . each member of the said Cheyenne and Arapaho [sic] tribes of Indians over the age of eighteen years shall have the right to select for himself or herself one hundred and sixty acres of land . . .

29 Stat. 989, 1022-23 (emphasis added). One of the "conditions hereinafter imposed" was Article IV, which provided: "No person shall have the right to make his or her selection of land in any part of said reservation that is now set or occupied for military, agency, school, school-farm, religious, or other public uses." Id. at 1023 (emphasis added).

The underscored language of these two provisions is subject to at least two possible interpretations: The first is that they exclude military lands like Fort Reno only from selection by tribal members. Under this reading, the Army's Fort Reno lands, while not open to selection, would have been ceded to the United States in 1891. This is the way the Agriculture Department's memorandum assumes, without close analysis, that it should be read.

4

This is also the way DOI officials have read it in the past. See H.R. Rep. No. 1935, 82nd Cong., 2nd Sess. 3-6 (1952) (letter from DOI to Chairman, Committee on Interior and Insular Affairs); H.R. 4756, supra, at 116 (letter from DOI to Chairman, Committee on Public Lands). Further, a Solicitor's Opinion addressing DOI's authority to issue rights-of-way across allotted Indian lands stated in dictum, also without close analysis, that reserved lands were not excluded from the 1891 cession. Status of Allotted Lands of Tribes Organized Under Oklahoma Indian Welfare Act, 59 I. D. 1, 2 (1945). DOI has, in the past, advocated for the return of Fort Reno to the Tribes, but on the ground that the Tribes were inadequately compensated for it. See Hearings on H.R. 4756 Before the House Subcomm. on Indian Affairs, 81st Cong., 1st Sess. (1949) at 116.

The other possible interpretation, favored by the Tribes, is that the overall cession was subject to the conditions articulated in Article IV. Under this view, lands like Fort Reno with ongoing public uses were not ceded by the Tribe in 1891, but remained in their prior state of ownership. Three factors make this interpretation credible.

First, in negotiations leading up to the 1891 allotment, government negotiators assured the Tribes that only "surplus" lands would be ceded. See, e.g., DOI Transcript of 1890 Negotiations, passim. Since the Fort Reno lands were being used for military purposes, they were not "surplus" in 1891.

Second, many lands designated for religious, school, and agency purposes in 1891 have since been returned to the Tribes. See, e.g., 74 Stat. 1029 (Sept. 14, 1960) (4,900 acres declared excess to school and agency needs); 56 Stat. 21 (June 29, 1942); 52 Stat. 213 (Apr. 13, 1938). Additionally, some school and agency lands were sold with the proceeds held for the benefit of the Tribes. See 36 Stat. 533 (June 17, 1910); 35 Stat. 444, 447-48 (May 29, 1908).

Third, there is the longstanding principle that, given two plausible interpretations of a statute, ambiguities must be resolved in favor of the Indians. See Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978); Bryan v. Itasca Cty., 426 U.S. 373 (1976); Carpenter v. Shaw, 280 U.S. 363 (1930); Cohen, supra, at 224-25. Construing the ambiguous interplay between Articles II & III and the conditions in Article IV in the Tribes' favor would exclude Fort Reno lands from the cession.

3.   **The Tribes have a credible argument that they were not compensated for Fort Reno lands in the 1965 ICC settlement.**

The ICC was established through the Indian Claims Commission Act (ICCA), 60 Stat. 1049 (Aug. 13, 1946), and was authorized to hear, inter alia, claims for "unconscionable consideration" in "treaties, contracts, and agreements between the claimant and the United States." ICCA § 2(3). The Tribes pursued a claim in the ICC for the unconscionably small consideration for lands they ceded in 1891, and also asked the ICC to "exercise its power in

5

equity to set aside . . . the jurisdiction of the Department of Agriculture conferred by the Act of April 21, 1948." See Severed Petition 329-A, Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States, ICC Docket Nos. 329-329-A (Nov. 1958) at 9. In October 1965, the ICC reached a settlement for $15 million for the ceded lands. 16 ICC 162, 165 (1965). The October settlement was to "finally settle and dispose of all rights, claims or demands which the petitioner has asserted or could have asserted." Id. at 171-72.

The Agriculture Department memorandum concludes that this settled the Tribes' claim to Fort Reno. There are, however, strong arguments to the contrary. First, the Tribes's ICC claim for Fort Reno sought equitable relief; that is, they asked for the land back, not compensation for it. This is expressly articulated in their prayer for relief that the ICC "set aside . . . the jurisdiction conferred by the Act of April 21, 1948." Early in its history, however (and well before the Tribe filed its claim), the ICC limited its remedies to monetary relief. Osage Nation of Indians v. United States, ICC Docket No. 9 (Dec. 30, 1948) at 12 (The ICCA 'does not specifically state the character of relief the Commission may grant, but this lack of specificity is not vital, for its provisions plainly limit the relief to that which is compensable in money").

Second, and more important, the 1965 settlement could not have applied to the Tribes' claim to Fort Reno because the Tribe's claim to it arose in 1948 (when the Army transferred it to USDA and ended its use for "military purposes exclusively"). This was two years after the ICC's jurisdictional cut-off date of 1946.[2] That is, if the Tribes did not cede Fort Reno in 1891, but instead retained an interest in the land that "vested" when the land no longer was to be used for military purposes, their claim to it did not ripen until 1948. Under this view, although the ICC settlement awarded further compensation to the Tribes for lands the Tribes ceded in 1891, it did not include compensation for Fort Reno lands.

4. The Tribes' claim is untimely under the Quiet Title Act.

Federal sovereign immunity insulates the United States from suit in the absence of an express waiver from Congress. Block v. North Dakota, ex rel. Bd. of Univ. and Sch. Lands, 461 U.S. 273, 280 (1983). The Quiet Title Act (QTA) is one such waiver, providing that the United States "may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a). The QTA provides, however, that all such claims "shall be barred unless the action is commenced within twelve years of the date upon which it accrued." § 2409a(g). The Tribe's claim to Ft. Reno accrued when the land

---

[2] The ICCA provided that no claim accruing after the enactment date of August 13, 1946, could be considered by the Commission. 25 U.S.C. § 70a (1976). Claims accruing after that date were to be heard by the Court of Federal Claims under 28 U.S.C. § 1505 (renamed the Court of Federal Claims on October 29, 1992, 106 Stat. 4506, 4516).

6

ceased to be used for military purposes and was transferred to the USDA instead of being returned to the Tribes. The QTA also provides that actions "shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." Id. The consideration given in the late 1940s and the early 1950s to whether Fort Reno should be returned to the Tribes plainly demonstrates that the Tribes knew or should have known about their claim to Fort Reno in 1948, when the Army transferred the land to the USDA. Accordingly, the QTA deadline has long passed for them to bring a claim for the land.

## II. The United States Department of Agriculture could use the Federal Property and Administrative Services Act to transfer surplus lands at Fort Reno to the Tribes

The Fort Reno lands that Congress transferred in 1948 to USDA's Agriculture Research Service (ARS) can be returned to the Tribes through application of the FPASA, 40 U.S.C. § 483(a)(2), if the lands are identified as "underutilized" and excess to the current needs of the agency. "Underutilized" is defined in the applicable regulations to mean "an entire property or portion thereof . . . (i) [w]hich is used only at irregular periods or intermittently by the accountable agency for current program purposes . . . or (ii) [w]hich is used for current program purposes that can be satisfied with only a portion of the property." 41 C.F.R. § 101-47.801(a)(2). Any property determined to be excess qualifies under FPASA for transfer to Interior to be held in trust for the Tribes.[3]

We understand that the ARS buildings at Fort Reno take up roughly 25 acres out of the 7000 now occupied by USDA (approximately 2,500 of the original 9,500 acres are used by the Justice Department for prison facilities).[4] Some of the remaining USDA acreage is used for grasslands, grazing, and other research projects. In 1994, when the Congressional Research Service noted Fort Reno employed only 5 scientists and had low research productivity compared to similar ARS facilities, the Administration proposed that it be closed. Neither the House nor the Senate appropriation bills for FY 1995 would have appropriated funds to keep the facility open, but funding was included in the conference report and the final bill. The Administration proposed closure again in FY96 but again funding was included at the eleventh hour in the Congress.

The USDA is obligated to conduct an annual survey of real property under its control to

---

[3] For a discussion of transfer of excess lands to the Department of the Interior to be held in trust for the benefit of an Indian tribe, see 6 U.S. Op. Off. Legal Counsel 172 (1982).

[4] We understand that the Tribes are willing to discuss the transfer of the mineral estate with or without the entire land surface and make any reasonable accommodation regarding the continued operation of the prison facilities, the ARS research facilities, and a national veterans' cemetery which has from time to time been proposed at Fort Reno.

7

identify land which is either not needed, underutilized, or "not being put to optimum use." 41 C.F.R. § 101-47.201-2(a)(1). If USDA, through this survey or other means, determines any property or portion of property is excess to its needs, it must report the determination to the General Services Administration (GSA). Id. at § 101-47.201-2(a)(3). Thereafter, in most cases, land utilization regulations outline a screening process to facilitate transfer of the excess land to other federal agencies. Id. at § 101-47.203-2.

Congress has made special provisions for excess land located within the boundaries of former Indian reservations, including those in Oklahoma. A 1975 amendment to the FPASA provides:

> The [GSA] Administrator shall prescribe such procedures as may be necessary in order to transfer without compensation to the Secretary of the Interior excess real property located within the reservation of any group, band or tribe of Indians which is recognized as eligible for services by the Bureau of Indian Affairs. Such excess property shall be held in trust by the Secretary for the benefit and use of the group, band, or tribe of Indians, within whose reservation such excess real property is located: *Provided*, That such transfers of real property within the State of Oklahoma shall be made to the Secretary of the Interior to be held in trust for Oklahoma Indian tribes recognized by the Secretary of the Interior when such real property (1) is located within boundaries of former reservations in Oklahoma as defined by the Secretary of Interior and when such real property was held in trust by the United States for an Indian tribe at the time of acquisition by the United States" . . .

40 U.S.C. § 483(a)(2) (emphases added).

Based on the above FPASA provision, three requirements must be satisfied for § 483(a)(2) to apply: (1) the tribe must be recognized by the Secretary of the Interior, (2) the real property at issue must be located within the boundaries of a former Indian reservation; and (3) the property must have been held in trust when acquired by the United States for other federal purposes.

The Fort Reno lands currently occupied by USDA satisfy all three requirements. First, the Tribes are recognized by the Secretary of the Interior. See 63 Fed. Reg. 71941, 71942 (Dec. 30, 1998). Second, Fort Reno lands are located within the limits of the former Cheyenne-Arapaho reservation. The Secretary of War's recommendation to President Arthur expressly refers to Fort Reno as located inside the Tribes' reservation boundary:

> I have the honor to request that the following-described tract of land in the Indian Territory, located within the limits of the Cheyenne and Arapaho Indian reservation, created by Executive order dated August 10, 1869, be duly declared and set apart by the Executive as a military reservation for the post of Fort Reno.

8

Letter of Robert T. Lincoln to the President of July 17, 1883, quoted in Kappler, supra, at 842.

Third, the United States held the Fort Reno property in trust for the Tribes when it created the Army's post in 1883. Executive Order reservations, like the one reserved for the Tribes in 1869, are held in trust by the United States. See generally Nevada v. United States, 463 U.S. 110, 115, 127 (1983) (Pyramid Lake Indian Reservation); Seymour v. Superintendent, 368 U.S. 351, 354-56 (1962) (Colville Reservation); Cheyenne-Arapaho Tribes of Oklahoma v. State of Oklahoma, 618 F.2d 665, 667 (10th Cir. 1980).

In sum, if the USDA identifies any of the Fort Reno lands as underutilized and determines them to be excess to its needs, the requirements of 40 U.S.C. § 483(a)(2) are satisfied and the excess lands qualify for transfer to DOI to be held in trust for the Cheyenne-Arapaho Tribes.

III. Conclusion

While the Tribes have a credible legal basis for arguing that they retained a right to the return of Fort Reno lands upon abandonment of their use for military purposes, the Quiet Title Act's twelve year statute of limitations forecloses successful assertion of such a claim in court. However, the USDA could use a provision of the Federal Property and Administrative Services Act (FPASA), 40 U.S.C. § 483(a)(2), to transfer land and/or interests in land, such as the mineral estate under Ft. Reno, excess to its needs, through the General Services Administration, to the Department of the Interior to be held in trust for the Tribes.