# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **CHEYENNE-ARAPAHO TRIBES** | ) |
| **OF OKLAHOMA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES OF AMERICA, <u>et</u>** | ) |
| **<u>al.</u>,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**No. 06-519**

**Judge Paul L. Friedman**

_____)

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

MATTHEW McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

JAMES M. UPTON
Trial Attorney
U. S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P. O.  Box 663
Washington, D. C.   20044-0663

Attorneys for Defendants

# TABLE OF CONTENTS

I.    THE COURT LACKS SUBJECT MATTER  JURISDICTION
      OVER PLAINTIFF'S SUIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Section 22(a) of the ICCA Bars this Suit Because the Plaintiff
            Tribes were Paid for their Ft. Reno Lands Claim  . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Plaintiff's Suit is Barred by the QTA's Twelve-Year Statute of
            Limitations Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    The United States Supreme Court has Held that the
                  Statute of Limitations Provision in the Quiet Title Act
                  Cannot Be Equitably Tolled  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            2.    The Federal Courts Have Applied Strict Constructions
                  of the QTA's Statute of Limitations in Suits Brought by
                  Indian Tribes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            3.    The United States Supreme Court and this Circuit Have
                  Refused to Rule Equitable  Estoppel Runs Against the
                  Government in Cases Where the Issue Has Been Presented . . . . . . . . . . 9

            4.    Even if the Court Were to Hold that the Doctrine of Equitable
                  Estoppel Applies Here, a QTA Suit Would be Barred  . . . . . . . . . . . . . 10

            5.    Even if the Court Held that the Doctrine of Fraudulent
                  Concealment Could, in Theory, Apply Here, the Circumstances
                  Do Not Warrant Application Against the Government,
                  and, Even if Applicable, Could Avail the Tribes Nothing . . . . . . . . . . . 10

      C.    This Suit is Barred by the Doctrine of Res Judicata  . . . . . . . . . . . . . . . . . . . . 13

      D.    The Six-Year Statute of Limitations Period Governing Suits
            Filed Under the Declaratory Judgment Act, Indian Tucker Act
            and Other Jurisdictional Acts Cited in the Complaint Bars Suits
            Under The Cited Acts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.   PLAINTIFF'S CLAIM IS NOT A CLAIM UPON WHICH RELIEF
      MAY BE GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

A.     The Plain Language of the 1891 Cession Agreement Clearly
Ceded the Ft. Reno Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.     The Tribes' Contemporaneous Understanding of the 1890
Cession Agreement Supports Defendants' Position on the
Cession Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     1.     The Indians' Contemporaneous Understanding of the
Scope of the 1890 Cession Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 17

     2.     The Indians' Contemporaneous Understanding of the
Term "Surplus" 1869 Reservation Lands . . . . . . . . . . . . . . . . . . . . . . 20

     3.     The Tribes Would Have Understood They Were Ceding
Lands Reserved for Various "Public Uses", Including the
Ft. Reno Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.     The Government Intended that the Proposed Cession Encompass
the "Reserved" Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     1.     The Secretary of the Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     2.     The Members of the Cherokee Commission . . . . . . . . . . . . . . . . . . . . . 23

D.     The Commissioner of Indian Affairs' 1892 Interpretation of
the Cession Agreement Indicates the Ft. Reno lands Were Ceded . . . . . . . . . . 23

E.     The General Land Office Records Show the Government
Treated the Ft. Reno Lands as "Ceded" Lands . . . . . . . . . . . . . . . . . . . . . . . 25

F.     The Reasoning of the 1999 Opinion Cannot be Reconciled
with the Solicitor's Longstanding Definition of the Term
"Surplus"Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

G.     The Return of Certain Lands "Reserved" for Agency, School
and Religious Purposes Does not Somehow Support the
Conclusion that The Ft. Reno Lands Were not Ceded . . . . . . . . . . . . . . . . . . 26

H.     Paragraph No. 18 of the 1961 Severed Petition Cannot be
Reconciled With the Plaintiff's Present Position that the
Ft. Reno Lands Were not Ceded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Adeleke  v. United States,
    355 F. 3d 144 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

American Trucking Associations, Inc. v. United States,
    310 U.S. 534 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Andrade v. United States,
    202 Ct. Cl. 988, 485 F.2d 660 (1973),
    cert. denied, 419 U.S. 831 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Armed Forces v. James,
    278 F. Supp. 2d 37 (D.D.C.  2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Artichoke Joe's Cal. Grand Casino v. Norton,
    353 F. 3d 712 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Aulston v. United States,
    915 F. 2d  584 (10th Cir.1990), cert. denied, 500 U.S. 916 (1991) . . . . . . . . . . . . . . . . 28

Bender v. Rocky Mountain Drilling Associates,
    648 F. Supp. 330 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Chevron U.S.A., Inc. v. Natural Resources Defense Council,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

China Trade Center, L.L.C. v. Washington Metro. Area Transit Auth.,
    34 F. Supp.2d 67 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Christensen v. Harris County,
    529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Citizens Coal Council v. Norton,
    330 F. 3d 478 (D.C. Cir. 2003), cert. denied, 540 U.S. 1180 (2004) . . . . . . . . . . . . . . . 24

Grimmit v. Brown,
    75 F.3d 506 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Heckler v. Community Health Service of Crawford County, Inc.,
    467 U.S. 51 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hoffman v. United States,
    266 F. Supp. 2d 27 (D.D.C. 2003), aff'd, 96 Fed. Appx. 717 (Fed. Cir.2004),
    cert. denied, 543 U.S. 1002 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

Hopland Band of Pomo Indians v. United States,
    855 F. 2d 1573 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Immigration and Naturalization Service v. Cardoza-Fonseca,
    480 U.S. 421 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Minn. v. Mille Lacs Bands of Chippewa Indians,
    526 U.S. 172 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21-23

Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,
    472 U.S. 237 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Northern Paiute Nation v. United States,
    225 Ct. Cl. 275, 634 F.2d 594 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

NW. Band of Shoshone Indians v. United States,
    324 U.S. 335 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Office of Personnel Management v. Richmond,
    496  U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States,
    650 F.2d 140 (8th Cir. 1981), cert. denied, 455 U.S. 907 (1982) . . . . . . . . . . . . . . . . . . . 3

Pauley v. BethEnergy Mines, Inc.,
    501 U.S. 680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Renne v. Geary, 501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

San Carlos Apache Tribe v. United States,
    272 F. Supp. 2d 860 (D. Ariz. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Seneca-Cayuga Tribes of Oklahoma v. Nat'l Indian Gaming Comm'n,
    327 F. 3d 1019 (10th Cir. 2003), cert. denied, 540 U.S. 1218 (2004) . . . . . . . . . . . . . . . 14

Sioux Nation v. United States,
    316 U.S. 317 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

South Carolina v. Catawba Indian Tribe,
    476 U.S. 498 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

Spirit Lake Tribe v. North Dakota,
    262 F. 3d 732 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

State of New Mexico v. Navajo Tribe of Indians,
    809 F. 2d 1455 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

Tagliente v. Himmer,
    949 F. 2d 1(1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

United States Dep't of Energy v. Ohio,
    503 U. S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Beggerly,
    524 U.S. 38 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

United States v. Chemical Foundation,
    272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Dann,
    470 U.S. 39 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7

United States v. Mottaz,
    476 U.S. 834 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

United States v. Philip Morris, Inc.,
    300 F. Supp. 2d 61 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

W & F Building Maint. Co., Inc. v. United States,
    56 Fed. Cl. 62 (2003), aff'd, 70 Fed. Appx. 589 (Fed. Cir 2003) . . . . . . . . . . . . . . . . . 29

Western Shoshone Nat. Council v. United States,
    73 Fed. Cl. 59 (Fed. Cl. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

White Mountain Apache Tribe v. Hodel,
    784 F.2d 921 (9th Cir. 1986), cert. denied, 479 U.S. 1006 (1986) . . . . . . . . . . . . . . . 8, 13

Wilson v. Midway Games, Inc.,
    198 F. Supp. 2d 167 (D. Conn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## FEDERAL STATUTES

Indian Claims Commission Act,
>Pub. L. No. 79-926, 60 Stat. 1049, ch. 959, Act of August 13, 1946 (ICCA) . . . . . *passim*

Little Tucker Act,
>28 U.S.C. § 1362  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Quiet Title Act, Pub. L. No. 92-562,
>Act of October 25, 1972, 86 Stat. 1176, 28 U.S.C. §2409a (2007) . . . . . . . . . . . . *passim*

Pub. L. No. 86-792, Act of September 14, 1960, 86 Stat. 791  . . . . . . . . . . . . . . . . . . . . . . 27

Pub. L. No. 494, ch. 224, 80th Cong., Act of April 21, 1948, 62 Stat. 197 . . . . . . . . . . . . *passim*

National Security Act of 1947, Pub. L. No. 299, 80th Cong., ch. 414, Act of July 31, 1947, 61 Stat. 695, 703 - 704  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Pub. L. No. 419, ch. 24, Act of June 29, 1942, 56 Stat. 21 . . . . . . . . . . . . . . . . . . . . . . . . 27

Pub. L. No. 480, ch. 141, Act of April 13, 1938, 52 Stat. 213  . . . . . . . . . . . . . . . . . . . . . . 27

Pub. L. No. 103, 75th Cong., ch. 245, Act of May 24, 1937, 50 Stat. 200 . . . . . . . . . . . . . *passim*

## OTHER AUTHORITIES

Treaties/Agreements:

>November 13, 1890 cession Agreement, ratified by the Act of March 3, 1891,
>26 Stat. 989, 1022  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Executive Orders:

>Executive Order of July 17, 1883, 1 Kappler 842 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Agency Legal Opinions:

>Solicitor's Opinion of February 26, 1999  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

>Solicitor's Opinion M-33510, 59 I.D. 1 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

>Solicitor's Opinion M-36599, 69 I.D. 195 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Memorandum of March 18, 1994 from James B. Snow, Acting Assistant
General Counsel, Natural Resources Division, U.S. Department of Agriculture . . . . . . 16


Legislative History:

Excerpts from legislative history of HR 2039, introduced in 105th Cong.,
1st Sess. on June 25, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

H.R. Rep. No. 1559, 92nd Cong., 2d Sess. (1972), reprinted in
1972 U.S. Code Cong. & Ad. News 4547, 4550-51 [Quiet Title Act] . . . . . . . . . . . . . 10

Sen. Rep. No. 1617, 86th Cong., 2nd Sess. (1960) [Return of Cheyenne - Arapaho
subagency reserve] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Sen. Rep. No. 856, 77th Cong., 1st Sess. (1941) [Return of agency and school
lands to the Tribes] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Sen. Rep. No. 986, 75th Cong., 1st Sess. (1937) [Return of the Seger School
Reserve Lands to the Tribes] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## ATTACHMENTS

O            March 18, 1994 Memorandum of Office of General Counsel of USDA concluding Ft. Reno lands had been ceded in 1891.

P            Tribes' 1958 Severed Petition in their ICCA case and government's Answer filed in 1959.

Q            Excerpts from Volume 20 of series of General Land Office Tract books covering the Ft. Reno lands. [National Archives Record Group 49, Oklahoma Tract Book, Vol. 20, left and right hand side of pages 86, 87, 90, 91, 116, and 119]

R-1 thru R-11      Entire Transcript of the Negotiations between the Cheyenne-Arapaho Tribes and the Cherokee Commission leading to the cession of the 1869 Executive Order Reservation. [National Archives Record Group 75, Entry 310, Irregularly Shaped Papers, Cherokee Commission Journals].

S            Letter of September 30, 1890 from Secretary of Interior John Noble to David Jerome, Chairman of the Cherokee Commission. [National Archives Record Group 48, Letters Sent by the Secretary of Interior, Microcopy No. 606, Roll 67, Aug. 30 - Nov. 3, 1890].

T            Letter of August 9, 1892 from Commissioner of Indian Affairs Morgan to the Secretary of Interior. [National Archives Record Group 48, Indian Division Letters Received, 1881-1907, Entry 653].

U            Letter of October 22, 1891 from Commissioner of Indian Affairs Morgan to the Secretary of Interior.  [National Archives Record Group 48, Indian Division Letters Received, 1881-1907, Entry 653].

V            Report of December 15, 1892 by Commissioner Morgan concerning attorney contracts with Indian Tribes filed with Interior since January 1, 1889. [National Archives Record Group 48, Indian Division Letters Received, 1881-1907, Entry 653].

W-1 thru W-4      Legislative histories of the 1938, 1942 and 1960 enactments returning "reserved" lands and the failed 1997 Ft. Reno bill.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' REPLY

### I.    THE COURT LACKS SUBJECT MATTER  JURISDICTION OVER PLAINTIFF'S SUIT.

### Introduction

Plaintiff's Ft. Reno claim is barred because it was within the exclusive jurisdiction of the ICCA.  The payment of the 1965 final judgment under the ICCA in favor of the plaintiff Tribes represented "a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." (Section 22(a) of the ICCA).  Plaintiff's suit is doubly barred by the Quiet Title Act's statute of limitations provision.  The suit is also barred by the doctrine of res judicata.

Even if the Court was able to get past these jurisdictional hurdles, the plaintiff can state no claim upon which relief may be granted because under the plain language of the 1891 cession Agreement all of the lands within the exterior boundaries of the 1869 Executive Order Reservation, except the lands to be allotted in severalty to members of the Cheyenne and Arapaho Tribes, were ceded.  There is no room for ambiguity or for an ability to construe the language of Articles II and IV in such a manner that results in the exclusion of the Ft. Reno lands from the operation of the 1891 cession Agreement.  Indeed, the Indian canon of construction "does [not] permit disregard of the clearly expressed intent of Congress." South Carolina v. Catawba Indian Tribe, 476 U.S. 498, 506 (1986).

We stress that the plaintiff has the burden of establishing that jurisdiction over this lawsuit exists.  Renne v. Geary, 501 U.S. 312, 316 (1991).  Indeed, the United States Supreme Court presumes that federal courts lack jurisdiction, unless the contrary appears affirmatively

1

from the record.  <u>United States Dep't of Energy v. Ohio</u>, 503 U. S. 607, 614 (1992).  This

court has no jurisdiction over an equitable/moral claim.  Finally, the 1999 Solicitor's Opinion,

relied upon by the Plaintiff, itself recognized that the Ft. Reno claim was not justiciable because

it was barred by the statute of limitations provision of the Quiet Title Act.

The Plaintiff contends that the 1999 Solicitor's Opinion, whose reasoning it adopts as its

own, " . . . expressly rejected the [Defendants'] fundamental arguments . . ."  (Pl. Opp. at 1).

This is a gross misrepresentation of the actual relationship between the 1999 Opinion and the

government's opening arguments both as to the lack of subject matter jurisdiction and the failure

to state a claim.[1/]

### A.   <u>Section 22(a) of the ICCA Bars this Suit Because the Plaintiff Tribes were Paid for their Ft. Reno Lands Claim.</u>

The 1999 Solicitor's Opinion concluded that the Tribes had not been paid for their Ft.

Reno lands claim filed in the ICCA suit because the true gist of that claim was the Tribes' request

that the Indian Claims Commission set aside the 1948 transfer of the remaining Ft. Reno

lands to the Department of Agriculture.  The Commission denied this relief because it lacked the

equitable jurisdiction to grant such relief.  The 1999 Opinion concludes the Tribes were not paid

for their Ft. Reno claim because it was an "equitable" claim.

The Opinion simply ignores the fact that the real essence of the ICCA Ft. Reno claim (set

out in Paragraph No. 17(b) of the Tribes' 1961 severed/amended petition (Attachment C to

---

[1/] Comparing the 1999 Opinion with the arguments in Defendants' opening brief on lack of
subject matter jurisdiction shows the following: (1) the Opinion supports arguments II B and C;
(2) the Opinion does not address arguments II D and E; and (3) the Opinion does not refute
argument II A - - namely: the Tribes were "paid" for their Ft. Reno lands/Ft. Reno lands claim
within the meaning of Section 22(a) of the ICCA which bars the claim.

Defendants' opening Memorandum)) was a claim for money damages for the government's use of the Ft. Reno lands from July 17, 1883 (the date of the Executive Order creating the Ft. Reno Military Reserve) until the date of judgment in the ICCA case, as measured by the rental value of said lands. Thus, the Ft. Reno claim was, in essence, a pre-August 13, 1946 claim for money damages within the exclusive jurisdiction of the ICCA. Accordingly, this Court lacks subject matter jurisdiction over the plaintiff's present action against the United States. See Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States, 650 F.2d 140, 142-43 (8th Cir. 1981), cert denied, 455 U.S. 907 (1982) (upholding dismissal of Tribe's action to quiet title to the Black Hills of South Dakota, because "Congress . . . deprived the district court of subject matter jurisdiction by expressly providing an exclusive remedy for the alleged wrongful taking through the enactment of the [ICCA]."); State of New Mexico v. Navajo Tribe of Indians, 809 F. 2d 1455, 1460-1468 (10th Cir. 1987) (held that the ICCA was the exclusive remedy for tribal claims against the United States which accrued prior to August 13, 1946 - - the jurisdictional cutoff point under the ICCA); San Carlos Apache Tribe v. United States, 272 F. Supp. 2d 860, 895 (D. Ariz. 2003) (finding that because the Tribe's breach of trust claim should have been brought before the ICC, the court lacked jurisdiction to consider the claim).

Moreover, the payment of the 1965 final judgment in the ICCA suit automatically triggered the operation of Section 22(a) of the ICCA which provides that payment amounts to a "full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." Pub. L. No. 79-926, ch. 959, Act of August 13, 1946, 60 Stat. 1049, 1055. "This provision constitutes a limitation on the Government's waiver of sovereign immunity." Western Shoshone Nat. Council v. United States, 73 Fed. Cl. 59, 68 (Fed. Cl. 2006)

(citing <u>Dann</u>, 470 U.S. at 45).  Because it applies to the plaintiff's claim, Section 22(a) of the

ICCA removes jurisdiction from this Court.  <u>Id</u>.  One of the matters in controversy in the ICCA

suit was whether the Ft. Reno lands had been ceded under the 1891 Agreement.  <u>See</u> copies of

1958 Severed Petition and Answer thereto appended as Attachment P.[2]  We note that in the

instant suit Plaintiff seeks the award of money damages for the Defendants' use of the Ft. Reno

lands (as measured by rental values) for the 50 years prior to 2006 and is identical in nature to

the ICCA claim which sought use value from 1883 to 1965.[3]  More importantly, the Tribes must

be held to their articulation of the Ft. Reno lands claim set forth in Paragraph No. 17(b) of the

1961 severed petition; they should not be allowed to **circumvent their own formulation of**

**their Ft. Reno claim in their ICCA suit** by adopting the Solicitor's 1999 characterization of

this ICCA claim.  For the court to allow this circumvention of Section 22(a) would effectively

─────────────────

[2]  The Ft. Reno claim was first raised in a 1958 Severed Petition to which the government filed
an Answer in January, 1959.  Paragraph No. 9(b) of this 1958 pleading raises the Ft. Reno claim
and the wording thereof is identical to the wording of the Ft. Reno claim in Paragraph No. 17(b)
of the 1961 Severed Petition.  Paragraph No. 9 of the 1959 Answer acknowledged the existence
of the July 17, 1883 Executive Order, but denied all of the remaining allegations concerning the
Ft. Reno claim. After this Answer was filed, the parties were at issue on the merits of the Ft.
Reno claim.

[3] The Ft. Reno lands, like the rest of the 1869 Reservation lands, were held by Executive Order
title.  The court does not have jurisdiction to award the damages requested, even if it found it had
subject matter jurisdiction over this suit.  Since Executive Order title is not a vested property
interest within the meaning of the Fifth Amendment (<u>See</u> <u>Sioux Nation v. United States</u>, 316
U.S. 317, 325-330 (1943)), and damages cannot be recovered for the "taking" of such land by the
government, it follows that damages in the form of rentals for the government's use of such lands
should not be recoverable, either.  Such damages would only be recoverable under the ICCA.
<u>Northern Paiute Nation v. United States</u>, 225 Ct. Cl. 275, 286-287, 634 F.2d 594, 600-601
(1980). The Tribes have already been compensated for their ICCA Ft. Reno lands claim.  In
addition, it is a virtual certainty that the Tribes would seek far more than $10,000 in damages in
the present case.  If so, the amount in controversy would exceed the $10,000 jurisdictional
jurisdiction limit of the Little Tucker Act.  <u>Adeleke  v. United States</u>, 355 F. 3d 144, 151-152 (2nd
Cir. 2004).

4

vitiate Section 22(a).  Section 22(a) requires the court to examine the Tribes' ICCA claim in its

totality.  The essence of the ICCA Ft. Reno claim is a pre-1946 claim for money damages which

was within the exclusive jurisdiction of the ICCA.  Clearly, the payment of the 1965 final

judgment paid the Plaintiff Tribes for their Ft. Reno claim.

But even if the court were to decide that the Plaintiff was not paid for its Ft. Reno lands

claim, Section 22(a) still bars this suit because Paragraph No. 18 of the Tribes' 1961 Severed

 Petition effectively states that all of the lands within the 1869 Executive Order Reservation,

aside from the lands allotted, were "disposed of" for  homesteading and various other uses.

Paragraph No. 18 should be viewed, in effect, as an assertion that all of the lands within the 1869

Reservation, except those selected for allotment, were ceded.  Since both appraisers in the ICCA

case valued all of the land within the 1869 Reservation, except for the allotted lands, this means

that the payment of the 1965 final judgment paid the Tribes for the Ft. Reno lands as part of their

"unconscionable consideration" claim (that is, the claim in Paragraph No. 18(b) of the 1961

Severed Petition that the Tribes were paid "unconscionable consideration" within the meaning of

Clause (3) of Section 2 of the ICCA for the 1869 Reservation lands ceded in 1891).  Indeed, one

of the Tribes' previous counsel believed that the payment of the 1965 final judgment " . . .  must

include some payment for the Fort Reno lands." See Attachment M to our opening

Memorandum.

Even though the Plaintiff's present Ft. Reno claim is an equitable claim, Section 22(a)

still bars it.  See United States v. Dann, 470 U.S. 39, 42-46 (1985) (held that the payment of a

final judgment under the ICCA in favor of the Western Shoshone Tribe for the extinguishment of

its aboriginal title to about 24 million acres of land barred the defense that the Tribe still had

aboriginal title to the BLM lands at issue asserted by members of the Tribe against the government in BLM's equitable action for ejectment of two of the members' trespassing cattle from BLM's lands).

If Section 22(a) even bars the assertion of a <u>defense</u> against the <u>government's</u> subsequent equitable action against members of the plaintiff tribe, then, <u>a</u> <u>fortiori</u>, a subsequent equitable suit against the government involving the <u>very same </u>(or virtually identical) <u>claim by the same plaintiff tribe which had  recovered a final judgment on that claim under the ICCA and had been paid for the claim is necessarily barred.</u>  Such a reading of Section 22(a) is entirely consistent with Congress' basic intent in enacting the ICCA - - that is, to <u>finally dispose</u> of these "ancient" Indian claims against the United States.  <u>See</u> <u>United States v. Dann</u>, 470 U.S. at 43-46.

**B.**  **Plaintiff's Suit is Barred by the QTA's Twelve-Year Statute of Limitations Period Because the Doctrine of Equitable Estoppel is Not Applicable Here.**

Plaintiff argues that the Army documents which establish the actual terms of the 'set-aside' of the Ft. Reno property for possible future military use (namely, the set-aside was of "certain buildings and facilities" at Ft. Reno) - - as opposed to the set aside of Ft. Reno **lands - -** were classified pursuant to the National Security Act of 1947 and not declassified until 1994.  In effect, the Tribes are arguing that their claim did not accrue until 1954, but they did not learn this until 1994, and the doctrine of equitable estoppel should be applied here, thereby tolling the running of the statute of limitations from 1954 to 1994.  Plaintiff contends that its suit was, therefore, filed within the 12-year statute of limitations period applicable to suits under the QTA.  This argument should be rejected for both legal and factual reasons.

Specifically, Plaintiff argues that the Army classified as "secret" records which relate to

the military use of Ft. Reno after 1948. Plaintiff states that after the 1948 transfer of Ft. Reno to

Agriculture, the

> . . . Government still put the property to 'military purposes', in that it operated a
> facility for the training of horses and mules for military use in Greece. This use
> continued to 1954, when the Government ceased these training operations. * * *

Pl. Opp. at 5, n.4. Plaintiff states that the documents which contain the quoted information

were classified as "secret" pursuant to the National Security Act of 1947. Pl. Opp. at 7. Plaintiff

then asserts the government publicly announced the Ft. Reno **property** would be " . . . 'set aside'

for possible military purposes in connection with the conflict in Indo-China." Id. As noted, the

government allegedly classified the " . . . actual terms of the 'set-aside' at Fort Reno." The actual

terms show, according to Plaintiff, show that " . . .  the government was setting aside **"certain**

**buildings and facilities"** at Ft. Reno for possible future use by the Army, rather than the Ft.

Reno **lands**. Id. (Emphasis added).

 In Plaintiff's opinion, this supposed distinction between "buildings and facilities" and

"lands" makes the doctrine of equitable estoppel applicable.[4] This is a distinction without a

difference. The "buildings and facilities" at Ft. Reno are improvements to the Ft. Reno lands and

affixed to said lands. Thus, the possible future use of "certain buildings and facilities" is legally

tantamount to use of the Ft. Reno **lands**. Such a distinction cannot reasonably be viewed as a

"false representation" whose existence must be proven as a threshold requirement for applying

the doctrine of equitable estoppel to even a private litigant.[5]

_____

[4] Richard Grellner, plaintiff's counsel, promised to provide the government with legible copies of
all the documents appended to its Opposition brief, but has not done so.

[5] The doctrine of fraudulent concealment is closely akin to the doctrine of equitable estoppel.
The doctrine of fraudulent concealment only applies when a plaintiff can establish that the

1. **The United States Supreme Court has Held that the Statute of Limitations Provision in the Quiet Title Act Cannot Be Equitably Tolled.**

Plaintiff asserts it is an "open question" as to whether the doctrine of equitable estoppel can toll the running of the QTA's 12-year statute of limitations period.  (Pl. Opp. at 10).  However, United States v. Beggerly,  524 U.S. 38, 48-49 (1998) (also cited by Plaintiff) held that the QTA's statute of limitations period cannot be equitably tolled. ("The QTA . . . has already effectively allowed for equitable tolling . . . .  Given this fact, and the unusually generous nature of the QTA's limitations time period, extension of the statutory period by additional equitable tolling would be unwarranted.") (citations omitted).

2. **The Federal Courts Have Applied Strict Constructions of the QTA's Statute of Limitations in Suits Brought by Indian Tribes.**

The federal courts have rendered strict constructions of the QTA's statute of limitations in actions brought by Indian tribes.  E.g., White Mountain Apache Tribe v. Hodel, 784 F.2d 921, 926 n.5 (9th Cir. 1986), cert. denied, 479 U.S. 1006 (1986); and Spirit Lake Tribe v. North Dakota, 262 F. 3d 732, 738 (8th Cir. 2001); and Navajo Tribe of Indians v. New Mexico, 809 F. 2d 1455, 1468 (10th Cir. 1987).

---

defendant actively misled the plaintiff (Hoffman v. United States, 266 F. Supp. 2d 27, 42 (D.D.C. 2003), aff'd, 96 Fed. Appx. 717 (Fed. Cir. 2004), cert. denied, 543 U.S. 1002 (2004)) and defendant's acts of concealment must have been directed at the plaintiff.  Wilson v. Midway Games, Inc., 198 F. Supp. 2d 167 (D. Conn. 2002).  Plaintiff has not made any showing that either the 1954 press release which they cite or the government's classification of the 1954 MOU between the Department of Agriculture and the Army as secret was done for the purpose of misleading the Tribes.  In other words, the Defendants' actions must have been taken with the intent to deceive the Tribes.  Tagliente v. Himmer, 949 F. 2d 1, 6-7 (1st Cir. 1991).  More importantly, if the QTA's statute of limitations cannot be equitably tolled, then the doctrine of fraudulent concealment is of no help to plaintiff, either.

**3.** **The United States Supreme Court and this Circuit Have Refused**
**to Rule Equitable Estoppel Runs Against the Government in**
**Cases Where the Issue Has Been Presented.**

Neither the United States Supreme Court nor the United States Court of Appeals for the

District of Columbia Circuit "has ever upheld a finding of equitable estoppel against the

Government." United States v. Philip Morris, Inc., 300 F. Supp. 2d 61, 70 (D.D.C. 2004). See

also Nat'l Conference on Ministry to the Armed Forces v. James, 278 F. Supp. 2d 37, 50 (D.D.C.

2003). While the United States Supreme Court has refused to rule that the doctrine of equitable

estoppel may never apply to the Government, the Supreme Court has recognized that the

arguments in favor of a flat prohibition on the application of the doctrine to the government are

"substantial." Office of Personnel Management v. Richmond, 496 U.S. 414, 423 (1990). In

any event, it is clear that the doctrine cannot be applied to the government "on the same terms as

any other litigant." Heckler v. Community Health Service of Crawford County, Inc., 467 U.S.

51, 60 (1984). Any litigant which seeks to have the doctrine applied to the government has a

"heightened burden." Philip Morris, 300 F. Supp. 2d 61 at 70. Defendants read these decisions

as having created, in effect, a very strong presumption against the application of the equitable

estoppel doctrine against the federal government.

We also note that Plaintiff ignores the strong presumption that federal government

officials act properly and in good faith in carrying our their official duties. United States v.

Arredondo, 31 U.S. (6 Peters) 691, 727-28 (1832); United States v. Chemical Foundation, 272

U.S. 1, 14-15 (1926) (a "presumption of regularity supports the official acts of public officers

and, in the absence of clear evidence to the contrary, courts presume that they have properly

discharged their official duties."); China Trade Center, L.L.C. v. Washington Metro. Area

9

Transit Auth., 34 F. Supp.2d 67, 70-71 (D.D.C. 1999) ("Government officials are presumed to act in good faith . . . . Plaintiff must present 'well-nigh irrefragable proof' of bad faith or bias on the part of government officials in order to overcome this presumption.") (citations omitted); Andrade v. United States, 202 Ct. Cl. 988, 997-98, 485 F.2d 660, 664-665 (1973), cert. denied, 419 U.S. 831 (1974) (presumption applied to government's attorneys when accused by plaintiffs of having acted in "bad faith").

### 4.  Even if the Court Were to Hold that the Doctrine of Equitable Estoppel Applies Here, a QTA Suit Would be Barred.

Even if the court were to hold the doctrine of equitable estoppel applied to the government, here, with the result that the QTA's 12-year statute of limitations was tolled until 1994, as the Plaintiff contends, **a QTA suit still would be barred.**  This is because Section 22(a) of the ICCA "trumps" the QTA claim because any QTA claim would necessarily be a claim "touching . . .  matters in controversy" in the ICCA suit - - the principal matter being whether the Ft. Reno lands were ceded under the 1891 cession  Agreement.[6/]

### 5.  Even if the Court Held that the Doctrine of Fraudulent Concealment Could, in Theory, Apply Here, the Circumstances Do Not Warrant Application Against the Government, and, Even if Applicable, Could Avail the Tribes Nothing.

In addition to foregoing arguments 1 through 4, an examination of the established criteria

---

[6/] It is important to note that in enacting the QTA, Congress did not intend to reopen the federal courts to Indian claims accruing before August 13, 1946.  Certainly, nothing in the QTA or its legislative history evinces an intent to repeal the limitations provisions of the ICCA, and no such repeal should be implied.  See  United States v. Mottaz, 476 U.S. 834, 850-51 (1986).  In fact, the QTA's legislative history is unequivocal in expressing Congress's intention to bar stale land claims against the United States.  See e.g., H.R. Rep. No. 1559, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S. Code Cong. & Ad. News 4547, 4550-51.

for the application of the doctrine of fraudulent concealment clearly demonstrates  it is <u>not</u>

applicable to the government, either, in this case.  The plaintiff must establish two prerequisites

for the court to apply the fraudulent concealment doctrine:

> defendant actively misled the plaintiff, and that the plaintiff "had neither actual
> nor constructive notice of the facts constituting [the plaintiff's] cause of action despite
> [the plaintiff's] due diligence."

<u>Hoffman v. United States</u>, 266 F. Supp. 2d 27, 42 (D.D.C. 2003), <u>aff'd</u>, 96 Fed. Appx. 717 (Fed.

Cir.2004), <u>cert</u>. <u>denied</u>, 543 U.S. 1002 (2004), quoting <u>Grimmit v. Brown</u>, 75 F.3d 506 (9th Cir.

1996).  The doctrine of fraudulent concealment requires a showing that the Defendants intended

to mislead the plaintiff, but the plaintiff has not shown that the government's 1954 press release

about the 1954 MOU between the Agriculture Department and the Army was done with the

intent to deceive the plaintiff.  <u>Tagliente v. Himmer</u>, 949 F. 2d 1,  6-7 (1st Cir. 1991).[7/] The same

is true of the classification of the 1954 MOU itself.

The Plaintiff assumes, without corroborating evidence, that the government officials in

the Army and Department of Agriculture actively intended to deceive the Tribe about the Army's

possible future use of the Ft. Reno Reserve.  Again, the strong presumption that government

officials act properly and in good faith in carrying out their official duties should not be ignored.

The plaintiff cannot satisfy the second prerequisite for the application of the fraudulent

concealment doctrine, either - - namely, show the Plaintiff Tribes had neither "actual or

constructive notice of the facts constituting [its] cause of action."  In fact, the Tribes got actual

notice of the facts comprising their cause of action under the QTA no later than 1948 when the

---

[7/] The Plaintiff has not proven the existence of any intent by the government to deceive the
plaintiff Tribes.

Congress transferred the remaining Ft. Reno lands to the Department of Agriculture.  Indeed, the

Ft. Reno lands were not being used for "military purposes exclusively" (as the July 17, 1883

Executive Order described the original use) once Congress transferred 1,000 acres of Ft. Reno

lands to the Bureau of Prisons in 1937.  See e.g., Hopland Band of Pomo Indians v. United

States, 855 F. 2d 1573, 1577 (Fed. Cir. 1988) (held that a cause of action "accrues" for statute of

limitations purposes " . . . when all events have occurred which fix the alleged liability of the

defendant and entitle the plaintiff to institute an action").

   Interestingly, the archival GLO records concerning Oklahoma support the 1948 accrual

date as well.  Specifically, we refer to Volume 20 of the GLO Tract Books covering Oklahoma

(See Attachment Q)[9] which contains a notation that the 1937 transfer of Ft. Reno lands [the

1,000 acres] to the Bureau of Prisons "revoked" the July 17, 1883 Executive Order with respect

to the lands transferred.  It follows that the 1948 transfer of the remaining Ft. Reno lands to the

Department of Agriculture **revoked** the 1883 Executive Order as to these transferred lands.

Arguably, once the 1948 transfer occurred the 1883 Executive Order became a nullity.

   Finally, a court will not even reach the issue of fraudulent concealment in situations

where the court finds the plaintiff had notice of the defendant's action(s) giving rise to the

alleged claim.  Bender v. Rocky Mountain Drilling Associates, 648 F. Supp. 330, 335 (D.D.C.

1986).  The Plaintiff had notice of its claim no later than 1948 when the remaining Ft. Reno

lands were transferred to Agriculture.  The Solicitor's 1999 Opinion concludes the Plaintiff's

---

[9] The Defendants' counsel has examined the photographic copy of the pages of Volume 20 (just
delivered on April 5, 2007) which Main Archives obtained at his request (see Attachment Q).
For some reason, the page(s) with said notation did not get copied.  Defendants' counsel will
provide the Court with a copies of the missing page(s) as soon as possible.

QTA cause of action accrued in 1948.[9]   Finally, even if the decision in <u>United States v.</u>

<u>Beggerly</u>, 524 U.S. 38 (1998) could be circumvented somehow, and the Court held the doctrine

of fraudulent concealment applicable, it **could avail plaintiff nothing** because Section 22 (a) of

the ICCA trumps any QTA claim.

### C.   <u>This Suit is Barred by the Doctrine of Res Judicata</u>.

Our opening Memorandum discusses the defense of <u>res</u> <u>judicata</u>.  We do not repeat the

argument here, but rather stress that the Ninth Circuit held that the doctrine applied to an

equitable claim brought in federal district court by the same tribe which had belatedly attempted

to raise the same claim (that is, a claim based on the same transactional facts) as a money

damages claim under the ICCA.  <u>White Mountain Apache Tribe v. Hodel</u>, 784 F. 2d 921, 925-

926 (9th Cir. 1986) <u>cert. denied</u>, 479 U.S. 1070 (1986).  Suffice to say that Plaintiff's Opposition

does not address this defense and it should be deemed to have been conceded.  This defense, by

itself, warrants dismissal of this lawsuit.

### D.   <u>The Six-Year Statute of Limitations Period Governing Suits Filed Under the Declaratory Judgment Act, Indian Tucker Act and Other Jurisdictional Acts  Cited in the Complaint Bars Suits Under The Cited Acts</u>.

We reiterate that the governing six-year statute of limitations period which controls suits

filed under the Declaratory Judgment Act, Indian Tucker Act and other jurisdictional statutes

---

[9] Plaintiff suggests that the government's statute of limitations argument is somehow defeated by the fact that the QTA was not enacted until 1972. (Pl. Opp. at 8). This suggestion has no merit. <u>See</u> <u>United States v. Mottaz</u>, 476 U.S. 834, 841-44 (1986) (QTA statute of limitations held to apply to the claim of BIA's unauthorized sale of three Indian allotments which was held to have accrued no later than <u>1967</u>  - - five years before the QTA was enacted).

cited in the Complaint bars this suit under these jurisdictional statutes.[10]  The doctrine of equitable estoppel, even if applicable, cannot salvage these claims.  Even if the plaintiff's accrual date of 1994 for its QTA claim were to be applied to the pursuit of its Ft. Reno claim under these other statutes, the claim would still be time-barred.  In any event, Plaintiff's Opposition did not address the substance of this defense, either.

In sum, this case must be dismissed with prejudice because the court lacks subject matter jurisdiction over this lawsuit.

## II.  PLAINTIFF'S CLAIM IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED

### Introduction

Plaintiff contends, in effect, that the 1999 Solicitor's Opinion conclusively refutes Defendants' arguments that the Complaint fails to state a claim upon which relief may be granted because the Ft. Reno lands were ceded under the November, 1890 cession Agreement which was ratified by the Act of March 3, 1891 (hereinafter referred to as the "1891 cession Agreement"). Again, the 1999 Opinion concluded that the Ft. Reno claim is not justiciable because it should have been brought under the Quiet Title Act (28 U.S.C. § 2409a (2007)), but was not, and is barred by the QTA's 12-year statute of limitations period.   A fuller examination demonstrates multiple reasons for rejecting any use of the 1999 Opinion that attempts to undercut the plain reading of the 1891 cession Agreement that the Ft. Reno lands were ceded.

As plaintiff concedes, the 1999 Opinion is not binding on the government.  See  Seneca-Cayuga Tribes of Oklahoma v. Nat'l Indian Gaming Comm'n, 327 F. 3d 1019, 1042-43 (10th Cir.

---

[10] Plaintiff's Opposition states that Plaintiff is relying solely on the QTA, but plaintiff might change its position.

2003) cert denied, 540 U.S. 1218 (2004). Indeed, an agency's interpretation of a statute contained in an opinion letter lacks the force of law and does not require Chevron-style deference. Christensen v. Harris County, 529 U.S. 576, 587 (2000). Plaintiff argues that the degree of weight to be accorded to the 1999 Opinion is directly commensurate with its 'power to persuade.' (Pl. Opp. at 4).

The Defendants' Memorandum in support of its Motion to Dismiss begins the analysis of the cession issue by examining the language of the 1891 cession Agreement. The 1999 Solicitor's Opinion concludes that the language of the Agreement is ambiguous and, therefore, considers **a part** of the Transcript of the Negotiations (between the Tribes and the government leading to the November 13, 1890 cession agreement which was ratified on March 3, 1891) (and two other "factors") in support of the conclusion that the Ft. Reno lands were not ceded. The following arguments refute the plaintiff's Opposition (which is based solely on the 1999 Opinion) with respect to the "cession" issue.

### A. The Plain Language of the 1891 Cession Agreement Clearly Ceded the Ft. Reno Lands.

The plain language of Article II of the 1891 cession Agreement ceded all title, rights and interest in the lands within the Tribes' 1869 Executive Order Reservation to the United States. Article II excepted from cession only the lands to be allotted in severalty. The legal description of the lands ceded included all the other lands on the Reservation and made no exception for the "reserved" lands identified in Article IV as lands used for agency, school, military and religious purposes which necessarily included Ft. Reno. The contemporaneous report of the Cherokee Commission which negotiated the cession confirms there was a total relinquishment of all lands on the Reservation, except the lands to be allotted. See Attachment F to opening Memorandum.

15

There is no ambiguity in the pertinent language of the cession Agreement or any reason to resort to the Indian canon of construction applicable to Indian treaties/agreements (which requires that ambiguities must be resolved in favor of Indian tribes). See South Carolina v. Catawba Indian Tribe, 476 U.S. 498, 506 (1986). Here, the plain and unambiguous text of the cession Agreement compels a reading that the Ft. Reno lands were ceded; the Court need go no further.[1/]

### B. The Tribes' Contemporaneous Understanding of the 1890 Cession Agreement Supports Defendants' Position on the Cession Issue.

The 1999 Opinion proceeds from the language of the 1890 cession agreement (which the Solicitor believed did not resolve the issue of whether the Ft. Reno lands were ceded in 1891) to the history of the negotiations leading to the Agreement. The Opinion notes that the government "assured the Tribes" during the negotiations  that they were ceding  "surplus" lands only, but that constitutes the end of the Solicitor's 1999 analysis. The Solicitor did not undertake the next logical step - - namely, he apparently made no attempt to determine the Tribes' contemporaneous understanding - - that is, their understanding as of 1890 - - of the term "surplus" lands.  Instead, the Solicitor reasons that "[s]ince the Ft. Reno lands were being used for military purposes they were not 'surplus' in 1891." (1999 Opinion at 4-5 ).

---

[1/] This reading accords with the March 18, 1994 reading of the cession Agreement by James B. Snow, Acting Assistant General Counsel, Natural Resources Division, U.S. Department of Agriculture to Arthur Nies, Assistant Deputy Administrator, Agricultural Research Service.  The 1999 Solicitor's Opinion acknowledges this 1994 Memorandum and other pronouncements on the cession issue by a prior Solicitor (Solicitor's Opinion M-33510, 59 I.D. 1 (1945); a 1949 letter to Congress by the Under Secretary of Interior; and a 1952 letter to Congress by the Secretary of Interior. These two letters are contained in Attachment A to Defendants' opening Memorandum.  A copy of the 1994 Memorandum is appended as Attachment O, since the last Attachment to our opening Memorandum was Attachment N.

While the plain language of Articles II and IV of the 1891 Agreement should resolve the cession issue, the history of the 1890 negotiations leading to the Agreement compels a determination that the Tribes' contemporaneous understanding of the scope/reach of the 1891 cession was that it encompassed "surplus" lands and that the term "surplus" lands meant all the lands on the 1869 Reservation, except the lands to be allotted, and included the Ft. Reno lands. Indeed, the fundamental touchstone for interpreting any Indian treaty or agreement (the 1891 cession Agreement is the functional equivalent of a treaty of cession because Congress refused to enter into treaties with Indian tribes after 1871) is what the Indians understood the terms of the particular treaty/agreement to mean at the time it was negotiated - - that is, the Indians' contemporaneous understanding. E.g., Minn. v. Mille Lacs Bands of Chippewa Indians, 526 U.S. 172, 196 (1999) (held that an Indian treaty/agreement should be construed to give effect to the terms thereof as the Indians themselves would have understood them). But, in addition, it is important to determine the intentions of the parties to the treaty/agreement. 526 U.S. at 196; see also Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 349 (1945) (held that the terms of the Indian treaty there at issue should be construed according to the tenor of the treaty and according to what the parties understood the treaty to mean at the time it was negotiated).

    1. **The Indians' Contemporaneous Understanding of the Scope of the 1890 Cession Agreement.**

During the negotiations leading to the November 13, 1890 cession Agreement, the Indians made a number of statements addressed to the scope of the proposed cession.[12]

---

[12]The entire Transcript of the Negotiations has been appended as Attachments R-1 through R-11. The need to split the Transcript into 11 parts was necessitated by the size constraints on individual documents under the court's electronic filing system. Simultaneously with the filing

However, since these should be considered in context, we have also quoted the pertinent

statements on the scope of the proposed cession made by the members of the Cherokee

Commission who negotiated the cession of the 1869 Executive Order Reservation lands.

At the outset of the third day of negotiations,  July 9, 1890, Commission Chairman

Jerome stated, in pertinent part, as follows:

* * * *

If you decide to do what the President wants you to do [cede the 1869 Executive Order Reservation] this Commission will agree with you how much land you ought to have and **how much money you ought to have for your interest in the lands that you do not select for homes. . . . .**

* * * *

Now we want you to write in this paper [the cession agreement] that after you have all your lan[d]s pick[e]d out as I will state by and by that **you will say to the United States that it may have the rest of the reservation**.  * * * **The Government also set apart on this reservation a Military Reservation containing fourteen or 15 sections**, we also propose that that [sic] shall be set aside so that no Indian nor white man can take his home on  this reservation.   : the [sic] Government has set apart land in this reservation for an Agency  both here and in other places, and for schools a[n]d for churches and where the  government has set aside land for school, military, church or agency purposes and we  propose that no Indian can take his home on any of that. . . .

* * * *

See  Attachment R-1 at 9-10 [Emphasis added].  See also  Attachment R-3 at 41 and R-4 at 65;

Attachment R-1 at 8.  These references document those instances in which the Commission

members reiterated that the Indians may not take [select] allotments on the "reserved" lands.

At the October 7, 1890 negotiating session, Commission Chairman Jerome stated that

once the Indians had selected their allotments,

---

of this brief, the Defendants are moving for leave to file a certified paper copy of the entire
Transcript because despite our most careful efforts some portions of the scanned copy are
illegible.  We are providing the Plaintiff with a paper copy and the court with a courtesy copy.

18

* * * *

> **"then the Government wants the title to the rest of the land released to them so they can make use of it ."**

* * * *

See Attachment R-5 at 2.  Two days later, Commissioner Sayre told the Indians that the

government  wanted them to enter into a contract with the government which would contain

certain provisions; in pertinent part, he stated  as follows:

* * * *

> First except for the land that the Indians may want and need for their own homes and farms, **we want the Indians to relinquish or give up all the land they have in this territory** [the lands within the external boundaries of the 1869 Executive Order Reservation]
>
> * * * *
>
> The exception to this is that we don't want any Indian to claim a home or a farm on any of the school or farm or agency or **military reservations that we want to keep**.

* * * *

See  Attachment R-5 at 5.  [Emphasis added].

The Indians understood that they were ceding only "surplus" lands.  For example, one of

the Arapaho Indians, Left Hand, stated on July 11, 1890:

* * * *

> You made this offer to us and I thought over it and I am going to set a price on this land and I want you to think over it. He says he is willing to **sell the surplus land** for $1.45 per acre; he is willing to take these allotments providing that each man, woman and child has 160 acres of land.

* * * *

See Attachment R-2 at 22 [Emphasis added].  Five other Indians expressly referred to "surplus"

 lands at this same session. Id. at 22-25. One of the five, Heap of Wolves, stated in

19

pertinent part, as follows:

> . . . .    the great father wants to buy the land and we are willing to sell it for $1.45
> per acre, the surplus land, I love the land but since the government want to buy the land I
> am willing to sell it for the price stated, and **all he wants [us] to sell is the surplus land.**

* * * *

Attachment R-2 at 24.

### 2.  <u>The Indians' Contemporaneous Understanding of the Term "Surplus"</u>
### <u>1869 Reservation Lands</u>.

The Indians understood that the term "surplus" lands meant all 1869 Reservation lands

other than those selected for allotment.  On July 11, 1890, Row of Lodges (referring to Cloud

Chief, a Cheyenne Indian) stated, in pertinent part, as follows:

> "He says that if he and all his people are to **take allotments** that they are to take
> 160  acres all round and **he says that if there is any surplus land** they would like to sell
> it at $1.45."

<u>See</u> Attachment R-2 at 23 [Emphasis added].  The statements of at least five other Indians at the

same session show that they understood the term "surplus" lands meant all lands within the

Reservation, except those lands which were to allotted.  <u>See</u> Attachment R-2 at 24-25.

On July 12, 1890, Commissioner Sayre effectively confirmed the Indians' understanding

of the term"surplus" lands.  After speaking about the matter of selecting allotments, Sayre

noted:

* * * *

> "Now I want to talk to you a few minutes about the money that the
> Commissioners offer to the Indians **for the residue or surplus lands. . . .**"

* * * *

<u>See</u> Attachment R-2 at 31 [Emphasis added].   On October 13, 1890, Scabby Bull

stated, in pertinent part, as follows:

* * * *

> ". . .  I do wish **after we take up our lands in severalty that there would be a**

20

**fence all round it so we can sell the surplus land. "**

\* \* \* \*

<u>See</u> Attachment R-9 at 36 [Emphasis added].

### 3.   <u>The Tribes Would Have Understood They Were Ceding Lands Reserved for Various "Public Uses", Including the Ft. Reno Lands</u>.

The history of the negotiations leading to the November, 1890 cession Agreement establishes the Tribes understood that: (1) the lands which were being ceded were "surplus" lands only; and (2) the term "surplus" lands meant all 1869 Executive Order Reservation lands other than those selected for allotment.  Commissioners Jerome and Sayre expressly told the Indians that after they had selected allotments they would be ceding the " **. . . the rest of the [R]eservation**" and expressly stated that the "rest of the [R]eservation" **included ". . . a Military Reservation containing fourteen or 15 sections . . . ."** [that is, Ft. Reno] and other lands "reserved" for "school, . . .  agency and church" uses. [Emphasis added].  Aside from the land selected for allotments, Commissioner Jerome stated that:

> **" . . . the Government wants the title to the rest of the land released to them so they can make use of it."**

Attachment R-5 at 2.

In sum, the Tribes' contemporaneous understanding of: (1) the scope of the cession; and (2) the meaning of the term "surplus" lands, compels the conclusion that they "would have understood" (the Supreme Court's phraseology in <u>Minn. v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172, 196 (1999)) that they were ceding the lands "reserved" for various "public uses", which includes the lands comprising Ft. Reno.

21

C.  **The Government Intended that the Proposed Cession Encompass the "Reserved" Lands.**

In addition to ascertaining the Indians' contemporary understanding of a treaty/agreement, it is essential for the court to determine the "intentions of the parties" at the time the treaty/agreement was negotiated, which means ascertaining the intentions of the Secretary of the Interior and the members of the Cherokee Commission who negotiated the treaty/ agreement, as well as the Indians' intentions.  Minn. v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999); and Nw. Bands of Shoshone Indians v. United States, 324 U.S. at 349.

1.  **The Secretary of the Interior.**

About a week before the second set of cession negotiations began on October 7, 1890, Secretary of the Interior John Noble wrote a letter to David Jerome, Chairman of the Cherokee Commission, which specified what Noble regarded as the desirable scope of the proposed cession.  The letter states, in pertinent part, as follows:

* * * *

"I have to say that I consider that your negotiations should still proceed upon the basis of the **total relinquishment by the Indians of all their claims to any land, wherever [sic] situated  . . . .**"

* * * *

[Emphasis added]  See letter of September 30, 1890, copy appended as Attachment S.   Since Plaintiff claims a present beneficial interest in the Ft. Reno lands which allegedly originated in 1883, Secretary Noble's stated intention to have the Cheyenne-Arapaho Tribes agree to a "total relinquishment of all their claims to any land, wherever [sic] situated" was so sweeping that it necessarily encompassed all  the "reserved" lands which were located on the Reservation,

22

including the Ft. Reno lands.  This expression of the Secretary's intention in seeking an

expansive cession agreement is entitled to great weight.  <u>Mille Lacs Band of</u>

<u>Chippewa Indians</u>, 526 U.S. at 196.

### 2.  <u>The Members of the Cherokee Commission</u>.

The members of the Cherokee Commission intended that, with the sole exception of the

lands selected for allotment, the proposed cession would encompass all the remaining lands on

the 1869 Reservation.  Commissioner Jerome specifically told the Indians on October 9, 1890

that the government wanted the Indians to give up the **"rest of the [R]eservation**" which

**included** " **. . . a Military Reservation containing fourteen or 15 sections** . . . ."  [Ft. Reno]

**and other "reserved" lands** utilized  for "school, . . . agency and church" purposes. [Emphasis

added].  In sum, the Commissioners clearly intended that the proposed cession encompass the Ft.

Reno lands.

### D.  <u>The Commissioner of Indian Affairs' 1892 Interpretation of the Cession Agreement Indicates the Ft. Reno lands Were Ceded</u>.

On August 9, 1892, the Commissioner of Indian Affairs Morgan passed along a

communication from Indian Agent Ashley (the Agent in charge of the Cheyenne and Arapaho

Agency) that white settlers had been committing timber trespass upon both "Indian allotments"

and "government land." <u>See</u> Attachment T.   In other words, this letter establishes, in effect, that

after the 1891 cession, there were two categories of landholdings within the boundaries of the

former 1869 Executive Order Cheyenne-Arapaho Reservation: (1) Indian allotments; and (2)

"Government land" which can only mean the lands "reserved" for agency, school, military

and  religious purposes.

This reading of the August 9th letter is consistent with a previous letter of the

Commissioner dated October 22, 1891.  This 1891 letter concerns the prospective establishment

of a boarding school on the Seger Colony (subsequently called the "Seger School Reserve"

which was returned to the Tribes' ownership in 1938 - - see footnote 15 , infra) and states, in

pertinent part, as follows:

> \* \* \* \*
>
> "Now that these Indians have **parted with their reservation** [tribal] **lands**, and
> are taking lands in severalty, it is very desirable that everything practicable [sic] should
> be  done for them. . . ."
>
> \* \* \* \*

[Emphasis added] See Attachment U.

In a December 15, 1892 report (listing and discussing contracts between Indian tribes and

attorneys filed with the Office of Indian Affairs since January 1, 1889), the Commissioner of

Indian Affairs discusses the contract between the Cheyenne-Arapaho Tribes and the attorneys

who represented them " . . .  in the negotiations which resulted in the **cession of the rights, title**

**and interest of the said tribes in and to all lands in Oklahoma to the United States.**"

[Emphasis added]  See Attachment V at 7.

The foregoing contemporaneous administrative construction of the 1891 cession

Agreement by the agency responsible for implementing the Agreement is entitled to great

weight/deference.  See in particular: Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,

472 U.S. 237, 252-255 (1985).  See also:  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696-

97 (1991);  Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844

(1984); American Trucking Associations, Inc. v. United States, 310 U.S. 534, 549-50 (1940);

and Citizens Coal Council v. Norton, 330 F. 3d 478, 481-82 (D.C. Cir. 2003), cert. denied, 540

U.S. 1180 (2004).   This is especially true because Interior drafted the cession Agreement of

November, 1890, which Congress ratified by the Act of March 3, 1891.  See the decision in

American Trucking Associations, Inc. v.  United States, 310 U. S. at 549-50 (the Court strongly

indicated that a heightened degree of deference must be accorded to an agency's construction of

statutory language which it drafted of which the cession Agreement is an excellent example).

### E.  The General Land Office Records Show the Government Treated the Ft. Reno Lands as "Ceded" Lands.

Volume 20 of the General Land Office Tract Books for Oklahoma shows that some Ft.

Reno lands transferred to the Bureau of Prisons in 1963 were "withdrawn from all forms of

appropriation under the public land laws."  Therefore, these lands had been open to public entry

prior to 1963 which could not have occurred unless the Ft. Reno lands had been ceded.  See

Attachment Q at Q-3 and Q-4.

The cited GLO records, together with the cited excerpts from the Transcript of the

Negotiations (copy of entire Transcript appended as Attachments R-1 through R-11); Secretary

Noble's September 30, 1890 letter to David Jerome (copy appended as Attachment S); and the

three letters of the Commissioner of Indian Affairs in 1891-1892) (copies appended as

Attachments T, U, and V) conclusively establish that the Ft. Reno lands were ceded by the 1891

Agreement.  As a result, the Plaintiff has no present beneficial interest in these lands.

In addition to the foregoing historical record which clearly establishes that the Ft. Reno

lands were ceded, there are additional compelling reasons why the 1999 Opinion has little power

to persuade on the cession issue which we explain in Arguments F, G, and H.

### F.  The Reasoning of the 1999 Opinion Cannot be Reconciled with the Solicitor's Long-standing Definition of the Term "Surplus" Lands.

The 1999 Opinion reasoned that the Ft. Reno lands were not "surplus" lands " . . .  since

they were being used for military purposes in 1891" and hence were not ceded. (1999 Op. at 5). This line of reasoning is directly undercut by a Solicitor's Opinion issued <u>37 years</u> prior to 1999. Solicitor's Opinion M-36599, 69 I.D. 195 (1962) defined "surplus" lands as lands " . . . surplus to allotment and surplus to other needs of the Indians when ceded." 69 I.D. at 201. [13]  It  is the **needs of the Indians** for lands to be selected for allotment, or the needs of the Indians for lands for other purposes which determines whether particular lands on an Indian reservation are "surplus"  **- - not the needs of the government.**   Clearly, the Ft. Reno lands fall within this definition of "surplus" lands; their use for military purposes in 1891 does not support the opposite conclusion. [14]

### G.  <u>The Return of Certain Lands "Reserved" for Agency, School and Religious Purposes Does not Somehow Support the Conclusion that The Ft. Reno Lands Were not Ceded.</u>

The Solicitor's analysis in support of his conclusion that the Ft. Reno lands were not ceded in 1891 rests, in large part, upon the fact that Congress had enacted three statutes which returned  to the Tribes' ownership certain lands which had been "reserved" for " . . . religious, agency and school" uses - - some of the "public uses" of the 1869 Reservation lands referenced in Article IV of the 1891 cession Agreement.  The apparent implication of this "second factor"

---

[13] This opinion arose in the context of Section 3 of the Indian Reorganization Act (25 U.S.C. §§ 461, <u>et</u> <u>seq</u>. and was applied to an 1896 outright cession of tribal lands to the United States by the San Carlos Apache Tribe.  Under the Interior Department's Manual, a Solicitor's Opinion with an "M" number designation is the final legal position of the Department, and is binding on the Department, and can only be expressly overturned by the Solicitor, Deputy Solicitor or the Secretary.

[14] Of course, we recognize that this 1962 Opinion, like the 1999 Opinion, does not have the force of law, <u>but</u> it is a well-reasoned opinion with considerable power to persuade on the definition of "surplus" lands.

(the Solicitor's language), is that the Ft. Reno lands, in contrast to these returned lands, had not

been returned because the Ft. Reno lands had not been ceded, but such an implication is totally

illogical once the legislative history of the three statutes is taken into account.

The legislative history of each of the three statutes enacted in 1938, 1942, and 1960 states

(as discussed below) that the "reserved" lands so returned had in each instance been **ceded.**

(Copies of these legislative histories appended as Attachments W-1, W-2 and W-3).[15]

---

[15]    The pertinent parts of the legislative history of each of the three enactments are as follows:

    1. 1938  Act

        The 1938 statute (Pub. L. No. 480, ch. 141, Act of April 13, 1938, 52 Stat. 213)
returned the Seger School Reserve to the Tribes.  The legislative history states that the Reserve
was comprised of four sections of land (of which three sections were part of the 1869
Reservation) and that " . . .  title [to the three sections] was transferred from the Indians to the
United States by the agreement of October 1890, ratified by the act of March 3, 1891 (26 Stat.
989, 1022) . . . . " Sen. Rep. No. 986, 75th Cong., 1st Sess. 2 (1937) (copy appended as
Attachment W-1).

    2. 1942  Act

        The 1942 legislation (Pub. L. No. 419, ch. 24, Act of June 29, 1942, 56 Stat. 21)
returned school and agency lands no longer used for these purposes.  The legislative history of
this Act noted: "[s]ome of the ceded lands [transferred to the United States under the 1890
Agreement] were reserved for Indian agency, school and other purposes . . .  " Sen. Rep. No.
856, 77th Cong., 1st Sess. 2 (1941) (copy appended as Attachment W-2).

    3. 1960 Act

        The 1960 enactment (Pub. L. No. 86-792, Act of September 14, 1960, 86 Stat. 791)
returned 3,900 acres out of 4,900 acres which had been used for the Cheyenne-Arapaho
subagency reserve.  The other 1,000 acres were transferred to the Department of Justice for use
of the El Reno Reformatory (federal penitentiary). The legislative history states that the 3,900
acres had previously been used for a BIA "dairy operation" which had been "discontinued."  Sen.
Rep. No. 1617, 86th Cong., 2nd Sess. 2 , 4 (1960) (copy appended as Attachment W-3). The
Report also states:, in pertinent part, as follows: "The land in question [the 4,900 acres] is a part
of a  large area that was ceded by the Cheyenne and Arapaho Tribes to the United States in an
agreement ratified by the act of march [sic.] 3, 1891 (26 Stat. 989, 1022)."

27

Obviously, if these "reserved" lands had been ceded, then, a fortiori, it follows that the lands "reserved" for "military" uses [that is, Ft. Reno lands] **must have been ceded as well**.  Indeed, Solicitor's Opinion M-33510, 59 I.D. 1 (1945) expressly states that the "reserved" lands "were not excluded from the [1891] cession."  (59 I.D. at 2).

This same legislative history is also significant for it establishes that, from 1938 to 1960, Interior maintained a consistent and reasonable construction of the 1891 cession Agreement on the question of whether the "reserved" lands had been ceded.   Since Interior did not deviate from this interpretation of the 1891 cession Agreement until 1999, it maintained a consistent interpretation for **61 years**.  Great deference must be accorded to an agency's long-standing interpretation of a statute it is empowered to administer.  E.g.,  Aulston v. United States, 915 F. 2d  584, 596 (10th Cir.1990), cert. denied, 500 U.S. 916 (1991).  Moreover, even if the court accords some weight to the 1999 Opinion, the fact that the 1999 Opinion conflicts with this 61-year long-standing interpretation, means that, at best, the 1999 Opinion is entitled to much less deference then Interior's long-standing interpretation.  Immigration and Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 446-47 (1987).

Seemingly, Plaintiff attempts to distinguish these three enactments from the first three failed bills introduced in 1949, 1950 and 1952[16] on the grounds that these failed bills were supported by "certain Congressional adversaries recognized the Tribes' continuing beneficial

---

[16]  In 1997, a fourth bill was introduced in Congress to return the Ft. Reno lands to the beneficial ownership of the Tribes, but the acreage figure of the lands to be returned was not specified in the bill.  See copy of this bill and the excerpts from the legislative history appended as Attachment W-4.  The failure to enact this bill apparently was the result of Congress' sole fixation with the idea that the  Tribes' 1996 contribution to Clinton re-election campaign may have been one of many alleged campaign finance law violations in 1996.

28

interest in the lands of Fort Reno" (emphasis added) (Pl. Opp. at 6). Yet, this argument makes little or no sense because the first three failed bills would have given the Tribes beneficial title to about 7,000 of the 9,493 acres contained in the Ft. Reno Reserve. As for the 1997 bill, we estimate it would have returned about 7,000 to 7,500 acres to the Tribes, because some of the land would have been transferred to the Bureau of Prisons which had received 1,000 acres of Ft. Reno land in 1937. [17]/

 Finally, the third "factor" cited in the 1999 Opinion in support of the conclusion that the Ft. Reno lands were not ceded - - namely, the "Indian canon" of construction of Indian treaties, agreements and statutes - - is not persuasive, either. The Indian canon of construction requires that ambiguities in Indian treaties, agreements and statutes must be resolved in favor of the Indians. However, an ambiguity does not arise merely because the parties have different interpretations of the provision of a treaty, statute or agreement at issue. Cf. W & F Building Maint. Co., Inc. v. United States, 56 Fed. Cl. 62, 69 (2003), aff'd, 70 Fed. Appx. 589 (Fed. Cir 2003) (held an ambiguity in a contractual provision only arises if there is more than one reasonable interpretation of the provision). In order for an ambiguity to arise within the meaning of the Indian canon, two "plausible" interpretations of the statutory provision at issue must exist. Artichoke Joe's Cal. Grand Casino v. Norton, 353 F. 3d 712, 722, 724 (9th Cir. 2003) (held, in effect, that the Indian canon applied because there were two "plausible" interpretations of a

---

[17]/ The common thread of the 1938, 1942 and 1960 enactments was that the government no longer had any need for these lands. By contrast, aside from use of the Ft. Reno lands by the Army, the Bureau of Prisons and the Department of Agriculture needed the Ft. Reno lands for a federal penitentiary and agricultural research facility, respectively. In short, Congress did not enact the first three Ft. Reno bills apparently because the government still needed the Ft. Reno lands, unlike the other "reserved" lands returned to tribal ownership in 1938, 1942, and 1960.

particular provision of the Indian Gaming Regulatory Act at issue - - not the situation here).

### H.  Paragraph No. 18 of the 1961 Severed Petition Cannot be Reconciled With the Plaintiff's Present Position that the Ft. Reno Lands Were not Ceded.

The language of Paragraph No. 18 of the 1961 Severed Petition in the ICCA suit reveals that the Tribes alleged, in essence, that all of the lands within the 1869 Executive Order Reservation, with the exception of the 529,685 acres allotted to the Cheyenne-Arapaho Indians, had been "disposed of" by the government after the enactment of the Act of March 3, 1891 cession Agreement.   Paragraph No. 18 alleges that: (1) the entire 1869 Executive Order Reservation contained 5,138,560 acres; and (2) subsequent to the March 3, 1891 Act, all of  the lands within the 1869 Reservation were "disposed of" for various listed purposes.  The listed uses and accompanying acreages show, that aside from the 529,685 acres allotted to the Cheyenne-Arapaho Indians, all of the remaining lands within the 1869 Reservation were disposed of by the government.  Thus, the Tribes were alleging, in effect, that **all of the remaining lands which necessarily included Ft. Reno** (and all of the other "reserved" lands) had been ceded.  Paragraph No. 18 should be treated as an admission that the Ft. Reno lands were ceded in 1891 **and cannot be reconciled with Plaintiff's  position in the instant lawsuit that the Ft. Reno lands were not ceded in 1891.**

For  the reasons explained under argument headings II A through H, above,  Defendants submit that the Ft. Reno lands were ceded in 1891.  Since these lands were ceded, the cession extinguished the alleged present "beneficial interest" which supposedly arose under the July 17, 1883 Executive Order.  This is because under Article II of the 1891 cession Agreement, the Cheyenne-Arapaho Tribes ceded and relinquished to the United States "all their claim, title, and

interest, of every kind and character, in and to" the lands encompassed within the external

boundaries of the 1869 Executive Order Reservation with the only exception being the lands to

be selected for allotment.[18]

In short, even if the court were to find that it has jurisdiction of over this lawsuit, this

case must be dismissed for failure to state a claim upon which relief may be granted.[19]

## CONCLUSION

Defendants submit this case must be dismissed for lack of subject matter jurisdiction.

The Plaintiff seeks to pursue the same claim in this court which it raised in its ICCA suit and for

which it was paid in 1965.  The court's limited  resources should not be consumed by this suit.

Having sought legislation to return the Ft. Reno lands to the Tribes' ownership in 1949, 1950,

1952 and 1997 - - a 48-year period - - Plaintiff knows full well that the proper forum for the

resolution of the present Ft. Reno lands claim is Congress.  The fact that there have been four

failed Ft. Reno bills, while unfortunate from the Tribes' perspective, cannot justify Plaintiff's

---

[18] Even if the court were to reach the cession issue and find that the Ft. Reno lands were not
ceded in 1891, it does not follow that the alleged beneficial interest presently exists because
Volume 20 of the series of GLO Tract Books which cover Oklahoma contains a notation that the
1937 transfer of 1,000 acres of Ft. Reno lands "revoked" the 1883 Executive Order as to the
1,000 acres.  It follows that the 1948 transfer of the remainder of the Ft. Reno lands to
Agriculture revoked the 1883 Executive Order as to the remainder of the lands.  Thus, the two
transfers operated so as to nullify the 1883 Order and it cannot now serve as a basis for the
Tribes' alleged present beneficial interest.

[19] Plaintiff argues that there are "genuine issues of material fact" with respect to whether the
Government misled the Tribes as to possible future use of Ft. Reno by the Army after 1954. See
Pl. Opp. at 10-11; Plaintiff's Statement Concerning Material Facts as to Which There Exists a
Genuine Issue (Attachment 3 to Pl. Opp.).  However, the Plaintiff does not allege the existence
of genuine issues of material facts with respect to whether the Ft. Reno lands were ceded in
1891, or as to whether the Tribes were paid for their Ft. Reno claim in their ICCA suit.  Instead,
the plaintiff relies solely on the 1999 Solicitor's Opinion as to the matter of cession and payment
for the Ft. Reno claim under the ICCA.

pursuit of the Ft. Reno lands claim in this court.

This suit should be dismissed with prejudice for lack of subject matter jurisdiction.  In the alternative, if the court holds it has jurisdiction over this suit, the suit should be dismissed for failure to state a claim upon which relief may be granted.


Dated this 6th day of April, 2007.

Respectfully submitted,

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division


/s/ James M. Upton
JAMES M. UPTON
U. S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.   20044-0663
Ph. (202) 305-0482
Fax: (202) 305-0506

OF COUNSEL:

    Tom Bartman, Esq.
    Maria Wiseman, Esq.
    Stephen Simpson, Esq.
    U. S. Department of the Interior
    Main Bldg. - - Mail Stop 6456
    1849 C Street, N.W.
    Washington, D.C.    20240


    James B. Snow, Esq.
    Jeffrey Vail, Esq..
    Office of the General Counsel
    U.S. Department of the Interior
    1400 Independence Avenue,  S.W.
    Washington, D.C.    20250


    <u>Department of Justice Paralegals</u>:

    Shelley Miller
    U.S. Department of Justice
    Environment & Natural Resources Division
    Natural Resources Section
    P.O. Box 663
    Washington, D.C.  20044-0663