**Attachment O**



United States
Department of
Agriculture

Office of the
General
Counsel

Washington,
D.C.
20250-1400

**18 MAR 1994**

MEMORANDUM FOR ARTHUR H. NIES
ASSISTANT DEPUTY ADMINISTRATOR
AGRICULTURAL RESEARCH SERVICE

FROM:        James B. Snow *Schmon*
             Acting Assistant General Counsel
             Natural Resources Division

SUBJECT:     ARS Grazinglands Research Laboratory at Fort Reno,
             Oklahoma - Request of the Cheyenne-Arapaho Tribes
             to Have the Mineral Rights under Fort Reno be
             Declared Excess to the Federal Government's Needs

**ISSUE**

The Cheyenne-Arapaho Tribes seek a declaration from the
Departments of Justice and Agriculture that the mineral rights
underneath Fort Reno, where both Departments conduct ongoing
operations, be declared excess to the Government's needs, thereby
allowing the Tribes to drill for oil in the subsurface.[1]  In
order to respond to the Tribes' request, it is necessary to
assess the jurisdictional status of the property, and then to
identify what legal factors ARS should consider in responding to
the Tribes' request that the subsurface rights be declared excess
under the Federal Property and Administrative Services Act
(FPASA) of 1949.

**DISCUSSION**

### 1. Jurisdictional Status of Ft. Reno

The original Cheyenne and Arapaho Indian Reservation
encompassed about four million acres in western Oklahoma.
President Grant executed an Executive Order dated August 10,
1869, creating the Cheyenne-Arapaho Reservation, which included
the Fort Reno lands.  The land description referred to in the
documents establishing the reservation included the area of the
Fort Reno property.  See Executive Order of President Grant of
August 10, 1869, I.C. Kappler, Indian Laws and Treaties 839
(G.P.O. 1904).

The Fort Reno Military Reserve was created by Executive
Order of President Arthur on July 17, 1883.  The Secretary of
War's recommendation to President Arthur that Fort Reno be

_____

[1]The Cheyenne-Arapaho Tribes requested a declaration for
these lands in the early 1980's from this Department, a request
that the Department did not act upon.

2

established expressly refers to its location as being within the
Cheyenne-Arapaho Reservation.

> I have the honor to request that the following-described
> tract of land in the Indian Territory, located within the
> limits of the Cheyenne and Arapaho Indian Reservation,
> created by Executive Order dated August 10, 1869, be duly
> declared and set apart by the Executive as a military
> reservation for the post of Fort Reno....

Letter of Robert T. Lincoln to the President on July 17, 1883,
I.C. Kappler, Indian Laws and Treaties 842 (GPO 1904)(emphasis
added).

On March 3, 1891, the Cheyenne-Arapaho Tribe ceded more than
4.6 million acres of land to the United States, including the
current Fort Reno site, for $1,500,000. See 26 Stat. 989, 1022.
In 1951, the Cheyenne-Arapaho Tribe filed a petition before the
Indian Claims Commission seeking, among other things, additional
compensation for the lands ceded by them to the United States.
After a hearing before the Commission on May 24-27, 1965, to
determine the value of the 1891 Executive Order reservation, the
tribes and the United States entered into negotiations which
resulted in a settlement offer from the United States to the
tribes of $15,000,000. The offer of settlement was accepted by
the tribes on September 18, 1965. In the Stipulation for Entry
of Final Judgment, the tribes agreed that "said amount shall
finally dispose of all rights, claims or demands which the
petitioner has asserted or could have asserted with respect to
the subject matter of these claims, and petitioner shall be
barred thereby from asserting any such right, claim or demand
against defendant in any future action." Cheyenne-Arapaho Tribes
v. United States, 16 Ind. Cl. Comm. 171-172 (1965).

The Federal Court of Appeals for the Tenth Circuit has
determined that tribal lands remaining after disestablishment of
the Cheyenne-Arapaho Reservation in 1891 continued to be held in
trust by the United States, confirming the fact that all the
lands reserved for the Tribes by the Executive Order of 1869 were
held in trust. Cheyenne-Arapaho Tribes v. Oklahoma, 618 F.2d 665,
667 (10th Cir. 1980). The Fort Reno property was within the
original reservation for which the Indian Claims Commission
compensated the Cheyenne-Arapaho Tribes. Cheyenne-Arapaho Tribes
v. United States, 10 Ind. Cl. Comm. 1, 105 (1961).

After World War II, the military utility of the Remount
Service of the U.S. Army at Fort Reno had ended, and all records
and property of the Remount Service were transferred to the U.S.
Department of Agriculture, with the intent of conducting horse
breeding at the site. This transfer was accomplished through the
enactment of Public Law 80-494, 62 Stat. 197, on April 21, 1948.
On March 18, 1949, the Department of Agriculture entered into a

3

Memorandum of Understanding with the Oklahoma Agricultural
Experiment Station for the operation of an experiment facility on
the site.  On May 22, 1963, the Secretary of the Interior issued
Public Land Order 3089 and reserved 1,670 acres of the Fort Reno
site for use by the Department of Justice.  This transfer of
jurisdiction was made pursuant to Executive Order 10355, issued
on May 26, 1952.

In our opinion, the Fort Reno land where the ARS Research
Facility is located is Federal land, pursuant to the Act of 1891.
To the extent the Cheyenne-Arapaho Tribes were inadequately
compensated for the value of the lands they ceded in 1891, they
were compensated in a final judgment before the Indian Claims
Commission in 1965 in the sum of $15,000,000.[2]  Therefore, the
land constituting the ARS Research Facility at Fort Reno is not
subject to any outstanding legal claims by the Cheyenne-Arapaho
Tribes.

## 2.  **PROCEDURES FOR DEVELOPMENT OF OIL AND GAS RESOURCES**

Most federally-owned lands which have not been withdrawn
from mineral leasing can be leased under the provisions of the
Mineral Lands Leasing Act of 1920. 30 U.S.C. §181, et. seq.
Federal development of the mineral estate at Fort Reno began in
1953 when the Bureau of Land Management (BLM) began issuing
leases on the Fort Reno lands under authority of the Mineral
Lands Leasing Act.  Five leases were issued by BLM covering all
of Fort Reno.  When those leases expired in 1965, further mineral
leasing of these lands under the Mineral Lands Leasing Act was
precluded because the City of El Reno adopted an Ordinance
annexing the Fort Reno lands.  Section 1 of the Mineral Lands
Leasing Act does not authorize the mineral leasing of lands
located within the boundaries of an incorporated city.
30 U.S.C. §181.

As noted above, BLM cannot issue mineral leases to the
subsurface lands under the Fort Reno site because these lands
have been annexed by the City of El Reno.  However, if the
subsurface rights were declared excess to the needs of the
Federal government, the subsurface could be transferred to the
Secretary of the Interior to be held in trust for certain
Oklahoma Indian tribes.  Under 25 U.S.C. §396 et seq., mineral
development of Indian land is permitted regardless of whether the
land is located within the boundaries of an incorporated city.

---

[2]The legal representative of the Cheyenne-Arapaho Tribes
concedes that the $15 million judgment "covers the entire parcel
of land given the tribes in 1869 and ceded by the tribes in
1890," and "it must include some payment for the Fort Reno
lands." (Letter from Boyce to Vail of 11/17/93, at 1.)

4

It is for that reason that the Cheyenne-Arapaho Tribes are seeking to have the Agricultural Research Service declare the subsurface excess to the agency's needs.

## 3.  **FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT OF 1949 (FPASA)**

The FPASA provides, in part, a system to dispose of surplus federal property.  See 40 U.S.C. §471 et. seq.  In 1974, Congress amended the FPASA and added a provision now codified at §483(a)(2).  Under that provision, excess federal real property in Oklahoma is to be held in trust for Oklahoma Indian tribes when the property is located within the boundaries of former reservations in Oklahoma and when such real property was held in trust by the United States for an Indian tribe at the time of acquisition by the United States.  The Congressional intent underlying this amendment was to make mandatory the conveyance of excess land by GSA that is located within a former reservation to the Secretary of the Interior to be held in trust for such use as the Indian tribe located on the former reservation believes best.  S. Rep. No. 1324, 93rd Cong., 2nd Sess. at 7130 (1974).

The Fort Reno lands are located within former Cheyenne-Arapaho reservation lands and were held in trust for these tribes at the time of acquisition by the United States in 1891.  Therefore, if the federal government declares the subsurface estate at Fort Reno excess to its needs, then pursuant to 40 U.S.C. §483(a)(2), the subsurface would be held in trust by the Secretary of the Interior for the benefit and use of the Cheyenne-Arapaho Tribes.

The central question is which agency has the authority to determine that the subsurface of the Fort Reno property is excess to the needs of the federal government.  Both USDA and the Department of Justice occupy the surface, while BLM is responsible for issuing mineral leases to the subsurface of these lands.  The term "excess property" means "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof." 40 U.S.C. §472(e).  This definition of excess property militates in favor of the Departments of Justice and Agriculture respectively determining whether the subsurface at Fort Reno is required for their needs.

USDA and the Department of Justice administer the surface at Fort Reno and may be said to "control" this property.  These agencies' interests and control extend beyond the surface to the subsurface, to the extent activities in the subsurface may impact surface uses.  While BLM normally would be responsible for issuing mineral leases to the subsurface, mineral leases cannot be issued to this subsurface under the Mineral Leasing Act because the subject land is part of the city of El Reno.

5

30 U.S.C. §181.  Because BLM does not administer leases to the subsurface of this property, BLM would not be the agency exercising "control" of the Fort Reno property.

4.  **FACTORS BEARING ON CONSIDERATION BY ARS AS TO WHETHER FORT RENO IS EXCESS TO ITS NEEDS**

Under the FPASA, excess property means "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof." 40 U.S.C. §472(e).  If an agency with control over property determines that such property is required for its needs and the discharge of its responsibilities, such property is not excess and will not be made available as such.

A decision to declare property excess to an agency's needs is at the discretion of the agency that exercises control over the subject property. 40 U.S.C. §472(e).  (See also Skokomish Indian Tribe v. General Services Administration, 587 F.2d 428 (9th Cir. 1978), a case in which the Ninth Circuit held that the Secretary did not abuse his discretion in withdrawing a request to GSA for excess property made by the Bureau of Indian Affairs on behalf of the plaintiff.)  There is no legal obligation for the Secretary of Agriculture to declare the subsurface estate at Fort Reno excess to the Department of Agriculture's needs. Indeed, GSA regulations provide that an agency which has reported property to GSA as excess and available for disposition may withdraw its report at any time prior to transfer to another Federal agency or prior to execution of a legally binding agreement for disposal as surplus property. 41 CFR §101-47.203-10.

If the subsurface at Fort Reno is declared excess, it should be done with awareness of possible adverse environmental impacts on the surface research program ARS currently conducts. Specifically, ARS should consider the potential risk of groundwater contamination resulting from the drilling.  The activities associated with drilling and oil extraction may cause adverse impacts on ARS activities, given the increased noise, traffic, and ground-disturbing activity adjacent to the ARS facility.  In addition, if the tribes' proposed slant drilling approach is not effective in extracting the oil, the tribes may seek access to the surface at Fort Reno, which would further risk disruption of ARS research activities.

The potential for ground disturbing impacts on the research activities conducted by ARS also must be considered with regard to the proposed National Cemetery that the Department of Veterans Affairs seeks to locate at Fort Reno.  Although no final decision has been made to locate this Cemetery at Fort Reno, ARS needs to

6

weigh the potential consequences that a declaration that the subsurface at Fort Reno is excess would have if a cemetery were situated at Fort Reno. It is questionable whether active oil drilling activities are compatible with a National Veterans cemetery situated in close proximity.

The only consideration the agency need undertake in this matter is whether the development of the subsurface is totally separate, unrelated and without effect on the management of the surface estate. The decision whether to excess the subsurface is a matter committed to agency discretion. In our opinion, there are no equitable considerations relevant to this decision. As stated above, our analysis of this property and litigation related to it indicates that the Tribes were fully compensated for their interest in the Fort Reno property under the 1965 Indian Claims Commission settlement.

**Summary**

The Fort Reno lands where ARS and the Justice Department administer federal facilities are federal lands, including the subsurface. At one time, these lands were part of the Cheyenne-Arapaho reservation, but these lands were ceded by the tribes to the federal government. ARS and the Justice Department, as the federal government agencies with control over these lands, are the agencies that will decide whether the subsurface beneath Fort Reno is excess land under the FPASA. The tribes were paid $15 million for their former reservation lands, which included the Fort Reno lands, in a 1965 Indian Claims Commission settlement with the United States. ARS can declare the subsurface at Fort Reno excess to its needs if the property is determined to be excess under the FPASA, but the agency is not legally required to do so.

We would be pleased to answer any further questions you may have on this matter.