UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Civil Action No. 06-519 (PLF) ) |
| UNITED STATES OF AMERICA, et al. | ) ) ) |
| Defendants. | ) ) ) |

PLAINTIFF'S MEMORANDUM IN SURREPLY TO
DEFENDANTS' MOTION TO DISMISS, OR IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT

INTRODUCTION

Defendants have introduced additional argument and significant new documentary material in support of their dispositive motion, but have nonetheless failed to demonstrate the Court should dispose of the matter on grounds that (a) in 1891 the Plaintiff Tribes agreed to relinquish right, title and interest in and to "surplus lands" alleged to include Fort Reno; (b) a subsequent settlement of litigation before the Indian Claims Commission served to extinguish any claim in and to the lands of Fort Reno; and ( c) in any case the Government is entitled to summary judgment on limitations grounds, because as a matter of the law the Tribes cannot show they brought suit within the applicable 12 year period or that the doctrine of equitable estoppel applies.

The Court granted the Tribes leave to surreply, requiring it to be "brief and concise." Minute Order (May 25, 2007). We proceed to show in as brief and concise fashion as possible, first, the record indicates Cheyenne and Arapaho tribal members involved in the inherently

coercive negotiations of 1891 conducted through interpreters, likely understood "surplus" to mean lands other than those chosen for individual allotments of land or otherwise necessary for their support, maintenance and <u>military protection</u>; second, the waiver of sovereign immunity represented by the Indian Claims Commission Act of 1946 did not permit a post- 1946 claim to "set aside ... the jurisdiction of the Department of Agriculture [to Fort Reno] conferred by the Act of April 21, 1948..." Severed Petition (November 24, 1958), ¶ 9(b) (Attachment P to Defendant's Reply), so that neither §22(a) of the Indian Claims Commission Act of 1946, nor the underlying settlement of the Tribes' claims before the Commission serve to preclude an action to quiet title in the lands of Fort Reno; and third, genuine issues of material fact surrounding decisions to classify and keep shrouded in secrecy for a periods up to fifty years the actual nature and military status of these lands should defeat summary judgment on limitations grounds.[1]

---

[1] The Tribes are also seeking a continuance to permit discovery pursuant to Rule 56(f) directed to subjects and documents bearing on accrual of limitations and the potential application of equitable estoppel, if the Court should reject dismissal on grounds deriving from the 1891 cession agreement and 1965 settlement of the litigation before the Indian Claims Commission. <u>See</u> Plaintiff Tribes' Rule 56(f) Motion for Continuance to Permit Discovery.

ARGUMENT

I. THE TRIBES DID NOT AGREE TO CEDE
THE LANDS OF FORT RENO LANDS IN 1891

The Opinion of the Solicitor of Interior rendered in 1999 ("1999 Solicitor's Opinion) is Attachment 1 to our original opposition to the Government's dispositive motion. It is difficult to improve upon the Solicitor's concise and closely reasoned analysis of this fundamental question[2], which appears in most relevant part as follows:

> [T]he 1891 allotment of the Cheyenne-Arapaho Reservation created a process to break up Indian land holdings by conferring title in small parcels to individual Indians. This served the dual purpose of allowing encroaching non-Indians to settle on the resulting "surplus" land, and promoting the assimilation of Indians into the dominant non-Indian culture. To this end, Articles II and III of the 1891 allotment act provided:
> Subject to the allotment of land in severalty to the individual members of the [Tribes] as hereinafter provided for, and subject to the conditions hereinafter imposed ... [the tribes] cede ... all their claim, title and interest, of every kind and character, in and to the lands [in the 1869 Executive Order].
> * * *
> Out of the lands ceded ... by Article II hereof ... each member of the said Cheyenne and Arapaho tribes of Indians over the age of eighteen years shall have the right to select for himself or herself one hundred and sixty acres of land
> ...
> 29 Stat. 989, 1022-23 (emphasis added). One of the "conditions hereinafter imposed" was Article IV, which provided: "No person shall have the right to

---

[2]The Solicitor also found it likely the 1883 Executive Order creating Fort Reno contemplated return of the lands when no longer needed, in part because the Fort was was "apparently established to keep the peace among the Indians (to protect the Cheyenne and Arapaho from other Tribes) and to protect non-Indians.... Because its reason for existence was so closely identified with the presence of the Tribes on the surrounding land, it would be natural to assume that, once the reason no longer obtained, the Tribes maintained a continuing interest in the lands." (citation omitted). In addition, the Tribes were not compensated, an important "indicia permanent cession was not contemplated.... (citation omitted), and finally, "during congressional hearings between 1949 and 1952, a number of DOI officials, tribal members, and residents of neighboring Oklahoma communities testified that it was generally understood Fort Reno lands were to be returned to the Tribes when no longer needed for the Army's Fort.... (citation omitted).

> make his or her selection of land in any part of said reservation that is now used or occupied by military, agency, school, school-farm, religious, or other public uses." Id. at 1023 (emphasis added).
>
> The underscored language of these two provisions is subject to at least two possible interpretations: The first is that they exclude military lands like Fort Reno only from selection by tribal members. Under this reading, the Army's Fort Reno lands, while not open to selection, would have been ceded to the United States in 1891. This is the way the Agriculture Department's [1994] memorandum assumes, without close analysis, that it should be read. * * * The other possible interpretation, favored by the Tribes, is that the overall cession was subject to the conditions articulated in Article IV. Under this view, lands like Fort Reno with ongoing public uses were not ceded by the Tribe in 1891, but remained in their prior state of ownership. Three factors make this interpretation credible.
>
> First, in negotiations leading up to the 1981 allotment, government negotiators assured the Tribes that only "surplus" lands would be ceded.... Since the Fort Reno lands were being used for military purposes, they were not "surplus" in 1891. [citations omitted].
>
> Second, many lands designated for religious, school, and agency purposes in 1891 have since been returned to the Tribes.... Additionally, some school and agency lands were sold with the proceeds held for the benefit of the Tribes.... [citations omitted].
>
> Third, there is the longstanding principle that, given two plausible interpretations of a statute, ambiguities must be resolved in favor of the Indians.... Construing the ambiguous interplay between Articles II & III and the conditions in Article IV in the Tribes' favor would exclude Fort Reno lands form the cession.

1999 Solicitor's Opinion at 4-5.

  The Government has introduced transcripts of negotiations between representatives of the United States and tribal representatives that culminated in the cession agreement, arguing that they show a "contemporaneous understanding" on the part of the Tribes that the lands of Fort Reno were included in the cession. Defendants Reply at 19-21. However, portions of the transcript selected for quotation actually do little for the Government's cause, and do nothing at all to establish that the Tribes somehow understood "surplus lands" to include the lands

expressly reserved from possible allotment, including Fort Reno. The Arapaho named Left Hand is simply quoted as saying through an interpreter that the Government "is willing to **sell the surplus land** for $1.45 an acre ..." (bold in original). Government's Reply at 19. Similarly, a Cheyenne named Cloud Chief (somehow referred to as "Row of Lodges"), is quoted as saying through an interpreter, "**[I]f there is any surplus land** they would like to sell it at $1.45." (bold in original). Government's Reply at 20.

     Indeed, we submit that statements by governmental representatives translated in turn for tribal representatives are inadequate to establish that Fort Reno and the other reserved lands were among those the Government was asking the Tribes to cede. Commissioner Sayre, for example, is quoted as saying, "except for the land that the Indians may want or need for their homes and farms, **we want the Indians to relinquish or give up all the land they have in this territory** [the lands within the external boundaries of the 1869 Executive Order]." (bold in original). Government's Reply at 19. It is undisputed that from the time Fort Reno was established by Executive Order in 1883, it had been held by the Army and maintained for military purposes, including military operations to protect the Tribes. We submit the Government cannot plausibly contend, and certainly cannot establish for purposes of a motion to dismiss, the existence of some "contemporaneous understanding" on the part of tribal representatives to the effect "**the land they have in this territory**" included lands of Fort Reno taken from the Tribes through Executive Order in 1883.[3]

---

[3]We feel bound to note the "contemporaneous understanding" during the negotiations that comes through most clearly in the transcripts is the sense the Tribes were being betrayed and overborne yet another time by an overwhelmingly superior power. At the outset Commissioner Jerome warned, "If you say you won't trade with us, if you won't do what the President wants you to do, the law of the Congress will be put in force and you will have to deal with someone else: you will have to deal with

In apparent recognition the meaning of "surplus lands" in the 1891 cession agreement is indeed of paramount importance for present purposes, the Government has attacked the 1999 Solicitor's Opinion and its conclusion the lands of Fort Reno "were being used for military purposes in 1891", Defendant's Reply at 26 (quoting 1999 Solicitor's Opinion at 5), so were not "surplus", and not subject to the cession.

The Government contends that "[t]his line of reasoning is directly undercut by a Solicitor's Opinion issued 37 years prior to 1999. Solicitor's Opinion M-36599, 69 I.S. 195 (1962) defined 'surplus' lands as lands ' ... surplus to allotment and surplus to the needs of the Indians when ceded.' 69 I.D. at 201...." It is the **needs of the Indians** for lands to be selected for allotment, or the needs of the Indians for lands for other purposes which determines whether particular lands on an Indian reservation are 'surplus' - - **not the needs of the government**. (footnote omitted, bold in original). Defendant's Reply at 26.

Yet not only has the Government tortured the 1962 Solicitor's Opinion in order to extract this "definition" of "surplus" lands[4], it actually serves in any case to bolster the Tribes'

---

someone a long ways off, you won't have anyone to come and see you as the Commission has done." Defendant's Reply, Attachment R 1, at 2. Old Crow, an elder of the Cheyenne Tribe, was unmoved by the threat. "Now I am going to speak my mind to you if I am killed for it", he said. Id. at 12. The old chief went on to express his "contemporaneous understanding" that "[we have been robbed of our land and the worth of our land every since the white man came into the country and they ought to be full of it." Ibid.

[4]The Government lifted the "definition" of surplus lands from the following language of the 1962 Solicitor's Opinion: "The [Indian Reorganization Act of 1934] rejects the allotment system. It seeks to put land back into tribal ownership. It is most logical to empower the Secretary to return to the tribes *any* land which the Government holds for their benefit. Whether the land was **surplus to allotments or surplus to other needs of the Indians when ceded** is totally immaterial to the purpose of the act."

contention the lands of Fort Reno were in no way "surplus" to "**the needs of the Indians**" (bold in original), Defendant's Reply at 26, in that one of the critical "military purposes" involved was "keep[ing] peace among the Indians (to protect the Cheyenne and Arapaho from other Tribes) ...." 1999 Solicitor's Opinion at 3.

Finally, we note that, while the Government has presented evidence relating to its representatives' contemporaneous and subsequent understanding of the lands ceded in the 1891 agreement, it has chosen to ignore the Tribes' very early assertion of a reversionary interest in the lands the parties expressly "reserved" from allotment. A letter to the "Indian Office" in Washington submitted in April 1912 by several dozen Cheyenne and Arapaho in opposition to a bill concerning the "sale and entry of certain lands in Oklahoma" accompanies a House Report submitted as Attachment 1 hereto. The tribal members made clear that "[w]e do not approve of selling any portion of the Cantonment Reservation at the present time. We understand that when this reserved land is no longer needed for school and agency purposes, the land reverts to the Cheyenne and Arapaho Indians." Id., p. 4.

## II. SECTION 22(a) OF THE ICCA DOES NOT PRECLUDE THE TRIBES' ACTION TO QUIET TITLE IN LANDS OF FORT RENO, NOR DOES THE SETTLEMENT OF THE ICC CASE

Section 22(a) of the Indian Claims Commission Act of 1946 provided that "[t]he payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." 25 U.S.C. § 70u(a) (1976). The Government argues that §22(a) precludes an action to quiet title in the lands of Fort Reno, because the "Severed Petition" filed on the Tribes' behalf in the Indian Claims Commission (or "ICC") (Attachment P to Defendant's Reply) included a request to "set aside ... the jurisdiction of the Department of Agriculture [to

Fort Reno] conferred by the Act of April 21, 1948..."[5] (citation omitted). Severed Petition (November 24, 1958), ¶ 9(b). This request to "set aside" jurisdiction was in the Government's view a "claim[] or demand[] touching ... matters involved in the controversy" within the meaning of §22(a) that was "full[y] discharge[d]" upon payment of the subsequent judgment to the Tribes.

However, it is undisputed the Congress limited the Commission's jurisdiction to claims accruing on before August 13, 1946. Act of August 13, 1956, ch. 959, § 2, 60 Stat. At 1050. The transfer of Fort Reno lands sought to be "set aside" was not alleged to have taken place until April 21, 1948, rendering any such request beyond the scope of the Commission's jurisdictional mandate. The Government has cited no authority for the proposition §22(a) serves to extinguish a claim as to which the Commission <u>lacked jurisdiction</u> to consider or <u>remedy</u>.[6]

The reference to <u>United States v. Dann</u>, 470 U.S. 39 (1985), Defendant's Reply at 5-6, is entirely misplaced. The claim for compensation to 24 million acres of aboriginal lands of the Western Shoshone accrued long before August 13, 1946. Individual members of the Tribe, the Dann sisters, were claiming continued aboriginal title in the land as against Government regulation requiring permits for grazing purposes, on the ground deposit of the judgment funds

---

[5]As noted in our original opposition, despite the nominal transfer of jurisdiction, the lands continued to be devoted to military purposes.

[6]The remedial powers of the Indian Claims Commission were from the outset held limited to economic compensation. <u>See</u>, e.g., Osage <u>Nation of Indians v. United States</u>, 1 Indian Claims Commission 54, <u>rev'd. on other grounds</u>, 119 Ct. Cl. 592, <u>cert. denied</u>, 342 U.S. 896 (1951); <u>see also</u>, Navajo Tribe v. New Mexico, 809 F.2d 1455, 1461 (10th Cit. 1987) (ICCA empowered the Commission to grant monetary compensation but not declaratory or injunctive relief).

into a trust account for the Tribes did not constitute any "payment of ... claim[]" within the meaning of §22(a), and the Tribes' claim of title had not been therefore been extinguished thereby. The Supreme Court simply held that "[o]nce the money was deposited into the trust account, payment was effected." Id. at 50.

    The Government also persists in arguing that the underlying settlement of the Tribes' claims before the ICC in 1965 should preclude the action here in light of the "set aside" request to the Commission and subsequent settlement of claims, despite the absence of any jurisdictional mandate in the Commission extending to claims arising after August 13, 1946. But see Devils Lake Sioux Tribe v. State of North Dakota, 917 F.2d 1049 (8th Cir. 1990). There the district court had entered summary judgment on the Tribe's claim of title to "lakebed", based on an earlier settlement of the Tribe's ICC claims. The Court of Appeals reversed and remanded for further development of the record, in part because "it remains subject to question whether the Tribe could have presented its claim to the lakebed before the Indian Claims Commission. As mentioned above, the Indian Claims Commission retained jurisdiction only over claims arising prior to 1946. By contrast, the Tribe asserts that ... its claim arose in 1981 when the United States allegedly refused to recognize the Tribe as the beneficial owner of the lakebed. Moreover, the Commission could only award monetary relief .... (footnote omitted)". Id. at 1056.

    We also submit that, had the Commission entered a judgment purporting to encompass the request to "set aside" a post-1946 transfer, this aspect of the judgment would in any case have been void, and not subject to preclusive effect in these proceedings. The Indian Claims Commission Act of 1946 represented a waiver of the sovereign immunity of the United States. It is axiomatic that "[t]he United States, as sovereign, is immune from suit save as it consents

to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941). See also, United States v. Mitchell, 463 U.S. 206, 212 (1983) ("the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction"); and United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003) ("[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity . . . together with a claim falling within the terms of the waiver" (emphasis added)).

The Restatement (Second) of Judgments sets forth the applicable principles as follows:

> When a court has rendered a judgment in a contested action, the judgment precludes the parties from litigating the question of the court's subject matter jurisdiction in subsequent litigation except if: (1) The subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority; or (2) Allowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government ....

Id., §12.

Here the "set aside" request was "plainly beyond the [ICC's] jurisdiction", in that the Commission could not entertain claims arising after August 13, 1946, and its remedial power had long been restricted to economic compensation. Osage Nation of Indians v. United States, supra. Moreover, we submit that precluding an action to quiet title in the Tribes based on the judgment of the Indian Claims Commission "would substantially infringe the authority of another ... agency of the government," Restatement, §12(2), namely the United States Congress that restricted consent to suit under the ICCA to claims accruing before August 13, 1946. "Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void." United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 514 (1940). Thus the Court should reject the Government's

suggestion it give "preclusive effect" to a settlement that could not have encompassed a request to "set aside" a post-1946 transfer, in that it was manifestly beyond the power of the Indian Claims Commission to entertain or remedy.

### III.  THE UNIQUE CIRCUMSTANCES PRESENTED GIVE RISE TO GENUINE FACTUAL ISSUES WHICH SHOULD PRECLUDE SUMMARY JUDGMENT ON LIMITATION GROUNDS

We argued previously that the doctrine of equitable estoppel should apply to prevent limitations from commencing any earlier than May 1994.  Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss, or in the Alternative for Summary Judgment ("Opposition" ) at 10.  The Government concedes "the United States has refused to rule that the doctrine of equitable estoppel may never apply to the Government ...."  Defendant's Reply at 9.  See United States v. Beggerly, 524 U.S. 38, 48-49 (1998) (Stevens, J., concurring) ("doctrine of fraudulent concealment or equitable estoppel might apply if the Government were guilty of outrageous conduct that prevented the plaintiff, though fully aware of the Government's claim of title, from knowing [its] own claim.").

However, the Government also notes, and we are bound to agree, that there is a paucity of authority for the proposition equitable estoppel applies as against the assertion of limitations by the United States, suggesting that those instances have been exceedingly rare in which the Government has been "guilty of outrageous conduct that prevented the plaintiff ... from knowing [its] own claim." Ibid.  Yet it must also be an exceedingly rare, if not unique, circumstance in which the actual status requisite to a claim of title has been obscured for many decades pursuant to classification decisions made on grounds of national security.

In our original Opposition we argued that "information classified for four decades would otherwise have revealed that only buildings and facilities ... were subject to 'set asides' for

-11-

possible military use, [meaning] that the lands were no longer in 'military use' status, and that [the] Executive Order of 1883 therefore no longer represented an obstacle to return of the lands or recognition of the Tribes' beneficial interest ...." Id. at 10-11.

The Government has argued in reply that "buildings and facilities" necessarily include the underlying and surrounding lands. This is tantamount to a concession the "military purposes" status of all Fort Reno[7] continued even after the nominal transfer of jurisdiction from the Army to the Department of Agriculture 1948. Thus any claim of title in the Tribes based on a reversionary interest in Fort Reno was premature, even assuming classification of the information had not prevented the Tribes from discovering the lands' true and continuing "military purposes." Following submission of our original Opposition, counsel for the Tribes obtained several documents pursuant to the Freedom of Information Act showing agreements between the Army and Department of Agriculture that, if they continue in force, mean Fort Reno's "military purposes" status may yet continue. As asserted in the affidavit accompanying Plaintiff Tribes' Rule 56(f) Motion for Continuance to Permit Discovery,

> 3. Documents in Attachment 2 to Plaintiff's Opposition that the Government kept classified for more than fifty years show that at the time of the transfer the Army fully intended to make continued use of the lands for military purposes. This should give rise to a genuine issue whether any claimed reversionary interest could have been asserted in 1948, or at any time thereafter that the lands continues to be devoted to military purposes.
> 4. The Tribes discovered only recently (via Government response to a FOIA request pending for several years) that, in agreements entered between the Army and Department of Agriculture in 1952 and 1954 (Attachments 2 and 3 to Plaintiff's Memorandum in Surreply) that also remained hidden from public view for more than fifty years, the lands continued to be designated in "standby status"

---

[7]It is undisputed the Bureau of Prisons operated a facility on approximately 1000 acres of the original Fort Reno lands beginning in 1937. In our view the remaining lands continued to be devoted to "military uses exclusively", and therefore subject to the Executive Order of 1883.

>for military purposes.  Together with the fact these documents too were apparently classified under the authority of the National Security Act, they give rise to a genuine issue whether the Tribes' claimed reversionary interest has <u>yet</u> accrued for limitations purposes. (emphasis in original).

 Affidavit of Richard J. Grellner in Support of Rule 56(f) Motion for Continuance to Permit Discovery.

Thus genuine issues of fact (also set forth in the Supplemental Statement of Genuine Issues which is Attachment 4 hereto) bearing upon whether a claim of title in the Tribes has "yet accrued" should preclude summary judgment on limitations grounds.  In the alternative, we submit the Tribes should be afforded the opportunity for discovery directed to additional information bearing on the "accrual" issue, and additional information bearing upon whether in the unique circumstances presented the Court should apply the doctrine of equitable estoppel to prevent the running of limitations any earlier than May 1994.[8]

---

[8] The Tribes' counsel has explained such information could include "transcripts of hearings conducted in El Reno, Oklahoma before several members of Congress over a period of several days in 1954.  Accounts of the hearings appear in copies of newspaper articles of the time included in the record as Attachment 3 to Plaintiff's Opposition.  The transcripts should be more readily available in discovery than they proved to pursuant to FOIA request, and could well shed light on representations made during the course of the hearings by Governmental representatives that obscured the actual nature and status of the Fort Reno lands.   They could show that, while tribal members had no knowledge of the continuing military uses contemplated by the Army, Governmental representatives with knowledge nonetheless withheld this information from the Tribes." Grellner Affidavit, ¶ 6.

CONCLUSION

For the foregoing reasons, and for such other reasons appearing in the record, the Cheyenne Arapaho Tribes respectfully request that this Court deny Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Judgment.

Respectfully submitted,

LAW OFFICE OF RICHARD J. GRELLNER

  /s/
Richard J. Grellner, OBA #15521, pro hac vice

439 NW 18th Street
Oklahoma City, Oklahoma 73103
Tel. (405) 834-8484
Fax: (405) 602-0990
E-mail; rjgrellner@hotmail.com

LAW OFFICE OF JOHN P. RACIN

  /s/
John P. Racin   Bar No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202.265.2516

Attorneys for Plaintiff Tribes