UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, ) ) ) Plaintiffs, ) ) ) v. ) ) UNITED STATES, et al., ) ) Defendants. ) ) | No. 06-519 Judge Paul L. Friedman |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SURREPLY**

**Introduction**

Plaintiff's surreply contains legal and factual arguments which merit a written response by the Defendants.

**ARGUMENT**

**I.     PLAINTIFF'S "GENUINE FACTUAL ISSUES" ARE NOT GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE DISMISSAL UNDER THE QUIET TITLE ACT LIMITATIONS AND THE INDIAN CLAIMS COMMISSION ACT BAR.**

Plaintiff argues for the existence of "unique circumstances presented [which] give rise to genuine factual issues which should preclude summary judgment on limitation grounds." (Pl. Surr. at 11). In essence, Plaintiff refers to genuine issues of fact which bear upon: (1) whether the doctrine of equitable estoppel should be applied to the government, thereby tolling the running of the Quiet Title Act's 12-year statute of limitations period; and (2) whether the Tribe's title/reversionary interest claim "has 'yet accrued,' " thereby resulting in the preclusion of "summary judgment on limitations grounds." (Pl. Surr. at 13). These "genuine factual issues"

are not genuine issues of **material** fact because they do not affect the outcome of this suit under the substantive law governing the Ft. Reno claim.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Government of Rwanda v. Rwanda Working Group, 150 F. Supp. 2d 1, 5 (D.D.C 2001).

    First, none of the factual issues regarding equitable estoppel suggest the Government was guilty of: (1) "outrageous misconduct"; (2) that prevented the plaintiff, though fully aware of the Government's claim of title, from knowing of the tribe's own claim, suggested by Justice Stevens as the only conceivable exception to the Supreme Court holding that equitable factors do not apply to toll the running of the statute of limitations period specified in the Quiet Title Act. United States v. Beggerly,  524 U.S. 38, 48-49 (1998).  No allegation is made that the government engaged in outrageous misconduct, nor can the Tribes accurately assert they were prevented from knowing of their own claim.  The Tribes, in fact, were on actual notice of their claim in 1949, when tribal counsel testified at hearings in 1949 ( on H.R. 4756) that the military had abandoned its use of the Ft. Reno lands.  William Howard Payne (then general counsel for the Tribes and later the lead counsel for the Tribes in their Indian Claims Commission Act ("ICCA") suit) testified, in pertinent part, as follows:   " * * * Ft. Reno is no longer useful for military purposes. **It has in fact been abandoned by the Army.** * * * ."    Hearings Before the Subcommittee on Indian Affairs of the Committee on Public Lands, House of Representatives, 81st Cong., 1st Sess.  59, 38 (1949) on H.R. 4756 (a bill to return about 7,000 acres of the Ft. Reno lands to the Tribes which failed to be passed by Congress) (See Attachment No. 1).

    Second, the factual issues relate solely to whether the government's statute of limitations defense with respect to plaintiff's QTA claim is viable.  Even if the court were to apply the

equitable estoppel doctrine to the government, and, thereby, toll the running of the QTA's statute of limitations period, the plaintiff's Quiet Title Act action would be barred by Section 22(a) of the ICCA and the doctrine of res judicata.  In addition, the government's merits defenses would defeat the claim.  The language of the 1891 cession Agreement clearly encompassed the "reserved" lands and the history of the Agreement squarely supports the same conclusion.  See Defendants' Reply at 15-31.  The Indian Claims Commission found, in effect, that all the "reserved" lands, including the Ft. Reno lands, had been **ceded in 1891**.  Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States, 16 Ind. Cl. Comm. 162, 164-165 (1965).  But, even assuming, arguendo, the Ft. Reno lands had not been ceded, the Congressional transfers of the Ft. Reno lands in 1937 and 1948 operated so as to **revoke the July 17, 1883 Executive Order** upon which the plaintiff's reversionary interest claim rests.[1]

As to the issue of whether the plaintiff's reversionary interest claim has yet accrued, we note that the Amended Complaint asserts the existence of a present "beneficial interest" (see ¶ 42 of Amended Complaint), and, is seemingly inconsistent with the "failure to accrue" argument. Again, this issue is not a genuine issue of material fact because it does not go to the merits of the claim.  Even if the plaintiff could establish that the Ft. Reno claim has not yet accrued, after having pled the opposite, then this suit should be dismissed for lack of ripeness.

Finally, plaintiff argues that discovery might uncover the 1954 hearings held in El Reno, Oklahoma before several members of Congress about the status of the Ft. Reno lands. (Pl. Surr.

---

[1] Plaintiff's surreply fails to address this argument which is set out in footnote 18 at page 31 of our Reply brief.

at 13, note 8). Such a claim cannot possibly be the factual predicate for equitable estoppel.[2] We assume such hearings were published and are a matter of public record, thereby obviating any need for discovery. This argument also raises the "unique history" of plaintiff's lead counsel, Richard Grellner, with respect to the Ft. Reno claim - - a matter which we believe relates to the the Tribes' allegation that they were prevented from knowing of their reversionary interest claim by governmental conduct.

In 1995, Mr. Grellner entered into a three-year, "Special Claims Attorney Contract" with the plaintiff Tribes (approved by BIA) which required him to:

> . . . advise and represent the Tribes in connection with **properly investigating, formulating, and pursuing, the claims of the Tribes against the United States**, relating to recovery and development by the Tribes of **certain lands and property** situated in the state of Oklahoma, **commonly known as the 'Fort Reno Lands',** and associated claims.

(Emphasis added).  See Attachment No. 1 (copy of Interior Board of Indian Appeals' September

---

[2] As the Federal Circuit recently explained outside the context of the Quiet Title Act "'[e]quitable tolling against the federal government is a narrow doctrine' that requires 'a compelling justification for the delay.'" DuMarce v. Scarlett, 446 F.3d 1294, 1305 (Fed. Cir. 2006) quoting Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (en banc). "Equitable tolling focuses primarily on the plaintiff's excusable ignorance of the limitations period." Supermail Cargo, Inc. v. United States, 68 F.3d 1204, 1207 (9th Cir.1995). As the Ninth Circuit has explained,

> The equitable tolling doctrine has been applied by the Supreme Court in certain circumstances, but it has been applied sparingly; for example, the Supreme Court has allowed equitable tolling when the statute of limitations was not complied with because of defective pleadings, when a claimant was tricked by an adversary into letting a deadline expire, and when the [agency's written] notice of the statutory period was clearly inadequate. Courts have been generally unforgiving, however, when a late filing is due to claimant's failure 'to exercise due diligence in preserving his legal rights.'

Id., quoting Scholar v. Pacific Bell, 963 F.2d 264, 267-68 (9th Cir.1992).

Even assuming all facts in Plaintiffs' pleadings to be true, there is no possible basis to find that the Tribes were "excusably ignorant" of the facts. Rather, the facts indicate that the Tribes' knew about the accrual of that reversionary interest claim when Tribal counsel testified in hearings before Congress in 1949 that abandonment of Ft. Reno by the Army had occurred.

4

25, 2000 Order, captioned "Richard J. Grellner v. Anadarko Area Director, Bureau of Indian Affairs", 35 IBIA 192).

No governmental action prevented plaintiffs from learning of their reversionary interest claim.  Moreover, given that the "Special Claims Attorney Contract" specifically charged Mr. Grellner with the duty of "properly investigating" the history/background of the Ft. Reno lands claim, the plaintiff's lead counsel arguably could, and should, have uncovered the transcripts of the 1954 hearings (whose existence was divulged by contemporaneous Oklahoma newspaper accounts), if they were matters of public record.  In Danna v. United States, 2 Cl. Ct. 220, 223 - 224 (1983), it was held the facts giving rise to a cause of action were not "inherently 'unknowable' " where these facts were contained in a publicly available document.  The Danna Court recognized the import of language in Japanese War Notes v. United Notes v. United States, 178 Cl. Ct. 630, 635, 373 F.2d 356 (1967), that puts plaintiffs "on inquiry" as to facts extant in the public domain.  "[I]f [a plaintiff] had the means of discovery in his power, he will be held to have known it."  Wood v. Carpenter, 101 U.S. (11 Otto) 135, 141 (1879).

**II.  SECTION 22(a) OF THE ICCA BARS THIS LAWSUIT**.

Plaintiff argues that the request that the Commission "set aside" the April 21, 1948 transfer of Ft. Reno lands to the Agriculture Department was beyond the Commission's jurisdiction because that jurisdiction did not extend to claims which accrued after August 13, 1946.  (Pl. Surr. at 7-11).  We reiterate our view that the Ft. Reno claim articulated in paragraph 9(b) of the 1958 severed petition (and repeated in Paragraph No. 17(b) of the 1961 severed petition) filed under the ICCA is a claim which accrued long before August 13, 1946.  Indeed, the Ft. Reno claim asserts the right to recover damages (as measured by the rental value of the

Ft. Reno lands) from July 17, 1883 ( the date of the Executive Order establishing Ft. Reno) up to the date of the entry of final judgment by the Commission; clearly, the plaintiff tribes treated the ICCA Ft. Reno claim as a pre-1946 claim.

Section 22(a) requires the court to analyze a claim filed under the ICCA as a whole. The fact that the claim articulated in plaintiff's ICCA suit included the "set aside" request does not mean that the Ft. Reno ICCA claim, as described by the plaintiff tribes in their 1958 and 1961 severed petitions and viewed as a whole, is not a claim which accrued before August 13, 1946, for Section 22(a) purposes. The United States Supreme Court's Dann decision certainly stands for the proposition that Section 22(a) is to be construed very expansively. To construe Section 22(a) as plaintiff would have the court do would vitiate Section 22(a), which constitutes one of the conditions upon the ICCA's broad waiver of sovereign immunity which allowed suits upon "ancient'" Indian tribal claims (some of which accrued in the 1780s) against the United States. [3]

Plaintiff also argues that the Dann opinion did not hold that the payment of the final judgment entered by the Indian Claims Commission in favor of the Western Shoshones, in and of itself, operated to extinguish the Western Shoshones' aboriginal title to its aboriginal title lands. We agree, but the government has made no such argument in this case. However, the Dann

---

[3] Plaintiff does not address our res judicata defense; the Tribes make no mention of the decision in White Mountain Apache Tribe v. Hodel, 784 F.2d 921, 925-26 (9th Cir. 1986) which Defendants believe is controlling. Even if this decision were not found to be controlling, the test of whether the plaintiff's present Ft. Reno claim is the same claim raised in plaintiff's ICCA lawsuit is whether the present claim arises from the same series of connected transactions as the Ft. Reno claim filed under the ICCA. E. g., Harnett v. Billman, 800 F.2d 1308, 1314 (4th Cir. 1986). A comparison of the Tribes' description of the Ft. Reno claim in the 1958 and 1961 severed petitions filed in ICC Docket No. 329-A with the general allegations contained in the Amended Complaint here demonstrates that the essence of both claims is premised upon the same series of connected transactions.

opinion clearly indicates that payment of the Commission's final judgment signified that the Commission had found the Western Shoshones' aboriginal title had been extinguished. Similarly, in 1965 the Commission found, in effect, that all the "reserved" lands (which included the Ft. Reno lands) had been ceded under the 1891 Agreement; thus, the payment of the 1965 final judgment (in ICC Docket Nos. 329-A and 329-B) in the amount of $15 million in favor of the plaintiff Cheyenne-Arapaho Tribes reflected the Commission's finding that all the "reserved" lands had been ceded.

     Most significantly, the plaintiff's lack of jurisdiction argument totally ignores the "continuing wrongs" doctrine of the Indian Claims Commission Act's jurisprudence - - namely, that the ICCA affords jurisdiction over "continuing wrongs." A "continuing wrong" is defined as a "course of wrongful governmental conduct which began before August 13, 1946 and continued thereafter." See Navajo Tribe of Indians v. United States, 218 Ct. Cl. 11, 17-21, 586 F. 2d 192, 196-98 (1978), cert. denied, 441 U.S. 944 (1979). The plaintiff's ICCA Ft. Reno claim qualifies as a "continuing wrong" which arose in 1883 (when the government first began to use the Ft. Reno lands for military purposes without paying any compensation (or payment of rentals thereafter)), and then began to treat these lands as its own in 1937 when Congress transferred 1,000 acres to the jurisdiction of Bureau of Prisons and continued to treat them as its own in 1948 when Congress transferred the remaining Ft. Reno lands to Agriculture's jurisdiction. In short, the ICCA jurisdiction over plaintiff's Ft. Reno claim extended beyond August 13, 1946.

     Plaintiff also contends that there was never a time before now when it could have asserted the Tribes' alleged reversionary interest in the Ft. Reno lands because they are still being used for military purposes. (Pl. Surr. at 11-13). However, in 1949, the Tribes knew that their

reversionary interest claim had accrued; they could have asserted the claim at that time.

The Complaint states that the Army began to use Ft. Reno as a "remount station" in 1908. The Congressional hearings on the Ft. Reno bill (H.R. 4756) introduced in 1949 indicate the Army was no longer using Ft. Reno as a "remount station."  Testimony of H.E. Hyden, Regional Counsel for the Indian Service, Anadarko, Oklahoma; Hearings Before the Subcommittee on Indian Affairs of the Committee on Public Lands, House of Representatives, 81st Cong., 1st Sess. 7, 9 (1949).  (See Attachment No. 2).  More importantly, William Howard Payne (then general counsel for the Tribes and later the lead counsel for the Tribes in their ICCA suit) testified, in pertinent part, as follows:   " * * * **Fort Reno is no longer useful for military purposes.  It has in fact been abandoned by the Army. * * *** " Id. at 59 and 38 (Emphasis added).

In sum, the cited testimony refutes the plaintiff's argument that the Tribes' alleged reversionary interest has "not yet accrued."  The reality is that it accrued in 1949, a fact the Tribes knew at that time.

**III.   THE  DOCUMENTATION SUBMITTED BY DEFENDANTS AND THE INDIAN CLAIMS COMMISSION'S 1965 FINDINGS ON THE 1891 CESSION CONCLUSIVELY ESTABLISH THAT THE FT. RENO LANDS WERE CEDED.**

Plaintiff cavalierly dismisses the historical/evidentiary value of the Transcript of Negotiations on the grounds that the remarks of the government officials had to be conveyed to the Cheyenne-Arapaho Indians by means of interpreters.  Plaintiff conveniently ignores the fact that traditionally Indian treaties (and agreements) effecting cessions of Indian lands have been negotiated through the use of interpreters.  That does not mean that the Transcript of Negotiations here has no probative value in establishing what the Cheyenne-Arapaho Indians

8

would have understood the terms of the treaty to mean in 1890, or what the intentions of the. parties were in 1890.   Indeed, plaintiff's argument is undercut by the fact that the portion of Solicitor Leshy's 1999 Opinion concerning the cession of Ft. Reno is based, in part, upon that very Transcript;  Solicitor Leshy must have believed this Transcript had probative value. Furthermore, the U.S. Supreme Court decisions upon which Defendants' rely (Minnesota v. Mille Lacs Bands of Chippewa Indians, 526 U.S. 172, 196 (1999) and Nw. Bands of Shoshone Indians v. United States, 324 U.S. 335, 339 (1945)) do not even remotely intimate that transcripts of treaty/agreement negotiations are of questionable historical/ probative value. [4] Finally, plaintiff cites no caselaw in support of this argument.

   Plaintiff contends that  the history of the 1890 treaty negotiations (Defendants' Reply at 17-23) are "unsupportive" of the government's cession argument, because the Ft. Reno lands were "taken" from the plaintiff Tribes by the 1883 Executive Order.  Even assuming, arguendo, plaintiff is correct, it does not follow that the cession of the Ft. Reno lands could not have occurred in 1891.  According to the plaintiff, the 1883 Executive Order created a reversionary interest in the Ft. Reno lands in the Tribes. The Tribes also describe this reversionary interest as a "beneficial interest" which they presently hold.  See para. 42 of Amended Complaint.

   Article II of the 1891 Agreement states that the cession includes **"all other lands or tracts of country in the Indian territory to which they [the Tribes] have or may set up or**

---

[4] The alleged unfairness of the negotiations (note 3 at 5-6 of the surreply) has no relevance here because this is a "moral" claim which the plaintiff tribes could, and should, have asserted in their ICCA suit under the "fair and honorable dealings" clause (Clause (5) of Section 2 of the ICCA at 60 Stat. 1050).  The jurisdictional statutes which plaintiff cites in its Complaint do not encompass such claims.  Cf. Menominee Tribe of Indians of Wisconsin v. United States, 221 Ct. Cl. 506, 514-520, 607 F.2d 1335, 1340-44 (1979).

**allege any right, title, interest, or claim whatsoever**." Thus, even if the Ft. Reno lands were, as a legal matter, no longer a part of the 1869 Reservation after 1883, as plaintiff contends, the quoted language was broad enough to encompass the Tribes' alleged beneficial interest in the Ft. Reno lands which, in any event, were still part of "Indian country,"or "Indian territory" after the 1883 Executive Order was issued.  See November 22, [189]0 pass allowing access to Cheyenne-Arapaho Reservation written at the Cheyenne-Arapaho Agency (presumably written by the officer in charge at Ft. Reno) which refers to the laws governing "Indian country" (which he states includes the Reservation) and "enclaves thereof." It can be inferred that Ft. Reno is one of those "enclaves." (Copy appended as Attachment No. 3); and Attachment F to the Memorandum in Support of Defendant's Motion to Dismiss (David Jerome's November 14, 1890 letter transmitting the Cherokee Commission's Report on the history of the 1890 cession negotiations with the Cheyenne-Arapaho Tribes gives Jerome's address as "Fort Reno, Ind. Ter.").

The very same legislative history which contains the 1912 letter upon which plaintiff relies (Pl. Surr. at 7), establishes that the Secretary of the Interior took the position that the "territory within which the cantonment lands [which were "reserved" lands] are included was ceded to the United States by [the] act of march 3, 1891 . . . . " H.R. Rep. No. 704, 62nd Cong., 2d Sess. 2-3 (1912) (Attachment No. 1 to Surreply). Thus, Attachment No. 1 establishes that **from 1912 to 1999** the Department of the Interior consistently took the view that the "reserved" lands had been ceded  - - **a consistent administrative construction of the 1891 Agreement for 87 years.** Such an extremely long, consistent construction is entitled to great weight/deference. E. g., Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 252-255 (1985).;

10

cases cited at 24-25 of Defendants' Reply.[5]

If Ft. Reno had been "taken" by the government in 1883, as plaintiff alleges, government officials need not have mentioned the Ft. Reno lands during the negotiations with respect to prohibiting allotments thereon because, under plaintiff's reasoning, the Ft. Reno lands were no longer part of the 1869 Executive Order Reservation. However, David Jerome, the Chairman of the Cherokee Commission, stated: "**The Government also set apart on this reservation [the 1869 Reservation] a Military Reservation containing fourteen or fifteen sections [Ft. Reno] . . .**" (Defendants' Reply at 18). Commissioner Sayre remarked that the Indians were prohibited from selecting any allotments on " . . . any of the school or farm or agency or **military reservations that we want to keep**." (emphasis added). See Defendants' Reply at 19). Jerome also stated that, except for the lands to be allotted, **"the Government wants the title to the rest of the land released to them so they can make use of it. "** Id. These remarks demonstrate that the government officials intended that the cession encompass the "reserved" lands (which included Ft. Reno). It is highly likely that these officials wanted to ensure that there would be no future (that is, post-1890) doubt that the government had full title to the "reserved" lands. This reading is strongly supported by Secretary of the Interior Noble's September 30, 1890 directive to David Jerome to obtain the **" . . . total relinquishment by the Indians of all their claims to any land wherever [sic] situated."** Defendants' Reply at 22.[6]

---

[5] Plaintiff's surreply does not even address our argument about Interior's consistent administrative position prior to 1999; plaintiff should be deemed to have conceded the argument.

[6] The Tribes contend that the Defendants' definition of '"surplus" lands (Defendants' Reply at 25-26) supports the Tribes' position that the Ft. Reno lands were not "surplus." Specifically, they argue that the Cheyenne-Arapaho Indians needed Ft. Reno to protect them from hostile tribes and since the Indians "needed" the Ft. Reno lands, the Ft. Reno lands cannot have been "surplus"

Finally, even if the court were to agree with plaintiff that the Ft. Reno lands were not ceded in 1891, and so found, no beneficial interest in the Ft. Reno lands can exist **at the present time** because Congress' transfer of 1,000 acres of the Ft. Reno lands to the Bureau of Prisons in 1937, together with its transfer of the remaining 8,493 acres to the Department of Agriculture in 1948, operated so as to **revoke** the July 17, 1883 Executive Order which created the alleged "beneficial interest." This conclusion is based upon the notation in Volume 20 of the General Land Office's tract books for Oklahoma which states that the Secretary of the Interior's 1963 Public Land Order 3890 transferring 1,600 acres of Ft. Reno lands [of the 8,493 acres of Ft. Reno lands previously transferred to Agriculture] to the Bureau of Prisons "revoked" the July 17, 1883 Executive Order "establishing the Fort Reno Military Reservation" as to the lands transferred. See Attachments Q-13 and Q-14 to the Defendants' Reply. If the transfer by the Secretary's Public Land Order 3890 could operate to revoke the 1883 Executive Order as to the 1,600 acres transferred, then, a fortiori, the 1937 and 1948 transfers of the Ft. Reno lands **by Congress,** must have operated to revoke the 1883 Executive Order as well as to **all** 9,493 acres

---

in 1890. Pl. Surr. at 6-7. This argument, while perhaps facially appealing, is wrong. It has always been commonly understood that the term "lands needed" by Indians refers to lands which the Indians required for their own use. Moreover, this argument cannot be reconciled with the language of Article IV of the 1891 Agreement which defines use of 1869 Reservation lands for "military" purposes as one of multiple types of "public" uses; "Indian" uses are not synonymous with "public" uses.

of Ft. Reno lands.  See note 18 of Defendants' Reply at 31. [7]

We stress that in its Opposition to Defendants' Motion to Dismiss plaintiff devotes only slightly more than two pages to the cession issue (Pl. Opp. at 2-4).  The essence of plaintiff's position is contained on page 3 which quotes from the portion of the 1999 Solicitor's Opinion deals which deals with the cession issue.  We addressed the reasoning of the Solicitor's Opinion at length in our Reply at 16-30.  The arguments which plaintiff **now** makes on the cession issue (and which we discuss above) are not found in its Opposition.  Not only are these latest arguments on the cession question unsound (as we have demonstrated above), but, as we discuss below, they are diametrically opposed to the 1965 findings made by the Indian Claims Commission in plaintiff's ICCA case.

In approving the proposed settlement of plaintiff's ICCA suit, the Indian Claims Commission found, in effect, that all the "reserved" lands (defined in Article IV of the 1891 Agreement as lands "now used or occupied for military, agency, school, school-farm, religious, or other public uses") were ceded in 1891.  Specifically, in Finding Nos. 55 and 56 (copy appended as Attachment No. 4 ) concerning the cession of the 1869 Executive Order Reservation entered in ICC Docket No.  329-A, the Commission found that the 1891 cession thereof involved " . . . **some 4,608,878 acres** [ceded] to the United States for the alleged unconscionable consideration of $1,500,000." (Emphasis added).  Cheyenne-Arapaho Tribes of Indians of

---

[7] Again, plaintiff does not address this argument, either.  Certainly, the GLO's administrative interpretation of the legal impact of utilizing the Ft. Reno lands for non-military government uses is entitled to considerable weight.  See Defendants' Reply Brief at 23-25 for case citations.
   It is worth noting that the Congressman who introduced the 1997 Ft. Reno bill (H.R. 2039) stated that the Indians understood the Ft. Reno lands would be returned "when the military no longer needed" them, but added this understanding was "not clearly documented."  See Attachment W-4 to Defendants' Reply.

Oklahoma v. United States, 16 Ind. Cl. Comm. 162, 164-165 (1965).

Both the plaintiff tribes' appraiser in Docket No. 329-A  (see Attachment J to Defendants' Memorandum in support of their Motion to Dismiss at 145) and the government's appraiser in Docket No. 329-A (see Attachment I to said Memorandum at 88) valued 4,406, 878 acres of the 1869 Reservation, as of March 3, 1891 - - the date of cession - - so as to determine the fair market value of the lands actually ceded.  This 4,406,878-acre figure was derived by subtracting 529,682 acres allotted to the Cheyenne-Arapaho Indians from the total acreage of the 1869 Reservation which contained  5,138,560 acres.  Neither appraiser made an additional deduction of the total acreage of the "reserved" lands (which included Ft. Reno) from the 5,138,560 acres encompassed by the 1869 Executive Order Reservation, in order to arrive at the total acreage of the lands being ceded. Therefore, the "reserved" lands necessarily comprised a part of the 4,406,878 acres which the Commission found had been ceded.  See Memorandum in support of Defendants' Motion at 5-6 and 8-9.

In other words, given the above-described record before the Commission in Docket No. 329-A, when the Commission found that 4,608,878 acres were ceded under the 1891 Agreement, it found, in effect, that **all of the reserved lands (including Ft. Reno) had been ceded.**  The Commission's findings on the scope of the 1891 cession are controlling.  See United States v. Pend Oreille Pub. Util Dist. No., 926 F. 2d 1502, 1507-1509 (9th Cir. 1991). (held that Indian Claims Commission's findings that the United States had extinguished the Kalispel Tribe's aboriginal title to the submerged lands at issue to be controlling; the conclusion that the aboriginal title to these lands had been extinguished was derived from the acreage figures

14

contained in the Commission's findings and not an express finding that aboriginal title to the submerged lands had been extinguished). The plaintiff Tribes are bound by the Commission's Finding Nos. 55 and 56 under the doctrine of **collateral estoppel.** <u>Securities Industries Ass'n v. Bd. of Governors</u>, 900 F.2d 360, 363-64 (D.C.Cir. 1990); <u>Elliott v. F.D.I.C.</u>, 305 F.Supp. 2d 79, 83 (D.D. C. 2004). This means that the plaintiff is barred from contending that the Ft. Reno lands were <u>not</u> ceded.

## CONCLUSION

Plaintiff's Surreply fails to offer any compelling reasons for the court to deny the Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment. We have demonstrated that plaintiff's "genuine issues of fact" are not genuine issues of <u>material</u> fact and do not support rejection of our statute of limitations defense with respect to the Quiet Title Act. Plaintiff's response to our Section 22(a) defense ( a defense we raised in our Motion to Dismiss, but not addressed in plaintiff's Opposition) reveals lack of understanding of the intended reach of Section 22(a) and rests upon an erroneous jurisdictional argument. Finally, we have demonstrated why plaintiff's argument on the cession issue is devoid of merit and, in any event, is barred by the Indian Claims Commission's Finding Nos. 55 and 56 issued in 1965 in plaintiff's ICCA suit. For the foregoing reasons, Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment should be granted.

Dated this 2nd day of July, 2007.

                                              Respectfully submitted,

                                              RONALD J. TENPAS
                                              Acting Assistant Attorney General

        s/James M. Upton
        JAMES M. UPTON
        U.S. Department of Justice
        Environment & Natural Resources
          Division
        Natural Resources Section
        P.O. Box 663
        Washington, D.C.   20044-0663
        Ph. (202) 305-0482
        Fax: (202) 305-0506
        E-mail address: james.upton@usdoj.gov

OF COUNSEL:

Maria Wiseman, Esq.
U.S. Department of the Interior
Office of the Solicitor
Main Bldg.
1849 C Street, N.W.
Washington, D. C.   20240

James M. Snow, Esq.
Jeffrey T. Vail, Esq.
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, D.C.   20250