ATTACHMENT NO. 1

# FORT RENO MILITARY RESERVATION LAND

## HEARINGS

BEFORE THE

## SUBCOMMITTEE ON INDIAN AFFAIRS OF THE COMMITTEE ON PUBLIC LANDS HOUSE OF REPRESENTATIVES

EIGHTY-FIRST CONGRESS

FIRST SESSION

ON

## H. R. 4756

A BILL SETTING ASIDE CERTAIN LANDS IN OKLAHOMA KNOWN AS THE FORT RENO MILITARY RESERVATION FOR THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA

JUNE 27, 28, 29, 30, JULY 21, AUGUST 10 AND 17, 1949

Serial No. 21

Printed for the use of the Committee on Public Lands



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1949

96772

COMMITTEE ON PUBLIC LANDS

J. HARDIN PETERSON, Florida, *Chairman*

| | |
|---|---|
| JOHN R. MURDOCK, Arizona | FRED L. CRAWFORD, Michigan |
| CLAIR ENGLE, California | WILLIAM LEMKE, North Dakota |
| MONROE M. REDDEN, North Carolina | FRANK A. BARRETT, Wyoming |
| TOBY MORRIS, Oklahoma | DEAN P. TAYLOR, New York |
| KEN REGAN, Texas | JAY LeFEVRE, New York |
| LLOYD M. BENTSEN, Jr., Texas | A. L. MILLER, Nebraska |
| COMPTON I. WHITE, Idaho | WESLEY A. D'EWART, Montana |
| WALTER S. BARING, Nevada | NORRIS POULSON, California |
| REVA BECK BOSONE, Utah | JOHN SANBORN, Idaho |
| FRED MARSHALL, Minnesota | JOHN P. SAYLOR, Pennsylvania |
| HARRY P. O'NEILL, Pennsylvania | |
| WAYNE N. ASPINALL, Colorado | JOSEPH R. FARRINGTON, Hawaii |
| LOUIS B. HELLER, New York | |

E. L. BARTLETT, Alaska
ANTONIO FERNÓS-ISERN, Puerto Rico

SUBCOMMITTEE ON INDIAN AFFAIRS

TOBY MORRIS, Oklahoma, *Chairman*

| | |
|---|---|
| JOHN R. MURDOCK, Arizona | WILLIAM LEMKE, North Dakota |
| COMPTON I. WHITE, Idaho | FRANK A. BARRETT, Wyoming |
| WALTER S. BARING, Nevada | WESLEY A. D'EWART, Montana |
| REVA BECK BOSONE, Utah | NORRIS POULSON, California |
| FRED MARSHALL, Minnesota | |

E. L. BARTLETT, Alaska

II

# CONTENTS

| | Page |
|---|---|
| William Zimmerman, Jr., Assistant Commissioner, Bureau of Indian Affairs, Department of the Interior | 2, 73, 130, 143 |
| H. E. Hyden, regional counsel, Indian Service, Anadarko, Okla | 7 |
| E. J. Overby, assistant to the Secretary of Agriculture | 19 |
| Philip W. Kelleher, Real Estate Division, Office, Chief of Engineers, Department of the Army, Washington, D. C. | 29 |
| H. W. Marston, Office, Agricultural Research Administrator, Department of Agriculture | 32 |
| William Howard Payne, general counsel and tribal attorney for the Cheyenne and Arapaho Tribes of Oklahoma, Washington, D. C. | 38, 71, 73, 109, 149 |
| Jesse Rowlodge, chairman, business committee, Cheyenne and Arapaho Tribes, Oklahoma | 78, 89, 94 |
| Kish Hawkins, representative for the Cheyennes and Arapahoes | 90 |
| J. F. Nighswander, El Reno, Okla | 95 |
| John H. Lynch, Assistant Director of Finance, Department of Agriculture | 110 |
| James V. Bennett, Director, Bureau of Prisons, Department of Justice | 119 |
| Preston Peden, counsel, Committee on Public Lands, House of Representatives | 136, 150 |
| J. D. Miller, budget officer, Bureau of Prisons | 144 |
| H. M. Critchfield, Department of Interior | 153 |

# FORT RENO MILITARY RESERVATION LAND

### TUESDAY, JUNE 28, 1949

House of Representatives,
Subcommittee on Indian Affairs of
the Committee on Public Lands,
*Washington, D. C.*

The subcommittee met, pursuant to adjournment, at 10 a. m., in the committee room of the House Committee on Public Lands, Hon. Toby Morris (chairman of the subcommittee) presiding.

Mr. Morris. The committee will now come to order, and we will proceed with the hearing of the Subcommittee on Indian Affairs on the bill under consideration yesterday, H. R. 4756.

The Subcommittee on Irrigation and Reclamation also has a scheduled hearing today. The chairman of that subcommittee, Mr. Murdock, called just a few minutes ago, and he will be a little late arriving.

As most of you know, especially the departmental witnesses, who are with us often, this committee is so crowded for time that we all have to do a little shifting now and then to help each other out.

We will move forward now as rapidly as we can, but I will make this announcement for the benefit of the witnesses present who might be interested: There will be a hearing on the Fort Reno, Okla., matter before the Indian Affairs Subcommittee, and there will be a hearing also before the Subcommittee on Irrigation and Reclamation. Those witnesses who are interested in the bill under consideration in the Irrigation and Reclamation Subcommittee, H. R. 5113, will please stand by for a little while. We will be calling on you with regard to that a little later.

We will now proceed with the further consideration of H. R. 4756.

We have heard departmental witnesses from the Department of the Interior and the Department of Agriculture. Are there any other departmental witnesses present this morning who want to be heard?

## STATEMENT OF PHILIP W. KELLEHER, REAL ESTATE DIVISION, OFFICE, CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY, WASHINGTON, D. C.

Mr. Kelleher. Yes, Mr. Chairman. I am from the Department of the Army.

Mr. Morris. All right. We will be happy to hear from you at this time.

Mr. Kelleher. Yes, sir.

Mr. Morris. Please give your name and the representative capacity in which you appear.

29

Mr. MORRIS. There will be somebody else testify on that, as to what they plan to do with it?

Mr. ZIMMERMAN. Yes, that is right.

Mr. MURDOCK. Mr. Chairman, I am concerned in this bill and in many other bills, about this matter of some of the Indians being landless, and some of them having allotments, and some tribes having land in tribal ownership and no allotments.

It is a rather jumbled picture, is it not, throughout the entire Indian country, and that is why I raised these two question. It may be that in the case of some Indian tribes, the land had better be allotted, whereas with other Indian tribes the land had better be in tribal ownership, it may depend upon the tribes.

Mr. LEMKE. Well, what do you say about your own Indians?

Mr. MURDOCK. In the case of most of our own Indians in Arizona, the land had better be in tribal ownership.

Mr. POULSON. Does not the State of Utah have about the same situation?

Mr. MURDOCK. I am not sure about that.

Mr. POULSON. You have the same tribe, do you not?

Mr. MURDOCK. No; the Navajos are the only ones common to both States.

Mr. MORRIS. Are there any further questions of Mr. Zimmerman at this time?

Do you have any other witnesses?

Mr. ZIMMERMAN. Do you wish the Department of Agriculture witnesses to appear next?

Mr. MORRIS. Do you have anyone else from the Indian Office?

Mr. ZIMMERMAN. Mr. Hyden is here.

Mr. MORRIS. From the Service?

Mr. ZIMMERMAN. Yes.

Mr. MORRIS. We want to have someone tell us what is proposed to be done with this land.

Mr. Hyden, will you give your full name to the reporter and the capacity in which you appear.

## STATEMENT OF H. E. HYDEN, REGIONAL COUNSEL, INDIAN SERVICE, ANADARKO, OKLA.

Mr. HYDEN. Mr. Chairman and members of the committee, my name is H. E. Hyden. I am regional counsel for the Indian Service with headquarters at Anadarko, Okla.

Mr. Wade Head, the general superintendent of the Western Oklahoma Council with headquarters at Anadarko, the council having jurisdiction over this land, was unable to be here and asked me to appear and represent him.

At first I would like to comment briefly on a point Congressman D'Ewart brought out a moment ago and that is that it is true that the three or four bills in the past that have withdrawn these lands, similar lands, Cheyenne-Arapaho ownership were prior to the enactment of the Indian Claims Commission Act. And it is their contention here that the Indian Claims Commission Act is limited in jurisdiction, that it does not provide for the restoration of these lands, and the Indians feel that their equities, because it involves the restoration of land, rather than merely awarding of a judgment which is the

difference between what they claim was inadequate consideration and their claim of adequate consideration is involved.

Mr. Zimmerman brought out another point a moment ago that I should like to emphasize just slightly, and that is that the Cheyenne-Arapho Indian Reservation is in a peculiar status, in that we have within the last few generations, of the middle age and the slightly older Indians, no allotments—there is a very peculiar situation for these allotted reservations, because a great number of them have no allotments available. In other words, the land available for allotment was exhausted in 1891 and there have been no lands open, no real opening of the rolls in addition to the allotments since that time.

Our plan briefly for the utilization of this land would be to utilize a part of it as homesites for Indian veterans, small tracts, probably, with garden tracts and homesites, and then to utilize the bulk of it for a tribal cattle enterprise.

Mr. MORRIS. A tribal cattle enterprise?

Mr. HYDEN. Yes. We feel that the best use of this land is grazing, and that is indicated by the fact that the Army has used it for a remount station for years, and we feel that we should not put the plow to any more of this land. There is some, I understand, being cultivated now, but if this land were restored to tribal ownership we contemplate using it as an operational base, and in conjunction with a loan program or revolving loan program that has been proposed for these Indians.

Mr. Head and I have felt that in due course we could probably maintain around 1,000 head of cattle, and we would have hopes that this would result in a net return of something in the neighborhood of $50,000 a year for the Indians. This program would call for the employment of a manager, and of course, so long as——

Mr. D'EWART (interposing). May I interrupt for a question?

Mr. HYDEN. Yes.

Mr. D'EWART. You do not mean you could get a return of some $50,000 a year from 1,000 head of cattle on 9,300 acres of land?

Mr. HYDEN. We figure about four to six head of cattle to the acre.

Mr. MORRIS. I might explain, Mr. D'Ewart, that we require a very much smaller acreage per head than is required out in the western part of the country. We require a very small acreage compared with the western grazing land to support a cow.

Mr. D'EWART. I would say, Mr. Chairman, that I am going down to Oklahoma to see 9,000 acres of land that will produce $50,000 income from cattle.

Mr. HYDEN. Mr. Congressman, I might add that there is some alfalfa land next to the Concho Agency which would be utilized in conjunction with this program.

Mr. MORRIS. This is very rich land, and a considerable amount of it, I would say, could produce alfalfa.

Mr. HYDEN. Yes; it is good alfalfa land.

Mr. MORRIS. I am not certain whether this is correct, but I understand that it is extremely fertile land, it is good land, and certainly is good grazing land.

Mr. WHITE. What land are you referring to now?

Mr. MORRIS. This is land which the Government has been using. It was originally set aside as a military reservation and the Army has

turned it over to the Department of Agriculture. It is now being used for a horse breeding station, or something of that sort, and the proposal is to give it back to the Indian tribes. It is now being used, or was used, as a remount station.

Mr. HYDEN. It is not a remount station now.

Mr. MORRIS. What is actually going on there at this time?

Mr. HYDEN. It is my understanding that they are breeding some horses there.

Mr. MORRIS. Race horses?

Mr. D'EWART. About a year ago the remount station was turned over by the Army to the Department of Agriculture for either disposal or continuance. We had a long struggle as to whether it would be abandoned or continued.

Mr. MORRIS. Yes.

Mr. D'EWART. And we lost out, and I imagine that the remount station lost out.

Mr. MORRIS. It was originally a remount station but as I understand it is now being used for breeding horses.

Mr. WHITE. Do I understand that the Indians owned this land?

Mr. MORRIS. The Indians have no control over it.

Mr. WHITE. There is just 6.5 sections involved?

Mr. MORRIS. I understand some 9,500 acres.

Mr. HYDEN. It is nearer 8,400.

Mr. WHITE. Six and five-tenths sections would be nearer 4,000 acres.

Mr. MORRIS. But there is more than that.

Mr. WHITE. The description in the bill refers to 6.5 acres.

Mr. MORRIS. But there is more on the next page. I think the testimony shows it would be about 9,500 acres. Is that right?

Mr. HYDEN. I am advised it is 8,493.

Mr. MORRIS. Eight thousand four hundred and ninety-three is the exact figure.

Mr. HYDEN. Yes.

Mr. WHITE. That is all good grazing land. What did you say you have on the land now?

Mr. HYDEN. It was turned over to the Department of Agriculture.

Mr. MORRIS. We have some witnesses here who will tell us about that.

Mr. WHITE. Very well.

Mr. HYDEN. The Indian representatives will be able to give you a more elaborate statement on what their intentions are.

Mr. WHITE. Do you advocate acquiring this land and then allotting it to the Indians; or what is the proposal?

Mr. HYDEN. The plan does not call for allotment in severalty.

Mr. WHITE. How do you propose to use the land if the Indians are not to have it allotted?

Mr. HYDEN. The Indians would have a tribal refund, or repurchase cattle program, where the members of the tribe would be able to secure a loan.

Mr. WHITE. You mean, you would not allot this land to the different Indians, but it would be used as a cattle enterprise, where you could sell the cattle for the benefit of all of the Indians?

Mr. HYDEN. That is right. And there will be some home sites assigned, without passing title, from the tribe to the individuals.

As a matter of fact, there are so many different parties involved here, it is quite difficult to get it all straightened out. In a way it is a rather simple bill, but it involves so many different departments and interests that it was hard to determine who all should be notified. Some of these departments are not at fault, especially the Department of Justice, for not having their reports ready, for the reason that the notice did not go out until very recently to the Department of Justice. Through inadvertence it was just overlooked. I want to make that explanation.

Now, Mr. Payne, you represent the proponents of this bill, the Indian tribes, and we would like to have your suggestions now as to who should be called upon first, to enlighten us on the view of those who are sponsoring the bill.

## STATEMENT OF WILLIAM HOWARD PAYNE, GENERAL COUNSEL AND TRIBAL ATTORNEY FOR THE CHEYENNE AND ARAPAHO TRIBES OF OKLAHOMA, WASHINGTON, D. C.

Mr. PAYNE. If it please the committee, Mr. Chairman, I would prefer to give my testimony at this time.

Mr. MORRIS. All right. We would be happy to hear from you.

Mr. PAYNE. If you are ready to proceed with the case for the Indians, I would like to be heard.

Mr. MORRIS. Yes, sir.

As I explained to the committee yesterday, and will explain again to those who might not have been present, William Howard Payne, the present witness before us, is a former resident of the city of El Reno, Okla. He lived nearby this land in question. He has for a number of years. He is a resident of the city of Washington and is an honorable member of the bar here in the city of Washington, and is formerly a citizen of the city of El Reno, which is nearby this site we are considering in this bill. He represents the two tribes of Indians involved, the Cheyenne and Arapahoes.

Mr. PAYNE. My name is William Howard Payne, and I am general counsel and tribal attorney for the Cheyenne and Arapaho Tribes of Oklahoma.

Mr. Chairman and members of the committee, I would like to present as briefly as possible—and I think it will be very brief—a sort of legal history of these Fort Reno lands.

The Cheyenne-Arapahoes, sometime prior to about 1804, became confederated. Prior to that time they were distinct Indian tribes.

The first knowledge of the Cheyennes, I believe, is reported by the French at about 1657, where they found them in the present State of Minnesota.

Later on, in about 1804, Lewis and Clark found them in the Black Hills of South Dakota, occupying that area.

The Cheyenne and Arapahoes were both there at about that time, and in 1825 the United States entered into a treaty with the Cheyennes. This treaty was purely a treaty of amity and friendship. There was no cession of lands, no relinquishment of lands, and no reservation defined and no money paid and none obligated.

The next treaty with the tribes, and first in which the United States treated with the Arapahoes, was the treaty of 1851, which was nego-

Cheyenne-Arapaho Reservation, no longer required for the purpose of the original reserve. The Congress authorized the sale under the homestead law at not less than $5 an acre, in 1910, and the proceeds were paid into the Treasury to the credit of the Cheyenne-Arapaho Indians of Oklahoma, and drew 3-percent interest per annum.

In 1938 there was Public Law 480 of the Seventy-fifth Congress (52 Stat. 213). Certain lands were eliminated from the Seeger school reservation in the western part of the reservation. Having been eliminated from the school reserve, no longer useful as school reserve, the lands were set aside for the use and benefit of the Cheyenne-Arapaho Tribes of Oklahoma. No allotments in severalty were permitted. They added to the sum total of the tribal ownership of land.

In 1942 there was Public Law 419 of the Seventy-seventh Congress (56 Stat. 21). That act of Congress vested title in certain lands formerly in the Executive order Cheyenne-Arapaho Reservation, vested title in the United States in trust for the Cheyenne-Arapaho Indians.

There is definite precedent, then, for this bill. Fort Reno is no longer useful for military purposes. It has been in fact abandoned by the Army. By act of Congress jurisdiction has been transferred to the Department of Agriculture. The War Department recently, as late as this spring, held a great auction and apparently sold off all the horse stock it had. The Army probably would have gone out of business much sooner had it not been for the Greek mule program and the Japanese horse-producing program. Those programs are coming to an end, and very soon. In fact, there is very little activity at the present time.

There is a very strange feeling in the general area of Fort Reno. There have been numerous newspaper articles and editorials referring to Fort Reno as an orphan. The Indians, having objected as early as almost immediately when they learned of this act of Congress in 1891 and the manner in which the agreement with them had been negotiated, began to oppose and object to the transactions that took place. They were obviously robbed. They lost 10,000,000 acres of land. There was no consideration, just giving them back 500,000 acres of their own land.

Based upon even $1 an acre, they have received only $1,500,000 for 10,000,000 acres of land, and they have only received 15 cents an acre which obviously is not just compensation.

If you were to base the compensation alone on the Executive order reservation they should have at least $1.25 an acre, or a minimum of $1 an acre. They should have gotten at least 4½ million dollars instead of 1½ million dollars. Even the 1½ million dollars we have shown was such that they actually received the benefit of only $500,000. The other $1,000,000 was appropriated for the depredation claims.

The tillable land there, amounting to about 1,200 acres, is some of the finest land in Oklahoma. It has great possibilities for grain and hay crop production.

The program that has been outlined here for the Cheyenne-Arapaho Tribes is one which occurs to me to be essentially the same program that has been outlined by the Department of Agriculture as to its prospective use of these lands. They are obviously more suited to grazing purposes than any other.