**ATTACHMENT NO. 1**

# FORT RENO MILITARY RESERVATION LAND

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON INDIAN AFFAIRS OF THE COMMITTEE ON PUBLIC LANDS HOUSE OF REPRESENTATIVES

EIGHTY-FIRST CONGRESS

FIRST SESSION

ON

## H. R. 4756

A BILL SETTING ASIDE CERTAIN LANDS IN OKLAHOMA KNOWN AS THE FORT RENO MILITARY RESERVATION FOR THE CHEYENNE-ARAPAHO TRIBES OF INDIANS OF OKLAHOMA

JUNE 27, 28, 29, 30, JULY 21, AUGUST 10 AND 17, 1949

Serial No. 21

Printed for the use of the Committee on Public Lands


UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1949

96772

## COMMITTEE ON PUBLIC LANDS

J. HARDIN PETERSON, Florida, *Chairman*

| | |
|---|---|
| JOHN R. MURDOCK, Arizona | FRED L. CRAWFORD, Michigan |
| CLAIR ENGLE, California | WILLIAM LEMKE, North Dakota |
| MONROE M. REDDEN, North Carolina | FRANK A. BARRETT, Wyoming |
| TOBY MORRIS, Oklahoma | DEAN P. TAYLOR, New York |
| KEN REGAN, Texas | JAY LeFEVRE, New York |
| LLOYD M. BENTSEN, JR., Texas | A. L. MILLER, Nebraska |
| COMPTON I. WHITE, Idaho | WESLEY A. D'EWART, Montana |
| WALTER S. BARING, Nevada | NORRIS POULSON, California |
| REVA BECK BOSONE, Utah | JOHN SANBORN, Idaho |
| FRED MARSHALL, Minnesota | JOHN P. SAYLOR, Pennsylvania |
| HARRY P. O'NEILL, Pennsylvania | |
| WAYNE N. ASPINALL, Colorado | JOSEPH R. FARRINGTON, Hawaii |
| LOUIS B. HELLER, New York | |

E. L. BARTLETT, Alaska
ANTONIO FERNÓS-ISERN, Puerto Rico

### SUBCOMMITTEE ON INDIAN AFFAIRS

TOBY MORRIS, Oklahoma, *Chairman*

| | |
|---|---|
| JOHN R. MURDOCK, Arizona | WILLIAM LEMKE, North Dakota |
| COMPTON I. WHITE, Idaho | FRANK A. BARRETT, Wyoming |
| WALTER S. BARING, Nevada | WESLEY A. D'EWART, Montana |
| REVA BECK BOSONE, Utah | NORRIS POULSON, California |
| FRED MARSHALL, Minnesota | |

E. L. BARTLETT, Alaska

II

# CONTENTS

|  | Page |
|---|---|
| William Zimmerman, Jr., Assistant Commissioner, Bureau of Indian Affairs, Department of the Interior | 2, 73, 130, 143 |
| H. E. Hyden, regional counsel, Indian Service, Anadarko, Okla. | 7 |
| E. J. Overby, assistant to the Secretary of Agriculture | 19 |
| Philip W. Kelleher, Real Estate Division, Office, Chief of Engineers, Department of the Army, Washington, D. C. | 29 |
| H. W. Marston, Office, Agricultural Research Administrator, Department of Agriculture | 32 |
| William Howard Payne, general counsel and tribal attorney for the Cheyenne and Arapaho Tribes of Oklahoma, Washington, D. C. | 38, 71, 73, 109, 149 |
| Jesse Rowlodge, chairman, business committee, Cheyenne and Arapaho Tribes, Oklahoma | 78, 89, 94 |
| Kish Hawkins, representative for the Cheyennes and Arapahoes | 90 |
| J. F. Nighswander, El Reno, Okla. | 95 |
| John H. Lynch, Assistant Director of Finance, Department of Agriculture | 110 |
| James V. Bennett, Director, Bureau of Prisons, Department of Justice | 119 |
| Preston Peden, counsel, Committee on Public Lands, House of Representatives | 136, 150 |
| J. D. Miller, budget officer, Bureau of Prisons | 144 |
| H. M. Critchfield, Department of Interior | 153 |

# FORT RENO MILITARY RESERVATION LAND

TUESDAY, JUNE 28, 1949

House of Representatives,
Subcommittee on Indian Affairs of
the Committee on Public Lands,
*Washington, D. C.*

The subcommittee met, pursuant to adjournment, at 10 a. m., in the committee room of the House Committee on Public Lands, Hon. Toby Morris (chairman of the subcommittee) presiding.

Mr. Morris. The committee will now come to order, and we will proceed with the hearing of the Subcommittee on Indian Affairs on the bill under consideration yesterday, H. R. 4756.

The Subcommittee on Irrigation and Reclamation also has a scheduled hearing today. The chairman of that subcommittee, Mr. Murdock, called just a few minutes ago, and he will be a little late arriving.

As most of you know, especially the departmental witnesses, who are with us often, this committee is so crowded for time that we all have to do a little shifting now and then to help each other out.

We will move forward now as rapidly as we can, but I will make this announcement for the benefit of the witnesses present who might be interested: There will be a hearing on the Fort Reno, Okla., matter before the Indian Affairs Subcommittee, and there will be a hearing also before the Subcommittee on Irrigation and Reclamation. Those witnesses who are interested in the bill under consideration in the Irrigation and Reclamation Subcommittee, H. R. 5113, will please stand by for a little while. We will be calling on you with regard to that a little later.

We will now proceed with the further consideration of H. R. 4756.

We have heard departmental witnesses from the Department of the Interior and the Department of Agriculture. Are there any other departmental witnesses present this morning who want to be heard?

## STATEMENT OF PHILIP W. KELLEHER, REAL ESTATE DIVISION, OFFICE, CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY, WASHINGTON, D. C.

Mr. Kelleher. Yes, Mr. Chairman. I am from the Department of the Army.

Mr. Morris. All right. We will be happy to hear from you at this time.

Mr. Kelleher. Yes, sir.

Mr. Morris. Please give your name and the representative capacity in which you appear.

29

96772—49—ser. 21——3

Case 1:06-cv-00519-PLF    Document 26-2    Filed 07/02/2007    Page 6 of 7

As a matter of fact, there are so many different parties involved here, it is quite difficult to get it all straightened out. In a way it is a rather simple bill, but it involves so many different departments and interests that it was hard to determine who all should be notified. Some of these departments are not at fault, especially the Department of Justice, for not having their reports ready, for the reason that the notice did not go out until very recently to the Department of Justice. Through inadvertence it was just overlooked. I want to make that explanation.

Now, Mr. Payne, you represent the proponents of this bill, the Indian tribes, and we would like to have your suggestions now as to who should be called upon first, to enlighten us on the view of those who are sponsoring the bill.

### STATEMENT OF WILLIAM HOWARD PAYNE, GENERAL COUNSEL AND TRIBAL ATTORNEY FOR THE CHEYENNE AND ARAPAHO TRIBES OF OKLAHOMA, WASHINGTON, D. C.

Mr. PAYNE. If it please the committee, Mr. Chairman, I would prefer to give my testimony at this time.

Mr. MORRIS. All right. We would be happy to hear from you.

Mr. PAYNE. If you are ready to proceed with the case for the Indians, I would like to be heard.

Mr. MORRIS. Yes, sir.

As I explained to the committee yesterday, and will explain again to those who might not have been present, William Howard Payne, the present witness before us, is a former resident of the city of El Reno, Okla. He lived nearby this land in question. He has for a number of years. He is a resident of the city of Washington and is an honorable member of the bar here in the city of Washington, and is formerly a citizen of the city of El Reno, which is nearby this site we are considering in this bill. He represents the two tribes of Indians involved, the Cheyenne and Arapahoes.

Mr. PAYNE. My name is William Howard Payne, and I am general counsel and tribal attorney for the Cheyenne and Arapaho Tribes of Oklahoma.

Mr. Chairman and members of the committee, I would like to present as briefly as possible—and I think it will be very brief—a sort of legal history of these Fort Reno lands.

The Cheyenne-Arapahoes, sometime prior to about 1804, became confederated. Prior to that time they were distinct Indian tribes.

The first knowledge of the Cheyennes, I believe, is reported by the French at about 1657, where they found them in the present State of Minnesota.

Later on, in about 1804, Lewis and Clark found them in the Black Hills of South Dakota, occupying that area.

The Cheyenne and Arapahoes were both there at about that time, and in 1825 the United States entered into a treaty with the Cheyennes. This treaty was purely a treaty of amity and friendship. There was no cession of lands, no relinquishment of lands, and no reservation defined and no money paid and none obligated.

The next treaty with the tribes, and first in which the United States treated with the Arapahoes, was the treaty of 1851, which was nego-

Cheyenne-Arapaho Reservation, no longer required for the purpose of the original reserve. The Congress authorized the sale under the homestead law at not less than $5 an acre, in 1910, and the proceeds were paid into the Treasury to the credit of the Cheyenne-Arapaho Indians of Oklahoma, and drew 3-percent interest per annum.

In 1938 there was Public Law 480 of the Seventy-fifth Congress (52 Stat. 213). Certain lands were eliminated from the Seeger school reservation in the western part of the reservation. Having been eliminated from the school reserve, no longer useful as school reserve, the lands were set aside for the use and benefit of the Cheyenne-Arapaho Tribes of Oklahoma. No allotments in severalty were permitted. They added to the sum total of the tribal ownership of land.

In 1942 there was Public Law 419 of the Seventy-seventh Congress (56 Stat. 21). That act of Congress vested title in certain lands formerly in the Executive order Cheyenne-Arapaho Reservation, vested title in the United States in trust for the Cheyenne-Arapaho Indians.

There is definite precedent, then, for this bill. Fort Reno is no longer useful for military purposes. It has been in fact abandoned by the Army. By act of Congress jurisdiction has been transferred to the Department of Agriculture. The War Department recently, as late as this spring, held a great auction and apparently sold off all the horse stock it had. The Army probably would have gone out of business much sooner had it not been for the Greek mule program and the Japanese horse-producing program. Those programs are coming to an end, and very soon. In fact, there is very little activity at the present time.

There is a very strange feeling in the general area of Fort Reno. There have been numerous newspaper articles and editorials referring to Fort Reno as an orphan. The Indians, having objected as early as almost immediately when they learned of this act of Congress in 1891 and the manner in which the agreement with them had been negotiated, began to oppose and object to the transactions that took place. They were obviously robbed. They lost 10,000,000 acres of land. There was no consideration, just giving them back 500,000 acres of their own land.

Based upon even $1 an acre, they have received only $1,500,000 for 10,000,000 acres of land, and they have only received 15 cents an acre which obviously is not just compensation.

If you were to base the compensation alone on the Executive order reservation they should have at least $1.25 an acre, or a minimum of $1 an acre. They should have gotten at least 4½ million dollars instead of 1½ million dollars. Even the 1½ million dollars we have shown was such that they actually received the benefit of only $500,000. The other $1,000,000 was appropriated for the depredation claims.

The tillable land there, amounting to about 1,200 acres, is some of the finest land in Oklahoma. It has great possibilities for grain and hay crop production.

The program that has been outlined here for the Cheyenne-Arapaho Tribes is one which occurs to me to be essentially the same program that has been outlined by the Department of Agriculture as to its prospective use of these lands. They are obviously more suited to grazing purposes than any other.