UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, </br></br>  Plaintiff, </br></br> vs. </br></br> UNITED STATES OF AMERICA, et al. </br></br>  Defendants. | ) </br> ) </br> ) </br> ) </br> ) </br> ) Civil Action No. 06-519 (PLF) </br> ) </br> ) </br> ) </br> ) </br> ) |

PLAINTIFF'S MEMORANDUM IN RESPONSE TO
DEFENDANTS' MOTION FOR LEAVE TO FILE THE
ATTACHED RESPONSE TO PLAINTIFF'S SURREPLY

INTRODUCTION

The Government has sought leave to file a Response to Plaintiff's Surreply, noting that, although Plaintiff Tribes do "not oppose this motion ..., on the condition that defendants will not oppose their motion for leave to file a reply ....," Defendant's Motion for Leave to File Attached Response to Surreply ("Defendant's Motion for Leave") at 2, "Defendants [nonetheless] cannot agree to this condition because they should, as the movants, have the final brief." Ibid.

Thus the Government, though in other contexts standing in a fiduciary relationship with the Tribes, would in this instance have, not just a final word against them, but a final documentary submission, and attendant argument, all without any opportunity of response from the Tribes. If the matter is indeed to decided "upon the most complete record possible", ibid., we submit it should include the following in response to the Government's most recent submission.

ARGUMENT

I.  THE GOVERNMENT HAS OFFERED NO GOOD REASON
FOR DENYING THE TRIBES DISCOVERY BEARING UPON AN
EQUITABLE ESTOPPEL THEORY, AND SUBMITTED PATENTLY
EXTRANEOUS MATERIAL IN OPPOSITION TO THE REQUEST

The Tribes have conceded the difficult challenge confronting any litigant seeking application of the doctrine of equitable estoppel as against the United States.  They have also sought a Rule 56(f) continuance permitting discovery directed to governmental conduct over a period of fifty years which served to conceal the fact of continuing military status of the Fort Reno even after the nominal jurisdictional transfer to the Department of Agriculture in 1948, information which, together with additional material developed in discovery, could establish the existence of genuine factual issues as to whether the "Government [was] guilty of outrageous conduct that prevented [the Tribes], though fully aware of the Government's claim of title, from knowing [their] own claim." United States v. Beggerly, 524 U.S. 38, 48-49 (1998) (Stevens, J., concurring).

The Government has done little more than reiterate what the Tribes acknowledge, that the burden confronting them on the merits of the equitable estoppel determination is considerable[1], but have offered no good reason for the Court to deny discovery pursuant to a Rule 56(f) request which should be granted "'almost as a matter of course unless the nonmoving party has not diligently pursued discovery of the evidence.'" Berkeley v. Home Ins. Co.,

---

[1] It does argue that "[t]he Tribes ... were on actual notice of their claim in 1949, when the Tribes' attorney at the time Mr. Payne testified before Congress that Fort Reno "has in fact been abandoned by the Army..." (citation omitted).  Defendant's Response to Plaintiff's Surreply at 2.  Yet at the time Mr. Payne was obviously unaware of information that remained classified for nearly fifty years, namely, at the time of the jurisdictional transfer to Agriculture, the Army took steps to maintain its military status.

68 F.3d 1409, 1414 (D.C. Cir. 1995) (quoting Wichita Falls Office Assocs. v. Banc One Corp., 978 F.2d 915, 919 n.4 (5th Cir. 1992)).

The Government has troubled to submit a decision of the Interior Board of Indian Appeals ("IBIA") in a matter involving payments due under an attorney contract entered more than a decade ago between the Tribes and their lead counsel.  See Response to Plaintiff's Surreply, Attachment 2.  Though the ostensible purpose is to show some lack of diligence in obtaining "the transcripts of the 1954 hearings (concerning the Tribes' interest in Fort Reno) ... if they were matters of public record"[2], Response to Plaintiff's Surreply at 5, the Government is well aware the Tribes and their attorneys have been unable to obtain the transcripts of the 1954 hearings pursuant to a FOIA request pending for years.  See Affidavit of Richard J. Grellner (Attachment to Plaintiff Tribes' Rule 56(f) Motion for Continuance to Permit Discovery).

The suggestion of ready access in the "public record" is so fanciful in the circumstances it gives rise to the unfortunate inference an "any means necessary" approach has impelled introduction of patently extraneous material, not in order to ensure "the most complete record possible", Defendants' Motion for Leave at 2, but simply to cast a negative light on the Tribes' representatives.  However, the facts underlying the IBIA decision - which reasonably diligent inquiry would have made clear - show an attorney fresh out of law school advancing $112,000 **in expenses** to the Tribes over a period of several years, and ultimately challenging the

---

[2]The Government argues that, no matter what might be revealed by these transcripts and similar information developed in discovery, the information "cannot possibly be the factual predicate for equitable estoppel...." (footnote omitted).  Defendant's Response to Surreply at 4.  However, the cases invoked in support of the assertion address the doctrine of equitable tolling, not equitable estoppel.  Id. at 4, n. 2.  We have long acknowledged the doctrine of equitable tolling does not apply in the context of a Quiet Title action.  United States v. Beggerly, supra.

Department of Interior - not the Tribes - when it held the value of his services over that same period to have been worth just about $8000, at an hourly rate of $50.  See Affidavit of Richard J. Grellner, ¶ 5, Attachment 1.

> II.  THE GOVERNMENT HAS FAILED TO SHOW DISMISSAL
> IS WARRANTED BASED ON THE SETTLEMENT BEFORE
> THE INDIAN CLAIMS COMMISSION: THE CLAIM DID NOT
> ACCRUE PRIOR TO AUGUST 1946, AND THE "FINDINGS
> OF FACT" BEFORE THE ICC SHOULD NOT BE TAKEN
> TAKEN TO PRECLUDE AN ACTION TO QUIET TITLE

In an implicit concession to doubts the doctrine of res judicata should apply here to defeat a claim as to which the Indian Claims Commission lacked jurisdiction[3], the Government now argues, in the context of a proposed Response to a surreply, that the Court should grant dismissal at this early stage of the litigation based upon several of the "Findings of Fact of Compromise Settlement" entered in connection with the 1965 settlement, including especially the reference to "testimony at the hearing [before the Indian Claims Commission] was directed

---

[3]We have explained the claim to "set aside ... the jurisdiction of the Department of Agriculture ...", Severed Petition, ¶ 9(b), November 25, 1958 (Attachment P to the Government's "Reply in Opposition" of April 7, 2006) was manifestly beyond the jurisdiction of the Indian Claims Commission (restricted to claims accruing prior to August 13, 1946), in that the alleged "jurisdiction of ... Agriculture" was "conferred by the Act of April 21, **1948** ...." Ibid. In White Mountain Apache Tribe v. Hodel, 784 F.2d 92 (9th Cir. 1986), the Tribe sought "to quiet title to some 14,000 acres ... [it] claim[ed] were erroneously excluded from its Reservation because of a faulty 1887 survey .... (emphasis added, footnote omitted). Id. at 925. Years before the Hodel litigation "[t]he Indian Claims Commission heard arguments from the Tribe that it had been wrongfully deprived of some lands .... [and] the Commission concluded the Tribe was correct and ... entitled to compensation ...." Ibid. The Tribe had then stipulated to a final judgment providing that the resulting settlement "finally dispose[d] of *all* rights, claims or demands which the [Tribe] asserted or *could have asserted* with respect to the subject matter of the suit ...." (italics in original). Id. at 926. Thus the fundamental predicate for applying res judicata - that a claim "with respect to the subject matter of the suit" "could have been asserted" in the earlier action - is absent here.

towards the value of the Tribes' Executive Order Reservation on March 3, 1891, the date of the cession of some 4,608,878 acres to the United States for an alleged unconscionable consideration of $1,500,000." Cheyenne-Arapaho Tribes of Indians of Oklahoma v. The United States of America, (Docket Nos. 329-A & 329-B) 16 Ind. Cl. Comm. 162, 164-65 (1965) (Attachment 4 to Response to Plaintiff's Surreply). The Government argues the Court should give collateral estoppel to this and a related finding and hold "plaintiff ... barred from contending that the Ft. Reno lands were not ceded." (emphasis in original). Response to Plaintiff's Surreply at 15.

The argument is mistaken as it is belated, first because it fails to account for pleadings showing a separate and distinct claim to "set aside" the 1948 jurisdictional transfer of Fort Reno lands the Tribes regarded as outside the cession of 1891; second, because the documentary record submitted by the Government in the ICC litigation gives rise to inconsistencies with respect to acreage within the 1869 Executive Order reservation; and third, because the argument ignores the principle that "consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus consent judgments ordinarily support claim preclusion [res judicata] but not issue preclusion [collateral estoppel]." Arizona v. California, 530 U.S. 392, 120 S.Ct. 1455, 146 L.Ed. 2d 308 (2000) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4443, pp. 384-385 (1981))

In their Severed Petition of November 25,1958 (Attachment P to Defendants' Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment), the Tribes referred to acreage potentially subject to the 1891 cession in a total amount identical to the figure now invoked by the Government, 4,608,878 acres (the following

total minus that "allotted in severalty to C & A's"):

|     Disposition | No. Acres |
|---|---|
| (a) Open to public settlement | 3,500,562 |
| (b) Allotted in severalty to C & A's | 529,682 |
| (c) Reserved to the Wichita Tribe | 732,800 |
| (d) Reserved for public schools | 231,829 |
| (e) Reserved for military purposes | 32,344 |
| (f) Reserved for highways, roads, etc. | 111,343 |

(Item (f) in the above tabulation derived by subtracting sum of other items from total acreage).

Severed Petition, ¶ 10 (November 25, 1958).

The Tribes went on to claim for payment in addition to "compensation for such lands purportedly ceded by the agreement ... not just, fair nor reasonable but ..., in fact unconscionable ...." (emphasis added). Id., ¶10(b).

The claim relating to the Fort Reno lands was separate and apart from the claim for compensation as to the "lands purportedly ceded by agreement", ibid., and was set forth in terms indicating the 9,493 acres withdrawn in 1883 were distinct from those involved in the 1891 cession:

> [O]n or about July 17, 1883, the President ordered the withdrawal of an area of 9,493 acres from said reservation for the establishment of the Fort Reno Military Reserve.... No compensation was stipulated or paid to petitioner. Petitioner understood that the lands of the Fort Reno Military Reserve would be returned to its use and benefit when no longer used for military purposes or the same were to relinquished by the military when required by the Secretary of the Interior for petitioner's purposes. Wherefore, petitioner asserts claim for the reasonable value of the use of said lands by the defendant from the date of July 17, 1883, reasonable and fair damages for the failure of the Secretary of the Interior to require the return of said lands to the use and benefit of petitioners; and pray for the exercise of its powers in equity by the Indian Claims Commission to set aside, or recommend the setting aside of the jurisdiction of the Department of Agriculture conferred by the Act of April 21, 1948 ... in said lands, and for such other and further relief as may be deemed meet and proper. (emphasis added).

Id. ¶ 9(b).

The record before the Indian Claims Commission reflected inconsistencies with respect to the acreage involved in the 1891 cession that could be attributable to Fort Reno. Attachment H to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment is a report styled "Historical Background" prepared by one of the Government's experts, and introduced as Exhibit A in Docket 329-A before the Indian Claims Commission. Among the expert's findings was that "the Cheyenne Arapaho received a total of slightly more than 5 million acres [under the Executive Order of 1869], including the 743,610 acres of the Wichita ...."[4] (emphasis added). Id. at 18 (Attachment H at 9). Yet the Severed Petition showed the total acreage "reserved to the Wichita Tribe" as 732,800, 10,810 acres less than the figure proclaimed by the Government's expert in Docket 329-A, which for present purposes should bolster the inference the Tribe's claim to "set aside" the transfer of Fort Reno indeed pertained to lands separate and apart from acreage within any cession of 1891.[5] At the very least the Tribes should have an opportunity to develop an explanation for the inconsistency in discovery, and determine the extent to which any such explanation further bolsters the inference the Fort Reno lands were indeed separate and apart from lands "purportedly ceded" in 1891.

The record in this instance is much like in Arizona v. California, supra, where the Supreme Court soundly rejected a similar argument that a settlement of Indian claims litigation

---

[4]The Government's expert noted conflicts in the historic record as well, indicating that his report depended in part on "acreage figures[] differing slightly from those in Litton [History of Oklahoma, I] ... taken from Kappler, Indian Affairs: Laws and Treaties, I, 1030. Kappler's figures add up to 4,294,417 acres as the total area of the Cheyenne Arapaho reservation, in contrast to the total sometimes used of 4,297,771 acres." Id. at 40, n. 3 (Attachment H at 19).

[5]This reference to documentary material outside the Amended Complaint prompts submission of the Second Supplemental Statement of Genuine Issues appearing as Attachment 2.

should preclude the Fort Quechan Tribe from asserting continued title in certain "disputed boundary lands."

The <u>Arizona</u> litigation[6] concerned tribal claims for increased water rights in the Colorado River system, deriving from the contention the Tribe's Fort Yuma Reservation "encompasses some 25,000 acres of disputed boundary lands ...." <u>Id.</u>, 530 U.S. at 397. The issue before the Court of relevance here was whether "the claims [are] precluded by ... a consent judgment entered by the United States Claims Court in 1983."[7] <u>Ibid</u>. Because resolution of the collateral estoppel issue in <u>Arizona</u> should be controlling here as well, and because the resolution derives from a fairly complex record and analysis, we are bound to set them out at some length:

> The specific dispute before us has its roots in an 1884 Executive Order ..., designating approximately 72 square miles of land along the Colorado River ... as the Fort Yuma Indian Reservation ... for the benefit of the Quechan Tribe. The Tribe, which had traditionally engaged in farming, offered to cede its rights to a portion of the Reservation to the United States in exchange for allotments of irrigated land to individual Indians. In 1893, the Secretary of the Interior concluded an agreement with the Tribe .... The 1893 Agreement provided for the Tribe's cession of a 25,000-acre tract of boundary lands on the Reservation. Language in the agreement, however, could be read to condition the cession on the performance by the United States of certain obligations ....
>
> Doubts about the validity and effect of the 1893 Agreement arose as early as 1935. * * * The Secretary of the Interior submitted the matter to the Department's Solicitor, Nathan Margold. In 1936, Solicitor Margold issued an opinion (Margold Opinion) stating that, under the 1893 Agreement, the Tribe had unconditionally ceded the lands in question to the United States..... The

---

[6] The decision in this instance is one of several the Court has rendered in litigation begun in 1952 as a result of Arizona and California contending for water rights in the system. <u>Id.</u> at 397-99.

[7]The Indian Claims Commission ceased operations in 1978, transferring its remaining cases to the Court of Claims. <u>Id.</u> at 402, n.1.

Margold Opinion remained the position of the Federal Government for 42 years.

In 1946, Congress enacted the Indian Claims Commission Act .... The Tribe filed an action before the Commission in 1951, challenging the validity and effect of the 1893 Agreement. In that action, referred to by the parties as Docket No. 320, the Tribe relied principally on two mutually exclusive grounds for relief. First, the Tribe alleged that the 1893 Agreement was obtained through fraud, coercion, and/or inadequate consideration, rendering it "wholly nugatory." ... At the very least, contended the Tribe, the United States had failed to perform the obligations enumerated in the 1893 Agreement, rendering the cession void.... In either event, the Tribe claimed continuing title to the disputed lands and sought damages essentially for trespass. Alternatively, the Tribe alleged that the 1893 Agreement was contractually valid but constituted an uncompensated taking of tribal lands, an appropriation of lands for unconscionable consideration, and/or a violation of standards of fair and honorable dealing ... According to this theory of recovery, the 1893 Agreement had indeed vested in the United States unconditional title to the disputed lands, and the Tribe sought damages as compensation for that taking. During the more than quarter-century of litigation in Docket No. 320, the Tribe vacillated between these two grounds for relief, sometimes emphasizing one and sometimes the other....

The Commission conducted a trial on liability, but stayed further proceedings in 1970 because legislation had been proposed in Congress that would have restored the disputed lands to the Tribe. The legislation was not enacted, and the Commission vacated the stay. In 1976, the Commission transferred the matter to the Court of Claims.

In the meantime, the Tribe had asked the Department of the Interior to reconsider its 1936 Margold Opinion regarding the 1893 Agreement. In 1977, Interior Solicitor Scott Austin concluded, in accord with the 1936 opinion, that the 1893 Agreement was valid and that the cession of the disputed lands had been unconditional.... It soon became clear both to the Tribe and to interested Members of Congress, however, that the Austin Opinion had provoked controversy within the Department, and, after the election of President Carter, the Department revisited the issue and reversed course. In 1978, without notice to the parties, Solicitor Leo Krulitz issued an opinion concluding that the 1893 Agreement had provided for a conditional cession of the disputed lands, that the conditions had not been met by the United States, and that "[t]itle to the subject property is held by the United States in trust for the Quechan Tribe."... On December 20, 1978, the Secretary of the Interior issued a Secretarial Order adopting the Krulitz Opinion and confirming the Tribe's entitlement to the disputed lands ....

The 1978 Secretarial Order caused the United States to change its position ... in Docket No. 320, which was still pending in the Claims Court .... Because the

Secretarial Order amounted to an admission that the 1893 Agreement had been ineffective to transfer title and that the Tribe enjoyed beneficial ownership of the disputed boundary lands, the United States no longer opposed the Tribe's claim for trespass in Docket No. 320....

In August 1983, ... the United States and the Tribe entered into a settlement of Docket No. 320, which the Court of Claims approved and entered as its final judgment. Under the terms of that settlement, the United States agreed to pay the Tribe $15 million in full satisfaction of "all rights, claims, or demands which plaintiff [i.e., the Tribe] has asserted or could have asserted with respect to the claims in Docket 320." .... The judgment further provided that "plaintiff shall be barred thereby from asserting any further rights, claims, or demands against the defendant and any future action on the claims encompassed on Docket 320." ... The United States and the Tribe also stipulated that the "final judgment is based on a compromise and settlement and shall not be construed as an admission by either party for the purposes of precedent or argument in any other case." ... Both the Tribe and the United States continue to recognize the Tribe's entitlement to the disputed boundary lands.

\* \* \* \* \*

The State parties ... assert that the instant water rights claims are precluded by the 1983 consent judgment in the Claims Court proceeding, Docket No. 320. [A] Special Master ... agreed, noting the consent judgment's declaration that the Tribe would "be barred thereby from asserting any further rights, claims or demands against the defendant and any future action encompassed on docket no. 320." ... On reconsideration, the Special Master provided a fuller account of his recommendation. The settlement, he concluded, had extinguished the Tribe's claim to title in the disputed boundary lands, vesting that title in the United States against all the world: "The only viable basis for a damage or trespass claim [in Docket No. 320] was that the 1893 taking was illegal and that title therefore remained with the Tribe. When the Tribe accepted money in settlement of this claim, it relinquished its claim to title." ...

Under standard preclusion doctrine, the Master's recommendation cannot be sustained. As already noted, the express terms of the consent judgment in Docket No. 320 barred the Tribe and the United States from asserting against each other any claim or defense they raised or could have raised in that action.... As between the parties to Docket No. 320, then, the settlement indeed had, and was intended to have, *claim-preclusive* effect .... But settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect. "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus consent judgments ordinarily support claim preclusion but not issue preclusion." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4443, pp. 384-385 (1981).

> This differentiation is grounded in basic res judicata doctrine. It is the general rule that issue preclusion attaches only "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." Restatement (Second) of Judgments § 27, p. 250 (1982). "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section [describing issue preclusion's domain] does not apply with respect to any issue in a subsequent action." Id., comment e, at 257.
>
> \* \* \* \* \*
>
> The State parties, perhaps recognizing the infirmity of their argument as a matter of standard preclusion doctrine, assert that common-law principles of issue preclusion do not apply in the special context of Indian land claims. Instead, they argue, § 22 of the Indian Claims Commission Act created a special regime of "statutory preclusion."... According to the State parties, the payment of a Commission judgment for claims to aboriginal or trust lands automatically and universally extinguishes title to the Indian lands upon which the claim is based and creates a statutory bar to further assertion of claims against either the United States or third parties based on the extinguished title... We need not decide whether, in the distinctive context of the Indian Claims Commission Act, some consent judgments might bar a tribe from asserting title even in discrete litigation against third parties, for the 1983 settlement of Docket No. 320 plainly could not qualify as such a judgment. Not only was the issue of ownership of the disputed boundary lands not actually litigated and decided in Docket No. 320, but, most notably, the Tribe proceeded on alternative and mutually exclusive theories of recovery. Had the case proceeded to final judgment upon trial, the Tribe might have won damages for a taking, indicating that title was in the United States. Alternatively, however, the Tribe might have obtained damages for trespass, indicating that title remained in the Tribe. The consent judgment embraced all of the Tribe's claims. There was no election by the Tribe of one theory over the other, nor was any such election required to gain approval for the consent judgment. The Special Master's assumption that the settlement necessarily and universally relinquished the Tribe's claim to title was thus unwarranted.... (citations and footnotes omitted, italics in original).

Id., 530 U.S. at 401-417.[8]

---

[8]We note the Government has invoked United States v. Pend Oreille Pub. Util. Dist., 926 F.2d 1502 (9th Cir. 1991) for the proposition "[t]he [Indian Claims] Commission's findings on the scope of the 1891 cession are controlling, Response to Plaintiff's Surreply at 14. The Arizona Court distinguished it along with several similar cases on grounds they "involved Indian Claims Commission Act petitions in which tribes claimed no continuing title, choosing instead to seek compensation from the United States for the taking of their lands." Id., 530 U.S. at 417. The Government here cannot plausibly contend the Tribes did other than assert their continuing interest in the lands of

We submit the Findings of Fact of Compromise Settlement invoked by the Government here are no more sufficient to warrant holding "the [1965] settlement necessarily and universally relinquished the Tribe's claim to title" in the lands of Fort Reno, where the Tribes asserted, not "alternative and mutually exclusive theories of recovery," but separate and distinct claims (a) for compensation for lands "purportedly ceded" in 1891; and (b) for the "set aside" of a jurisdictional transfer of Fort Reno lands not included within those lands (a non-monetary claim of title not within the jurisdiction of the Commission in any case).

## CONCLUSION

For the foregoing reasons, Plaintiff Tribes respectfully request that this Court entertain this Response to the Government's latest submission, and deny Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment.

Respectfully submitted,

LAW OFFICE OF RICHARD J. GRELLNER

  /s/
Richard J. Grellner, OBA #15521, pro hac vice

439 NW 18th Street
Oklahoma City, Oklahoma 73103
Tel. (405) 834-8484
Fax: (405) 602-0990
E-mail; rjgrellner@hotmail.com

---

Fort Reno.

LAW OFFICE OF JOHN P. RACIN

  /s/
John P. Racin   Bar No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202.265.2516

Attorneys for Plaintiff Tribes