UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-0519 (PLF) |
| UNITED STATES, et al., | ) ) ) | |
| Defendants. | ) ) | |

OPINION

This matter is before the Court on defendants' motion to dismiss, or, in the alternative, for summary judgment and the motion of plaintiff Cheyenne-Arapaho Tribes of Oklahoma ("Cheyenne-Arapaho") for a continuance to permit discovery under Rule 56(f) of the Federal Rules of Civil Procedure.[1]

The facts giving rise to the instant litigation began more than 130 years ago, when President Ulysses S. Grant established the Cheyenne-Arapaho Tribes of Oklahoma Indian Reservation in Oklahoma. See Compl. ¶ 12; Mot. Ex. B (Exec. Order (Aug. 10, 1869), reprinted in 1 Kappler 841 (1904)) ("1869 Exec. Order"). In 1883, President Chester A. Arthur carved out the Fort Reno Military Reserve from a 9,493 acre plot of the reservation established in 1869.

---

[1] The papers submitted to the Court include: plaintiff's First Amended Complaint ("Compl."); defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment ("Mot."); Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Opp."); Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment ("Reply"); Plaintiff's Rule 56(f) Motion for Continuance to Permit Discovery ("Pl's 56(f) Mot."); and Defendants' Opposition to Plaintiff's Rule 56(f) Motion for a Continuance to Permit Discovery ("56(f) Opp.").

1

See Compl. ¶ 13;  Mot. Ex. D (Exec. Order (July 17, 1883), reprinted in 1 Kappler 842-43 (1904)) ("1883 Exec. Order").  At the time, the Executive Order implied that the Cheyenne-Arapaho had a reversionary interest in the land once it ceased being used for anything other than military purposes.  See id.  Eight years later, the Cheyenne-Arapaho signed a treaty relinquishing their interest in the reservation established in 1869, subject to individual allotments of land in severalty.  See Compl. ¶ 14;  Mot. Ex. E (Agreement of 1891, U.S.-Cheyenne-Arapaho, Mar. 3, 1891, reprinted in 1 Kappler 415 (1904)) ("1891 Treaty").  The treaty did not specifically mention the Cheyenne-Arapaho's reversionary interest in the Fort Reno lands.  See Compl. ¶ 15; 1891 Treaty.

The lawsuit now before the Court involves alleged ambiguities in the treaty signed over 100 years ago, a classified military order and almost a century's worth of litigation.  In the end, however, the Court concludes that the United States has not waived its sovereign immunity because the statute of limitations has expired under the Quiet Title Act, and that this Court therefore lacks jurisdiction.  Accordingly, the Court will grant defendants' motion to dismiss and will deny plaintiff's Rule 56(f) motion.

## I.  BACKGROUND

### A.  Historical Background

In 1869, President Ulysses S. Grant established through Executive Order the Cheyenne-Arapaho Tribes of Oklahoma Indian Reservation.  See Compl. ¶ 12; 1869 Exec. Order.  The reservation was comprised of 5,138,560 acres of land in Oklahoma.  See Mot. Ex. C (Plaintiff's Complaint, as a Severed Petition from a previous complaint, before the Indian Claims Commission.  Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, Severed Petition, Docket No. 392-329-A (1958) ¶ 17) ("Severed Petition").  In 1883, President Chester A. Arthur

2

signed an Executive Order proclaiming that "[a] tract of land in the Indian Territory, located within the limits of the Cheyenne and Arapaho Indian Reservation, created by Executive order dated August 10, 1869, be duly declared and set apart by the Executive as a military reservation for the post of Fort Reno . . . ." 1883 Exec. Order at 842. The Order described a 9,493 acre plot located within the Cheyenne-Arapaho Tribes of Oklahoma Indian Reservation, stipulating that the land be "set[] apart for military purposes *exclusively* . . . ." Id. (emphasis added). Plaintiff alleges that this gave the plaintiff a reversionary interest in the land once it was used for anything other than military purposes. See Compl. ¶ 37. In 1890, plaintiff agreed to relinquish its interest in the reservation established in 1869, subject to the allotment of tracts of land given to individual members of the tribes. See 1891 Treaty at 416. The treaty did not mention plaintiff's reversionary interest in the Fort Reno lands. See id. Congress ratified the agreement in 1891. See id.

In 1948, the Army transferred approximately 7,000 acres of the Fort Reno reserve to the Department of Agriculture for "dairy operations." See Compl. ¶ 20; accord Reply at 27 n.3. Plaintiff alleges that according to a "classified order" issued by the Army in 1954, the acreage transferred to the Department of Agriculture in 1948 was put on military "standby status." See Compl. ¶¶ 22-23. As exhibits to its Opposition, plaintiff supplies several documents stamped "declassified," including a letter dated April 22, 1954, stating: "Need has been established by present mobilization plans for fac[ility] to process and train horses and mules for mil. svc . . . . at D/Agric Beef Cattle Research Station at Fort Reno, Okla . . . . Recommended that fac[ility] listed . . . be retained in standby basis for use of [Quartermaster Corps.] for mobilization needs." Opp. Ex. 2 at 28. Plaintiff alleges that the order was not "declassified" until 1994. See Compl. ¶ 23.

3

*B.  The Indian Claims Commission*

Only Congress may ratify treaties and regulate commerce between the United States and the Indian tribes.  See U.S. CONST. art. I, § 8, cl. 3; art. II, § 2, cl. 2.  Each treaty or agreement is ratified through an individual piece of legislation.  See, e.g., 1891 Treaty.  This protocol led Congressman Henry Jackson, Chairman of the House Committee on Indian Affairs in 1945, to remark, "[W]e are being harassed constantly by various individual pieces of legislation.  I do not want to act on separate legislation and Congress is being told to act on those bills, without knowing the facts . . . ."  U.S. v. Dann, 470 U.S. 39, 45 (1985) (quoting H.R. REP. NO. 1466 at 10 (1945)).  In 1946, Congress established the Indian Claims Commission ("ICC"), a quasi-judicial body given authority to determine the merits of all Indian claims against the United States that accrued prior to August 13, 1946 (the date of the statute's enactment).  See Pub L. No. 726, 25 U.S.C. § 70, 60 Stat. 1049 (1946).  The "chief purpose of the [Act was] to dispose of the Indian claims problem with finality."  U.S. v. Dann, 470 U.S. at 45 (quoting H.R. REP. NO. 1466 at 10 (1945)).  Congress hoped the ICC would "sift all these claims [and] subject [them] to appropriate judicial review."  Id. at 46.  The ICC had only a temporary mandate, and, after several renewals, it was abolished in 1978.  See Pub. L. No. 94-465, 25 U.S.C. § 70v, 90 Stat.  1990 (1978).

*C.  Plaintiff's Litigation History*

Plaintiff began litigation in 1929 in the U.S. Court of Claims, alleging that the 1891 Treaty provided inadequate compensation for the 4,608,878 acres of land it ceded.[2]  See Mot. at 7-8.  Plaintiff's attorney died midway through that case, however, and the suit was

---

[2]   This figure is calculated from the 5,138,560 acres of land established in the Executive Order of 1869, minus the 1891 allotment of 529,682 acres given to individual tribe members under the 1891 Treaty.

4

dismissed in 1941 for lack of prosecution.  See id.  In 1951, plaintiff filed suit before the ICC, again alleging that its compensation under the 1891 Treaty was inadequate.  See Severed Petition ¶ 21.  Plaintiff specifically sought compensation, *inter alia*, for the Fort Reno lands.  See id. ¶ 17(b).  The suit was delayed again, however, when one of plaintiff's attorneys suddenly died in 1961.  See Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, 16 Ind. Cl. Comm. 612, 624 (1966).  The suit continued for another four years until 1965, when plaintiff agreed to a $15 million settlement with the defendants.  See Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, 16 Ind. Cl. Comm. 162, 183 (1966).  In the settlement, plaintiff agreed to several "finality clauses," including one which read: "Entry of final judgment in said amount shall finally dispose of all rights, claims or demands which the petitioner has asserted or could have asserted with respect to the subject matter of these claims . . . ."  Id. at 171 (quoting Stipulation for Entry of Final Judgment).

        The instant litigation centers on alleged ambiguities in the 1891 Treaty and the 1965 ICC settlement.  Plaintiff asserts that the rights given up in the 1891 Treaty did not include its reversionary interest in the Fort Reno lands established in the Executive Order of 1883.  See Compl. ¶ 15.  Plaintiff further alleges that because the 1965 ICC settlement related only to the 1891 Treaty, it has yet to receive adequate compensation for the Fort Reno lands.  See id. ¶ 42.  As such, plaintiff requests declaratory relief that it has a right to the Fort Reno lands, and an accounting for mining rights thereon since 1948.  See id. ¶¶ 36-44.

## II.  LEGAL STANDARDS

### A.  Quiet Title Act

The Quiet Title Act allows individuals to obtain declaratory relief concerning real property disputes against the United States.  See 28 U.S.C. § 2409a (2000).  It is "the exclusive means by which adverse claimants may challenge the United States' title to real property." Warren v. United States, 234 F.3d 1331, 1335 (D.C. Cir. 2000) (quoting Block v. North Dakota, 461 U.S. 273, 286 (1983)).  The Quiet Title Act operates by waiving the United States' sovereign immunity.  See 28 U.S.C. § 2409a(a).  This waiver, however, requires claimants to bring an action "within twelve years of the date upon which it accrued."  See id. § 2409a(g). "Accrual" occurs "on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  Id.  A "test of reasonableness applies to determine whether a plaintiff or his predecessors in interest knew or should have known of a federal claim of interest in property."  Warren v. United States, 234 F.3d at 1335.  A plaintiff need not know "the claim's full contours," but possess only a "reasonable awareness" of the government's claim.  Id. (quoting Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980)).  Beyond the twelve year statute of limitations, sovereign immunity has not been waived.  See Warren v. United States, 234 F.3d at 1335.

### B.  Motion to Dismiss Standard

Federal courts are courts of limited jurisdiction, with the ability only to hear cases entrusted to them by a grant of power contained in either the Constitution or in an act of Congress.  See, e.g., Beethoven.com LLC v. Librarian of Congress, 394 F.3d 939, 945 (D.C. Cir. 2005); Hunter v. District of Columbia, 384 F. Supp.2d 257, 259 (D.D.C. 2005); Srour v. Barnes, 670 F. Supp. 18, 20 (D.D.C. 1987) (citing City of Kenosha v. Bruno, 412 U.S. 507, 511 (1973)).

6

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing that the court has jurisdiction.  See Brady Campaign to Prevent Gun Violence v. Ashcroft, 339 F. Supp.2d 68, 72 (D.D.C. 2004).  In considering whether to dismiss a complaint for lack of subject matter jurisdiction, the court must accept all of the factual allegations in the complaint as true, but may in appropriate cases consider certain materials outside the pleadings.  See Jerome Stevens Pharms., Inc. v. FDA, 402, F.3d 1249, 1253-54 (D.C. Cir. 2005).  "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).  While the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiff is those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  See Primax Recoveries, Inc. v. Lee, 260 F. Supp.2d 43, 47 (D.D.C. 2003).

III.  DISCUSSION

A.  Defendants' Motion to Dismiss

1.  The Quiet Title Act

Defendants move to dismiss the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  See Mot. at 10.  Defendants argue that the statute of limitations of the Quiet Title Act bars the plaintiff's claims, and thus demonstrates that the United States has not waived its sovereign immunity.  See id. at 15. Defendants further point out that the Quiet Title Act is the exclusive means to challenge the

7

United States' claims to real property.  See Warren v. United States, 234 F.3d at 1335.  The Court agrees that, for this reason, it lacks jurisdiction to hear the plaintiff's claims.

The Quiet Title Act's statute of limitations requires only a single moment in time, twelve years or more prior to the instant lawsuit, where plaintiff should have been reasonably aware of the United States' claims to the Fort Reno lands.  See Warren v. United States, 234 F.3d at 1335.  Although the facts giving rise to the instant litigation are complex, the Court can glean several instances where the plaintiff either was or should have been aware of its claim.  In 1948, the Army's transfer of acreage to the Department of Agriculture demonstrated the government's claim to the Fort Reno lands.  See Compl. ¶ 20.  Even assuming (without deciding) that plaintiff's reversionary interest survived the 1891 Treaty, the transfer should have made plaintiff "reasonably aware" that the United States was asserting an adverse claim to its reversionary interest, as the land ceased being used for "military purposes *exclusively*" at that time.  See Warren v. United States, 234 F.3d at 1335.

Plaintiff's suit before the ICC in 1951 further demonstrates plaintiff's awareness of the United States' claim on the Fort Reno lands.  See Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, 16 Ind. Cl. Comm. at 162.  Indeed, plaintiff's own Complaint before the ICC stated:

> [O]n or about July 17, 1883, the President ordered the withdrawal of an area of 9,493 acres from said reservation for the establishment of the Fort Reno Military Reserve[.]  No compensation was stipulated nor paid to the petitioner.  Petitioner understood that the lands of the Fort Reno Military Reserve would be returned to its use and benefit when no longer used for military purposes or that the same were to be relinquished by the military when required by the Secretary of the Interior for petitioner's purposes.

Mot. Ex. C. ¶ 17(b).  Plaintiff cannot now argue that it was not aware of a claim that it placed in writing in a Complaint before the ICC more than 50 years ago.

Other evidence that plaintiff was "reasonably aware" of the United States' claim are the several "finality clauses" in the 1965 settlement. See Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, 16 Ind. Cl. Comm. at 171-72. These included the following language:

> 2. Entry of final judgment in said amount shall finally dispose of all rights, claims or demands which the petitioner has asserted or could have asserted with respect to the subject matter of these claims, and petitioner shall be barred thereby from asserting any such right, claim or demand against defendant in any future action. . . .
>
> 6. The final judgment of the Indian Claims Commission pursuant to this stipulation shall constitute a final determination by the Commission of the above captioned case . . . all parties hereby waiving any and all rights to appeal from or otherwise seek review of such final determination.

Id. Surely, plaintiff was aware that the government included the Fort Reno lands when the parties agreed to dispose of "all rights, claims or demands . . . with respect to the subject matter of these claims" before the ICC. See id.[3] Since the statute of limitations has run, the United States has not waived its sovereign immunity and this Court lacks jurisdiction in the instant matter.

2. Equitable Tolling and Equitable Estoppel

In an effort to overcome the Quiet Title Act's time bar, plaintiff argues that the Court should apply the doctrine of equitable estoppel to toll the statute of limitations. See Opp. at 10. Plaintiff suggests that because the Army issued a classified order putting the Fort Reno lands on "military standby status," its claim could not ripen until the order was declassified in

---

[3]   Even without the Quiet Title Act, the Court alternatively concludes that plaintiff, pursuant to its settlement agreement, has lost "all rights, claims or demands . . . with respect to the [Fort Reno lands], and [plaintiff] shall be barred thereby from asserting any such right, claim or demand against defendant in any future action." Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, 16 Ind. Cl. Comm. at 171-72. This is an alternative ground which mandates dismissal of the complaint, based on the litigation before the ICC.

1994.  See Pl's 56(f) Mot. at 2.  Because plaintiff asks the Court, in essence, to toll the statute, the Court must determine whether plaintiff is requesting the Court to apply the doctrine of "equitable tolling" or the doctrine of "equitable estoppel" to the Quiet Title Act.

"Equitable tolling" is "when the plaintiff despite all due diligence is unable to obtain vital information bearing on the existence of his claim."  Chung v. U.S. Dept. of Justice, 333 F.3d 273, 278 (D.C. Cir. 2003); see also Jankovic v. Int'l Crisis Group, 494 F.3d 1080, 1086 (D.C. Cir. 2007).  "Equitable estoppel," on the other hand, "precludes a defendant, because of his own inequitable conduct – such as promising not to raise the statute of limitations defense – from invoking the statute of limitations."  Chung v. U.S. Dept. of Justice, 333 F.3d at 178.  The court of appeals has further noted that the two

> have distinct criteria – the former revolving around the conduct of the defendant and the latter around the circumstances of the plaintiff.  There is a difference in effect as well:  equitable estoppel takes the statute of limitations out of play for as long as is necessary to prevent the defendant from benefitting from his misconduct, whilst equitable tolling – as a method for adjusting the rights of two 'innocent parties' – merely ensures that the plaintiff is not, by dint of circumstances beyond his control, deprived of a 'reasonable time' in which to file suit.

Id. at 278-79.

To the extent that it pleads facts that fall within the ambit of either doctrine, plaintiff's arguments concerning the classified order would fall within the doctrine of equitable tolling rather than equitable estoppel.  Plaintiff argues that the classification of the 1954 order prevented it from obtaining vital information concerning its claim until the order's declassification in 1994.  See Opp. at 10.  This information concerned the potential vesting of plaintiff's reversionary interest in the Fort Reno lands.  See id.  Plaintiff essentially argues that since the Army's order was classified, the statute should be tolled since "by dint of circumstances beyond [its] control, [it was] deprived of a 'reasonable time' in which to file suit."

10

Chung v. U.S. Dept. of Justice, 333 F.3d at 278-79.  This is equitable tolling; plaintiff's argument does not fall under the doctrine of equitable estoppel.  Plaintiff does not claim that the Army's classification of the order was "inequitable," nor does it seek to toll the statute until now on grounds of "inequitable conduct."  Rather, plaintiff seeks only to toll the statute until 1994 when the Army's order became declassified.  See Pl's 56(f) Mot. at 2.  Therefore, the Court will construe plaintiff's request as one for equitable tolling and not equitable estoppel.

The Supreme Court unanimously rejected equitable tolling of the Quiet Title Act in United States v. Beggerly. 524 U.S. 38, 48-49 (1998).  As the Supreme Court explained:

> Equitable tolling is not permissible where it is inconsistent with the text of the relevant statute.  United States v. Brockamp, 519 U.S. 347 (1997).  Here, the QTA, by providing that the statute of limitations will not begin to run until the plaintiff "knew or should have known of the claim of the United States," has already effectively allowed for equitable tolling.  See Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990) ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass").  Given this fact, and the unusually generous nature of the QTA's limitations time period, extension of the statutory period by additional equitable tolling would be unwarranted.  This is particularly true given that the QTA deals with ownership of land.  It is of special importance that landowners know with certainty what their rights are, and the period during which those rights may be subject to challenge.  Equitable tolling of the already generous statute of limitations incorporated in the QTA would throw a cloud of uncertainty over these rights, and we hold that it is incompatible with the Act.

United States v. Beggerly. 524 U.S. at 48-49 (parallel citations omitted).  The Court therefore must deny plaintiff's request to equitably toll the Quiet Title Act's statute of limitations under the Supreme Court decision in Beggerly.

Alternatively, even if the Court were to construe plaintiff's request to be one under the doctrine of equitable estoppel, the Court would still deny plaintiff's request. Plaintiff argues that because the Fort Reno lands were being used for "military purposes" only pursuant to a classified order, it was unable to determine that it lacked an interest in the property until the order became declassified in 1994. See Def's 56(f) Mot. at 2. To deem this prayer for relief as one for equitable estoppel would be to turn the doctrine on its head. Equitable estoppel tolls the statute of limitations when a defendant's inequitable conduct prevented a plaintiff from realizing his or her claim – not when a defendant's inequitable conduct made that claim more apparent, as is the case here.[4] Here, plaintiff argues the defendants' conduct *wrongly informed* it of its claim, not that the defendants' conduct *wrongly concealed* its claim. The Court therefore rejects plaintiff's equitable estoppel argument.

### B. *Plaintiff's Motion for Discovery Under Rule 56(f)*

Plaintiff requests transcripts of Congressional hearings conducted in 1954 concerning the Fort Reno lands under Rule 56(f) of the Federal Rules of Civil Procedure.

---

[4]   To put it simply, for purposes of equitable estoppel, the classified order would have had to hide the fact that plaintiff did have a claim, not the fact that it did not. Plaintiff's reversionary interest was triggered when the land ceased being used for military purposes exclusively. It follows, however, that because the order putting Fort Reno on military standby status was classified, plaintiff should have thought that its reversionary interest had vested – back then – even though the land was secretly still being used for military purposes (although not "*exclusively*," see supra at 3).

In other words, plaintiff had no way to know that the land was on standby status for the military, because the order was classified – so plaintiff should have deemed its reversionary interest in the land to have vested (because as far as plaintiff was aware, the land was not being used for military purposes). And it is more than reasonable to assume that plaintiff did in fact think it had an interest in the Fort Reno lands, because plaintiff actually asserted its claim in a complaint before the ICC, which it settled. Plaintiff thought it *had* a claim against the government when it *did not*. These circumstances are the *opposite* of what equitable estoppel seeks to prevent. Equitable estoppel, in the above situation, would only be applicable if the government's conduct made the plaintiff believe it *did not have* a claim when, in fact, it *did*.

12

See Pl's 56(f) Mot. at 3. Plaintiff argues that the documents "could show that, while tribal members had no knowledge of the continuing military uses contemplated by the Army, Governmental representatives with knowledge nonetheless withheld this information from the Tribes." Id. Plaintiff's motion is denied. Even if the transcripts do demonstrate what plaintiff believes, they would not help plaintiff establish jurisdiction. First, plaintiff's requested discovery can only establish jurisdiction if the Court applies either the principle of equitable tolling or the principle of equitable estoppel to the Quiet Title Act, each of which the Court has already rejected. Second, even if the Court were to limit plaintiff's Rule 56(f) motion to "jurisdictional discovery," plaintiff cannot "show that additional discovery would be beneficial to its establishment of [] jurisdiction." Medical Solutions, Inc. v. C Change Surgical LLC, 468 F. Supp.2d 130, 135-36 (D.D.C. 2006). Additional discovery would not show that the Quiet Title Act's statute of limitations has not run. It therefore would be "inappropriate to subject [defendants] to the burden and expense of discovery." Comsat Corp. v. Finshipyards S.A.M., 900 F. Supp. 515, 524 n.4 (D.D.C. 1995).

## IV. CONCLUSION

Plaintiff, the Cheyenne-Arapaho Tribes of Oklahoma, requests declaratory relief concerning its right to lands now held by the United States. The Quiet Title Act's statute of limitations, however, establishes an absolute bar to the plaintiff's claims in the instant case. Without a waiver of sovereign immunity, the Court is powerless to act upon plaintiff's complaint. In addition, plaintiff already litigated these claims to completion in 1965, when it settled its claims before the ICC.

Accordingly, the Court will grant defendants' motion to dismiss the case for lack of subject matter jurisdiction and will deny plaintiff's motion for a continuance to permit discovery. An Order consistent with this Opinion will issue this same day.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: September 27, 2007

14