UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 06-519 (PLF) |
| UNITED STATES OF AMERICA, et al. | ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

INTRODUCTION

Plaintiff Tribes seek amendment of the Opinion of September 27, 2007 in a limited but important respect, withdrawal of a footnote in which the Court invoked a 1965 "settlement [of litigation before the Indian Claims Commission] ... as an alternative ground which mandates dismissal ...." Id. at 9, n. 3. Though a modest reference in an Opinion turning almost entirely upon the Quiet Title Act and the dispositive impact of its limitations period, brief mention of such an alternative ground is nonetheless devastating to Tribes that for more than a century have maintained a continuing interest in the historic lands of Fort Reno. More important for present purposes, we submit the reference is the product of "clear error ... [resulting in] manifest injustice", Anyanwutaku v. Moore, 151 F.3d 1053, 1057, (D.C. Cir. 1998), and thus subject to amendment pursuant Fed.R.Civ.P. 59(e). We treat the rule's demanding standard briefly before turning to the reasons the Court should exercise its broad discretion in the unusual circumstances presented by withdrawing the footnote to the Opinion holding the 1965 settlement of the ICC litigation to be an alternative ground for dismissal.

<u>RULE 59(e) OF THE FEDERAL RULES</u>

It is axiomatic that "Rule 59(e) motions 'need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice.'" <u>Anyanwutaku v. Moore</u>, <u>supra</u> (quoting <u>Firestone v. Firestone</u>, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curium)). The rule does not represent "an opportunity to reargue facts and theories upon which the court has already ruled." <u>New York v. United States</u>, 880 F. Supp. 37, 38 (D.D.C. 1995), nor a chance "to raise arguments or present evidence that could have been raised prior to the entry of judgment." 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 at 127-28 (2d ed. 1995). But again, it does represent an opportunity to "correct clear error and manifest injustice", and we submit that is precisely the situation presented here, where the Indian Claims Commission **lacked jurisdication** of any claims accruing after August 13, 1946, it is undisputed the transfer between Departments of Army and Agriculture took place in 1948, and the record shows a genuine issue as to whether the lands of Fort Reno were included in the acreage for which monetary compensation was sought before the Indian Claims Commission.

<u>ARGUMENT</u>

It is undisputed Congress limited the jurisdiction of the Indian Claims Commission to claims accruing on before August 13, 1946. Act of August 13, 1956, ch. 959, § 2, 60 Stat. At 1050. It is also undisputed the transfer of Fort Reno lands subject to the Tribes' "set aside" request before the Commission was not alleged to have taken place until April 21, 1948, clearly rendering any such request beyond the scope of the Commission's jurisdictional mandate. In <u>Devils Lake Sioux Tribe v. State of North Dakota</u>, 917 F.2d 1049 (8th Cir. 1990), the district court had entered summary judgment on the Tribe's claim of title to certain "lakebed",

based on an earlier settlement of the Tribe's ICC claims.  The Court of Appeals for the Eighth

Circuit reversed and remanded for further development of the record, in most significant part

because "it remains subject to question whether the Tribe could have presented its claim to the

lakebed before the Indian Claims Commission.... [T]he ... Commission retained jurisdiction

only over claims arising prior to 1946.  By contrast, the Tribe asserts that ... its claim arose in

1981 when the United States allegedly refused to recognize the Tribe as the beneficial owner of

the lakebed.  Moreover, the Commission could only award monetary relief .... (footnote

omitted)".[1]  Id. at 1056.

In their Severed Petition of November 25, 1958 (Attachment P to Defendants' Reply to

Plaintiff's Opposition to Defendant's Motion to Dismiss) the Tribes referred to acreage

potentially subject to the 1891 cession in a total amount identical to the figure invoked by the

Government, 4,608,878 acres (the following minus that "allotted in severalty to C & A's"):

| Disposition | No. Acres |
|---|---|
| (a)  Open to public settlement ...................... | 3,500,562 |

---

[1]The Devil's Lake decision in this respect represents an important judicial
imprimatur by the Eighth Circuit of principles later invoked by the Solicitor of the
Department of Interior in the Memorandum to the Assistant Secretary for Indian Affairs
of February 26, 1990 included in the record as Attachment 1 to the Tribes' Memorandum
of Points and Authorities in Opposition to Defendants' Motion to Dismiss, or, in the
Alternative for Summary Judgment ([T]he Tribe's ICC claim for Fort Reno sought
equitable relief; that is they asked for the land back, not compensation for it.  This is
expressly articulated in their prayer for relief that the ICC "set aside ... the jurisdiction
conferred by the Act of April 21, 1948."  Early in its history, however (and well before
the Tribe filed its claim), the ICC limited remedies to monetary relief.... * * *  Second,
and more important, the 1965 settlement could not have applied to the Tribes' claim to
Fort Reno because the Tribe's claim to it arose in 1948 (when the Army transferred it to
USDA and ended its use for "military purposes exclusively").  This was two years after
the ICC's jurisdictional cut-off date of 1946...." (emphasis in original).  Id., p. 9).

|     |     |     |
| --- | --- | --- |
| (b) Allotted in severalty to C & A's ............. | 529,682 |
| ( c) Reserved to the Wichita Tribe ................ | 732,800 |
| (d) Reserved for public schools .................... | 231,829 |
| (e) Reserved for military purposes ................ | 32,344 |
| (f) Reserved for highways, roads, etc. .......... | 111,343 |

       (Item (f) in the above tabulation derived by subtracting
sum of other items from total acreage).

Severed Petition, ¶ 10 (November 25, 1958).

      The Tribes went on to claim for payment in addition to prior "compensation for such

lands <u>purportedly ceded by the agreement</u> ... not just, fair nor reasonable but ..., in fact

unconscionable ...." (emphasis added).  <u>Id.</u>, ¶10(b).

      The claim to "set aside" the transfer of the Fort Reno lands was separate and apart from

the claim for  compensation as to the "lands purportedly ceded by agreement", <u>ibid.</u>, and set

forth in terms indicating the 9,493 acres withdrawn in 1883 were **distinct from** from those

allegedly involved in the 1891 cession:

> [O]n or about July 17, 1883, the President ordered the withdrawal of an area of
> 9,493 acres from said reservation for the establishment of the Fort Reno Military
> Reserve....  No compensation was stipulated or paid to petitioner.  Petitioner
> understood that the lands of the Fort Reno Military Reserve would be returned to
> its use and benefit when no longer used for military purposes or the same were to
> relinquished by the military when required by the Secretary of the Interior for
> petitioner's purposes.  Wherefore, petitioner asserts claim for the reasonable
> value of the <u>use</u> of said lands by the defendant from the date of July 17, 1883,
> reasonable and fair damages for the failure of the Secretary of the Interior to
> require the <u>return</u> of said lands to the use and benefit of petitioners; and pray for
> the exercise of its powers in equity by the Indian Claims Commission to <u>set aside</u>,
> or recommend the setting aside of the jurisdiction of the Department of
> Agriculture conferred by the Act of April 21, 1948 ... in said lands, and for such
> other and further relief as may be deemed meet and proper.  (emphasis added).

<u>Id.</u> ¶ 9(b).

      The record before the Indian Claims Commission reflected inconsistencies with respect

to the acreage involved in the 1891 cession which additional inquiry could show attributable to

the lands of Fort Reno.  Attachment H to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment is a report styled "Historical Background" prepared by one of the Government's experts, and introduced as Exhibit A in Docket 329-A before the Indian Claims Commission.  Among the expert's findings was that "the Cheyenne Arapaho received a total of slightly more than 5 million acres [under the Executive Order of 1869], including the 743,610 acres of the Wichita ...."[2]  (emphasis added).  Id. at 18 (Attachment H at 9).  Yet the Severed Petition showed the total acreage "reserved to the Wichita Tribe" as 732,800, 10,810 acres less than the figure proclaimed by the Government's expert in Docket 329-A, which for purposes of a motion to dismiss or for summary judgment should bolster the inference the Tribe's claim to "set aside" the transfer of Fort Reno indeed pertained to lands separate and apart from acreage within any cession of 1891.[3]

---

[2]The Government's expert noted conflicts in the historic record as well, indicating that his report depended in part on "acreage figures[] differing slightly from those in Litton [History of Oklahoma, I] ... taken from Kappler, Indian Affairs: Laws and Treaties, I, 1030.  Kappler's figures add up to 4,294,417 acres as the total area of the Cheyenne Arapaho reservation, in contrast to the total sometimes used of 4,297,771 acres."  Id. at 40, n. 3 (Attachment H at 19).

[3]A record reference outside the Amended Complaint prompted submission of a Second Supplemental Statement of Genuine Issues, Attachment 2 to Plaintiff's Memorandum in Response to Defendant's Motion for Leave to File the Attached Response to Plaintiff's Surreply (the Court eventually denied the Motion).  The Statement is as follows: "Whether the Tribes claim before the Indian Claims Commission to 'set[] aside the jurisdiction of the Department of Agriculture', Severed Petition, ¶ 9(b) (November 25, 1958) (Attachment P to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment ("Defendant's Reply")) in the lands of Fort Reno was a claim of reversionary rights in lands separate and distinct from the lands described in ¶ 10 of the Severed Petition ... "purportedly ceded" to the United States in 1891.  Id. ¶ 10(a).  Defendant's Exhibit A, Docket No. 329, Indian Claims Commission (Attachment H to Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, at 9)."

The record here is remarkably like that in <u>Arizona v. California</u>, 530 U.S. 392, 120 S.Ct. 1455, 146 L.Ed.2d 308 (2000), where the Court soundly rejected an argument that settlement of Indian claims litigation should preclude the Fort Quechan Tribe from asserting continued title in certain "disputed boundary lands." The <u>Arizona</u> litigation[4] concerned tribal claims for increased water rights in the Colorado River system, deriving from the contention the Tribe's Fort Yuma Reservation "encompasses some 25,000 acres of disputed boundary lands ...." <u>Id.</u>, 530 U.S. at 397. The issue of relevance for present purposes was whether "the claims [are] precluded by ... a consent judgment entered by the United States Claims Court in 1983."[5] <u>Ibid</u>. Because we submit resolution of the issue in <u>Arizona</u> should be controlling here as well, because it bears heavily on the existence of "clear error or manifest injustice" for Rule 59(e) purposes, and because it derived from a complex record and analysis, we quote at some length:

> The specific dispute before us has its roots in an 1884 Executive Order ..., designating approximately 72 square miles of land along the Colorado River ... as the Fort Yuma Indian Reservation ... for the benefit of the Quechan Tribe. The Tribe, which had traditionally engaged in farming, offered to cede its rights to a portion of the Reservation to the United States in exchange for allotments of irrigated land to individual Indians. In 1893, the Secretary of the Interior concluded an agreement with the Tribe .... The 1893 Agreement provided for the Tribe's cession of a 25,000-acre tract of boundary lands on the Reservation. Language in the agreement, however, could be read to condition the cession on the performance by the United States of certain obligations ....
>
> Doubts about the validity and effect of the 1893 Agreement arose as early as 1935. * * * The Secretary of the Interior submitted the matter to the Department's Solicitor, Nathan Margold. In 1936, Solicitor Margold issued an opinion

---

[4] The decision in this instance is one of several the Court has rendered in litigation begun in 1952 as a result of Arizona and California contending for water rights in the system. <u>Id.</u> at 397-99.

[5] The Indian Claims Commission ceased operations in 1978, transferring its remaining cases to the Court of Claims. <u>Id.</u> at 402, n.1.

(Margold Opinion) stating that, under the 1893 Agreement, the Tribe had unconditionally ceded the lands in question to the United States..... The Margold Opinion remained the position of the Federal Government for 42 years.

In 1946, Congress enacted the Indian Claims Commission Act .... The Tribe filed an action before the Commission in 1951, challenging the validity and effect of the 1893 Agreement. In that action, referred to by the parties as Docket No. 320, the Tribe relied principally on two mutually exclusive grounds for relief. First, the Tribe alleged that the 1893 Agreement was obtained through fraud, coercion, and/or inadequate consideration, rendering it "wholly nugatory." ... At the very least, contended the Tribe, the United States had failed to perform the obligations enumerated in the 1893 Agreement, rendering the cession void.... In either event, the Tribe claimed continuing title to the disputed lands and sought damages essentially for trespass. Alternatively, the Tribe alleged that the 1893 Agreement was contractually valid but constituted an uncompensated taking of tribal lands, an appropriation of lands for unconscionable consideration, and/or a violation of standards of fair and honorable dealing ... According to this theory of recovery, the 1893 Agreement had indeed vested in the United States unconditional title to the disputed lands, and the Tribe sought damages as compensation for that taking. During the more than quarter-century of litigation in Docket No. 320, the Tribe vacillated between these two grounds for relief, sometimes emphasizing one and sometimes the other....

The Commission conducted a trial on liability, but stayed further proceedings in 1970 because legislation had been proposed in Congress that would have restored the disputed lands to the Tribe. The legislation was not enacted, and the Commission vacated the stay. In 1976, the Commission transferred the matter to the Court of Claims.

In the meantime, the Tribe had asked the Department of the Interior to reconsider its 1936 Margold Opinion regarding the 1893 Agreement. In 1977, Interior Solicitor Scott Austin concluded, in accord with the 1936 opinion, that the 1893 Agreement was valid and that the cession of the disputed lands had been unconditional.... It soon became clear both to the Tribe and to interested Members of Congress, however, that the Austin Opinion had provoked controversy within the Department, and, after the election of President Carter, the Department revisited the issue and reversed course. In 1978, without notice to the parties, Solicitor Leo Krulitz issued an opinion concluding that the 1893 Agreement had provided for a conditional cession of the disputed lands, that the conditions had not been met by the United States, and that "[t]itle to the subject property is held by the United States in trust for the Quechan Tribe."... On December 20, 1978, the Secretary of the Interior issued a Secretarial Order adopting the Krulitz Opinion and confirming the Tribe's entitlement to the disputed lands ....

The 1978 Secretarial Order caused the United States to change its position ... in Docket No. 320, which was still pending in the Claims Court .... Because the Secretarial Order amounted to an admission that the 1893 Agreement had been ineffective to transfer title and that the Tribe enjoyed beneficial ownership of the disputed boundary lands, the United States no longer opposed the Tribe's claim for trespass in Docket No. 320....

In August 1983, ... the United States and the Tribe entered into a settlement of Docket No. 320, which the Court of Claims approved and entered as its final judgment. Under the terms of that settlement, the United States agreed to pay the Tribe $15 million in full satisfaction of "all rights, claims, or demands which plaintiff [i.e., the Tribe] has asserted or could have asserted with respect to the claims in Docket 320." .... The judgment further provided that "plaintiff shall be barred thereby from asserting any further rights, claims, or demands against the defendant and any future action on the claims encompassed on Docket 320." ... The United States and the Tribe also stipulated that the "final judgment is based on a compromise and settlement and shall not be construed as an admission by either party for the purposes of precedent or argument in any other case." ... Both the Tribe and the United States continue to recognize the Tribe's entitlement to the disputed boundary lands.

* * * * *

The State parties ... assert that the instant water rights claims are precluded by the 1983 consent judgment in the Claims Court proceeding, Docket No. 320. [A] Special Master ... agreed, noting the consent judgment's declaration that the Tribe would "be barred thereby from asserting any further rights, claims or demands against the defendant and any future action encompassed on docket no. 320." ... On reconsideration, the Special Master provided a fuller account of his recommendation. The settlement, he concluded, had extinguished the Tribe's claim to title in the disputed boundary lands, vesting that title in the United States against all the world: "The only viable basis for a damage or trespass claim [in Docket No. 320] was that the 1893 taking was illegal and that title therefore remained with the Tribe. When the Tribe accepted money in settlement of this claim, it relinquished its claim to title." ...

Under standard preclusion doctrine, the Master's recommendation cannot be sustained. As already noted, the express terms of the consent judgment in Docket No. 320 barred the Tribe and the United States from asserting against each other any claim or defense they raised or could have raised in that action.... As between the parties to Docket No. 320, then, the settlement indeed had, and was intended to have, *claim-preclusive* effect .... But settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect. "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus consent judgments

-8-

> ordinarily support claim preclusion but not issue preclusion." 18 C. Wright, A.
> Miller, & E. Cooper, Federal Practice and Procedure § 4443, pp. 384-385 (1981).
> This differentiation is grounded in basic res judicata doctrine. It is the general rule
> that issue preclusion attaches only "[w]hen an issue of fact or law is actually
> litigated and determined by a valid and final judgment, and the determination is
> essential to the judgment." Restatement (Second) of Judgments § 27, p. 250
> (1982). "In the case of a judgment entered by confession, consent, or default,
> none of the issues is actually litigated. Therefore, the rule of this Section
> [describing issue preclusion's domain] does not apply with respect to any issue in
> a subsequent action." Id., comment e, at 257.

Id., 530 U.S. at 401-417.

Where the claim to "set aside" the 1948 transfer of the Fort Reno lands to Department of Agriculture was manifestly beyond the jurisdiction of the Indian Claims Commission, and where the record shows a genuine issue whether the lands of Fort Reno were included within the acreage for which the Tribes sought compensation before the Commission, the principles set forth in Arizona v. California should preclude reference to the 1965 settlement as an alternative basis for dismissal. Especially in light of the issue's tremendous historic significance to the Tribes, and the distinct possibility an appellate court would decline to take up an alternative ground addressed so briefly, we respectfully submit the unusual circumstances militate in favor of this Court exercising its broad discretion in favor of granting the modest relief sought.

## CONCLUSION

For the foregoing reasons, Plaintiff Tribes respectfully request pursuant Rule 59(e) of the Federal Rules of Civil Procedure that this Court alter or amend the judgment by withdrawing footnote 3 on page 9 of the Opinion underlying the judgment entered September 27, 2007, together with the reference to an alternative ground for dismissal appearing in the concluding sentence on page 13. A proposed Order follows as Attachment 2.

Respectfully submitted,


LAW OFFICE OF RICHARD J. GRELLNER



___/s/_____
Richard J. Grellner, OBA #15521, <u>pro</u> <u>hac</u> <u>vice</u>

439 NW 18th Street
Oklahoma City, Oklahoma 73103
Tel. (405) 834-8484
Fax: (405) 602-0990
E-mail; rjgrellner@hotmail.com


LAW OFFICE OF JOHN P. RACIN



___/s/_____
John P. Racin   Bar No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202.265.2516

Attorneys for Plaintiff Tribes

-10-